# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| AMERICAN EXPLORATION & PRODUCTION COUNCIL,<br><br>*Petitioner,*<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and JANE NISHIDA, Acting Administrator, United States Environmental Protection Agency,<br><br>*Respondents.* | No. 25-1029 |

## PETITION FOR REVIEW

Pursuant to § 307(b)(1) of the Clean Air Act (42 U.S.C. § 7607(b)(1)), 5 U.S.C. §§ 702 and 706, Federal Rule of Appellate Procedure 15(a), and D.C. Circuit Rule 15, American Exploration & Production Council petitions this Court for review of the final agency action taken by Respondents United States Environmental Protection Agency and Jane Nishida, Acting Administrator, United States Environmental Protection Agency, entitled "Waste Emissions Charge for Petroleum and Natural Gas Systems: Procedures for Facilitating Compliance, Including Netting and Exemptions," 89 Fed. Reg. 91,094

(Nov. 18, 2024) ("Final Rule"). A copy of the Final Rule is attached

hereto as Exhibit A.


Respectfully submitted this 17th day of January, 2025,

WILLIAMS WEESE PEPPLE & FERGUSON PC

*/s/ R. Clay Taylor*

R. Clay Taylor
John H. Bernetich
Jennifer L. Biever
Corey Y. Lim
1801 California Street, Suite 3400
Denver, CO 80202
Phone: 303-861-2828
Fax: 303-861-4017
E-mail: ctaylor@williamsweese.com
        jbernetich@williamsweese.com
        jbiever@williamsweese.com
        clim@williamsweese.com

*Attorneys for Petitioner American*
*Exploration & Production Council*

# Exhibit A



# ENVIRONMENTAL PROTECTION AGENCY

**40 CFR Parts 2, 98, and 99**

**[EPA–HQ–OAR–2023–0434; FRL–10246.1–03–OAR]**

**RIN 2060–AW02**

**Waste Emissions Charge for Petroleum and Natural Gas Systems: Procedures for Facilitating Compliance, Including Netting and Exemptions**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is promulgating a regulation to facilitate compliance with the requirements of the Waste Emissions Charge in the Clean Air Act's (CAA) Methane Emissions Reduction Program (MERP). Enacted as part of the Inflation Reduction Act (IRA), this program requires the EPA to impose and collect an annual charge on methane emissions that exceed waste emissions thresholds specified by Congress.

**DATES:** This final rule is effective January 17, 2025.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–HQ–OAR–2023–0434. All documents in the docket are listed in the *https://www.regulations.gov* index. Although listed in the index, some information is not publicly available, *e.g.,* confidential business information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy. Publicly available docket materials are available either electronically in *https://www.regulations.gov* or in hard copy at the EPA Docket Center, WJC West Building, Room 3334, 1301 Constitution Ave. NW, Washington, DC. This Docket Facility is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744 and the telephone number for the Air Docket is (202) 566–1742.

**FOR FURTHER INFORMATION CONTACT:** Jennifer Bohman, Climate Change Division, Office of Atmospheric Protection (MC–6207A), Environmental Protection Agency, 1200 Pennsylvania Ave. NW, Washington, DC 20460; telephone number: (202) 343–9548; email address: *merp@epa.gov.*

*World wide web (WWW).* In addition to being available in the docket, an electronic copy of this final rule will also be available through the WWW. Following the Administrator's signature, a copy of this final rule will be posted on the EPA's Inflation Reduction Act Methane Emissions Reduction Program website at *https://www.epa.gov/inflation-reduction-act/methane-emissions-reduction-program.*

**SUPPLEMENTARY INFORMATION:**

*Regulated entities.* This final regulation affects certain owners or operators of facilities in certain segments of the petroleum and natural gas systems industry that report more than 25,000 metric tons (mt) of carbon dioxide equivalent ($CO_2e$) pursuant to the requirements codified at 40 Code of Federal Regulations (CFR) part 98, subpart W (Petroleum and Natural Gas Systems) (hereafter referred to as "part 98, subpart W"). Per the requirements of CAA section 136(d), the industry segments to which the waste emissions charge may apply are offshore petroleum and natural gas production, onshore petroleum and natural gas production, onshore natural gas processing, onshore gas transmission compression, underground natural gas storage, liquefied natural gas storage, liquefied natural gas import and export equipment, onshore petroleum and natural gas gathering and boosting, and onshore natural gas transmission pipeline. Regulated categories and entities include, but are not limited to, those listed in Table 1 of this preamble:

TABLE 1—EXAMPLES OF AFFECTED ENTITIES BY CATEGORY

| Category | North American Industry Classification System (NAICS) | Examples of affected facilities |
|---|---|---|
| Petroleum and Natural Gas Systems ................................. | 486210 | Pipeline transportation of natural gas. |
| | 221210 | Natural gas processing and transmission compression. |
| | 211120 | Crude petroleum extraction. |
| | 211130 | Natural gas extraction. |

Table 1 of this preamble is not intended to be exhaustive, but rather provides a guide for readers regarding facilities likely to be affected by this final rule. This table lists the types of facilities that the EPA is now aware could potentially be affected by this action. Other types of facilities than those listed in the table could also be subject to requirements. To determine whether you would be affected by this action, you should carefully examine the applicability criteria found in 40 CFR part 99, subpart A (General Provisions) and the applicability criteria found in 40 CFR part 98, subpart A (General Provisions) and subpart W (Petroleum and Natural Gas Systems). If you have questions regarding the applicability of this action to a particular facility, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

The EPA must collect charges from owners or operators of applicable facilities that both: (1) Report more than 25,000 metric tons (mt) of carbon dioxide equivalent ($CO_2e$) of greenhouse gases (GHGs) per year pursuant to the petroleum and natural gas systems source category requirements of the Greenhouse Gas Reporting Rule, and (2) exceed methane emissions intensity thresholds set forth in CAA section 136 for different types of applicable facilities. This final rule facilitates compliance with provisions of the CAA, including those related to netting of emissions for purposes of determining the charge and various exemptions to the charge; establishes confidentiality determinations for data elements included in waste emissions charge filings; and establishes filing and auditing procedures to facilitate compliance with the statutory requirements.

*Acronyms and abbreviations.* The following acronyms and abbreviations are used in this document.

BOEM   Bureau of Ocean Energy Management
CAA   Clean Air Act
CBI   confidential business information
CEMS   continuous emission monitoring system
CFR   Code of Federal Regulations
$CH_4$   methane
$CO_2$   carbon dioxide
$CO_2e$   carbon dioxide equivalent

e-GGRT   electronic Greenhouse Gas Reporting Tool
EG   emission guidelines
EIA   Energy Information Administration
EPA   U.S. Environmental Protection Agency
ET   Eastern time
FR   Federal Register
GHG   greenhouse gas
GHGRP   Greenhouse Gas Reporting Program
GWP   Global Warming Potential
IRA   Inflation Reduction Act of 2022
ICR   Information Collection Request
LDC   local distribution company
LNG   liquified natural gas
mmBtu   million British thermal units
MMscf   million standard cubic feet
mt   metric tons
$N_2O$   nitrous oxide
NAICS   North American Industry Classification System
NGLs   natural gas liquids
NSPS   new source performance standards
OMB   Office of Management and Budget
PRA   Paperwork Reduction Act
RFA   Regulatory Flexibility Act
RY   reporting year
scfh   standard cubic feet per hour
U.S.   United States
UMRA   Unfunded Mandates Reform Act of 1995
UNFCCC   United Nations Framework Convention on Climate Change
VOC   volatile organic compound
WEC   waste emissions charge
WWW   World Wide Web

**Table of Contents**

I. Background
    A. How is this preamble organized?
    B. Executive Summary
    C. Background and Related Actions
    D. Legal Authority
II. Procedures for Facilitating Compliance, Including Netting and Exemptions
    A. Final Definitions To Support WEC Implementation and Associated Revisions to Part 98, Subpart A
    B. Common Ownership or Control for Netting of Emissions
    C. Waste Emissions Thresholds
    D. Exemptions to the Waste Emissions Charge
III. General Requirements of the Final Rule
    A. WEC Filing Requirements
    B. Remittance and Assessment of WEC
    C. Authorizing the Designated Representative
    D. General Recordkeeping Requirements
    E. General Provisions, Including Auditing and Compliance and Enforcement
    F. Other Final Minor Revisions or Clarifications
IV. Final Confidentiality Determinations for Certain Data Reporting Elements
    A. Overview and Background
    B. Final Confidentiality Determinations for New Data Elements
    C. Final Amendments to 40 CFR Part 2
    D. Final Reporting Determinations for Inputs to Emission Equations
    E. Changes to Confidentiality Determinations for Data Elements Reported Under Subpart W
V. Impacts of the Final Rule
VI. Statutory and Executive Order Reviews
    A. Executive Order 12866: Regulatory Planning and Review and Executive Order 14094: Modernizing Regulatory Review
    B. Paperwork Reduction Act (PRA)
    C. Regulatory Flexibility Act (RFA)
    D. Unfunded Mandates Reform Act (UMRA)
    E. Executive Order 13132: Federalism
    F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
    G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
    H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use
    I. National Technology Transfer and Advancement Act
    J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations and Executive Order 14096: Revitalizing our Nation's Commitment to Environmental Justice for All
    K. Congressional Review Act
    L. Judicial Review
    M. Determination under CAA Section 307(d)
    N. Severability

# I. Background

## A. How is this preamble organized?

This first section (section I) of this preamble contains background information regarding the final rule. This section also discusses the EPA's legal authority under the Clean Air Act (CAA) to promulgate implementing regulations for aspects of the waste emissions charge, codified at 40 CFR part 99 (hereafter referred to as "part 99"). Section I of the preamble also discusses the EPA's legal authority to make confidentiality determinations for new data elements included in waste emissions charge filings (WEC filings) required by the final rule. Section II. of this preamble contains detailed information on the provisions in this final rule to facilitate implementation of CAA section 136(c) through (g), in particular the netting and exemption provisions. Section II. of this preamble also contains information on the revisions to 40 CFR part 98, subpart A to harmonize part 99 and part 98 reporting obligations. Section III. of this preamble describes the general requirements for the final rule, including procedures to facilitate filing and compliance. Section IV. of this preamble discusses the final confidentiality determinations for new data reporting elements for the proposed part 99 and also discusses confidentiality determinations for two data elements reported under part 98, subpart W. Section V. of this preamble discusses the impacts of this action. Section VI. of this preamble describes the statutory and Executive order

requirements applicable to this final action.

## B. Executive Summary

In August 2022, Congress passed, and President Biden signed, the Inflation Reduction Act of 2022 (IRA) into law. Section 60113 of the IRA created the Methane Emission Reduction Program (MERP) and amended the Clean Air Act (CAA) by adding section 136, "Methane Emissions and Waste Reduction Incentive Program for Petroleum and Natural Gas Systems". CAA section 136, as designed by Congress, establishes a three-part framework to help States, industry, and communities reduce methane ($CH_4$) emissions from the oil and gas sector. It further complemented a recently finalized rule under section 111 of the CAA (that was proposed at the time the Inflation Reduction Act was passed) to reduce methane emissions from new and existing oil and gas facilities. Oil and natural gas facilities are the nation's largest industrial source of methane, a greenhouse gas (GHG) that is 28 times more potent than carbon dioxide ($CO_2$) and is responsible for approximately one third of all warming resulting from anthropogenic emissions of greenhouse gases.[1] The three-part framework established by Congress in CAA section 136 addresses these emissions by: (1) directing the EPA to impose and collect a "Waste Emissions Charge" (WEC) on methane emissions from high-emitting and inefficient oil and gas operations; (2) directing the EPA to update subpart W of the Greenhouse Gas Reporting Program to ensure accurate reporting of methane emissions by oil and natural gas facilities that is based on empirical data; and (3) providing over $1 billion in financial and technical assistance to assist the industry, States, and communities in deploying methane mitigation and monitoring solutions. By implementing provisions of the WEC, this final rule helps to fulfill one of the pillars of this three-part framework. As Congress intended, the WEC, including the provisions finalized in this final rule, will incentivize a variety of near-term actions to reduce methane emissions from oil and natural gas operations while the EPA and States

---

[1] IPCC, 2021: *Summary for Policymakers. In: Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change* [Masson-Delmotte, V., P. Zhai, A. Pirani, S.L. Connors, C. Péan, S. Berger, N. Caud, Y. Chen, L. Goldfarb, M.I. Gomis, M. Huang, K. Leitzell, E. Lonnoy, J.B.R. Matthews, T.K. Maycock, T. Waterfield, O. Yelekçi, R. Yu, and B. Zhou (eds.)]. Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA, pp. 3–32, doi:10.1017/9781009157896.001.

work to implement the EPA's recently finalized CAA section 111 methane standards.

This action is also intended to work hand-in-hand with the other two elements of the CAA section 136 framework. Earlier this year, the EPA finalized a rule (89 FR 42062, May 14, 2024) (hereafter referred to as the "2024 Subpart W Final Rule") that fulfills Congress's directive in CAA section 136 to improve the reporting of GHG emissions under subpart W of the Greenhouse Gas Reporting Program and ensure that oil and gas facilities' reporting requirements are based on empirical data and more accurately reflect emissions. Because CAA section 136 requires that the EPA utilize subpart W emissions reports as the basis for determining the applicability of the WEC and calculating WEC obligations for owners and operators of applicable facilities, the EPA's recent revisions to subpart W are an important adjunct to this final rule that will ensure WEC obligations are based on the most accurate and comprehensive emissions data available. In addition, to implement the third part of the CAA section 136 framework, the EPA is partnering with the U.S. Department of Energy (DOE) to provide up to $1.36 billion in financial and technical assistance to a broad range of stakeholders to identify, measure, and mitigate emissions from the oil and gas sector. As described in section I.C.2. of this preamble, the EPA and its partners are acting expeditiously to award this funding through a combination of formula and competitive grant processes. These funds will accelerate the deployment of methane monitoring and mitigation technologies that will reduce methane emissions from oil and natural gas facilities and, potentially, help reduce or eliminate WEC obligations for certain applicable facilities by lowering their emissions intensity.

The WEC final rule requirements in this action are designed to meet Congress's directive to provide an incentive for the early adoption of methane emission reduction practices and technologies, including those that are required under the Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review (NSPS/EG), which Congress expected to be promulgated pursuant to CAA section 111 at the time it created the WEC. CAA section 136 makes this connection to the oil and gas methane emission standards clear by including an exemption from the charge for

operations that are subject to and in compliance with final methane emissions requirements promulgated pursuant to CAA sections 111(b) and (d). The WEC is thus an important piece of a comprehensive national strategy established by Congress via the IRA to reduce methane emissions. The WEC advances the reduction of methane emissions from the oil and gas sector by providing for sources covered under the CAA section 111 rules a set of emissions reduction incentives that are in effect until full implementation of oil and gas methane emissions standards promulgated by the EPA on March 8, 2024. Those standards were, as Congress specifically acknowledged via explicit reference in the IRA, under development at the time the WEC was enacted. For methane emissions sources not covered by the CAA section 111 rules, the emission reduction incentives created by the WEC remain in place after full implementation of the CAA section 111 methane standards.

On January 26, 2024, the EPA proposed a regulation to facilitate implementation of the provisions of the WEC, following the requirements of CAA section 136(c)–(g) (89 FR 5318). The WEC program applies to applicable facilities that report more than 25,000 mt $CO_2$e of greenhouse gases emitted per year pursuant to the Greenhouse Gas Reporting Rule's requirements for the petroleum and natural gas systems source category (codified as 40 CFR part 98, subpart W).[2] An applicable facility, as defined in CAA section 136(d), is a facility within the following industry segments (as the following industry segments are defined in part 98, subpart W): onshore petroleum and natural gas production, offshore petroleum and natural gas production, onshore petroleum and natural gas gathering and boosting, onshore natural gas processing, onshore gas transmission compression, onshore natural gas transmission pipeline, underground natural gas storage, liquefied natural gas import and export equipment, and liquefied natural gas storage.[3]

CAA section 136 defines three important elements of the WEC program: (1) waste emissions thresholds; (2) netting of emissions across different facilities; and (3)

exemptions for certain emissions and facilities. Facilities may owe a WEC obligation if their subpart W reported emissions exceed the waste emissions thresholds specified in CAA section 136(f) and they are not eligible for an exemption.[4] The waste emissions threshold is a facility-specific amount of metric tons of methane emissions calculated using the methane intensity thresholds specified by Congress in CAA section 136(f)(1) through (3) and a facility's natural gas throughput (or oil throughput in certain circumstances).

Congress specifically laid out certain requirements in the text of the statute. The waste emissions charge is specified in CAA section 136(e) to begin for emissions occurring in 2024 at $900 per metric ton of methane exceeding the threshold, increasing to $1,200 per metric ton of methane in 2025, and to $1,500 per metric ton of methane in 2026 and subsequent years. The WEC only applies to the subset of a facility's emissions that are above the waste emissions threshold.

Congress structured the WEC so that it focuses on high-emitting and inefficient oil and gas facilities (*i.e.,* those with emissions greater than 25,000 mt $CO_2$e of greenhouse gases emitted per year and that have a methane emissions intensity in excess of the statutory waste emissions threshold). Facility efficiency, reflected in the amount of methane emissions per unit of production or throughput, can directly affect a facility's WEC obligations since more efficient facilities have emissions below the thresholds at which facilities are required to pay a charge. The WEC therefore incentivizes more efficient operations because the charge applies only to the least efficient and most wasteful of oil and gas facilities (and only to the subset of their emissions that exceed thresholds and are not exempt). CAA section 136(f)(4) allows facilities subject to the WEC that are under common ownership or control to net emissions across those facilities, which could result in a reduced charge, or avoidance of the charge.[5]

In addition, Congress created three exemptions that may lower a facility's WEC obligation or exempt the facility entirely from the charge. The first exemption, found in CAA section 136(f)(5), exempts from the charge

---

[2] 42 U.S.C. 7436(c) ("The Administrator shall impose and collect a charge on methane emissions that exceed an applicable waste emissions threshold under subsection (f) from an owner or operator of an applicable facility that reports more than 25,000 metric tons of carbon dioxide equivalent of greenhouse gases emitted per year pursuant to of part 98 of title 40, Code of Federal Regulations, regardless of the reporting threshold under that subpart.").

[3] 42 U.S.C. 7436(d).

[4] 42 U.S.C. 7436(f)(1)–(3).

[5] 42 U.S.C. 7436(f)(4) ("In calculating the total emissions charge obligation for facilities under common ownership or control, the Administrator shall allow for the netting of emissions by reducing the total obligation to account for facility emissions levels that are below the applicable thresholds within and across all applicable segments identified in subsection (d).").

emissions occurring at facilities in the onshore or offshore petroleum and natural gas production industry segments that are caused by eligible delays in environmental permitting of gathering or transmission infrastructure.[6] The second exemption, found in CAA section 136(f)(6), exempts from the charge, if certain conditions are met, those facilities that are subject to and in compliance with final methane emissions requirements promulgated pursuant to CAA sections 111(b) and (d).[7] This exemption becomes available only if a determination is made by the Administrator that such final requirements are approved and in effect in all States with respect to the applicable facilities, and that the emissions reductions resulting from those final requirements will achieve equivalent or greater emission reductions as would have resulted from the EPA's methane emissions requirements proposed in 2021.[8] The third exemption, found in CAA section 136(f)(7), exempts from the charge reporting year emissions from wells that are permanently shut in and plugged.[9]

As a result of these key design features of the WEC, the EPA anticipates that many facilities in the oil and natural gas sector will not be subject to WEC obligations. Many oil and natural gas facilities already fall below the annual emissions threshold and waste emissions thresholds that would cause them to be subject to the WEC, or are

likely to avail themselves of the netting provisions in this final rule to reduce or eliminate WEC obligations. Further, as the EPA and States implement the CAA section 111 2024 Final NSPS/EG for new and existing sources, many oil and natural gas facilities are likely to qualify for the regulatory compliance exemption. The CAA section 111 2024 Final NSPS/EG as well as the financial and technical assistance the EPA is administering under section 136 of the CAA, are also expected to drive methane emission reductions that will help applicable facilities reduce or eliminate their WEC obligations. The charge, then, will primarily serve as an incentive, particularly to high-emitting and inefficient facilities, to reduce their emissions of methane.

The EPA received over 50,000 comments in response to the proposal. After consideration of the public comments, the EPA has made several changes in this final rule that are described in section I.B. and in sections II. and III. of this preamble. While some of these changes represent a meaningful shift from the proposed approach, all changes were within the scope of notice provided through the EPA's request for comment, and discussion, at proposal. Moreover, these changes result in a final rule that better aligns with the statutory purpose and structure of the WEC. Specifically, the final rule is designed to achieve several goals: (1) Provide a strong incentive for early action to reduce methane by States, companies, and facilities, as Congress directed; (2) appropriately implement the exemptions specified by Congress; (3) give additional clarity to regulated entities; and (4) streamline implementation. By harmonizing the WEC regulations with implementation of the CAA section 111 requirements, this final rule encourages early emissions reductions and reduces the WEC burden on facilities that are in compliance with applicable CAA section 111 requirements. Furthermore, this final rule aims to increase flexibility so that accessing the exemptions created by Congress is not unduly restrictive, while still maintaining the integrity of the program. Finally, this rulemaking allows for expanded netting compared to the proposal while providing more specificity on the conditions under which netting may occur to minimize the potential for fraud.

The EPA is revising the regulatory compliance exemption in response to the many commenters that suggested changes to better align with Congress' purpose to incentivize States to move promptly toward full implementation of the CAA section 111 program, and to

motivate regulated facilities to achieve emissions reductions as quickly as possible. This Congressional intent is illustrated in the language of the law and in the suite of incentives for expeditious methane emissions reductions it creates. The principal change to the regulatory compliance exemption in this final rule addresses when the exemption becomes available. The EPA concludes that allowing the exemption to be available for each State once it has fully implemented the methane emissions requirements promulgated pursuant to CAA sections 111(b) and (d), rather than all at once after the last State's plans are approved, is both a better reading of the law and has greater fidelity to the Congressional purpose. Industry commenters emphasized that a State-by-State approach would incentivize States to move quickly to develop and submit approvable State plans implementing the section 111 emissions guidelines, furthering Congress's intent in enacting the compliance exemption. Making the compliance exemption available to facilities in a State as soon as all CAA section 111(b) and (d) facilities within that State are subject to all of their applicable methane emissions requirements will provide an incentive for every State to move expeditiously, and avoid delays in effectuating the compliance exemption that might occur if the slowest State sets the pace. At the same time, to fully implement Congress' intention that the WEC serve as a mechanism for incentivizing emissions reductions until sources begin to comply with all of their emissions control obligations, the final rule provides that the regulatory compliance exemption becomes available in each State only after sources are required to comply with all of their State plan requirements. As described in more detail in section II.D.2. of this preamble, these changes ensure the regulatory compliance exemption reflects the facts on the ground for facilities operating in each State, while tying the exemption to the date actual emissions reductions are achieved as Congress intended.

In response to the information provided in comments, the EPA is also finalizing other changes to the regulatory compliance exemption that help ensure the WEC and the CAA section 111 rules work together as intended. As noted by commenters, it is important that the WEC incentivize early action before compliance deadlines and then relieve from the charge those facilities operating in compliance with the CAA section 111 rules. In this final rule, as many

---

[6] 42 U.S.C. 7436(f)(5) ("Charges shall not be imposed pursuant to paragraph (1) on emissions that exceed the waste emissions threshold specified in such paragraph if such emissions are caused by unreasonable delay, as determined by the Administrator, in environmental permitting of gathering or transmission infrastructure necessary for offtake of increased volume as a result of methane emissions mitigation implementation.").

[7] 42 U.S.C. 7436(f)(6) ("Charges shall not be imposed pursuant to subsection (c) on an applicable facility that is subject to and in compliance with methane emissions requirements pursuant to subsections (b) and (d) of section 7411 of this title upon a determination by the Administrator that— (i) methane emissions standards and plans pursuant to subsections (b) and (d) of section 7411 of this title have been approved and are in effect in all States with respect to the applicable facilities; and (ii) compliance with the requirements described in clause (i) will result in equivalent or greater emissions reductions as would be achieved by the proposed rule of the Administrator entitled "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review" (86 FR 63110 (November 15, 2021)), if such rule had been finalized and implemented.").

[8] *Id.*

[9] 42 U.S.C. 7436(f)(7) ("Charges shall not be imposed with respect to the emissions rate from any well that has been permanently shut-in and plugged in the previous year in accordance with all applicable closure requirements, as determined by the Administrator.").

commenters suggested, the EPA is limiting the types of noncompliance that would cause a facility to lose the regulatory compliance exemption, reducing the timeframe for which the exemption would be lost in the event of noncompliance, and narrowing the scope of emissions that would lose the exemption in the event of noncompliance for facilities in segments with unique, basin-wide facility definitions. The final rule will thereby create a stronger incentive for facilities to meet the requirements of the CAA section 111 rules while making the regulatory compliance exemption more accessible.

To reflect comments persuasively suggesting that a more expansive approach to netting would reflect a better reading of the legislative text, the final rule changes the approach from the proposal to apply netting to encompass facilities under common ownership or control at the parent company level. One of the key provisions of the WEC created in CAA section 136(f) relates to the ability of facilities under common ownership or control to net emissions, such that facilities with emissions below the waste emissions threshold can offset emissions from facilities above the threshold to reduce the overall WEC burden. The EPA proposed that a facility's owner or operator would be the regulated entity under WEC as well as the entity used for netting of emissions across facilities under common ownership or control. As commenters highlighted, the text of section 136(f) suggests Congress supported broad application of netting, and commenters also noted that broader application of netting may help incentivize emission reductions by allowing companies to take advantage of cost-effective reduction opportunities across their entire operations rather than being limited by reductions that can be achieved across a smaller number of facilities. The EPA received significant comments that restricting the netting provisions to the owner or operator was inconsistent with the intent of the provision, since parent companies both own and control subsidiaries. As described in more detail in section II.B.1., the final regulations continue to define a facility's owner or operator as the regulated entity under WEC (*i.e.,* responsible for the payment of the WEC), consistent with CAA section 136(c). However, these final regulations reflect that the best reading of the statute entails a broader interpretation of the term "common ownership or control," and so the final rule expands the use of netting to the parent company

level by allowing owners and operators with a common parent to transfer negative emissions amongst each other. This approach of maintaining the WEC regulatory obligations at the owner and operator level, while allowing the transfer of negative emissions or "netting" across owners and operators with a common parent, reconciles the difference in statutory language in CAA sections 136(c) and 136(f).

The EPA is also making a number of changes to improve the implementation of the WEC in response to logistical and feasibility concerns raised in response to the proposal. For example, the EPA is specifying WEC filing and resubmittal deadlines of August 31 and December 15, respectively. These dates are later than the proposed deadlines, thereby allowing for more accurate reporting prior to WEC submission, reducing the number of resubmissions and corrections, and reducing overall burden.

In this final rule, the EPA is also making modifications to the implementation of the unreasonable delay and plugged well exemptions, as well as revisions to definitions and calculations to support the finalized rule. We are also finalizing revisions to 40 CFR part 98, subpart A (general provisions) for all facilities that report under subpart W to harmonize reporting responsibilities in part 98 with the reporting responsibilities and WEC obligation in part 99 such that responsibility to report and resubmit reports under part 98 if errors are identified in the part 98 report align with the obligated party under part 99. The final provisions of part 99 and part 98 under this rulemaking are described in further detail in sections II. and III. of this preamble.

## C. Background and Related Actions

Congress designed the WEC to work in tandem with several related EPA programs. Together, these actions are expected to greatly reduce methane emissions. This section discusses the impacts of methane on public health and welfare and provides more details on the EPA programs relevant to methane emissions from oil and gas systems.

### 1. How does methane affect public health and welfare?

Elevated concentrations of greenhouse gases (GHGs) including methane have been warming the planet, leading to harmful changes in the Earth's climate that are occurring at a pace and in a way that threatens human health, our economy and infrastructure, and the natural environment, both in the United

States (U.S.) and at a global level. While the EPA is not statutorily required to make any particular scientific or factual findings regarding the impact of GHG emissions on public health and welfare in support of the WEC, the EPA is providing in this section a brief scientific background on methane and climate change to offer additional context for this rulemaking and to help the public understand the environmental impacts of GHGs such as methane.[10]

As a GHG, methane in the atmosphere absorbs terrestrial infrared radiation, which in turn contributes to increased global warming and continuing climate change, including increases in air and ocean temperatures, changes in precipitation patterns, retreating snow and ice, increasingly severe weather events, such as hurricanes of greater intensity, and sea level rise, among other impacts. Methane also contributes to climate change through chemical reactions in the atmosphere that produce tropospheric ozone and stratospheric water vapor. In 2023, atmospheric concentrations of methane increased by nearly 11 parts per billion (ppb) over 2022 levels to reach 1922 ppb.[11] Concentrations are now more than two and a half times larger than the preindustrial level of 729 ppb.[12] Methane is responsible for about one third of all warming resulting from human emissions of well-mixed GHGs,[13] and due to its high radiative efficiency compared to carbon dioxide, methane mitigation is one of the best opportunities for reducing near-term warming. In the U.S., the oil and gas sector is the largest source of industrial methane emissions.[14]

---

[10] The EPA did not and is not reopening previous determinations regarding endangerments to public health and welfare in providing this background in this rulemaking.

[11] NOAA, *https://gml.noaa.gov/webdata/ccgg/trends/ch4/ch4_annmean_gl.txt.* Accessed 8/22/24.

[12] Blunden, J. and T. Boyer, Eds., 2022: "State of the Climate in 2021." *Bull. Amer. Meteor. Soc.,* 103 (8), Si–S465, *https://doi.org/10.1175/2022BAMSStateoftheClimate.1,* 103 (8), Si–S465, *https://doi.org/10.1175/2022BAMSStateoftheClimate.1.*

[13] IPCC, 2021: *Summary for Policymakers. In: Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change* [Masson-Delmotte, V., P. Zhai, A. Pirani, S.L. Connors, C. Péan, S. Berger, N. Caud, Y. Chen, L. Goldfarb, M.I. Gomis, M. Huang, K. Leitzell, E. Lonnoy, J.B.R. Matthews, T.K. Maycock, T. Waterfield, O. Yelekçi, R. Yu, and B. Zhou (eds.)]. Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA, pp. 3–32, doi:10.1017/9781009157896.001.

[14] EPA (2024). Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2022 U.S. Environmental Protection Agency, EPA 430R–24004. *https://www.epa.gov/ghgemissions/*

Major scientific assessments continue to be released that further advance our understanding of the climate system and the impacts that methane and other GHGs have on public health and welfare both for current and future generations. According to the Intergovernmental Panel on Climate Change (IPCC) Sixth Assessment Report, ''it is unequivocal that human influence has warmed the atmosphere, ocean and land. Widespread and rapid changes in the atmosphere, ocean, cryosphere and biosphere have occurred.''[15] Recent EPA modeling efforts[16] have also shown that impacts from these changes are projected to vary regionally within the U.S. For example, large damages are projected from sea level rise in the Southeast, wildfire smoke in the Western U.S., and impacts to agricultural crops and rail and road infrastructure in the Midwest and Northern Plains. Scientific assessments, the EPA analyses, and updated observations and projections document the rapid rate of current and future climate change and the potential range impacts both globally and in the United States,[17] presenting clear support regarding the current and future dangers of climate change and the importance of GHG emissions mitigation. The Methane Emissions Reduction Program is intended to respond to and mitigate these impacts by improving availability of and access to monitoring and emission reduction technologies and incentivizing methane emissions reductions from oil and gas systems.

2. Related Actions

Congress designed the WEC to work in tandem with several related EPA programs, in particular the Greenhouse Gas Reporting Program and the CAA section 111 requirements. As mandated by CAA section 136(c) and (d), the scope and effect of the WEC is closely related to the EPA's long-standing Greenhouse Gas Reporting Program requirements for oil and natural gas facilities, which are codified in subpart W of the EPA's GHGRP regulations. Specifically, the applicability of the WEC is based upon the quantity of metric tons of $CO_2e$ emitted per year pursuant to the requirements of subpart W. Further, CAA section 136(e) requires that the WEC amount be calculated based upon methane emissions reported pursuant to subpart W. In order to ensure that WEC charges are based on methane emissions data that is as accurate and comprehensive as possible, section 136(h) further required the EPA to undertake a rulemaking to review and revise subpart W as necessary to ensure that reporting is ''based on empirical data,'' ''accurately reflect[s] the total methane emissions and waste emissions from applicable facilities,'' and ''allow[s] owners and operators of applicable facilities to submit empirical emissions data.'' As a result, this final action builds upon previous subpart W rulemakings.

In the 2024 Subpart W Final Rule, the EPA finalized revisions to subpart W consistent with the authority and directives set forth in CAA section 136(h) as well as the EPA's authority under CAA section 114. In that rulemaking, the EPA finalized revisions to require reporting of additional emissions or emissions sources to address potential gaps in the total methane emissions reported by facilities to subpart W. For example, these revisions added a new emissions source, referred to as ''other large release events,'' to capture large emission events that are not accurately accounted for using the existing methods in subpart W.[18] See section II.B. of the preamble to the 2024 Subpart W Final Rule (89 FR 42062) for more information on this source category. The emissions from these events and other newly added sources are required to be included in the total emissions reported under subpart W starting with reporting year 2025. The EPA also finalized revisions to add or revise existing calculation methodologies to improve the accuracy of reported emissions, incorporate additional empirical data, and allow owners and operators of applicable facilities to submit empirical emissions data that could appropriately demonstrate the extent to which a charge is owed in implementation of CAA section 136, as directed by CAA section 136(h). The EPA also finalized revisions to existing reporting requirements to collect data that will improve verification of reported data, ensure accurate reporting of emissions, and improve the transparency of reported data. For clarity of discussion within this preamble, unless otherwise stated, references to provisions of subpart W (*i.e.,* 40 CFR 98.230 through 98.238) reflect the language of that subpart as effective January 1, 2025.

Under the Greenhouse Gas Reporting Program, the EPA also finalized a separate rule (89 FR 31802, April 25, 2024), which included updates to the General Provisions of the Greenhouse Gas Reporting Rule to reflect revised global warming potentials (GWPs), reporting of GHG data from additional sectors (*i.e.,* non-subpart W sectors), and revisions to source categories other than subpart W that improve implementation of the Greenhouse Gas Reporting Rule. The revision to the GWP of methane (from 25 to 28) is expected to lead to a small increase in the number of facilities (<188 facilities)[19] that exceed the subpart W 25,000 mt $CO_2e$ threshold and thus become subject to the part 99 requirements. This final Greenhouse Gas Reporting Program rule is not expected to otherwise impact subpart W reporting requirements as they pertain to the applicability or implementation of the part 99 requirements.

Separately, on November 15, 2021 (86 FR 63110), the EPA proposed under CAA section 111(b) standards of performance regulating GHGs (in the

*inventory-us-greenhouse-gas-emissions-and-sinks-1990-2022.*

[15] *Id.*

[16] (1) EPA. 2024. *Technical Documentation on the Framework for Evaluating Damages and Impacts (FrEDI).* U.S. Environmental Protection Agency, EPA 430–R–24–001.

(2) Hartin C., E.E. McDuffie, K. Novia, M. Sarofim, B. Parthum, J. Martinich, S. Barr, J. Neumann, J. Willwerth, & A. Fawcett. Advancing the estimation of future climate impacts within the United States. EGUsphere doi: 10.5194/egusphere-2023–114, 2023.

[17] (1) USGCRP, 2023: Fifth National Climate Assessment. Crimmins, A.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, B.C. Stewart, and T.K. Maycock, Eds. U.S. Global Change Research Program, Washington, DC, USA. *https://doi.org/10.7930/NCA5.2023.*

(2) IPCC, 2021: *Summary for Policymakers. In: Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change* [Masson-Delmotte, V., P. Zhai, A. Pirani, S.L. Connors, C. Pe´an, S. Berger, N. Caud, Y. Chen, L. Goldfarb, M.I. Gomis, M. Huang, K. Leitzell, E. Lonnoy, J.B.R. Matthews, T.K. Maycock, T. Waterfield, O. Yelekçi, R. Yu and B. Zhou (eds.)]. Cambridge University Press.

[18] As defined at 40 CFR 98.238, effective January 1, 2025, an other large release event means any planned or unplanned uncontrolled release to the atmosphere of gas, liquids, or mixture thereof, from wells and/or other equipment that result in emissions for which there are no methodologies in 40 CFR 98.233 other than under 40 CFR 98.233(y) to appropriately estimate these emissions. Other large release events include, but are not limited to, well blowouts, well releases, pressure relief valve releases from process equipment other than hydrocarbon liquids storage tanks, storage tank cleaning and other maintenance activities, and releases that occur as a result of an accident, equipment rupture, fire, or explosion. Other large release events also include failure of equipment or equipment components such that a single equipment leak or release has emissions that exceed the emissions calculated for that source using applicable methods in 40 CFR 98.233(a) through (h), (j) through (s), (w), (x), (dd), or (ee) by the threshold in 40 CFR 98.233(y)(1)(ii). Other large release events do not include blowdowns for which emissions are calculated according to the provisions in 40 CFR 98.233(i).

[19] In the 2024 Final GHGRP Rule, the EPA estimated that 188 additional facilities would be subject to subpart W due to the increase in GWP. However, many of these facilities would also report under other subparts, such as subpart C, and for some of these facilities, reported emissions to subpart W will be below the WEC applicable threshold of 25,000 metric tons $CO_2e$.

form of limitations on emissions of methane) and volatile organic compounds (VOCs) for certain new, reconstructed, and modified sources in the oil and natural gas source category (proposed as 40 CFR part 60, subpart OOOOb) (hereafter referred to as ''NSPS OOOOb''), as well as emissions guidelines regulating emissions of methane under CAA section 111(d) for certain existing oil and natural gas sources (proposed as 40 CFR part 60, subpart OOOOc) (hereafter referred to as ''EG OOOOc''). The November 15, 2021 proposal (covering both NSPS OOOOb and EG OOOOc)—which Congress explicitly referred to in section 136(f)(6)—will be referred to hereafter as the ''2021 NSPS/EG Proposal.'' The 2021 NSPS/EG Proposal sought to strengthen standards of performance previously in effect under section 111(b) of the CAA for new, modified and reconstructed oil and natural gas sources, and to establish emissions guidelines under section 111(d) of the CAA for States to follow in developing plans to establish standards of performance for existing oil and natural gas sources.

On December 6, 2022, the EPA issued a supplemental proposal to update, strengthen, and expand upon the 2021 NSPS/EG Proposal (87 FR 74702). This supplemental proposal modified certain standards proposed in the 2021 NSPS/ EG Proposal and added proposed requirements for sources not previously covered.[20] Among other things, the supplemental proposal sought to encourage the deployment of innovative and advanced monitoring technologies by establishing more flexible performance requirements than the 2021 NSPS/EG Proposal, and also included provisions to establish a process for certified expert monitoring to identify ''super-emitters'' for prompt mitigation.

On March 8, 2024, the final NSPS OOOOb and EG OOOOc rules (hereafter referred to as the ''2024 Final NSPS/ EG'') were published in the **Federal Register** (89 FR 16820). First, the EPA finalized NSPS OOOOb regulating methane and VOCs emissions from new, modified, and reconstructed sources in the Crude Oil and Natural Gas source category pursuant to CAA section 111(b)(1)(B). Second, the EPA finalized emission guidelines, including presumptive standards in EG OOOOc

that would limit methane emissions from existing sources in the Crude Oil and Natural Gas source category, as well as requirements under the CAA section 111(d) for States to follow in developing, submitting, and implementing State plans to establish performance standards.[21] Among other things, the final rule strengthens standards, phases out routine flaring of natural gas from new well sites, requires all well sites and compressor stations to be routinely monitored for leaks, requires storage vessels to reduce emissions by 95 percent, sets standards for certain facilities that have not been previously regulated, and provides companies greater flexibility to use innovative and cost-effective methane detection technologies. It will also utilize data collected by certified third parties to identify and address ''super emitting'' sources and eliminate or minimize emissions from common pieces of equipment used in oil and gas operations such as process controllers, pumps, and storage tanks.

Congress envisioned a strong connection between EPA programs for methane emissions from oil and gas systems. The 2024 Final NSPS/EG is relevant to this WEC final rule in two ways: first, implementation of the CAA section 111(b) and (d) standards will help drive methane emissions reductions that can help many facilities achieve methane emission levels that are below the thresholds specified by Congress (described in section II.B. of this preamble), thereby enabling applicable facilities to reduce or avoid charges under the WEC program; and second, compliance with the CAA section 111(b) and (d) standards may (if certain criteria are met) exempt facilities from the WEC under the regulatory compliance exemption outlined at CAA section 136(f)(6) (discussed in section II.D.2. of this preamble). The WEC thus serves as an important bridge and backstop to the full implementation of the 2024 Final NSPS/EG, and an additional incentive thereafter to continue to comply with the CAA section 111 rules.

In addition to creating the WEC and directing the EPA to revise subpart W, Congress also established the MERP under section 136 of the CAA to provide financial and technical assistance to reduce methane emissions from the oil and gas sector. To implement this program, the EPA is partnering with the

U.S. Department of Energy (DOE) to provide up to $1.36 billion in financial and technical assistance. On December 15, 2023, the EPA and the DOE announced the award of $350 million in formula grant funding to 14 States help measure and reduce methane emissions, supporting industry efforts to cut methane emissions from low-producing, marginal conventional wells on non-Federal lands and support environmental restoration of well sites. On June 21, 2024, the EPA and the DOE announced the availability of $850 million in federal funding to help measure and reduce methane emissions from the oil and gas sectors. This competitive solicitation will enable a broad range of eligible U.S. entities to apply, including industry, academia, non-governmental organizations, Tribes, State and local government, and others. As designed by Congress, these resources and incentives were intended to complement the regulatory programs and to help facilitate the transition to a more efficient petroleum and natural gas industry.

*D. Legal Authority*

In August 2022, the IRA was signed into law. Section 60113 of the IRA amended the CAA by adding section 136, and the EPA is finalizing this rulemaking under the authority provided by that section. As noted in section I.B. of this preamble, the IRA added CAA section 136, ''Methane Emissions and Waste Reduction Incentive Program for Petroleum and Natural Gas Systems,'' which requires that the EPA impose and collect an annual specified charge on methane emissions that exceed an applicable waste emissions threshold from an owner or operator of an applicable facility that reports more than 25,000 mt $CO_2e$ of greenhouse gases emitted per year pursuant to subpart W of the GHGRP. Under CAA section 136, an ''applicable facility'' is a facility within nine of the ten industry segments subject to subpart W, as currently defined in 40 CFR 98.230 (excluding natural gas distribution).

The EPA is also finalizing elements of this rulemaking under its authority provided in CAA section 114. CAA section 114(a)(1) authorizes the Administrator to require emissions sources, persons subject to the CAA, or persons whom the Administrator believes may have necessary information to monitor and report emissions and provide other information the Administrator requests for the purposes of carrying out any provision of the CAA (except for a provision of title II with respect to

---

[20] Examples of some of the changes the 2022 Supplemental proposed included proposed requirements that all well sites are monitored for leaks, requirements to ensure the proper operation of flares, zero-emission requirement for process controllers and pumps, standards for dry seal centrifugal compressors, and a super-emitter response program, among other things.

[21] In this action, the EPA also finalized several related actions stemming from the joint resolution of Congress, adopted on June 30, 2021, under the CRA, disapproving the 2020 Policy Rule, and also finalized a protocol under the general provisions for use of Optical Gas Imaging.

manufacturers of new motor vehicles or new motor vehicle engines). Thus, CAA section 114(a)(1) additionally provides the EPA authority to require the information in this final rule because the information is relevant for carrying out CAA section 136.

The Administrator has determined that this action is subject to the provisions of section 307(d) of the CAA. Section 307(d) contains a set of procedures relating to the issuance and review of certain CAA rules.

In addition, pursuant to sections 114, 301, and 307 of the CAA, the EPA is publishing final confidentiality determinations for the new data elements required by this final regulation.

## II. Procedures for Facilitating Compliance, Including Netting and Exemptions

*A. Final Definitions To Support WEC Implementation and Associated Revisions to Part 98, Subpart A*

In accordance with CAA section 136(d), applicable facilities under part 99 are those facilities within certain industry segments as defined under part 98, subpart W. To support implementation of the WEC, we are finalizing several definitions within the general provisions of 40 CFR 99.2 which follow from the statutory text.

### 1. Applicable Facility and WEC Applicable Facility Definitions

The EPA received comments expressing support for the proposed definitions for "applicable facility" and "WEC applicable facility." Certain commenters disagreed that the statutory text requires alignment of the definition of an "applicable facility" in the proposed WEC rule with the subpart W facility definitions, and stated that CAA section 136(d) leaves room for interpretation as to the definition of an "applicable facility." After consideration of comments received, the EPA is finalizing a definition of "applicable facility" as specified by the statute to mean a facility within one or more of the following industry segments: onshore petroleum and natural gas production, offshore petroleum and natural gas production, onshore petroleum and natural gas gathering and boosting, onshore natural gas processing, onshore natural gas transmission compression, onshore natural gas transmission pipeline, underground natural gas storage, Liquified Natural Gas (LNG) import and export equipment, or LNG storage, as those industry segments are defined in 40 CFR 98.230 of subpart W.[22] The EPA does not agree with the commenters that the statute leaves open for interpretation the meaning of "applicable facility;" rather, the agency concludes that the statute expressly defines "applicable facility" in the same manner as the term "facility" has long been defined under 40 CFR part 98 and applied to the nine industry segments listed in CAA section 136(d). In addition to reflecting the plain language of the statutory text, aligning the definition of an applicable facility with the definitions of a facility within the industry segments in subpart W, for each corresponding industry segment, simplifies implementation and reduces burden on industry and the EPA. The approach supported by some commenters would have established different definitions of "facility" for subpart W and WEC, requiring the EPA to establish new reporting requirements for certain industry segments and requiring industry to calculate and report emissions for the same equipment twice. The EPA also received comments requesting that we clearly state that oil and gas producers generating less than 25,000 tons of $CO_2$ equivalent are not required to submit documentation to the regulatory body proving that the emissions threshold was not exceeded. After consideration of comments, the EPA is finalizing with clarifying revisions a definition of "WEC applicable facility" in 40 CFR 99.2, which means an applicable facility, as defined in this section, for which the owner(s) or operator(s) of a part 98 reporting facility was required to report GHG emissions under part 98, subpart W of this chapter of more than 25,000 metric tons $CO_2e$ for the reporting year. This final definition clarifies that the obligation for reporting under part 98 may apply to multiple owners or operators for a facility, that the status as a WEC applicable facility is based upon reporting in compliance with part 98, and that whether or not a part 98 reporting facility is a WEC applicable facility is based upon a specific reporting year. This definition is taken from the threshold set in the statute. Only WEC applicable facilities are required to report under part 99.

A single reporting facility under part 98, subpart W, typically consists of operations within a single petroleum and natural gas industry segment. However, a single reporting facility may represent operations in two or more industry segments. Facilities that may potentially have operations representing multiple industry segments and would report as the same facility if co-located

[22] *See* 42 U.S.C. 7436(d).

include facilities that have co-located operations in the onshore natural gas processing, onshore natural gas transmission compression, underground natural gas storage, LNG import and export equipment, and LNG storage industry segments. We are finalizing as proposed that such operations would be considered a single WEC applicable facility under part 99.

In cases where a subpart W facility reports under two or more of the industry segments listed in the previous paragraph, the EPA is finalizing as proposed that the 25,000 mt $CO_2e$ threshold is evaluated based on the total facility GHG emissions reported to subpart W across all the relevant industry segments (*i.e.,* the facility's total subpart W GHGs). As discussed in section II.C.1. of this preamble, the waste emissions threshold is the facility-specific quantity of annual emissions, based upon the relevant intensity thresholds specified by Congress, above which the EPA must impose and collect the WEC. For the purposes of determining the waste emissions threshold for a WEC applicable facility that operates within multiple industry segments, the EPA is finalizing as proposed that each industry segment is assessed separately (*i.e.,* using industry segment-specific throughput and methane intensity threshold) and then summed together to determine the waste emissions threshold for the facility. The EPA is finalizing as proposed that this approach is used in all cases where a WEC applicable facility contains equipment in multiple subpart W industry segments.

The EPA considered an alternative definition of WEC applicable facility as it applies to subpart W facilities that report under two or more industry segments. This alternative approach would have assessed these facilities against the 25,000 mt $CO_2e$ applicability threshold using the $CO_2e$ reported under subpart W for each individual segment at the facility rather than the total facility subpart W $CO_2e$ reported across all segments. CAA section 136(d) defines an applicable facility as "a facility within the [nine] industry segments" subject to the WEC and does not specify that an applicable facility is in one and only one industry segment. The EPA understands this to mean that an applicable facility constitutes an entire subpart W facility, including those that report under more than one segment. Thus, based on the statutory text, the EPA is finalizing as proposed to assess WEC applicability based on the entire subpart W facility's emissions that are reported under subpart W.

Based on subpart W data for the 2022 reporting year, no more than two dozen facilities report data for multiple segments, and when total subpart W $CO_2e$ is summed across all segments at these facilities, almost all of these facilities remain below the 25,000 mt $CO_2e$ threshold. Historic data also show that the industry segments (onshore natural gas processing, onshore natural gas transmission compression, and underground natural gas storage) located at these facilities that report data for multiple segments generally have methane emissions below the waste emissions thresholds. The final approach of using total subpart W facility $CO_2e$ for determining WEC applicability therefore should not result in a significant number of facilities being subject to the WEC compared to an approach that assessed applicability using subpart W $CO_2e$ for each individual industry segment at a facility. Based on historic data, the EPA does not expect the very small number of facilities with operations in multiple subpart W segments that could be subject to the WEC under the final approach to experience a substantially different financial impact than they would have under this alternative approach.

2. Facility Applicable Emissions, WEC Applicable Emissions, Net WEC Emissions, and Net WEC Emissions After Transfers Definitions

We are finalizing as proposed a definition for "facility applicable emissions" in 40 CFR 99.2 which means the annual methane emissions from a WEC applicable facility that are either equal to, below, or exceeding the waste emissions threshold for the facility prior to consideration of any applicable exemptions. We are also finalizing as proposed a definition for "WEC applicable emissions" in 40 CFR 99.2, which means the annual methane emissions from a WEC applicable facility after consideration of any applicable exemptions. The calculation methodology for WEC applicable emissions is addressed in section II.C.3. of this preamble.

The EPA is also finalizing definitions of "net WEC emissions" and "net WEC emissions after transfers" to clarify the total amount of methane that is subject to charge and to account for revisions from the proposal to netting requirements. The EPA is finalizing a definition of "net WEC emissions" in 40 CFR 99.2 to mean the sum of WEC applicable emissions from facilities with the same WEC obligated party, as calculated pursuant to 40 CFR 99.22 using equation B–8. If a WEC obligated

party only has one WEC applicable facility, net WEC emissions are equal to that facility's WEC applicable emissions. The EPA is finalizing a definition of "net WEC emissions after transfers" to mean the total quantity of methane emissions subject to charge for a WEC obligated party. If the WEC obligated party is not eligible to, or elects not to, transfer or receive negative net WEC emissions pursuant to 40 CFR 99.23, the net WEC emissions after transfers are determined pursuant to 40 CFR 99.22 and are equal to net WEC emissions. If the WEC obligated party transfers or receives negative net WEC emissions pursuant to 40 CFR 99.23, the net WEC emissions after transfers reflect such transfers subject to the requirements of 40 CFR 99.23. If a WEC obligated party does not participate in any transfer of net WEC emissions with other WEC obligated parties with a common parent company, that WEC obligated party's net WEC emissions after transfers are equal to its net WEC emissions.

3. WEC Obligated Party Definition

We are finalizing the definitions of "WEC obligated party" and "WEC applicable facility". The EPA received comment requesting that we recognize the differences between ownership and operatorship as well as the complexity of ownership and operator agreements, including acknowledging the dynamics of these across basins, facilities, and individual wells. After consideration of the comments received, and in addition to finalizing the definition for WEC applicable facility discussed earlier in this section, we are finalizing with revision a definition for the term "WEC obligated party" in 40 CFR 99.2. As finalized, the term WEC obligated party refers to the owner or operator of one or more WEC applicable facilities. The WEC obligated party of a WEC applicable facility must be one of the owners or operators of that facility under subpart W, as reported under 40 CFR 98.3(c)(14). We note that although there are differences in the common definitions of ownership and operatorship and there may be complex agreements between owners and operators, for the purposes of subpart W, there are specific definitions for owner(s) and operators(s) in subpart A and subpart W of part 98, with some segments, such as onshore natural gas production, having unique definitions.[23] We are finalizing the term

"WEC obligated Party" to be consistent with these definitions. For WEC applicable facilities that have more than one owner or operator, we are finalizing that the WEC obligated party is an owner or operator selected by a binding agreement among the owners and operators of the WEC applicable facility. The EPA anticipates that such an agreement would be similar to those used in carrying out 40 CFR 98.4(b) under the GHGRP. We are finalizing as proposed that the WEC obligated party must be one of the owners or operators of the WEC applicable facility as of December 31 of the reporting year, with one exception. This exception is related to the circumstances in which a WEC applicable facility is involved in a transaction(s) subsequent to the end of the reporting year (*i.e.*, between January 1 and December 31 of the year following the reporting year) that results in all of the owners or operators (of the facility as of December 31 of the reporting year) ceasing to exist prior to the WEC filing date. In this case, the WEC obligated party would be one of the owner(s) or operator(s) that acquired the facility as a result of the transaction(s) to be selected by mutual agreement among all of the acquiring owner(s) or operator(s). This revision is necessary to avoid cases in which there is no eligible owner or operator to serve as the WEC obligated party. We note that in case of transactions where only one owner or operator ceases to exist and that entity was the WEC obligated party, the remaining owners or operators of the WEC applicable facility that were the owners or operators as of December 31 of the reporting year would need to select a new WEC obligated party. Additionally, we have finalized clarifying language in the definition of WEC obligated party to make clear that each WEC applicable facility must have only one WEC obligated party for a reporting year. This requirement was included in the proposed rule under proposed 40 CFR 99.4, but we are further clarifying by making it explicit in the definition of WEC obligated party. The EPA notes that WEC obligated parties may only net for the applicable

---

[23] For example, 40 CFR 98.238 defines *Facility with respect to onshore petroleum and natural gas production for purposes of reporting under this subpart and for the corresponding subpart A*

requirements as all petroleum or natural gas equipment on a single well-pad or associated with a single well-pad and $CO_2$ EOR operations that are under common ownership or common control including leased, rented, or contracted activities by an onshore petroleum and natural gas production owner or operator and that are located in a single hydrocarbon basin as defined in 40 CFR 98.238. Where a person or entity owns or operates more than one well in a basin, then all onshore petroleum and natural gas production equipment associated with all wells that the person or entity owns or operates in the basin would be considered one facility.

reporting year for which they are reporting; in other words, emissions occurring before December 31 should not be netted with emissions occurring after December 31.

In addition to establishing the entity regulated under the WEC, the EPA is finalizing the temporal bounds for which a WEC obligated party is responsible for its facilities and their associated emissions, as well as establishing obligations for transacted assets. For the purposes of submitting the WEC filing, we are finalizing that the WEC obligated party's (including through binding agreement) WEC applicable facilities are the WEC applicable facilities for which it is the owner or operator, as of December 31 of each reporting year. Under the final rule, the WEC obligated party is responsible for any WEC applicable emissions from facilities for which it was the facility owner or operator as of December 31 of the corresponding reporting year. The EPA recognizes that facilities may be acquired or divested at any time in a given reporting year, and that under the final rule the year-end WEC obligated party, or the WEC obligated party selected by mutual agreement among all of the acquiring owner(s) or operator(s) if the existing WEC obligated party ceases to exist, would be responsible for data and any corresponding WEC obligation for the entire reporting year. The EPA believes that this approach is both reasonable and necessary for implementation of the WEC program. Subpart W data reporting uses the same approach for circumstances where facilities are acquired or divested during a given reporting year; the facility owner or operator as of December 31 is responsible for reporting emissions for the entire year. Because the subpart W data is inextricably linked to the WEC filing, the EPA assessed that it would complicate and potentially be inappropriate to have different parties be liable for the legal obligations of the same facility under each regulation. Specifically, different entities being legally liable for the same facility under subpart W and the WEC program could lead to challenges for WEC filings and associated data verification, increase industry burden by requiring significant coordination between different companies, and lead to situations where separate entities are responsible for reporting subpart W data and paying any charge calculated from that data. The EPA therefore believes it would be neither practical nor accurate for the reporting responsibility and potential WEC obligation for a single facility to be split among multiple WEC obligated parties in such circumstances.

The EPA also recognizes that a facility's owner or operator may change between December 31 of a given reporting year and August 31 of the following year, when WEC filings are due, or later in the year and prior to when corrections may occur. In such situations, under the final rule the WEC obligated party associated with a facility as of December 31 of a given reporting year is responsible for accounting for that facility in its WEC filing and is responsible for any WEC obligation associated with that facility for that reporting year. The new owner or operator after the transaction would only become the new WEC obligated party starting with the year of purchase, assuming they are still the owner or operator as of December 31 of the year of the transaction. The EPA received several comments related to the acquiring of a WEC obligated party by another WEC obligated party prior to the WEC filing such that the WEC obligated party as of December 31 for the applicable reporting year ceases to exist. One commenter stated that the proposal was ambiguous as to whether companies that purchase WEC applicable facilities (and thus would become WEC obligated parties, as of December 31 of the reporting year) would be responsible for retaining records, and all associated obligations, that were generated by the previous owners or operators of those facilities. Another commenter suggested that the responsibility for reporting emissions under the WEC should remain with the party responsible for recordkeeping for a facility at the time the emissions occur at the facility, rather than the time reporting would be required. After consideration of the comments received, we are further clarifying from proposal that under this final rule, in cases where a facility has a single owner or operator and that WEC obligated party is acquired by single WEC obligated party such that the WEC obligated party as of December 31 for the applicable reporting year ceases to exist, the acquiring WEC obligated party assumes responsibility for the acquired WEC obligated party's WEC applicable facilities for that reporting year. In cases where a facility has a single owner or operator and that WEC obligated party is acquired by multiple owners or operators following a transaction that results in the WEC obligated party as of December 31 for the applicable reporting year to no longer exist, the post-transaction owners or operators must select among themselves by binding agreement which owner or operator will be the facility's WEC obligated party for that reporting year.

4. Gathering and Boosting Related Definitions

The EPA is revising the definitions for "gathering and boosting system" and "gathering and boosting system owner or operator" under 40 CFR part 99. The EPA received comments indicated that proposed definitions of "gathering and boosting system" and "gathering and boosting system owner or operator" under part 99 do not match the revisions under subpart W. The EPA agrees these definitions should align with subpart W. Therefore, the EPA is revising from proposal the definition for "gathering and boosting system" to mean a single network of pipelines, compressors and process equipment, including equipment to perform natural gas compression, dehydration, and acid gas removal, that has one or more connection points to gas and oil production or one or more other gathering and boosting systems and a downstream endpoint, typically a gas processing plant, transmission pipeline, LDC pipeline, or other gathering and boosting system. Additionally, the EPA is revising from proposal the definition of "gathering and boosting system owner or operator" to mean any person that holds a contract in which they agree to transport petroleum or natural gas from one or more onshore petroleum and natural gas production wells or one or more other gathering and boosting systems to a downstream endpoint, typically a natural gas processing facility, another gathering and boosting system, a natural gas transmission pipeline, or a distribution pipeline, or any person responsible for custody of the petroleum or natural gas transported.

5. Revisions to 40 CFR Part 98, Subpart A Related to WEC Obligated Party Definition

As part of these final amendments, the EPA is also finalizing revisions to 40 CFR part 98, subpart A, for all facilities that are subject to the GHGRP and report under subpart W. On August 1, 2023 (88 FR 50282), the EPA proposed revisions to 40 CFR 98.4 to address changes in the owner or operator of a facility in the four industry segments in subpart W (Petroleum and Natural Gas Systems) that have unique definitions of facility. The proposed provisions would define which owner or operator is responsible for current and future reporting years' reports and clarify how to determine responsibility for revisions to annual reports for reporting years prior to

owner or operator changes for specific industry segments in subpart W, beginning with RY2025 reports. In the 2024 Subpart W Final Rule, the EPA finalized the provisions regarding current and future reporting years' reports in 40 CFR 98.4(n). However, the EPA did not take action on proposed amendments related to responsibility for revisions to annual reports for reporting years prior to owner or operator changes for specific industry segments in subpart W and indicated the intent to consider those proposed revisions in coordination with the 2024 WEC rulemaking and take action, if finalized, on these requirements at the same time.

The current regulations at 40 CFR 98.4(h), which cover changes in owners and operators, absent the changes being finalized in this rulemaking, state that in the event an owner or operator of the facility or supplier is not included in the list of owners and operators in the certificate of representation under this section for the facility or supplier, such owner or operator shall be deemed to be subject to and bound by the certificate of representation, the representations, actions, inactions, and submissions of the designated representative and any alternate designated representative of the facility or supplier, as if the owner or operator were included in such list. 40 CFR 98.4(h) goes on to additionally state that within 90 days after any change in owners or operators of the facility or supplier (including the addition of a new owner or operator), the designated representative or any alternate designated representative shall submit a certificate of representation that is complete under this section except that such list shall be amended to reflect the change. Thus the owners and operators of facilities are bound to the actions, inactions and submissions of the designated representative of the facility when they become an owner or operator of the facility, as defined in 40 CFR part 98. The current regulations at 40 CFR 98.4(g), absent the changes being finalized in this rulemaking, state that if there is a change in the designated representative or alternate designated representative, then all representations, actions, inactions, and submissions by the previous designated representative or the previous alternate designated representative of the facility are binding on the new designated representative and the owners and operators of the facility or supplier. Thus, any new owners and operators are bound to the actions and submissions of the previous designated representatives, including historical submissions for the facility prior to becoming an owner or operator.

However, the responsibility for reporting under part 98 could potentially be inconsistent with the WEC obligated party responsible for reporting under 40 CFR part 99, as described earlier in this section.

Many commenters recommended that no new owner should be responsible for the WEC generated by the prior owner and that emissions reporting should remain the responsibility of the owner or operator who generated the reportable emissions. The EPA believes that preparation and submission of multiple reports by different entities related to the same emission sources would lead to duplicative burden and raise the potential for inconsistencies in reported data. After consideration of comments received, and in alignment with 40 CFR part 99, in this final rule, the EPA is making changes to the regulations for facilities that report under subpart W to specify that, with two exceptions, the owner(s) and operator(s) as of December 31 of the reporting year, will remain responsible for that reporting year, even after sale of the facility. These changes are intended to ensure that the entity responsible for subpart W data for specific reporting years under various transaction scenarios is aligned with the WEC obligated party responsible for WEC filing and any WEC obligation in those years. The EPA is also clarifying that for the first transaction after January 1, 2025, the sellers will also remain responsible for historic reporting, (*i.e.,* reporting years prior to 2024). Specifically, in this final rule, the EPA is adding 40 CFR 98.4(o), which applies in lieu of the last sentence of 40 CFR 98.4(g) for facilities that report under subpart W, starting with transactions that occur on or after January 1, 2025, to address responsibility for reporting years prior to a year in which there is a change in the owners and operators. According to the new paragraph, when there is a change in the owner(s) or operator(s) of a subpart W facility on or after the effective date of this final rule that involve the owner(s) or operator(s) as of December 31 of the year prior to the year of the transaction, the owners and operators as of December 31 of the year prior to the year of the transaction, *i.e.,* the sellers, must select a historic reporting representative who will be responsible after the transaction(s) for that reporting year and if it is the first transaction after January 1, 2025, for all prior years. In these cases, the owner(s) and operator(s) of the facility as of December 31 of the year prior to the year in which the facility is sold are bound to the actions of the historic

reporting representative and any previous designated representative or historic reporting representative for the relevant years. The historic reporting representative is selected by an agreement binding on the selling owner(s) and operator(s), unless the owner(s) or operator(s) selling the facility ceases to exist and/or is acquired as a result of a transaction(s), in which case all of the owners or operators involved in that transaction shall select at the time of sale a historic reporting representative by an agreement binding on each of the owners and operators involved in the transaction. The second exception is that for changes in owners or operators that occur after December 31, 2024 and before the effective date of this final rule that involve the owner(s) and operator(s) as of December 31, 2024, the buying and selling owners and operators must jointly select a historic reporting representative. In these cases, the owners and operators of the facility as of December 31 of the year prior to the year in which the facility is sold and the acquiring owners and operators are bound to the actions of the historic representative. In any of these scenarios, it is the EPA's intent for this person to be the WEC obligated party designated representative or represent the WEC obligated party corresponding to the applicable part 98 reporting year, for a facility that is a WEC applicable facility as defined in 40 CFR 99.2, so that there is alignment between WEC obligated parties and the owner(s) and operator(s) responsible for reporting for facilities that report under subpart W while also clarifying historical reporting requirements. The final provisions of 40 CFR 98.4(o) also specify that for cases where an entire facility is merged or acquired by a new owner(s) or operator(s), the seller must notify the EPA of the date of the last transaction resulting in the change to the owner(s) or operator(s) and that the acquiring owner or operator must notify the EPA of the e-GGRT ID number of the facility acquired in transaction. This additional information is necessary to determine when a historical reporting representative is required and maintain the ability to verify year-to-year changes in annual emissions for facilities post-transaction.

The final provisions of 40 CFR 98.4(o)(6) specify the reporting years for which a historic reporting representative is responsible. Based on the effective date of these amendments, these provisions will first apply to transactions that occur in calendar year 2025. For the first transaction that occur after January 1, 2025, the historic

reporting representative is responsible for submissions (if they have not occurred prior to the transaction) and revisions to annual GHG reports under 40 CFR 98.3(h) for all reporting years prior to the reporting year in which the transaction occurred. For subsequent transactions, the owners or operators of a facility that reports under subpart W as of December 31 of each reporting year are responsible for reporting and revisions to annual GHG reports corresponding to that reporting year. We note that these revisions do not impact how reporting responsibility for years prior to reporting year 2024 transfer upon a change in ownership prior to the effective date of this final rule. The existing provisions of subpart A (specifically 40 CFR 98.4(g)) continue to apply, so that the designated representative or alternate designated representative or historic reporting representative, as applicable, of the facility for reporting year 2024 maintain responsibility for the submissions of the previous designated representative and any necessary revisions to reports for reporting year 2024 and earlier. The final provisions of 40 CFR 98.4(o)(6) also specify that if the responsible owner(s) or operators(s) are acquired such that the owner(s) or operator(s) cease to exist as a result of a transaction, the acquiring owners would become responsible for submission (if not already submitted before the transaction) and any revisions to annual reports for the reporting year prior to the transaction and, if applicable, annual GHG reports under 40 CFR 98.3(h) for additional reporting years prior to the transaction as specified in paragraphs 40 CFR 98.4(o)(6)(i) and (ii).

### 6. Additional Definitions To Support WEC Implementation

The EPA is adding definitions in 40 CFR 99.2 for "parent company," "United States parent company," "qualified professional engineer," and "well identification (ID) number," which were not included as proposed part 99 regulatory definitions in the proposed rule. Commenters stated that definitions are necessary to implement CAA section 136 and create regulatory harmony. After consideration of comments, the EPA believes it will provide clarity to add definitions for these terms to implement the WEC. In alignment with part 98 subpart A, we are finalizing the definition of "United States parent company" to mean the highest-level United States company, as reported under 40 CFR 98.3 for a WEC applicable facility, with an ownership interest in the facility as of December 31 of the year for which data are being

reported. Additionally, for ease of understanding, the EPA is finalizing the definition of "parent company" to be the United States parent company.

We are also finalizing a definition for the term "Administrator" to mean the Administrator of the United States Environmental Protection Agency or the Administrator's authorized representative. This definition is aligned with the definition of the same term in part 98 subpart A. We proposed to define the term "e-GGRT ID number" as the identification number assigned to a facility by the EPA's electronic Greenhouse Gas Reporting Tool for submission of the facility's part 98 report. We are instead finalizing the defined term as "Facility ID number" for consistency of terminology in the final rule and with revised definition referring to the Greenhouse Gas Reporting Program where the proposal referred to the associated reporting tool and omitting the reference to submission of reports as these identifiers are not used solely for report submission.

The EPA also received comments stating that the proposed rule did not include sufficient detail regarding the certification criteria for third-party auditors. After consideration of comments and as discussed in section III.B.2., the EPA is requiring that auditors be qualified professional engineers, and is finalizing the definition for "qualified professional engineer," in alignment with the definition of "qualified professional engineer" in NSPS OOOOb, to mean an individual who is licensed by a State as a Professional Engineer to practice in one or more disciplines of engineering and who is qualified by education, technical knowledge, and experience to review and interpret the records required under 40 CFR 99. Additionally, to align with the definition under part 98 subpart W, we are also finalizing the definition for "well ID number," to mean the unique and permanent identification number assigned to a petroleum or natural gas well. Under the final definition, if the well has been assigned a U.S. Well Number, the well ID number required in this subpart is the US Well Number. Under the final definition, if a U.S. Well Number has not been assigned to the well, the well ID number is the identifier established by the well's permitting authority.

### B. Common Ownership or Control for Netting of Emissions

One of the important flexibilities created by Congress in section 136(f)(4) allows for facilities to reduce their overall WEC payments by transferring

emissions from facilities that are below the waste emissions threshold to facilities that have emissions that are above the waste emissions threshold (otherwise known as "netting"). The EPA proposed that the owner or operator of the facility should be both the WEC obligated party (i.e., the entity responsible for paying the WEC obligation) and the highest-level organization across which this netting should be allowed. The EPA received numerous comments arguing that netting should be allowed at the parent company level to maximize flexibility in implementation. After careful consideration of the comments and further review of the statutory language, the EPA is finalizing provisions that increase access to the netting provisions by allowing for the netting of emissions across facilities that are under common ownership or control of a parent company, rather than an owner or operator as proposed. However, the EPA is finalizing as proposed that the owner or operator is the WEC obligated party, thereby making a distinction in this final rule that the WEC obligated party and the corporate level at which netting may occur do not have to be one and the same. Although the EPA is allowing for additional access to netting in this final rule by allowing netting to occur at the parent company level, the EPA is also providing more specificity on the parameters and conditions under which this netting may occur. Additionally, the EPA is finalizing requirements for the treatment of net WEC emissions used in netting that are subsequently revised or invalidated.

### 1. EPA Interpretation To Implement "Common Ownership or Control" for the Purposes of Part 99

CAA section 136(c), which establishes the methane charge, states that "the Administrator shall impose and collect a charge on methane emissions that exceed an applicable waste emissions threshold under subsection (f) from an owner or operator of an applicable facility. . ." Congress directly requires that a facility owner or operator, which has a distinct and established legal meaning, be the entity on which the WEC is imposed and from which a charge is collected. Therefore, the EPA is finalizing its determination that the WEC obligated party for a particular applicable facility shall be the owner or operator of that applicable facility; or if more than one owner or operator exists, the owners or operators of that facility must designate an entity to be the WEC obligated party. The netting provision at CAA section 136(f)(4), meanwhile, allows WEC applicable facilities under

"common ownership or control" to net "emissions by reducing the total obligation to account for facility emissions levels that are below the applicable thresholds within and across all applicable segments" listed in section 136(d) and as defined in subpart W. In this final rulemaking, the EPA is interpreting this language to allow netting at the parent company level. Notably, sections 136(c) and 136(f)(4) employ different language—while 136(c), which establishes the WEC obligated party, refers specifically to an "owner or operator" of an applicable facility, section 136(f)(4) refers to facilities "under common ownership or control." The statute therefore requires that the facility owner or operator must be the WEC obligated party but provides for netting at the parent company level. The final requirements for netting are designed to align with both of these statutory directives. In this section, the EPA details the overall approach for application of common ownership or control and the justification for use of a facility's owner or operator as the WEC obligated party with netting based on common parent company.

The EPA proposed that netting would be limited to the WEC obligated party level. That is, the owner or operator would be both the WEC obligated party and the highest-level entity across which emissions could be netted. We received comments on the proposed use of the owner or operator as the highest-level entity across which facilities could net their emissions. Certain commenters disagreed with the proposed interpretation to define "common ownership or control" at the owner or operator level and stated that a parent company approach would not only reflect Congressional intent but would also align with legal precedent and the EPA's application of "common ownership or control" under other programs. These commenters also stated that a parent company approach would better incentivize methane emissions reductions, as parent companies could more effectively allocate resources across their operations for methane mitigation—and would have an incentive to do so if netting were allowed at the parent company level. Other commenters were supportive of the proposed approach and believed it was aligned with the statutory text. After consideration of comments received, the EPA is finalizing revisions from the proposed approach such that the facility owner or operator remains the WEC obligated party, but netting is allowed across owners or operators with the same parent company.

The EPA interprets the netting provision at CAA section 136(f)(4) to mean that amongst WEC obligated parties with a common parent company, WEC obligated parties with metric tons of methane below the waste emissions thresholds (*i.e.*, the difference between emissions equal to the waste emissions threshold and reported emissions) may transfer "negative net WEC emissions" to one or more WEC obligated parties with facilities with metric tons of methane emissions that exceed the waste emissions thresholds (*i.e.*, positive net WEC emissions).[24] For the purposes of establishing common ownership or control under CAA section 136(f)(4), the EPA is finalizing a definition of "WEC obligated party" in 40 CFR 99.2. The EPA is finalizing that each WEC applicable facility be associated with a single WEC obligated party (though each WEC obligated party may be associated with multiple WEC applicable facilities), which is reported under the requirements at 40 CFR 99.7.

As discussed in section II.A. of this preamble, the EPA is finalizing the definition of "WEC obligated party" to mean the WEC applicable facility's "owner or operator" as defined in 40 CFR 99.2 for the applicable industry segment as of December 31 of the reporting year or that became an owner or operator of the WEC applicable facility in a transaction occurring subsequent to the end of the reporting year (*i.e.*, between January 1 and December 31 of the year following the reporting year) that resulted in the owner or operator of the facility as of December 31 of the reporting year ceasing to exist. For WEC applicable facilities with more than one owner and/or operator, the WEC obligated party must be selected by binding agreement following the provisions of 40 CFR 99.4. Each WEC applicable facility must have only one WEC obligated party for any given reporting year. WEC obligated parties may only net for the applicable reporting year for which they are reporting. The EPA is finalizing definitions for owner or operator that are applicable to the onshore petroleum and natural gas

production, offshore petroleum and natural gas production, onshore petroleum and natural gas gathering and boosting, onshore natural gas processing, onshore natural gas transmission compression, onshore natural gas transmission, underground natural gas storage, LNG import and export equipment, and LNG storage industry segments at 40 CFR 99.2. These definitions are identical to the corresponding definitions in 40 CFR part 98; that is, the owner or operator (or one of the owners or operators, selected by binding agreement between all existing owners or operators) associated with a subpart W facility as reported under 40 CFR 98.3(c)(14) and included in the relevant COR as directed in 40 CFR 98.4(i)(3) would also be the WEC obligated party for that facility.

In some cases, a WEC applicable facility may have multiple owners and/or operators. In these situations, the EPA is finalizing as proposed a system by which the facility owner or operators must designate one of the owners and/or operators as the WEC obligated party for that facility, as detailed in 40 CFR 99.4. The process for selection of the WEC obligated party at facilities with multiple owners or operators is similar to the approach for selecting a designated representative under 40 CFR part 98. This process requires selection of a single WEC obligated party for the WEC applicable facility by an agreement binding on each of the owners or operators associated with the facility. The final requirements for facilities with multiple owners or operators allocate all facility-level methane emissions below or exceeding the waste emissions thresholds to a single WEC obligated party for each facility.

The EPA proposed that a facility owner or operator would be both the WEC obligated party, and the entity used to define common ownership or control. Comments received by the EPA on the proposed approach focused on the entity used for netting, and did not distinguish between the concepts of the WEC obligated party and the netting entity. Many of these comments focused on the proposed interpretation of common ownership or control rather than the WEC obligated party; though it is likely that commenters assumed that they would be the same entity. In other words, the EPA did not receive comments critical of defining the WEC obligated party as a facility's owner or operator outside the broader discussion of common ownership or control. Instead, commenters supported defining the WEC obligated party as the parent company because they supported the

---

[24] As further explained in section II.C.3., to calculate the amount by which a WEC applicable facility is below or exceeding the waste emissions threshold, the EPA is finalizing as proposed to use equation B–6 of 40 CFR 99.21(a), in which the facility waste emissions threshold, as determined in 40 CFR 99.20, is subtracted from total methane emissions from the WEC applicable facility. This calculation results in a value of metric tons of methane, the total facility applicable emissions, that is positive for facilities exceeding the waste emissions threshold ("positive net emissions") and negative for facilities below the waste emissions threshold ("negative net emissions").

use of netting at the parent company level.

In this final rule, the EPA recognizes that the appropriate corporate level at which netting is allowed need not be the same as the WEC obligated party. The EPA is finalizing the use of facility owner or operator as the WEC obligated party for three reasons. First, the plain text of the statute specifies that an "owner or operator of an applicable facility" is the entity on which a charge is imposed and from which a charge is collected. Second, as noted in the proposed rule, designating the owner or operator as the WEC obligated party aligns with the approach used in subpart W of the Greenhouse Gas Reporting Program, under which the facility owner or operator is responsible for reporting the annual emissions which, pursuant to requirements under CAA section 136(c), will be used to calculate the charge under this program. Third, the agency appreciates that a parent company is often a separate legal entity from a facility's owner or operator, which could be a wholly owned subsidiary or company of which a parent company has partial ownership.[25] Depending on the structure of the corporate family and the applicable corporate laws, the liabilities of an owner or operator may not transfer to the parent corporate company, even if that parent company fully owns the owner or operator. Furthermore, while a parent company may have ownership or control over certain aspects of a subsidiary's operations or corporate decisions, it does not necessarily have control over the subsidiary's assets (such as a facility). In light of Congress's specific reference to the "owner or operator of an applicable facility" as the entity from which the WEC be imposed and collected, and the limitations on the extent to which parent companies can assume liabilities held by their corporate subsidiaries, the EPA does not believe it is consistent with the statute to define the WEC obligated party as a parent company.

Although the statute expressly requires the EPA to treat the owner or operator of an applicable facility as the WEC obligated party, it does not limit netting solely to facilities belonging to the same owner or operator. Further, based upon our consideration of the public comments, the EPA has concluded that netting amongst WEC obligated parties with the same parent company, rather than at the level of an

owner or operator, is best supported by the statutory text. There is no language in CAA section 136(f)(4), or any other part of CAA section 136, that limits the definition of "common ownership or control" for the purposes of netting. The proposed approach of limiting netting solely to facilities belonging to the same owner or operator would have represented a narrower interpretation of "common ownership or control" than the statute requires, and in many instances reduced the number of "common" facilities available for netting relative to a parent company approach. In this case, the complete text 136(f)(4) states that "in calculating the total emissions charge obligation for facilities under common ownership or control, the Administrator shall allow for the netting of emissions by reducing the total obligation to account for facility emissions levels that are below the applicable thresholds within and across all applicable segments identified in subsection (d)." The EPA believes that the best reading of this provision would allow for netting at the parent company level, because the statutory text does not put any limitations on the definition of "common ownership or control." Instead, the full text of the provision suggests that the term "common ownership or control" should be read broadly in this context because 136(f)(4) directs the EPA to allow for netting "with and across all applicable segments . . ." The number of "common" facilities will usually be higher when the parent company approach is used, and lower when the owner or operator approach is used—and owners or operators under common ownership or control of a parent company will tend to have operations across more applicable segments; the owner or operator of a facility is less likely to also own or operate facilities in different industry segments. Congress's reference to netting "within and across" all applicable segments indicates an intent that netting be available across a broader geographic area, which supports the parent company approach.

Therefore, the EPA is finalizing that netting may occur via transfer of negative net WEC emissions from a WEC obligated party to one or more WEC obligated parties with the same parent company that have positive net emissions, since these WEC obligated parties (i.e., owners or operators) are under common ownership or control. The requirements finalized in this rulemaking define the WEC obligated party at the owner or operator level while allowing for netting to occur across owners or operators with a

common parent company. This approach reconciles the statutory language in CAA section 136(c) and 136(f)(4) in a manner that is implementable and provides the EPA with a means to verify netting activities to ensure the integrity of the final WEC rule. The use of parent company for determining "common ownership or control" in this final rule is specific to part 99 and the WEC program and does not affect how "common ownership or control" is defined under other existing EPA or Federal regulations, or in any way limit how "common ownership or control" may be defined in future regulations.

While the EPA is finalizing a regulatory structure that allows for netting to occur across owners or operators with a common parent company, the EPA understands that the control a parent company has over its subsidiaries (i.e., owners or operators) to take action and to participate in netting may vary. Parent/subsidiary relationships are heterogeneous and governed by various corporate law structures and/or other legal constraints that this rulemaking is not intended to impact or alter. Although commenters stated that parent companies have control over subsidiaries and make resource allocations across the subsidiaries, the EPA cannot confirm whether that is true in all cases. This rulemaking allows owners and operators with a common parent company to net emissions, provided such netting is not constrained or prohibited by other rules or laws.

2. Facilities Eligible for the Netting of Emissions

The EPA is finalizing which facilities are eligible to participate in netting, as allowed by CAA section 136(f)(4). We are finalizing netting eligibility criteria based on a facility's total reported subpart W GHG emissions, status in relation to the regulatory compliance exemption, and overall regulated status under the GHGRP. In our final approach to netting, we chose interpretations which are the most consistent with a plain reading of the CAA, were reasonable from a policy perspective, and were the most transparent and straightforward to implement. As described in more detail in the following sections, the final approach establishes that if a facility's emissions are not subject to the WEC, either because the facility is not a WEC applicable facility, or because a WEC applicable facility has zero WEC applicable emissions, as a result of application of one or more eligible exemptions, that facility's emissions

---

[25] The EPA notes that in some cases, the owner or operator of a facility may be a parent company. In these instances, the WEC obligated party would by default be a parent company.

would not factor into the netting of emissions for a WEC obligated party. In other words, only WEC applicable facilities may net, and only WEC applicable emissions may be netted. As explained further in this section of the preamble, we believe this interpretation is consistent with CAA section 136(f)(4), "the Administrator shall allow for the netting of emissions by reducing the total obligation to account for facility emissions levels that are below the applicable thresholds within and across all applicable segments identified in subsection (d)," since the reference to "applicable thresholds" and "applicable segments", which reflect other subsections under CAA section 136, implies that only WEC applicable emissions should be considered in the netting calculation. We note that for applicable facilities eligible for any exemptions, emissions associated with these exemptions are removed from any emissions exceeding the waste emissions threshold prior to netting calculations.

The WEC proposal explained that certain categories of subpart W facilities are not eligible for netting because they are out of the scope of the WEC program. There are two categories of subpart W facilities that report annually under the GHGRP but may have subpart W emissions less than or equal to 25,000 mt $CO_2e$. These include subpart W-only facilities that are on the GHGRP offramp due to an emissions level below 25,000 mt $CO_2e$, and subpart W facilities with total emissions from all GHGRP subparts equal to or exceeding 25,000 mt $CO_2e$ but subpart W emissions less than or equal to 25,000 mt $CO_2e$. The EPA proposed that these facilities would not be subject to the WEC, would not be WEC applicable facilities, and would not be eligible for netting. The EPA received comments supporting an approach that would allow these facilities to net with facilities under common ownership or control whose subpart W emissions are above 25,000 mt $CO_2e$ (*i.e.,* WEC applicable facilities). Commenters also supported allowing facilities not required to report under subpart W to voluntarily report emissions and include those facilities in netting. In all of these suggested approaches, only those emissions below the waste emissions thresholds would be brought into the netting pool; any additional facilities with subpart W emissions equal to or less than 25,000 mt $CO_2e$ would not increase potential exposure to charge because charges for such facilities are specifically prohibited by the statute. A facility with subpart W emissions equal to or less than 25,000 mt $CO_2e$ would, by statute, not be subject to charge. Other commenters were supportive of the proposed approach to only allow facilities with subpart W emissions greater than 25,000 mt $CO_2e$ to participate in netting. After consideration of comments received, the EPA is finalizing the proposed requirements delineating the types of facilities that are eligible for netting. Sections II.B.2.a–d of this preamble provide detailed information on the final requirements for netting eligibility and the EPA's justification for not expanding netting eligibility.

a. Facilities Required To Report to GHGRP and That Have Subpart W Emissions Greater Than 25,000 Metric Tons of $CO_2e$

In accordance with CAA section 136(c) and the definition of "WEC applicable facility" in 40 CFR 99.2, we are finalizing as proposed that subpart W facilities that have subpart W emissions greater than 25,000 mt $CO_2e$ are eligible for netting, with the exception of those that are receiving the regulatory compliance exemption for the entire year (as discussed in section II.D.2. of this preamble). Facilities that report 25,000 mt $CO_2e$ or less under subpart W are not subject to the WEC, and the EPA is finalizing as proposed that such facilities are not eligible for netting. These types of facilities are discussed in greater detail in section II.B.2.c. of this preamble. The final approach follows what the Agency considers to be the best reading of the plain text of, and the relationship between, CAA sections 136(d), 136(c), and 136(f) (which includes subsections 136(f)(4) and 136(f)(1)–(3)). The final approach also represents a reasonable policy choice in line with the EPA's understanding of Congress's intent that the WEC program constitute a meaningful incentive to reduce methane emissions. Accordingly, the following sections provides an overview of the relevant statutory text, and the corresponding legal basis for the final approach under which only WEC applicable facilities may net, and only WEC applicable emissions may be netted, under CAA section 136(f)(4). This section also explains the policy rationale behind the EPA's final approach.

CAA section 136(d) introduces the nine industry segments within which all subpart W facilities must fall in order to be evaluated for WEC applicability. Importantly, facilities within these segments are "applicable facilities", per CAA section 136(d), but they are not necessarily "WEC applicable facilities", subject to possible WEC obligation, unless they report over 25,000 mt $CO_2e$ per year under subpart W. CAA section 136(c) clarifies this point. Specifically, CAA section 136(c) requires the Administrator to impose and collect a charge on the owner or operator "of an applicable facility that reports more than 25,000 metric tons of carbon dioxide equivalent of greenhouse gases emitted per year pursuant to subpart W". Thus, building upon the CAA section 136(d) definition, CAA section 136(c) establishes that only facilities which both fall within one or more of the nine CAA section 136(d) industry segments *and* report more than 25,000 mt $CO_2e$ under subpart W are subject to the WEC program. For clarity, in this rulemaking the EPA refers to these facilities as "WEC applicable facilities".

CAA section 136(f), which is entitled "Waste Emissions Threshold", includes a series of subsections under this heading. Subsections 136(f)(1)–(3) illustrate the meaning of "waste emissions threshold" in this context and explain that these are actually a series of thresholds which determine when and how to impose a charge on methane emissions from WEC applicable facilities, depending on which industry segment or segments they fall under. Specifically, the nine CAA section 136(d) industry segments are categorized into four groups, and a waste emissions threshold is applied to each of the four. CAA section 136(f)(1) covers offshore and onshore petroleum and natural gas production (industry segments (1) and (2) under CAA section 136(d)), and further divides this category depending on whether or not natural gas is sent to sale: "With respect to imposing and collecting the charge under subsection (c) for an applicable facility in an industry segment listed in paragraph (1) or (2) of subsection (d), the Administrator shall impose and collect the charge on the reported metric tons of methane emissions from such facility that exceed (A) 0.20 percent of the natural gas sent to sale from such facility; or (B) 10 metric tons of methane per million barrels of oil sent to sale from such facility, if such facility sent no natural gas to sale."[26]

CAA sections 136(f)(2) and (3) follow the same model: section 136(f)(2) establishes thresholds for nonproduction petroleum and natural gas systems (industry segments (3), (6), (7), and (8) under section 136(d),[27]) and

---

[26] 42 U.S.C. at 7436(f)(1).

[27] Specifically: (3) onshore natural gas processing; (6) liquefied natural gas storage; (7) liquefied natural gas import and export equipment; and (8) onshore petroleum and natural gas gathering and boosting.

imposes a charge on "the reported metric tons of methane emissions that exceed 0.05 percent of the natural gas sent to sale from or through such facility"; [28] and section 136(f)(3) establishes thresholds for natural gas transmission (industry segments (4), (5), and (9)) [29] and imposes a charge on "the reported metric tons of methane emissions that exceed 0.11 percent of the natural gas sent to sale from or through such facility." [30] But each industry-specific threshold is introduced in the same way: "With respect to *imposing and collecting the charge under subsection (c) for an applicable facility in an industry segment listed* in paragraph (x) of subsection (d), [charges shall be imposed as follows]." Following this plain text, it is clear that the CAA section 136(f) waste emissions thresholds apply *only to WEC applicable facilities*—that is, facilities within one or more of the nine WEC industry segments listed in section 136(d) which emit more than 25,000 mt per year $CO_2e$ under subpart W, and thus may be subject to charge under CAA section 136(c).

Finally, the netting provision itself, CAA section 136(f)(4), states that "in calculating the total emissions charge obligation for facilities under common ownership or control, the Administrator shall allow for the netting of emissions by reducing the total obligation to account for facility emissions levels that are below the applicable thresholds within and across all applicable segments identified in subsection (d)." The EPA is finalizing as proposed that this netting provision applies to WEC applicable facilities and WEC applicable emissions only, for three reasons.

First, the EPA believes that under the best reading of the statute, the term "applicable thresholds" refers to the waste emission thresholds outlined in CAA section 136(f)(1)–(3). This is important because, the waste emissions thresholds apply *only* to WEC applicable facilities—they determine whether, and how, a charge shall be imposed on methane emissions from a facility which has already been triggered into the WEC program by virtue of its emissions being greater than 25,000 mt per year $CO_2e$ in subpart W. The thresholds do not apply to facilities which emit 25,000 or fewer metric tons per year of $CO_2e$ under subpart W, because under CAA section 136(c), no

charge may be imposed or collected on such facilities. Because methane emissions from facilities that emit 25,000 or less metric tons per year of $CO_2e$ under subpart W are not WEC applicable emissions, they cannot be compared to the waste emissions thresholds, and they cannot be considered to fall either above or below these thresholds.

As previously stated, the EPA's conclusion that the term "applicable thresholds" in CAA section 136(f)(4) refers to the waste emissions thresholds outlined in CAA section 136(f)(1)–(3) is supported by both the text and structure of the statute. The structure of the statute strongly supports the presumption that CAA section 136(f)(4) refers to netting based on a facility's relationship to the waste emissions thresholds because CAA section 136(f)(4) appears as part of CAA section 136(f), under the "waste emissions threshold" heading, and immediately following CAA section 136(f)(1)–(3)'s establishment of the specific waste emissions thresholds for each industry segment. It follows that CAA section 136(f)(4)'s reference to "applicable thresholds" refers to these industry segment-specific requirements, and accordingly "applicable segments" refers to the industry segments identified in CAA section 136(f)(1)–(3).

The text also strongly supports this interpretation because CAA section 136(f)(4) refers to facility emissions levels that are "below the *applicable thresholds,*" plural. The use of the plural, and the use of the term "applicable," both indicate that Congress was referring here to the multiple waste emissions thresholds introduced in CAA sections 136(f)(1) through (3), which specifically and separately apply to WEC applicable facilities within various subsets of industry segments, defined in CAA section 136(d). Again, these separate thresholds *only* apply to WEC applicable facilities, which emit over 25,000 metric tons per year of $CO_2e$.

In addition to the "applicable thresholds" question, the EPA believes that Congress's use of the term "applicable segments" in stating that the EPA may "redu[ce] the total obligation to account for facility emissions levels that are below the applicable thresholds *within and across all applicable segments identified in subsection (d),*" is significant here. While CAA section 136(d) introduces the nine relevant "industry segments" within which all WEC applicable facilities must fall, CAA section 136(f)(4) classifies these segments into four groups, and is the only provision to

use the term "applicable segments." CAA section 136(f) establishes a set of requirements determining when and how to impose a charge on those facilities triggered into the program, depending on their industry segment and the amount of methane they emit. It follows that CAA section 136(f)(4)'s reference to "applicable thresholds" refers to these four group-specific thresholds, and "applicable segments" refers to the nine segments within the four segment groups. In other words, each group of segments constitutes the "applicable" segments to their corresponding applicable threshold. This is important, again because the four groups laid out under CAA section 136(f) include only WEC applicable facilities.

Finally, Congress's statement that netting shall be employed "in calculating the total emissions charge obligation for facilities under common ownership or control", further indicates that only WEC applicable facilities may be netted. Logic indicates that only WEC applicable facilities, with WEC applicable emissions, would be relevant to a determination of total emissions charge obligation. As regards the WEC program, WEC obligated parties are concerned with methane emissions from the WEC applicable facilities for which they are responsible—not various other subpart W facilities for which a WEC charge can never be imposed.

In addition to this stated legal rationale, the final approach also represents a reasonable policy choice in line with the EPA's understanding of Congress's intent that the WEC program constitute a meaningful incentive to reduce methane emissions. Specifically, should the WEC program allow netting from subpart W facilities emitting 25,000 mt $CO_2e$ per year or less under subpart W, WEC obligated parties would lose an incentive to reduce emissions at WEC applicable facilities that exceed their waste emissions thresholds. Negative emissions from facilities with subpart W emissions of 25,000 mt $CO_2e$ or less could be used to net out positive emissions from WEC applicable facilities, allowing WEC obligated parties to zero out WEC obligations without actually reducing emissions overall. Given that many subpart W facilities that report 25,000 mt $CO_2e$ or less under subpart W would also be well below their waste emissions threshold, allowing these facilities to net could add significant negative tons to the WEC program such that actual methane emissions from WEC applicable facilities could increase without increasing WEC obligations.

---

[28] *Id.* at section 7436(f)(2).

[29] Specifically, (4) onshore natural gas transmission compression; (5) underground natural gas storage; and (9) onshore natural gas transmission.

[30] *Id.* at section 7436(f)(3).

b. Facilities With Subpart W Emissions Greater Than 25,000 Metric Tons of $CO_2e$ That Are Receiving the Regulatory Compliance Exemption

The EPA is finalizing as proposed that during such time that a facility receives the regulatory compliance exemption, that facility would have zero WEC applicable emissions and thus would not be able to participate in the netting of methane emissions across facilities under common ownership or control of a WEC obligated party. The final approach is based on a plain reading of the statutory text, and follows the same reasoning outlined in section II.B.2.a. of this preamble, which explains that under the best reading of the text, only WEC applicable facilities may net. This section will further expand upon the EPA reasoning that only WEC applicable emissions may be netted, and clarify this point for purposes of the regulatory compliance exemption.

CAA section 136(f)(6)(A) states that "[c]harges shall not be imposed pursuant to subsection (c) on an applicable facility that is subject to and in compliance with methane emissions requirements pursuant to subsections (b) and (d) of section 111" if specific criteria are met (these criteria are discussed in section II.D.2. of this preamble). The EPA's interpretation of the regulatory compliance exemption is that, for a WEC applicable facility meeting the exemption criteria, the entire facility is exempted, and therefore the facility does not generate WEC-applicable emissions. In order to net, facilities must be WEC applicable facilities (they must emit over 25,000 mt $CO_2e$ per year under subpart W) and they must also generate WEC applicable emissions (methane emissions, as reported under subpart W, below or above the WEC emissions thresholds *that are subject to charge*.) Again, this follows from the text. Section 136(f)(4) applies "in calculating the total emissions charge obligation" only. Emissions which are subject to an exemption are by definition not subject to charge. WEC applicable emissions are only those subpart W methane emissions subject to charge under section 136(c). Because WEC applicable facilities that receive the regulatory compliance exemption for the entire year would have zero WEC applicable emissions, these facilities would by default not be able to participate in netting (*i.e.,* they would have no emissions to net). The approach of facilities with the regulatory compliance exemption for the entire year having zero WEC applicable emissions allows for the practical implementation of the exemption within the broader framework of the WEC calculations. Clarifying that, pursuant to the statutory directive, exempted facilities generate zero WEC applicable emissions ensures that charges shall not be imposed on these facilities without interfering with netting calculations or removing facility-specific reporting elements necessary for WEC implementation. Such facilities continue to be included in WEC filings reported under part 99 as long as they remain WEC applicable facilities. Further, if such facilities fall out of compliance such that the regulatory compliance exemption no longer applies and they again generate WEC applicable emissions, such facilities can again be included in netting. Similarly, for WEC applicable facilities that have partial eligibility for the regulatory compliance exemption, as described in section II.D.2.f. of this preamble, such that they have positive WEC applicable emissions, those facilities would also be included in netting.

The EPA notes that facilities with emissions below the waste emissions threshold would not have positive WEC applicable emissions and therefore would not benefit from the exemption. In this final rule, facilities with emissions below the waste emissions threshold would not receive the regulatory compliance exemption, and thus these facilities would always have WEC applicable emissions and be able to participate in netting across facilities under common ownership or control. Section II.D.2.f. of this preamble discusses the regulatory compliance exemption in relation to facilities that are below the waste emissions threshold.

c. Exclusion of Facilities Reporting 25,000 or Fewer Metric Tons of $CO_2e$ to Subpart W of Part 98

Per CAA section 136(c), the WEC shall only be imposed on owners or operators of applicable facilities that report more than 25,000 mt $CO_2e$ under subpart W. A large number of facilities that report under the GHGRP have subpart W emissions below 25,000 mt $CO_2e$ because they report emissions under multiple subparts (*e.g.,* subpart W and subpart C) and have total emissions greater than 25,000 mt $CO_2e$ across multiple subparts. In addition, some part 98 subpart W facilities have reduced their emissions over time and are allowed to cease reporting or "offramp" due to meeting either the 15,000 mt $CO_2e$ level or the 25,000 mt $CO_2e$ level for the number of years specified in 40 CFR 98.2(i) based on the $CO_2e$ reported, as calculated in accordance with 40 CFR 98.3(c)(4)(i) (*i.e.,* the annual emissions report value as specified in that provision).

We are finalizing as proposed that subpart W facilities with subpart W emissions equal to or below 25,000 mt $CO_2e$ are not WEC applicable facilities and are therefore excluded from netting. This approach aligns with a plain reading of the requirement in CAA section 136(c) that only applicable facilities with subpart W emissions exceeding 25,000 mt $CO_2e$ are subject to the WEC—facilities below this threshold are not subject to the WEC and therefore do not generate WEC applicable emissions and are not eligible to net emissions.

d. Exclusion of Facilities Not Required To Report to the GHGRP

Per CAA section 136(c) and (d), CAA section 136(f)(4), and the definition of "WEC Applicable Facility" in 40 CFR 99.2, which reflects the statutory text at CAA section 136(d), we are finalizing as proposed that facilities that are not required to report to the GHGRP, and thus are not WEC applicable facilities, are not eligible for netting. Again following the reasoning outlined in section II.B.2.a. of this preamble, this approach is based on a plain reading of CAA section 136(f)(4), which states that netting is allowed within and across the nine subpart W industry segments identified in CAA section 136(d); section 136(d), which states that "applicable facility(ies)" are facilities within industry segments "as defined in subpart W"; and section 136(c), which states that the WEC is only applicable to subpart W facilities that report more than 25,000 mt $CO_2e$ per year under subpart W. Following the plain text, only facilities subject to subpart W may be evaluated as possible WEC applicable facilities, and only WEC applicable facilities (subpart W facilities emitting over 25,000 mt $CO_2e$ under subpart W) can have WEC applicable emissions that may be subject to charge. As explained in section II.B.2.a. of this preamble, only WEC applicable facilities are eligible to net, and only WEC applicable emissions may be netted. Further, CAA section 136(c) states that the WEC is only applicable to certain facilities that report under subpart W of the GHGRP.

*C. Waste Emissions Thresholds*

Congress established waste emissions thresholds for certain oil and gas operations to incentivize emissions reductions and efficient production, processing, and transport of hydrocarbons. These waste emissions thresholds are applied to individual oil and gas facilities; facilities that exceed

the thresholds may be subject to charge, while facilities that are below the threshold are not subject to charge. Building upon the definitions described in section II.A. of this preamble, this section explains the mechanics of the WEC calculations.

The waste emissions thresholds are defined in terms of industry segment-specific methane intensity thresholds applicable to certain facilities that report GHG emissions under subpart W of the GHGRP. The industry segment-specific methane intensity thresholds specified in CAA 136(f) and listed in Table 2 of this preamble are based on a rate of methane emissions per amount of natural gas or oil sent to sale from or through a facility. The industry segment-specific methane intensity thresholds are generally defined in terms of a percentage of throughput (*e.g.,* 0.002 percent of natural gas sent to sale). However, since the WEC is based on metric tons of methane (*e.g.,* $900/metric ton) that exceed the threshold, for the purposes of calculating the number of metric tons that are subject to charge, we are finalizing as proposed an approach that calculates the facility waste emissions thresholds in metric tons of methane.

The EPA proposed specific calculation methodologies and data input elements for the WEC calculations. The EPA received comments supportive of the proposed approaches for the WEC calculations. We also received comments suggesting revisions to the proposed approaches for the waste emissions threshold calculation, the methane emissions metric used to determine facility tons above or below the waste emissions threshold, and the treatment of facilities with zero throughput. However, the proposed changes suggested by commenters would not be consistent with the plain reading of the CAA and would make the calculations much more complicated to implement without necessarily improving accuracy. Therefore, the EPA is finalizing the approaches discussed in this section of the preamble as proposed, with the exception of the treatment of certain facilities with zero throughput.

For the onshore and offshore petroleum and natural gas production industry segments, CAA section 136(f) differentiates based on whether the facility is sending natural gas to sale or only sending oil to sale, and if the facility does not send natural gas to sale, the threshold is based on methane emissions per amount of oil sent to sale. For facilities that are not in the onshore or offshore production industry segments, the industry segment-specific methane intensity thresholds are based on the amount of natural gas sent to sale from or through the facility. The industry segment-specific methane intensity thresholds are applied to the natural gas or petroleum throughput attributable to that industry segment to calculate facility-specific waste emissions thresholds. See Table 2 for an overview of how the waste emissions thresholds are calculated. When determining whether a facility has WEC applicable emissions, the owner or operator of an applicable facility must compare the facility's reported methane emissions, as reported under subpart W, to the facility's waste emissions threshold. Facilities with methane emissions that exceed the waste emissions threshold may be subject to charge. For WEC applicable facilities with the same WEC obligated party, the WEC applicable emissions for each facility are summed to calculate the net WEC emissions for that WEC obligated party. For WEC obligated parties with the same parent company, WEC obligated parties with negative net emissions may transfer those negative emissions to WEC obligated parties with positive net emissions. A WEC obligated party's total WEC obligation is based on its total emissions at the end of this transfer of any negative emissions.

Subpart W requires reporting of natural gas throughput by thousand standard cubic feet, oil by barrels, and methane by metric ton. As a practical matter, since the WEC is based on a dollar per metric ton of methane, the waste emissions thresholds must generally be converted into metric tons of methane for comparison against reported methane, generally by multiplying the thresholds by the density of methane.

TABLE 2—INDUSTRY SEGMENT THROUGHPUT METRICS AND METHANE INTENSITIES

| Industry segment | Throughput metric[a] | Industry segment-specific methane intensity |
|---|---|---|
| Onshore petroleum and natural gas production. | The quantity of natural gas produced from producing wells that is sent to sale in the calendar year, in thousand standard cubic feet 40 CFR 98.236(aa)(1)(i)(B); or the quantity of crude oil produced from producing wells that is sent to sale in the calendar year, in barrels, if facility sends no natural gas to sale under 40 CFR 98.236(aa)(1)(i)(C)[b]. | 0.20 percent of natural gas sent to sale from facility; or 10 metric tons of methane per million barrels of oil sent to sale from facility, if facility sends no natural gas to sale. |
| Offshore petroleum and natural gas production. | The quantity of natural gas produced from producing wells that is sent to sale in the calendar year, in thousand standard cubic feet 40 CFR 98.236(aa)(2)(i); or the quantity of crude oil produced from producing wells that is sent to sale in the calendar year, in barrels, if facility sends no natural gas to sale under 40 CFR 98.236(aa)(2)(ii). | |
| Onshore petroleum and natural gas gathering and boosting. | The quantity of natural gas transported through the facility to a downstream endpoint such as a natural gas processing facility, a natural gas transmission pipeline, a natural gas distribution pipeline, a storage facility, or another gathering and boosting facility in the calendar year, in thousand standard cubic feet under 40 CFR 98.236(aa)(10)(ii). | 0.05 percent of natural gas sent to sale from or through facility. |
| Onshore natural gas processing ..... | The quantity of residue gas leaving that has been processed by the facility and any gas that passes through the facility to sale without being processed by the facility in the calendar year, in thousand standard cubic feet under 40 CFR 98.236(aa)(3)(ix)[b]. | |
| Onshore natural gas transmission compression. | The quantity of natural gas transported through the compressor station in the calendar year, in thousand standard cubic feet under 40 CFR 98.236(aa)(4)(i). | 0.11 percent of natural gas sent to sale from or through facility. |
| Onshore natural gas transmission pipeline. | The quantity of natural gas transported through the facility and transferred to third parties such as LDCs or other transmission pipelines in the calendar year, in thousand standard cubic feet under 40 CFR 98.236(aa)(11)(iv). | |
| Underground natural gas storage .... | The quantity of natural gas withdrawn from storage and sent to sale in the calendar year, in thousand standard cubic feet under 40 CFR 98.236(aa)(5)(ii). | |

TABLE 2—INDUSTRY SEGMENT THROUGHPUT METRICS AND METHANE INTENSITIES—Continued

| Industry segment | Throughput metric [a] | Industry segment-specific methane intensity |
|---|---|---|
| LNG import and export equipment .. | For LNG import equipment, the quantity of LNG imported that is sent to sale in the calendar year, in thousand standard cubic feet; for LNG export equipment, the quantity of LNG exported that is sent to sale in the calendar year, in thousand standard cubic feet under 40 CFR 98.236(aa)(6) and (7). | 0.05 percent of natural gas sent to sale from or through facility. |
| LNG storage ................................... | The quantity of LNG withdrawn from storage and sent to sale in the calendar year, in thousand standard cubic feet under 40 CFR 98.236(aa)(8)(ii). | |

ᵃ Throughput metrics in this table are based on the subpart W reporting elements as effective January 1, 2025, and would apply for assessment of WEC beginning with reporting year 2025. Instances where the citation for the throughput metric for reporting year 2024 differs are noted in additional footnote. Note that in instances where there is no change to the citation for the segment-specific throughput metric, the EPA has amended the verbiage of subpart W, effective January 1, 2025, for consistency with CAA section 136. Refer to section III.U. of the preamble to the 2024 Subpart W Final Rule for full discussion of these amendments.

ᵇ For reporting year 2024, the applicable subpart W throughput reporting element for the onshore natural gas processing industry segment is 40 CFR 98.236(aa)(3)(ii).

1. Facility Waste Emissions Thresholds

CAA section 136(f)(1) through (3) establishes facility-specific waste emissions thresholds above which the EPA must impose and collect the WEC. The CAA defines waste emissions threshold requirements, and establishes the method for calculation of the charge, for nine segments of the oil and gas industry.

CAA section 136(f)(1) requires the EPA to impose and collect the WEC on facilities in the onshore petroleum and natural gas production and offshore petroleum and natural gas production industry segments with methane emissions, in metric tons, that exceed either 0.20 percent of the natural gas sent to sale from the facility or, if no natural gas is sent to sale, 10 metric tons of methane per million barrels of oil sent to sale from the facility. To determine the waste emissions threshold from a WEC applicable facility in the onshore petroleum and natural gas production and the offshore petroleum and natural gas production industry segments, the EPA is finalizing as proposed two equations based on whether the facility sends natural gas to sale, which reflect the statutory text at 136(f)(1)(A) and (B). For onshore and offshore petroleum and natural gas production WEC applicable facilities that send natural gas to sale, we are finalizing as proposed equation B–1 of 40 CFR 99.20(a). This equation multiplies the annual quantity of natural gas sent to sale from a WEC applicable facility by 0.002 (i.e., 0.20 percent) and the density of methane (0.0192 metric tons per thousand standard cubic feet).[31] For onshore and

offshore petroleum and natural gas production facilities that have no natural gas sent to sale, we are finalizing as proposed equation B–2 of 40 CFR 99.20(b). In equation B–2, the annual quantity of oil sent to sale from a WEC applicable facility is multiplied by 10 metric tons of methane per million barrels of oil.[32]

For WEC applicable facilities in the onshore petroleum and natural gas gathering and boosting, onshore natural gas processing, LNG import and export equipment, and LNG storage industry segments, CAA section 136(f)(2) requires the EPA to impose and collect a WEC on facilities with reported methane emissions, in metric tons, that exceed 0.05 percent of the natural gas sent to sale from or through such facility. To determine the waste emissions threshold from a WEC applicable facility in these industry segments, we are finalizing as proposed equation B–3 under 40 CFR 99.20(c). This equation multiplies the annual quantity of natural gas sent to sale from or through a WEC applicable facility by 0.0005 (i.e., 0.05 percent) and the density of methane (0.0192 metric tons per thousand standard cubic feet) to determine the facility-level waste emissions threshold.[33] The EPA notes

that certain facilities in the gathering and boosting and natural gas processing industry segments may have zero throughput values using this approach, because these facilities either receive no natural gas, or process or dispose of natural gas received in a manner that results in sending zero quantities of natural gas to sale. Treatment of these facilities is discussed in section II.C.6. of this preamble.

CAA section 136(f)(3) requires the EPA to impose and collect a waste emissions charge on WEC applicable facilities in the onshore natural gas transmission compression, onshore natural gas transmission pipeline, and underground natural gas storage industry segments with methane emissions, in metric tons, that exceed 0.11 percent of the natural gas sent to sale from or through such facility. We are finalizing as proposed equation B–4 under 40 CFR 99.20(d) to calculate the waste emissions charge from a WEC applicable facility in these industry segments. Equation B–4 multiplies the annual quantity of natural gas sent to sale from or through a WEC applicable facility by 0.0011 (i.e., 0.11 percent) and the density of methane (0.0192 metric tons per thousand standard cubic feet) to determine the facility-level waste emissions threshold.[34]

The annual quantity of natural gas sent to sale from or through a facility reported under subpart W is reported in units of thousand standard cubic feet of

---

[31] Equation B–1 reflects the statutory text at 136(f)(1)(A), which states: "With respect to imposing and collecting the charge under subsection (c) for an applicable facility [in the onshore petroleum and natural gas production and offshore petroleum and natural gas production industry segments], the Administrator shall impose and collect the charge on the reported metric tons of methane emissions from such facility that exceed

(A) 0.20 percent of the natural gas sent to sale from such facility. . . ." 42 U.S.C. 7436(f)(1)(A).

[32] Equation B–2 reflects the statutory text at 136(f)(1)(B), which states: "With respect to imposing and collecting the charge under subsection (c) for an applicable facility [in the onshore petroleum and natural gas production and offshore petroleum and natural gas production industry segments], the Administrator shall impose and collect the charge on the reported metric tons of methane emissions from such facility that exceed. . . (B) 10 metric tons of methane per million barrels of oil sent to sale from such facility, if such facility sent no natural gas to sale." 42 U.S.C. 7436(f)(1)(B).

[33] Equation B–3 reflects the statutory text at 136(f)(2), which states: "With respect to imposing and collecting the charge under subsection (c) for an applicable facility in [the onshore petroleum and natural gas gathering and boosting, onshore natural gas processing, LNG import and export equipment, and LNG storage industry segments], the

Administrator shall impose and collect the charge on the reported metric tons of methane emissions that exceed 0.05 percent of the natural gas sent to sale or through such facility." 42 U.S.C. 7436(f)(2).

[34] Equation B–4 reflects the statutory text at 136(f)(3), which states: "With respect to imposing and collecting the charge under subsection (c) for an applicable facility in [the onshore natural gas transmission compression, onshore natural gas transmission pipeline, and underground natural gas storage industry segments], the Administrator shall impose and collect the charge on the reported metric tons of methane emissions that exceed 0.11 percent of the natural gas sent to sale from or through such facility." 42 U.S.C. 7436(f)(3).

natural gas per year, while facility methane emissions are reported in metric tons. The EPA interprets the industry segment-specific methane intensity thresholds (*i.e.,* 0.20 percent, 0.05 percent, and 0.11 percent) indicated in CAA section 136(f)(1) through (3) to be in units of thousand standard cubic feet of methane emissions per thousand standard cubic feet of natural gas. This requires reconciliation of methane emissions reported on mass basis and throughput reported on a volumetric basis. Because the waste emission charge is assessed using dollars per metric ton, the amount by which a facility is below or exceeding the waste emissions threshold must ultimately be converted to metric tons. The approach in equations B–1, B–3, and B–4 calculates facility waste emissions thresholds in metric tons by calculating the volume of gas at the given industry segment-specific methane intensity and then calculating what the mass of that volume would be if it were methane by multiplying by the density of methane (0.0192 metric tons per thousand standard cubic feet at standard temperature and pressure of 60 °F and 14.7 psia). This allows the waste emissions threshold to be directly compared to reported metric tons of methane. This approach is mathematically equivalent to, but simpler than, an approach that would convert reported methane emissions to volume, subtract a volumetric waste emissions threshold from that reported volume, and then convert the resulting value back to metric tons methane. The EPA notes that the approach used in this final rule does not require information on the constituents or density of natural gas throughput.

As described in this section of the preamble, the waste emissions thresholds are calculated at the facility level, using the industry segment-specific methane intensity threshold given in CAA sections 136(f)(1) through (3), and specific industry segment throughput metrics reported under part 98, subpart W. The vast majority of facilities report as a single subpart W facility to a single subpart W industry segment. However, as discussed in section II.A. of this preamble, there are a small number of reporters that report as a single subpart W facility to multiple subpart W industry segments. Specifically, for facilities that report to multiple industry segments under a single subpart W facility, we are finalizing in 40 CFR 99.20(e) that the facility-level waste emissions threshold is determined as the sum of the waste

emissions thresholds for each industry segment within which the facility operates.

The EPA is finalizing as proposed its interpretation of "natural gas sent to sale" to mean the amount of natural gas sent to sale from a facility in the onshore or offshore petroleum and natural gas industry segments, as reported under subpart W. The EPA is finalizing as proposed its interpretation of "natural gas sent to sale from or through" to mean the natural gas throughput volume for a facility not in the onshore or offshore petroleum and natural gas industry segments that aligns with the movement of gas through a facility (*e.g.,* gas transported rather than gas received), as reported under subpart W. For facilities in the onshore and offshore petroleum and natural gas production industry segments that do not send natural gas to sale, the EPA is finalizing as proposed its interpretation of "barrels of oil sent to sale" to mean the quantity of crude oil sent to sale, as reported under subpart W.

The EPA is aware of and received comment on other approaches for calculating "methane intensity" currently in use. These include methodologies that allocate total methane emissions between the petroleum and natural gas value chains and/or use methane rather than natural gas as the throughput value. CAA section 136(f)(1) through (3) refers to reported facility emissions and does not discuss allocation of emissions between petroleum and natural gas. In the case of the methane charge program established in CAA section 136, the statutory text is clear that facilities that produce only oil are to calculate the waste emissions threshold based on only on the quantity of oil sent to sale. The statutory text is clear that in all other cases, the quantity of natural gas sent to sale is the appropriate throughput value.[35] Further, the final approach can be implemented with data currently reported under subpart W, while alternative methane intensity methodologies would require reporting of additional data and increase the burden on the oil and gas industry. For example, an approach that calculates intensity as methane emissions divided by the methane in natural gas throughput would require facilities to collect and report additional information of the methane content of natural gas. Again, this approach would not be aligned with the statute, which defines the intensity as methane emissions as a percentage of natural gas,

not methane emissions as a percentage of methane. An approach that calculates methane intensity as the mass of methane emissions divided by the mass of natural gas would also not align with a plain reading of the statutory text or standard conventions. The natural gas sent to sale from or through a facility is reported under subpart W in thousand standard cubic feet, a volumetric unit of measure. Congress was aware of this metric when it established the waste emissions thresholds. Further, all percentage-based methane intensity metrics that the EPA is aware of are volume-based rather than mass-based, and while natural gas throughput is commonly reported both in terms of volume and energy content, it is not common practice to report throughput in terms of mass. Such an approach would also require facilities to collect and report detailed information on all of the constituents of natural gas throughput. Finally, an approach that allocates methane emissions between the petroleum and natural gas value chains based on energy content would not be aligned with the statute, which does not make any mention of allocating total facility methane emissions to the petroleum and natural gas value chains and assessing the WEC using a subset of total facility emissions. This approach would also require facilities to collect and report detailed data on the constituents and energy content of all hydrocarbon throughput. The EPA therefore believes that the approaches finalized in this rulemaking not only follow a plain reading of CAA section 136(f) but are also the best and most reasonable approaches.

2. Facility Methane Emissions

To determine the total methane emissions from a WEC applicable facility, the EPA is finalizing as proposed to use facility-level methane data as reported under subpart W. Facility methane emissions must be calculated using methods or data required by subpart W and by this final rule for the emissions year covered by the annual WEC filing. For example, for the first year of the WEC (2024 emissions), WEC calculations are based on the subpart W requirements effective for the 2024 reporting year, and emissions year 2025 emissions and beyond are based on subpart W requirements effective in reporting year 2025 or any future revisions. The final approaches for calculating waste emissions thresholds and facility methane emissions align with the text of CAA section 136(f). CAA section 136(f)(1) through (3) states that the WEC is to be calculated based "on the

[35] See 42 U.S.C. 7436(f)(1)–(3).

reported metric tons of methane emissions from such facility that exceed" specified percentages of the "natural gas sent to sale from such facility" or "natural gas sent to sale from or through such facility" (or for onshore and offshore petroleum facilities that do not send gas to sale, "ten metric tons of methane per million barrels of oil sent to sale from such facility"). The EPA is finalizing its interpretation of "reported metric tons of methane emissions" to mean all reported methane emissions from a facility, as reported under subpart W, except in cases when emissions for stationary combustion emissions reported under 40 CFR 98.236(z) double-count emissions reported for an other large release event under 40 CFR 98.236(y), in which case the "reported metric tons of methane emissions" are adjusted according to the provisions finalized at 40 CFR 99.7(b)(2)(ix). This value, only adjusted to prevent double-counting as specified, is an input to equation B–6 of 40 CFR 99.21.

We are finalizing these provisions to adjust the subpart W methane emissions to prevent double-counting in the unlikely event that a stationary combustion source emits at the level requiring reporting as an other large release event in the subpart W report for a WEC applicable facility. In general, we did not expect that any stationary combustion source would have emissions above the threshold required to be reported under the provisions at 40 CFR 98.236(y) for other large release events. To qualify for reporting as an other large release event, the stationary combustion source must have methane emissions of 100 kg/hr or greater. We note that this emission rate would be evaluated on a per individual stationary combustion source basis unless they have a single root cause and we do not believe any single stationary combustion source would emit methane at this level unless it was significantly malfunctioning. Therefore, we expect that stationary combustion sources would be reported under the provisions of other large release events only under rare circumstances. For sources other than stationary combustion sources that have calculation methods in subpart W, the 100 kg/hr threshold is evaluated incremental to the emissions estimated using the methods in subpart W and subpart W contains provisions in 40 CFR 98.233(y)(1)(ii) to prevent double-counting of emissions reported under other large release events and these other subpart W calculation methods. However, stationary combustion emissions are subject to direct

assessment of the 100 kg/hr threshold as specified in 40 CFR 98.233(y)(1)(i) with no provisions to revise emissions calculated under 98.233(z) for the period of time the stationary source was malfunctioning and emitting methane at rates exceeding 100 kg/hr. Therefore, it is possible, however unlikely, that there may be some double-counting of emissions being reported under 40 CFR 98.236(y) and (z) and we are finalizing part 99 provisions to ensure that the total methane emissions (and the total $CO_2e$ emissions) for the facility are corrected for part 99 purposes to prevent this potential for double-counting of emissions under the WEC program. In the exceedingly unlikely event that the total $CO_2e$ for a facility drops below the 25,000 mt $CO_2e$ WEC reporting threshold as a result of this adjustment for double-counting of emissions, we are finalizing 40 CFR 99.7(b)(2)(ix) related to the reporting requirements and assessment of WEC for such facilities. In this circumstance, the total facility applicable emissions and WEC applicable emissions for the facility would be defined as zero, and the facility would not be subject to reporting requirements beyond those necessary to link the facility to subpart W reporting and substantiate the existence of double-counting of emissions due to the reporting of stationary combustion source emissions as an other large release event.

### 3. Facility WEC Calculation

To calculate the amount by which a WEC applicable facility is below or exceeding the waste emissions threshold, the EPA is finalizing as proposed to use equation B–6 of 40 CFR 99.21(a), in which the facility waste emissions threshold, as determined in 40 CFR 99.20, is subtracted from facility total methane emissions. This calculation results in a value of metric tons of methane, the total facility applicable emissions, that is negative for facilities below the waste emissions threshold and positive for facilities exceeding the waste emissions threshold. The remainder of 40 CFR 99.21 describes how to determine the WEC applicable emissions below or exceeding the waste emissions threshold considering any exemptions that may apply for WEC applicable facilities with total facility applicable emissions greater than 0 mt $CH_4$ (see section II.D. of this preamble for more information on the exemptions). As discussed in section II.D.2. of this preamble, the EPA is finalizing as proposed that WEC applicable facilities receiving the regulatory compliance exemption for the entire year are

exempted from the WEC, and therefore have zero WEC applicable emissions. Section II.D.2.g. of this preamble also explains the facility-level WEC applicable emissions calculation for facilities with partial eligibility for the regulatory compliance exemption. For facilities with total facility applicable emissions greater than 0 mt $CH_4$ that are eligible for the unreasonable delay or plugged well exemptions, any methane emissions associated with those exemptions are subtracted to calculate WEC applicable emissions. See sections II.D.1.b and II.D.3.b of this preamble for explanation of how the quantity of methane emissions that qualify for exemption due to the unreasonable delay and plugged well exemptions, respectively, are calculated. These calculations rely upon methane emissions data reported to subpart W and calculation methodologies specified in this final rule. For all other facilities, facility applicable emissions are equal to WEC applicable emissions (unless the facility is receiving the regulatory compliance exemption).

### 4. Calculation Procedures for Netting

As described in section II.B., the EPA is finalizing that the owner or operator is the WEC obligated party while allowing for netting among WEC obligated parties with the same parent company. This structure creates a potential mismatch in liability should one owner or operator incorrectly calculate their subpart W emissions and/or their WEC obligation, and then magnifies this error by netting emissions with another owner or operator with the same parent company. Therefore, in this section, the EPA is providing additional details and restrictions on how the netting calculations must be done when netting is used, and how the netting transactions must be tracked and reported.

As described in section II.A.3. of this preamble, if a WEC applicable facility has multiple owners or operators, those entities must elect among themselves by binding agreement a single owner or operator as the WEC applicable facility's WEC obligated party for a given year. Similarly, if a WEC applicable facility has multiple parent companies, that facility's WEC obligated party must indicate in its certificate of representation for the reporting year and its annual WEC filing which parent company is selected for the purposes of designating the WEC obligated party's (*i.e.,* owner's or operator's) netting pool. If a WEC applicable facility has multiple owners or operators and multiple parent companies, the owner or operator selected as the WEC obligated party and

the parent company selected for netting must be related (*e.g.*, the WEC obligated party must be a subsidiary or at least partially owned by the parent company selected for netting). These requirements are included as part of the contents of the certificate of representation submitted by the WEC obligated party for the reporting year pursuant to the finalized requirements of 40 CFR 99.4(i) as well as the annual WEC filing pursuant to the finalized requirements of 40 CFR 99.7(b). Within the certificate of representation, the WEC obligated party must identify the WEC applicable facilities for which they are responsible for the reporting year as well as the parent company for which these facilities would be included in netting. Within the annual WEC filing, the WEC obligated party must indicate whether any of the WEC applicable facilities were acquired in transactions that resulted in the owners or operators for the facility as of December 31 of the reporting year ceasing to exist, and whether such facilities were associated with a parent company that is different from the WEC obligated party's parent company pursuant to the finalized requirements of 40 CFR 99.7(b)(1)(iv). This reporting is required because as a result of the finalized requirement of 40 CFR 99.4, a WEC obligated party may become responsible for the reporting of a WEC applicable facility for which they were not an owner or operator of as of December 31 of the reporting year, and which may not have been under the common ownership or control of the WEC obligated party's parent company as of December 31 of the reporting year.

The EPA is finalizing rules and requirements at 40 CFR 99.23 to govern the transfer of net WEC emissions across WEC obligated parties with a common parent company. The first step in the finalized netting process is the calculation of metric tons of methane emissions equal to, below, or exceeding the waste emissions threshold, or WEC applicable emissions, for each WEC applicable facility as specified in 40 CFR 99.21. The next step is summing WEC applicable emissions across all of a WEC obligated party's WEC applicable facilities. This calculation, finalized at 40 CFR 99.22(a) using equation B–8, yields net WEC emissions for each WEC obligated party. In circumstances where a WEC obligated party became responsible for facilities for which they were not an owner or operator of as of December 31 of the reporting year, the requirements at 40 CFR 99.2(b) and (c) would instead apply and the WEC obligated party would determine separate net WEC emission totals for

their WEC applicable facilities that shared the same parent company as identified in the certificate of representation and those WEC applicable facilities that did not share the same parent company. The final step involves optional netting of emissions across WEC obligated parties with the same parent company. In this process, WEC obligated parties with negative net WEC emissions (as calculated using Equation B–8) may transfer those negative net WEC emissions to WEC obligated parties (with positive net WEC emissions) with the same parent company. After the negative net WEC emissions have been transferred as determined by each of the WEC obligated parties with a common parent company, each WEC obligated party's net WEC emissions after transfers, or total methane emissions above or below the waste emissions threshold is finalized. This final amount of metric tons methane is used to determine if a WEC obligated party owes a WEC obligation for the given year.

Since the owner or operator is the WEC obligated party, they are ultimately responsible for the entire WEC payment associated with their total emissions above the waste emissions threshold. Although an individual owner or operator's WEC obligation may be reduced based on netting with another owner or operator that has WEC applicable emissions below the waste emissions threshold within the parameters specified, if those negative quantities of net WEC emissions are later invalidated, the WEC obligated party who received the negative WEC emissions to reduce their WEC obligation would be required to resubmit their WEC filing to remove the negative WEC emissions from their calculations and would have to adjust their payment accordingly. Provisions applicable to this scenario are finalized at 40 CFR 99.23(f)(2).

A key element of WEC obligated party netting is that WEC obligated parties with zero or negative net WEC emissions cannot be subject to charge. A WEC obligated party with negative net WEC emissions may transfer negative quantities of net WEC emissions to WEC obligated parties with whom it shares the same parent company as finalized at 40 CFR 99.23(a), but it can never receive positive emissions. Similarly, the WEC obligation of a WEC obligated party can never exceed the charge that would be calculated using their net WEC emissions. The WEC obligated party's positive net WEC emissions after transfers can decrease but can never increase as a result of netting. In other words, only negative quantities of net

WEC emissions can be transferred, and positive quantities of net WEC emissions cannot be transferred as finalized at 40 CFR 99.23(b). Further, negative net WEC emissions and negative net WEC emissions after transfers cannot be banked or otherwise saved for a future WEC filing year; all negative net WEC emissions and negative net WEC emissions after transfers are valid only for the WEC filing year in which they were created.

The EPA is also finalizing requirements to address impacts to netting that result from WEC filing resubmissions. While the EPA expects that most questions related to unverified subpart W data will be resolved by the time of the WEC filing, continued revisions to subpart W reports or WEC filing resubmissions that impact emissions (*e.g.*, revisions to exemption data) could impact a WEC obligated party's net WEC emissions and thus netting. These include situations in which revisions invalidate negative net WEC emissions that have been transferred and situations in which revisions result in additional negative net WEC emissions that become available for transfer. As discussed in section III.B. of this preamble, resubmissions of WEC filings, including the applicable subpart W data, will not be accepted after December 15 unless the resubmission is related to eligibility for the regulatory compliance exemption, resolution of the verification process (including third-party auditing), or otherwise permitted by the Administrator.

The EPA is finalizing that any WEC obligated party that receives negative net WEC emissions loses the benefit of those negative net WEC emissions if they are later invalidated. For example, if WEC obligated party A transferred negative 10 metric tons of methane to WEC obligated party B with the same parent company, but a revision to the WEC filing for the WEC obligated party A results in the 10 metric tons of negative emissions being eliminated, the final WEC emissions of the WEC obligated party B that received the emissions will revert to the number it was before the 10 metric tons were subtracted from the total. This means that in this circumstance, the final WEC emissions of receiving WEC obligated party B would increase by 10 metric tons.

To determine how previously transferred negative net WEC emissions that are later invalidated are removed from netting when multiple WEC obligated parties receive negative tons, the order in which transfers were approved by the designated

representative of the WEC obligated party receiving the transfer in accordance with the finalized requirement of 40 CFR 99.23(c) will be used on a "last in first out" basis. This indicates the order and amount of negative net WEC emissions that are removed from the net WEC emissions after transfers of a WEC obligated party that receives any negative net WEC emissions, should any of the negative net WEC emissions be invalidated. Affected WEC obligated parties would be required to submit a revised WEC filing and pay any new charge or increase in charge pursuant to the finalized requirements of 40 CFR 99.7(e) and 99.8(d). In situations where revisions to WEC filings result in *additional* negative net WEC emissions becoming available for netting, the applicable WEC obligated party with newly available negative net WEC emissions for transfer may transfer those negative net WEC emissions to another eligible WEC obligated party. The receiving WEC obligated party may then refile. The EPA will then provide any applicable refunds post verification of the amended report. Provisions applicable to the change in availability of transferred WEC emissions as a result of revisions to the WEC filing for the WEC obligated party that provided the transfers are finalized at 40 CFR 99.23(f). All of these requirements are designed to allow for netting at the parent company level while addressing the potential mismatch in WEC obligations should one owner or operator incorrectly calculate their WEC obligation and then magnify this error by netting with another owner or operator with the same parent company.

The EPA is finalizing reporting and recordkeeping requirements at 40 CFR 99.23 for WEC obligated party emissions netting. As finalized at 40 CFR 99.23(c), each transfer of negative quantities of net WEC emissions must be completed in an electronic format specified by the Administrator. The EPA anticipates that these transfers will occur in an electronic system similar to the existing e-GGRT system used by the GHGRP. Each transfer must be initiated by the designated representative of the WEC obligated party that is transferring the negative quantities of net WEC emissions. The transfer will be considered to have occurred at such time that the designated representative of the WEC obligated party that is receiving the transfer approves receipt of the transfer. The electronic system will record the metric tons of negative WEC emissions that are transferred, the WEC obligated parties involved in each

transfer, and the time that the designated representative of the WEC obligated party receiving the transfer approved receipt. These records will establish the order of precedence for these metric tons under the finalized requirement of 40 CFR 99.23(f)(2) related to transfers that are later invalidated. These electronic records are essential to establish the requirements for facilities to participate in netting, as allowed by CAA section 136(f)(4). Finally, WEC obligated parties that transfer and receive negative net WEC emissions must maintain all records associated with the transactions, including but not limited to any value exchanged, if applicable, for emissions transferred to each WEC obligated party under the finalized requirement of 40 CFR 99.23(g).

### 5. Waste Emissions Charge Calculation

CAA section 136(e) establishes annual $/metric ton charges for all methane emissions for which a charge is owed. The EPA is finalizing as proposed that a WEC obligated party's total annual WEC obligation is calculated by multiplying its net WEC emissions after transfers, as determined by Equation B–8 and after any transfer of emissions pursuant to 40 CFR 99.23, by the annual $/metric ton charge. WEC obligated parties with net WEC emissions after transfers less than or equal to zero do not have a WEC obligation. WEC obligated parties with net WEC emissions after transfers greater than zero have a WEC obligation and are required to pay a waste emissions charge. WEC obligation calculations are to be made for calendar years 2024, 2025, 2026, and each year thereafter as per 40 CFR 99.24.

### 6. Gathering and Boosting and Processing Facilities With Zero Reported Throughput

The EPA is aware of a small number of gathering and boosting and natural gas processing facilities that emit methane and report under subpart W, but do not send gas to sale. As a result, these facilities would report zero natural gas volumes for the throughput metrics used in the waste emissions threshold calculations. For the gathering and boosting industry segment, these may be facilities that receive natural gas but then reinject it underground or otherwise do not transport any natural gas. For the processing industry segment, these may be fractionation plants that only receive and process natural gas liquids (NGLs) and do not handle natural gas. We proposed that all reported methane emissions from facilities with no reported throughput

would be considered to be exceeding the waste emissions threshold. We received comments disagreeing with the EPA's proposed approach and interpretation of the statutory text, indicating that WEC applicable facilities that do not send gas to sale are not contemplated by the statute and that it is inappropriate for the EPA to impose a charge in the absence of an applicable threshold. After continued review of the statutory text and consideration of comments received on the treatment of these facilities, we are finalizing a determination that these facilities do not generate WEC applicable emissions, and therefore will not be subject to charge. Using Equation B–3 under 40 CFR 99.20(c), gathering and boosting and processing facilities with zero natural gas throughput would have a waste emissions threshold of 0 mt; all reported methane emissions from these facilities would therefore be exceeding the threshold. However, CAA section 136(f)(2), the statutory text from which Equation B–3 is derived, states that the waste emissions threshold is calculated using the "natural gas sent to sale from or though" a facility. These specific types of gathering and boosting and processing facilities do not send any natural gas to sale. Therefore, based on the language in CAA section 136(f)(2), it would not be appropriate to subject these facilities to charge. Although the EPA is not aware of facilities in industry segments other than gathering and boosting and processing that would report emissions to subpart W of more than 25,000 mt $CO_2e$ while having zero throughput of natural gas or oil sent sales, the EPA believes the same interpretation should apply that they would not be subject to charge. The EPA is finalizing language at 40 CFR 99.21 that for a WEC applicable facility for which the waste emissions threshold is zero, the total facility applicable emissions (*i.e.*, the methane emissions equal to, below, or exceeding the waste emissions threshold for a WEC applicable facility prior to consideration of any applicable exemptions) and the WEC applicable emissions (*i.e.*, the methane emissions equal to, below, or exceeding the waste emissions threshold for a WEC applicable facility after consideration of any applicable exemptions) are both zero.

### D. Exemptions to the Waste Emissions Charge

Congress created three exemptions to the WEC to reduce or eliminate the charge under certain circumstances. The first exempts emissions that result from eligible delays in environmental permitting. The second exempts from

charge those facilities that are in compliance with applicable CAA section 111 regulations, once certain criteria are met. The third exempts emissions from wells that are permanently plugged. The EPA received numerous comments indicating that the proposal made accessing the exemptions designed by Congress infeasible and impractical. In this final rule, the EPA has made a number of changes to the exemptions, in particular the regulatory compliance exemption, to ensure that access to, and implementation of, these exemptions is appropriate and consistent with the best reading of the statute. In addition, the EPA is clarifying in this final rule that a WEC obligated party may elect whether or not to submit a claim for exemption for a WEC applicable facility that meets the applicability requirements for each exemption.

1. Exemption for Emissions From Eligible Delays in Environmental Permitting (CAA Section 136(f)(5))

The permitting delay exemption created by CAA section 136(f)(5) allows for production facilities to reduce their WEC obligation if the permitting of natural gas offtake infrastructure is delayed unreasonably. Congress identified unreasonable delays in approval of permits for offtake infrastructure as a possible barrier to methane mitigation for WEC obligated parties, particularly because these delays could prevent increased volumes of natural gas from being routed to a sales line, and therefore directed the EPA to determine what constitutes an unreasonable delay. In this action, the EPA is finalizing provisions that clarify the definition of an unreasonable delay for the purposes of this exemption, under what circumstances the permitting delay exemption will be available to WEC obligated parties, and what emissions (*i.e.*, from what sources) are eligible for the exemption.

CAA section 136(f)(5) establishes an exemption for emissions resulting from delay in environmental permitting by stating, "Charges shall not be imposed pursuant to paragraph (1) on emissions that exceed the waste emissions threshold specified in such paragraph if such emissions are caused by unreasonable delay, as determined by the Administrator, in environmental permitting of gathering or transmission infrastructure necessary for offtake of increased volume as a result of methane emissions mitigation implementation."

This provision exempts from the charge certain emissions occurring at facilities in the onshore and offshore production segments where permitting

has been unreasonably delayed. Paragraph (1) referenced in the exemption refers to CAA section 136(f)(1), which establishes the waste emissions threshold for applicable facilities in the production sector, as discussed in section II.B. of this preamble. The exemption is limited to emissions occurring as a result of certain delays in environmental permitting of gathering or transmission infrastructure necessary for offtake of increased volume as a result of methane emissions mitigation implementation. The EPA interprets "gathering or transmission infrastructure necessary for offtake" to include gathering and transmission pipelines and compressor stations, and "increased volume as a result of methane emissions mitigation implementation" to include increased amounts of natural gas at on- or offshore production facilities available for transport that would have otherwise been emitted if not for an unreasonable delay in the environmental permitting of offtake infrastructure.

a. Emissions Eligible for the Permitting Delay Exemption

To assist in defining and determining "unreasonable delay" related to environmental permitting, the EPA is finalizing a set of four criteria for applying the unreasonable delay exemption established by CAA section 136(f)(5). These criteria only apply in the context of determining eligible emission exemptions for the implementation of CAA 136(f)(5) and this final rulemaking; they are not intended to speak to the reasonableness of a permitting delay in any other context. The EPA understands that the issue of what constitutes an unreasonable delay is multi-faceted and may be quite different under different regulatory and factual circumstances. At the same time, the EPA believes it is important in the context of this program to provide a definition that is consistent with the statutory charge, practical for the EPA to administer, and straightforward for applicable facilities to follow. With those caveats in mind, the EPA is finalizing the following four criteria for implementing this exemption, largely as proposed: (1) the facility must have emissions that exceed the waste emissions threshold; (2) the entity seeking the exemption must have not contributed to the delay in permitting; (3) the exempted emissions must be those resulting from gas used as an onsite fuel source, gas used for another useful purpose that an otherwise purchased fuel or raw material would have served, gas reinjected into a well, or gas flared, if

that gas would have been routed to a gas gathering flow line or collection system to a sales line without the permit delay; and (4) a period of 36 months must have passed from the time a submitted permit application was determined to be technically complete by the applicable permitting authority.

The EPA believes this approach aligns with the statutory text and meets the Congressional intent of this exemption, while also providing reporting facilities with a clear and predictable set of criteria that the EPA can apply in a timely manner. The EPA requested and received comment on numerous aspects of this exemption. Comments on the four proposed criteria for determining exemption eligibility are discussed in the following paragraphs. Several commenters recommended that the EPA retain strong and clear criteria in the final rule for operators seeking an exemption based on unreasonable environmental permitting delays. Separate from the four criteria, several commenters were opposed to the proposed approach of using defined criteria for assessing exemption eligibility and recommended that the EPA evaluate each eligibility claim on a case-by-case basis. These commenters stated that the circumstances of each individual permitting delay are unique such that they can only be assessed on a case-by-case basis. The EPA decided against such an approach in this final rule for several reasons. Reviews of the individual circumstances of each situation would run counter to Congressional intent because facilities would be unable to predict what they owe, take action to limit any applicable charge, or settle their WEC obligation in a timely manner, potentially leading to payments that were later found subject to this exemption. The approach the EPA is adopting means that payments are more likely to align with amounts owed, including applicable exemptions, and thus more closely track the purpose for which Congress included this exemption. A case-by-case approach would also create a significant time and resource burden for both regulated entities and for the EPA. We expect that many types of permitting situations can arise, with many permutations. If industry were required to demonstrate unreasonable delay on a case-by-case basis, the review process would have resulted in uncertainty for industry and could have led to a significant backlog, thus making the annual calculation of the WEC obligation unduly burdensome. In addition, case-by-case decision making would require repeated exercise of judgment, which could lead

to inconsistent results and protracted disputes, interfering with the Congressional purpose in including this exemption. In order to ensure that the unreasonable delay exemption can be administered in an efficient manner, and to provide industry with clear and predictable requirements that must be met to receive this exemption, the EPA is finalizing the proposed approach of utilizing four set criteria to evaluate eligibility for the unreasonable delay exemption. As described in this section, the EPA has finalized certain changes to the individual criteria, after consideration of comments, to increase the accessibility and practicality of implementing this exemption.

The EPA notes that the four criteria used to evaluate eligibility for the WEC unreasonable delay exemption, including the timeframe, are for the purpose of defining the emissions eligible for an exemption for the purposes of the implementation of CAA 136(f)(5) and this rulemaking only and are not applicable for defining an unreasonable delay outside of this context. The criteria in this section do not apply to the determination of unreasonable delay for purposes of the National Environmental Policy Act (NEPA), the Administrative Procedure Act (APA), or any other law involved in permitting processes or any other agency actions. In particular, the timeline criterion should not be considered applicable or informative to the determination of unreasonable delay in any context other than determining emission exemptions for the implementation of CAA 136(f)(5) and this rulemaking.

The first criterion, that the facility must have emissions that exceed the waste emissions threshold, is based on CAA 136(f)(5), which states that "charges shall not be imposed pursuant to paragraph (1) on emissions that exceed the waste emissions threshold specified in such paragraph if such emissions are caused by unreasonable delay." A straightforward reading of this language limits the exemption to emissions exceeding the waste emissions threshold. Since charges will not be imposed if emissions are below the waste emissions thresholds, an exemption is unnecessary in such cases and, as per the statutory text, not applicable. For facilities that exceed the waste emissions threshold, emissions eligible for the permitting delay exemption will be subtracted from the facility emissions that exceed the waste emissions threshold. The exempted emissions will not be used to reduce emissions totals below the threshold (*i.e.,* the lowest possible WEC applicable

emissions for a facility with the exemption are zero).

The second criterion relates to responsiveness on the part of the production sector WEC applicable facility that is reporting emissions caused by a delay in gathering or transmission infrastructure: the entity potentially eligible for the exemption (*i.e.,* a WEC obligated party's WEC applicable facility in the onshore or offshore production sector) cannot have contributed to the unreasonable delay in permitting. We proposed that neither the WEC obligated party seeking the exemption, nor the entity responsible for seeking the permit, may have contributed to the delay. Several commenters explained that the production facilities seeking the exemption are often separate from the midstream entities seeking the permit, and that the production companies may have no control or influence over the midstream company's interaction with permitting authorities. After consideration of comments received on this criterion, we recognize that there may be limited or no control by the WEC obligated party seeking the exemption over the responsiveness of a separate permittee. Therefore, to increase the accessibility of this WEC exemption, the EPA is finalizing that only the WEC obligated party seeking the exemption is relevant for the criteria of contribution to delay in the environmental permitting process.

Contributions to the delay by the WEC obligated party seeking to exempt a portion of their emissions from one or more WEC applicable facilities due to an unreasonable delay will be determined based upon the timeliness of response to requests for additional information or modification of the permit application, as applicable. A WEC obligated party seeking this exemption may or may not be the entity seeking the permit, but still may be required to provide permit relevant information. Delays in response by the WEC obligated party seeking the exemption exceeding the response time requested or agreed to by the permitting agency regarding requests for additional information or a permit application revision, or responses that exceed 30 days from the request if no specific response time is requested, are considered to contribute to the delay in processing the permit application. Upon review and consideration of comments regarding clarification on whether lawsuits contributing to delays in the permitting process would be included in this exemption, the EPA is finalizing that delays from litigation in the environmental permitting process of

gathering or transmission infrastructure are generally eligible for this exemption, except in those cases when the entity requesting the exemption is a plaintiff in said lawsuit. Therefore, the EPA is finalizing that delays contributed to the entity seeking the exemption either through delayed response or unresponsiveness during the permitting process or through initiation of a lawsuit regarding the permitting process in question are ineligible for the exemption. Note that this determination of what constitutes a delay eligible for the exemption in environmental permitting is specific solely to implementation of CAA section 136(f)(5) and this rulemaking for part 99 and is not applicable to any other section of the CAA, or any permitting program administered by the EPA or other Federal permitting authorities, or by a State, Tribal or local permitting authority.

The third criterion is that the exempted emissions must be those resulting from specific emissions sources and activities. The EPA proposed that only flared emissions would be eligible for the exemption. The EPA received comment recommending that emissions from other sources also be eligible for the exemption. Specifically, commenters requested adding emissions resulting from activities that are compliance options for associated gas under NSPS OOOOb and EG OOOOc. The EPA agrees that emissions from the implementation of these additional methane emissions mitigation activities should be eligible for exemption, and notes that beneficial use and reinjection are often preferable to flaring, as demonstrated by the NSPS OOOOb and EG OOOOc associated gas compliance options' infeasibility determination requirement prior to routing gas to a control device. After consideration of these comments, the EPA is finalizing a revised list of emissions sources that are eligible for the exemption to more closely align the WEC with the 2024 NSPS/EG rule: the use of gas as an onsite fuel source, gas used for another useful purpose that an otherwise purchased fuel or raw material would have served, gas reinjected into a well, and flaring of gas. The EPA is finalizing that emissions from these sources must meet two criteria to be eligible for exemption: (1) all activities associated with these emissions must be in compliance with all applicable environmental local, State, and Federal regulations, and (2) the emissions must have only occurred as the result of an unreasonable delay in permitting, as

defined in this section of the preamble and 40 CFR 99.30. The EPA believes that this approach reasonably follows from the text of section 136(f)(5), which exempts emissions caused by unreasonable delay in the permitting of "gathering or transmission infrastructure *necessary for offtake of increased volume as a result of methane emissions mitigation implementation.*"[36] Other emissions occurring at the wellsite are not exempt because they are not associated with the delay or because they do not occur in compliance with applicable regulations. Any emissions from activities that are not in compliance with applicable regulations are ineligible for the exemption. This approach accords with the text of section 136(f)(5), which states that the exemption is for emissions occurring as a result of unreasonable delay in permitting required for the build out of infrastructure "necessary for offtake of increased volume *as a result of* methane emissions mitigation"[37] The EPA understands that this provision is designed to exempt emissions from activities done in compliance with regulations, where sources are prepared to capture gas but cannot yet do so due to lack of offtake infrastructure.

The fourth criterion is that an eligible "unreasonable delay" would be a delay that exceeds 36 months from the date that a submitted environmental permit application was determined to be technically complete by the relevant permitting authority. This time period is not tied to the timing of the WEC; a facility that meets all four criteria would be eligible for the exemption in the first year of the WEC if the time period requirement has been met. The relevant permitting authority could be the United States Federal Energy Regulatory Commission (FERC), or other Federal, State or local agencies that issue environmental permits. The environmental permitting process can require multiple steps, and target dates for permit actions can vary by regulatory agency and depend, for example, on whether the relevant permit is for a new or existing source, or whether the action is a major or minor modification. This 36-month timeframe for unreasonable delay is intended to provide a predictable process for determination of this exemption, given that there are so many different contexts in which it might apply, and the unreasonableness of each could vary widely, and is not specific to particular permitting actions or agency timelines.

The EPA proposed a timeline somewhere in the range of 30 to 42 months, with the default to be specified in this final rule after consideration of comments received. This preliminary range was based on the EPA's understanding of timelines for oil and gas permitting across Federal agencies. In particular, the preliminary range was informed by the EPA's review of data made available through the Federal Permitting Improvement Steering Council (FPISC) through Title 41 of the Fixing America's Surface Transportation Act (FAST–41). The "Recommended Performance Schedules for 2020" released by FPISC contains data for the Federal review and permitting of 18 pipeline projects under the FAST–41 program.[38] For these projects, the mean time from receipt by FERC of a complete application to the issuance of a certificate of public convenience and necessity for interstate natural gas pipelines was 23 months, with three of the 18 projects (17 percent) exceeding 30 months. Criteria for inclusion in the FAST–41 program include projects that are considered likely to require investment exceeding $200,000,000 and that do not qualify for abbreviated review under applicable law; or projects of a size and complexity that the FPISC determines are likely to benefit from inclusion.[39] On this basis, the EPA believes the FAST–41 dataset may be a conservative population (*i.e.*, require more complex environmental review and permitting) when compared to the total of all gathering or transmission infrastructure projects.

The proposed range of 30 to 42 months also took into account the 2023 Fiscal Responsibility Act, which set a limit under the National Environmental Policy Act of 1 year for completion of an Environmental Assessment and 2 years for completion of an Environmental Impact Statement unless extended by the lead agency in consultation with the applicant or project sponsor. However, the amount of time necessary to complete an Environmental Assessment or Environmental Impact Statement will vary depending on the specific agency action at issue, and the proposed

timeline was not intended to reflect a determination of the reasonable length of a time necessary to complete such analysis in any specific instance. For projects requiring approval or permitting from a Federal agency, completion of an Environmental Assessment or Environmental Impact Statement must occur prior to the agency taking a final agency action. Additional steps in the process that must be completed following completion of review under NEPA may add several months to the overall timeframe (*e.g.*, convening of FERC to approve or deny a certificate of public convenience and necessity).

The EPA did not receive substantive comments supporting a specific number of months from the proposed range of 30 to 42 months. Considering our analyses, and in an effort to simplify and streamline requests for this exemption, we determined that an approach of 36 months is appropriate and in alignment with the Congressional intent of specifying delays that are *unreasonable,* only for the purposes of this unreasonable environmental permitting delay exemption under the WEC.

All four criteria must be met and verified by the EPA for emissions to be eligible for this exemption. No single factor, including timing, is determinative as to whether a delay is unreasonable in the context of this exemption. We are not assessing whether a delay of a period of 36 months alone (*i.e.*, in the absence of the other three criteria) should be considered unreasonable in the context of this exemption, and we are not assessing the reasonableness of a particular timeframe or collection of conditions outside of the context of this exemption specific to CAA section 136. An assessment of reasonableness in any other context depends on the circumstances specific to that context, which can vary considerably and there is no straightforward way to determine whether a delay is reasonable or unreasonable that applies to all contexts.

b. Calculation of Emissions Resulting From an Unreasonable Delay

Through the provisions at 40 CFR 99.32, the EPA is finalizing that exempted emissions are those resulting from gas used as an onsite fuel source, used for another useful purpose that an otherwise purchased fuel or raw material would have served, reinjected into a well, or flared, and these emissions were caused by the delay. Exempted emissions are the methane emissions (or a subset of the methane emissions from these activities) reported

---

[36] 42 U.S.C. 7436(f)(5) (emphasis added).
[37] *Id.*

[38] Federal Permitting Improvement Steering Council, "2020 Recommended Performance Schedules." Federal Infrastructure Permitting Dashboard. April 6, 2020. *https://www.permits.performance.gov/fpisc-content/recommended-performance-schedules.* Accessed August 28, 2023.

[39] Federal Permitting Improvement Steering Council, "FAST–41 Fact Sheet." Federal Infrastructure Permitting Dashboard. September 13, 2022. *https://www.permits.performance.gov/documentation/fast-41-fact-sheet.* Accessed August 28, 2023.

under subpart W. To calculate the exempted emissions quantity, the entity must determine the time period within the reporting year associated with the emissions that occurred as a result of the delay. The delay begins when emissions would have been avoided through the operation of the gathering or transmission infrastructure, not when construction would have begun, as in many cases the infrastructure would not be immediately in place and operational at the time of permitting approval. For example, a permit to construct might be needed before construction begins, and construction could take months or more before the infrastructure would be in place. Where the exempted emissions cover the entire reporting year, the exempted emissions are the total reported to part 98 for the exempted sources. The exempted flaring emissions would be the total reported to part 98 for flare stacks, associated gas flaring, and the portion of offshore methane emissions attributable to flaring. Note that for reporting year 2024, where a continuous emissions monitoring system (CEMS) was used to measure emissions from a flare stack, the volume of gas sent to that flare stack and associated methane emissions would not be quantified under the final requirements of this part at 40 CFR 99.32(b)(4) and 99.32(c)(8), respectively. This is because pursuant to 40 CFR 98.236(n)(12), methane emissions are not reported for these flare stacks in reporting year 2024 and thus there is no associated quantity of emissions to exempt from charge. Regarding emissions from gas used as an onsite fuel source, the exempted emissions would be the total methane emissions reported to part 98 for onsite combustion and crankcase venting. For emissions from gas used for another useful purpose that an otherwise purchased fuel or raw material would have served, the exempted emissions would be the total methane emissions reported to part 98 for combustion, crankcase venting, and associated equipment leaks. For those emissions from the reinjection of excess gas into the well or injection into another well, the exempted emissions would be those methane emissions reported to part 98 associated with combustion from compressor drivers, crankcase venting, reciprocating or centrifugal compressor venting (associated with reinjection), and equipment leaks (for those components associated with well injection).

Where exempted emissions occur in only a fraction of a reporting year, the facility is to use data on applicable emissions over that timeframe if available, and if unavailable, the facility is to adjust applicable part 98 reported emissions using the fraction of the year that the exemption is available. Where applicable emissions impacted by permitting delay only account for a portion of the total emissions from exempted sources (i.e., associated gas flaring, combustion, compressor emissions), the facility is to adjust their part 98 reported emissions for these sources using company records and/or engineering calculations. We sought comment but received none specifically on the provisions regarding the use of reported flaring emissions to determine exempted emissions, the use of part 98 data, and the approaches for quantifying emissions for fractions of the reporting year.

c. Reporting and Recordkeeping Requirements for the Exemption for Emissions Resulting From a Permit Delay

Through the provisions at 40 CFR 99.31, the WEC obligated party seeking to exempt a portion of their emissions from one or more WEC applicable facilities must provide information on each well pad or offshore platform impacted by the delay. This includes the type of permit, permitting authority, the company name and name of the facility that submitted the permit application, and the date that the permit application was complete. The WEC obligated party must report the planned timing of the commencement of the offtake of gas had the permit not been delayed. This includes a listing of the methane emissions mitigation activities that are impacted by the delay and the volumes of gas associated with and emissions from the use of gas as an onsite fuel source, the use of gas for another useful purpose that an otherwise purchased fuel or raw material would have served, reinjection of the gas into a well, and the flaring of gas, if that gas would have been routed to gathering or transmission infrastructure. This reporting also includes information used in the calculation of emissions from the use of gas as an onsite fuel source, the use of gas for another useful purpose that an otherwise purchased fuel or raw material would have served, reinjection of the gas into a well, and the flaring of gas that is necessary for verification of emissions calculations and is not reported to subpart W of the GHGRP. This also includes a certification of compliance with all applicable local, State, and Federal regulations regarding said emissions. While a listing of each of these applicable regulations is not required to be reported, retention of a record listing of all applicable local, State, and Federal regulations is required. The WEC obligated party must report the time period associated with the emissions that occurred as a result of the delay within the filing year. The WEC obligated party must also certify that the production segment entity impacted by the delay did not contribute to the unreasonable delay. The EPA requires this information for the verification of exemption eligibility and of exempted emission quantity. Reported information will be used to conduct verification as discussed in section III.A.4., and reported information, records and other information as applicable will be used to conduct any auditing that occurs under section III.E.1.

2. Regulatory Compliance Exemption Under CAA Section 136(f)(6)

The regulatory compliance exemption created in CAA section 136(f)(6) allows for WEC applicable facilities subject to methane emissions requirements pursuant to CAA section 111(b) and (d) to claim an exemption from paying the charge if certain criteria are met. As such, Congress explicitly exempts WEC applicable facilities that are in compliance with NSPS OOOOb and EG OOOOc-implementing plans from having to pay the charge. The criteria for exemption from the WEC established by Congress provide a strong incentive for States to develop timely and effective State plans under EG OOOOc and for facilities to comply with the regulations for new and existing sources. In this action, the EPA is finalizing provisions that clarify when the regulatory exemption will become available, under what conditions it can be claimed by a WEC applicable facility, and under what conditions it may be lost.

As described in further detail in this section, upon careful consideration of the public comments received on the numerous facets of the regulatory compliance exemption, the EPA is finalizing changes from proposal to some elements of the exemption in order to better align with Congressional objectives and the text of the statute. The final approach strengthens the incentives for early State action to implement EG OOOOc by taking a State-by-State approach to the required Administrator determinations and requiring that these emission standards be in place before the regulatory compliance exemption is available. At the same time, these changes provide reasonable access to the exemption for applicable facilities working to achieve and maintain compliance with methane

emissions requirements pursuant to CAA sections 111(b) and (d) by limiting the types of compliance deviations that would trigger a loss of the regulatory compliance exemption, by reducing the time period during which a facility that is not in compliance loses the exemption, and, for certain facilities, limiting the emissions that lose the exemption to those from the portion of the facility with noncompliance. In this section II.D.2., we summarize the final approach for all facets of the regulatory compliance exemption. Individual elements of the final exemption requirements are discussed in more detail in the following subsections.

The framework established by Congress in the regulatory compliance exemption statutory text encourages methane reductions in the period before State programs are in effect, and then exempts from charge WEC applicable facilities once they are in compliance with the methane emissions requirements of the final NSPS OOOOb/EG–OOOOc-implementing State and Federal plans.[40] The statutory framework also encourages timely submission of approvable EG OOOOc-implementing State plans and timely compliance with the emissions limitations therein (as well as compliance with the standards of performance in NSPS OOOOb) in order to ensure that those requirements achieve meaningful emissions reductions.

The WEC does not require, but rather incentivizes, methane emissions reductions and sustained emissions mitigation activity across the oil and gas industry. In particular, for WEC applicable facilities in industry segments that are covered by EG OOOOc, the WEC incentivizes

emissions reductions earlier than may otherwise be required pursuant to EG OOOOc-implementing State and Federal plans. The EPA expects that, as CAA section 111(b) and (d) facilities implement and comply with the methane emissions requirements of NSPS OOOOb and EG OOOOc-implementing State and Federal plans, many of the WEC applicable facilities that contain those emissions sources subject to those regulations and plans would fall below the waste emissions thresholds, and thus will not be subject to the charge. However, the regulatory compliance exemption recognizes that certain WEC applicable facilities may remain above the waste emissions thresholds even after implementation of the requirements in the final NSPS OOOOb and approved State and Federal plans under EG OOOOc; the regulatory compliance exemption provides an opportunity for relief from charge to these WEC applicable facilities whose constituent CAA section 111(b) and (d) facilities are in compliance with their respective requirements.

Congress provided that the regulatory compliance exemption would only come into effect after a determination by the Administrator that "(i) methane emissions standards and plans pursuant to subsections (b) and (d) of section 111 have been approved and are in effect in all States with respect to the applicable facilities" and "(ii) compliance with the requirements described in clause (i) will result in equivalent or greater emissions reductions as would be achieved by [the 2021 NSPS/EG Proposal], if such rule had been finalized and implemented" (the "equivalency determination").[41] The EPA concludes that the best reading of the statute is that Congress intended to provide an incentive for the EPA to set standards for new methane emissions sources at least as strong as those it proposed, and for States to move promptly in adopting and implementing the standards of performance for existing sources in their EG OOOOc-implementing plans that likewise achieve reductions equal to or greater than those initially proposed. This intention is evident through the Administrator determinations that must be made before the regulatory compliance exemption becomes available. Additionally, the exemption is only available to WEC applicable facilities that are "subject to and in compliance with methane emissions requirements pursuant to subsections (b) and (d) of section 111."[42] Collectively, the criteria in section

136(f)(6)(A) for invoking the exemption mean that if the final NSPS OOOOb and/or EG OOOOc-implementing State or Federal plans are not finalized, the methane emissions requirements therein are not implemented, or the standards are less stringent than those in the 2021 NSPS/EG Proposal, the exemption would not be available. In other words, WEC applicable facilities would not be eligible for the regulatory compliance exemption until all of the requisite conditions are met, and until that time, the WEC provides an incentive to reduce methane emissions.

In this final rule, the EPA is finalizing a determination that the prerequisite Administrator determinations for the regulatory compliance exemption in CAA section 136(f)(6)(A)(i) and (ii) will be made on a State-by-State basis after each State or Federal plan pursuant to CAA section 111(d) is approved and in effect. Also in the final rule, WEC applicable facilities located in a given State (or States, where the facility spans multiple States) will become eligible for the regulatory compliance exemption after the Administrator determination has been made for the State(s) in which the facility is located and at the point in time when the WEC applicable facility is subject to and in compliance with the requirements in the final NSPS OOOOb and applicable EG OOOOc-implementing State and Federal plan(s)—that is, when WEC applicable facilities must begin complying with all of the methane emissions requirements therein. These final requirements for the timing of regulatory compliance exemption availability include two key changes from the proposed rule. First, the final rule includes a shift from the proposed approach of making the exemption available to all WEC applicable facilities at the same time after *all* State plans are approved, to the final approach of making the exemption available on a State-by-State basis. Second, the final rule includes a shift from the proposed approach of making the exemption available upon the effective date of the State or Federal plans, to the final approach of making the exemption available when a WEC applicable facility is "in compliance with methane emission requirements" of both the NSPS OOOOb standards and EG OOOOc-implementing State or Federal plans—that is, the point in time when all of the CAA section 111(b) and (d) facilities are legally required to comply with the methane emissions standards therein. Together, these changes help achieve one of the overarching goals of encouraging early emission reductions.

---

[40] Under the Tribal Authority Rule (TAR), eligible Tribes may seek approval to implement a plan under CAA section 111(d) in a manner similar to a state. See 40 CFR part 49, subpart A. Tribes may, but are not required to, seek approval for treatment in a manner similar to a state for purposes of developing a Tribal implementation plan (TIP) implementing the EG codified in 40 CFR part 60, subpart OOOOc. The TAR authorizes Tribes to develop and implement their own air quality programs, or portions thereof, under the CAA. However, it does not require Tribes to develop a CAA program. Tribes may implement programs that are most relevant to their air quality needs. If a Tribe does not seek and obtain the authority from the EPA to establish a TIP, the EPA has the authority to establish a Federal CAA section 111(d) plan for designated facilities that are located in areas of Indian country. A Federal plan would apply to all designated facilities located in the areas of Indian country covered by the Federal plan unless and until the EPA approves a TIP applicable to those facilities. In this notice, all uses of the phrase "state and Federal plans" are intended to include any Tribal plans, to the extent that any Tribal plans are developed to implement EG OOOOc.

[41] CAA section 136(f)(6)(A).

[42] CAA section 136(f)(6)(A).

The EPA is also finalizing other elements of the Administrator determinations under CAA section 136(f)(6)(A)(i) and (ii), including establishing the relative points of comparison for the equivalency determination, in order to ensure that those elements align with the statutory requirements. Because NSPS OOOOb is already finalized and in effect in all States, the EPA is finalizing an approach wherein the Administrator will make these determinations for each individual State once each EG OOOOc-implementing State plan, or applicable Federal plan, is approved.

In this final rule, eligible WEC applicable facilities can seek exemption from the WEC through the regulatory compliance exemption when facilities subject to methane emissions requirements pursuant to NSPS OOOOb and EG OOOOc-implementing State and Federal plans are "in compliance" with those requirements. The EPA is finalizing that a WEC applicable facility's eligibility for the regulatory compliance exemption will be based on the compliance status of the CAA section 111(b) and (d) facilities contained within that WEC applicable facility, as indicated in annual reports required to be submitted under NSPS OOOOb and EG OOOOc-implementing State and Federal plans. The EPA proposed that compliance status of these CAA section 111(b) and (d) facilities would be assessed to determine exemption eligibility, but the specific criteria used to evaluate eligibility are different in this final rule than in the WEC proposal. The EPA is also finalizing other changes to the applicability provisions for this exemption after consideration of comments received. First, the EPA is limiting the scope of noncompliance with NSPS OOOOb and plans pursuant to EG OOOOc that would cause a WEC applicable facility to no longer qualify for the regulatory compliance exemption. For self-reported noncompliance, noncompliance with monitoring requirements, emission limits and any surrogate limits, operating limits (including operating parameter limits), and work practice standards—the categories of noncompliance most likely to result in emissions increases—will disqualify a WEC applicable facility from the regulatory compliance exemption. Also, any violations of NSPS OOOOb or an NSPS OOOOc plan that are adjudicated in an administrative or judicial action will disqualify the WEC appliable facility from the regulatory compliance exemption. Second, the EPA is

finalizing that for all WEC applicable facilities, exemption eligibility is assessed on a calendar quarterly basis (*i.e.,* January 1–March 31), compared to the proposal's approach, which would have assessed eligibility on an annual basis. Third, for all WEC applicable facilities defined at the basin-level (*i.e.,* facilities in the onshore production and gathering and boosting industry segments), the EPA is finalizing that loss of exemption availability would be applied at the "site" level rather than the facility level;[43] for facilities in all other industry segments, the EPA is finalizing as proposed that the exemption would be lost at the facility level.

In the following sections, the EPA describes in more detail the final determinations regarding the availability of the exemption, and specifically: (1) the point in time at which the Administrator will make the determination(s) pursuant to CAA section 136(f)(6)(A)(i)–(ii) and the process for how the determinations will be made; (2) the point in time at which the regulatory compliance exemption will become available to eligible applicable facilities; and (3) the process for resumption of the WEC pursuant to CAA section 136(f)(6)(B) if the criteria for the regulatory compliance exemption are no longer met. The EPA is also finalizing elements related to the administration of the regulatory compliance exemption, including: (1) how to interpret CAA section 136(f)(6)(A) to govern the interaction between WEC applicable facilities and both CAA section 111(b) affected facilities and CAA section 111(d) designated facilities (collectively referred to in this preamble as "CAA section 111(b) and (d) facilities") for the purposes of the regulatory compliance exemption; (2) how compliance with the methane emissions requirements promulgated under CAA sections 111(b) and (d) will be defined for the purposes of the regulatory compliance exemption; and (3) reporting requirements for applicable facilities claiming the regulatory compliance exemption.

---

[43] Each subpart W facility in the onshore production segment or the gathering and boosting segments is typically comprised of multiple well-pad sites or gathering and boosting sites. A well-pad site is defined in the 2024 Final Subpart W Rule as "all equipment on or associated with a single well-pad" and a gathering and boosting site is defined as "a single gathering compressor station [. . .], centralized oil production site [. . .], gathering pipeline site [. . .], or other fence-line site within the onshore petroleum and natural gas gathering and boosting industry segment".

a. Timing for the Administrator's Regulatory Compliance Exemption Determinations

Before an applicable facility may claim the regulatory compliance exemption, the Administrator must determine that: (1) "methane emissions standards and plans pursuant to subsections (b) and (d) of section 111 have been approved and are in effect in all States with respect to the applicable facilities," and (2) "compliance with the requirements described in clause (i) will result in equivalent or greater emissions reductions as would be achieved by the [2021 NSPS/EG Proposal], if such rule had been finalized and implemented."[44] This framework indicates that Congress intended these prerequisites to exemption availability to encourage timely implementation of the emission reduction requirements in the 2024 Final NSPS/EG and to ensure that those requirements achieve meaningful emissions reductions.

The EPA proposed that both Administrator determinations would be made for the entire nation at one point in time when EG OOOOc-implementing plans were approved and in effect in each and every State that contained WEC applicable facilities. Because the Administrator determinations must be made before the exemption becomes available, under the proposed approach, the exemption would have become available to all States at the same time at a point after the approval of the last State or Federal plan. In other words, the regulatory compliance exemption would have become available to all eligible WEC applicable facilities in the country at the same time, and an applicable facility located in a State or States with an approved plan(s) would be required to wait until all plans in the country were approved and the EPA had then made the necessary Administrator determinations before it could become eligible for the regulatory compliance exemption. The EPA also sought comment on an alternative approach wherein the regulatory compliance exemption would become available on a State-by-State basis based on the finalization of plans for individual States. The EPA received a significant number of public comments on the proposed approach, with many commenters disagreeing with the EPA's proposed interpretation of the statutory text. Such commenters argued that the proposed approach disincentivized States from taking early action in the development of State plans, undercutting Congress' principal goal of

---

[44] CAA section 136(f)(6)(A).

limiting methane emissions as quickly as possible. They contended that "proactive States" would not realize any benefits for their regulated communities by acting early, discouraging quick action. In addition, many commenters stated that the availability of the exemption could be held back by "lagging States," which would unreasonably and unfairly limit the availability of the exemption by making it subject to the action or inaction of the least responsive State. Commenters also argued that the EPA's proposal misinterpreted the phrase "in all States with respect to the applicable facilities" in CAA section 136(f)(6)(A)(1), and that this phrase commanded a reading of the statute that supported the alternative "State-by-State" approach to the Administrator determinations.

After consideration of public comments, the EPA is finalizing an alternative approach, on which the Agency solicited comment, regarding the timing of the Administrator determinations required in CAA section 136(f)(6)(A)(i)–(ii). As described in the proposed rule, such determinations will occur on a State-by-State basis as State plans are approved and, where appropriate, Federal plans issued pursuant to CAA section 111(d). This approach means that the Administrator will proceed in a State-by-State manner to make determinations that: (i) "methane emissions standards and plans pursuant to subsections (b) and (d) of section 111 have been approved and are in effect in all States with respect to the applicable facilities," and (ii) "compliance with the requirements described in clause (i) will result in equivalent or greater emissions reductions as would be achieved by the [2021 NSPS/EG Proposal], if such rule had been finalized and implemented." CAA section 136(f)(6)(A)(i)–(ii). Upon those determinations as to each State, the exemption will become available to the WEC applicable facilities located in that State when the final compliance dates have passed with respect to both (1) the NSPS OOOOb standards for new sources and (2) the standards established under that State's plan (or Federal plan, if applicable) pursuant to EG OOOOc. See section II.D.2.b. of this preamble for further discussion of when an applicable facility may claim the exemption.

The first Administrator determination is related to the timing of the promulgation of final methane emissions standards under CAA section 111(b) and in State and Federal plans pursuant to an EG issued under CAA section 111(d). The EPA is finalizing a determination that this temporal

requirement in CAA section 136(f)(6)(A)(i) is met for all WEC applicable facilities in a particular State at the point in time when *both* (1) emission standards for new sources under CAA section 111(b) have been promulgated and are in effect and (2) a State's plan for existing sources pursuant to an EG issued under CAA section 111(d) has been fully approved by the EPA and is in effect—or if either no State plan or only a partial plan has been approved, a Federal plan is in effect.

Regarding Federal plans, the EPA is finalizing, as proposed, a determination that "plans pursuant to subsection . . . (d) of section 111," CAA section 136(f)(6)(A)(i), includes the promulgation of a Federal plan where the EPA determines that a State has failed to submit a fully approvable State plan, as that is the only way a complete plan pursuant to CAA section 111(d) would take effect in those States. Accordingly, because the emissions standards for new sources under CAA section 111(b) have already been finalized by the EPA in the 2024 Final NSPS/EG, approval of the State (or Federal) plan for States with existing sources subject to the EG under CAA section 111(d) will determine the timing for when the determinations pursuant to CAA section 136(f)(6)(A)(i) and (ii) can be made for each State.

The EPA is finalizing this State-by-State approach based on the Agency's interpretation of the best reading of CAA section 136(f)(6). Specifically, the EPA concludes that the best interpretation of the phrase "all States with respect to the applicable facilities" in CAA section 136(f)(6)(A)(i) means that the determination is to be made for each State individually, and that State plans must be approved and in effect for all States in which a WEC applicable facility claiming the exemption is located. The EPA solicited comment on this alternative interpretation at proposal. *See* 89 FR 5338. At proposal, the EPA proposed "to interpret 'all States' in CAA section 136(f)(6)(A)(i) to mean that every State with an applicable facility (*i.e.,* all States with WEC applicable facilities) must have an approved plan (State or Federal) before the determination [in CAA section 136(f)(6)(A)(i)] can be made." *Id.* at 5337. In addition, the EPA proposed to interpret the statutory text to mean that the Administrator must make only *one* determination as to both prongs in CAA section 136(f)(6)(A)(i) and (ii). Upon consideration of public comments received on this proposed statutory interpretation, and upon reexamining the text of the statute, the EPA no longer

finds that the proposed approach is the best reading of the statute and, concludes that the "State-by-State" approach to the Administrator determinations that the EPA is finalizing in this rulemaking is the best reading of the statute.

First, commenters contend, and the EPA agrees, that the proposed approach misinterpreted, and thus failed to give appropriate effect to, the modifier "with respect to the applicable facilities" in CAA section 136(f)(6)(A)(i). As one commenter noted:

The term "the applicable facilities" [in CAA section 136(f)(6)(A)(i)] refers not to *all facilities* nationwide, but to the *specific* facilities whose eligibility for the Regulatory Compliance Exemption is in question. Giving meaning to all terms of the statute results in the conclusion that a facility is not eligible for the Regulatory Compliance Exemption until all States in which the applicable facility is located have a State or Federal OOOOc plan in effect. As for the words "in all States," they refer not to *all* States that have any existing sources (as the EPA proposes to read them), but rather to all States in which the WEC obligated party has equipment in a given facility. The EPA itself in the proposal repeatedly notes that there are facilities which extend across State lines. *See, e.g.,* 89 [FR] at 5399. All that these words provide is that no facility is eligible for the Regulatory Compliance Exemption for existing sources until all States in which that facility is located have a State or Federal existing-source plan in effect.[45]

Upon reconsideration of the text, the EPA agrees with this commenter that "with respect to applicable facilities" is best interpreted to account for the fact that some applicable facilities straddle State lines and that this phrase should not be read to mean, as proposed, that every State in the country with a WEC applicable facility must have a plan pursuant to CAA section 111(d) "approved and in effect" before the Administrator can make a determination under CAA section 136(f)(6)(A)(i). This reading is a better interpretation of the statute because it gives meaning to this modifying phrase in the context of the subject identified in CAA section 136(f)(6)(A)—"an applicable facility" seeking the exemption from the WEC. In other words, when Congress wrote that the exemption's availability depended, in part, on plans being in effect "in all States with respect to the applicable facilities," it meant all the States in which the applicable facilities seeking the exemption operate.

Second, at proposal, the EPA interpreted the use of the singular in CAA section 136(f)(6)(A) directing the

---

[45] Comment of the American Exploration and Production Council, Document ID No. EPA–HQ–OAR–2023–0434–0276 at p. 20.

EPA to make "a determination" on the requirements outlined in CAA section 136(f)(6)(A)(i) and (ii) as limiting the EPA to *one* determination. At proposal, because the EPA believed that the Administrator could only make one determination, which, by necessity, could only be done once all standards and plans were in place, the EPA concluded that we were bound to make the determination only once EG OOOOc-implementing plans were in place in all states. However, upon consideration of the public comments challenging that interpretation and after reexamining the statutory text, the EPA now concludes that the statute does not *require* a reading that limits the Administrator to making only one determination. Rather, the best reading of the phrase "a determination" in CAA section 136(f)(6)(A) is that it was intended to ensure that the determination required by both prongs (i) and (ii) had been made with respect to the WEC applicable facility seeking the exemption described in CAA section 136(f)(6)(A). In other words, because "applicable facility" is framed in the singular in paragraph (A), it is logical that the prerequisite "determination" would also be framed in the singular as to that facility. But that does not indicate the Administrator is *precluded* from making more than one determination as necessary to effectuate availability of the exemption nationwide. We therefore do not read the statute to limit the Administrator to making one determination, but rather believe that the statute indicates that the Administrator is permitted to make multiple determinations. As one commenter explained:

[T]he singular use of "a" within the phrase "upon a determination by the Administrator" is countered by the singular word "an" within the phrase "[c]harges shall not be imposed pursuant to subsection (c) on an applicable facility that is subject to and in compliance with methane emissions requirements." This phrase clearly contemplates that the Regulatory Compliance Exemption is being made for particular applicable facilities, and *that* is the correct frame through which the subsequent phrase "a determination" should be made.[46]

As just described, the EPA agrees with this statutory interpretation. And further, because the first of the two Administrator determinations in CAA section 136(f)(6)(A)(i) hinges on the approval of each State's plan (which will apply to all WEC affected facilities within the State), the best approach to implementing this statutory directive is for the Administrator to make the

determinations in CAA section 136(f)(6)(A)(i) and (ii) on a State-by-State basis.

The EPA notes that while the best approach to meaningfully implementing these statutory provisions is for the EPA to make a determination under CAA section 136(f)(6)(A) upon the approval of each State plan, that does not preclude the EPA from reviewing and revising an Administrator determination if a standard or plan is later revised, in order to ensure that the conditions of CAA section 136(f)(6)(A) are still met, consistent with the resumption of charge language in CAA section 136(f)(6)(B). Moreover, the language in CAA section 136(f)(6)(B), which anticipates that "the conditions in clause (i) or (ii)" of CAA section 136(f)(6)(A) may at some point "cease to apply," supports the EPA's interpretation in this final rule that the Administrator is not bound to making only one determination. Congress clearly anticipated that the EPA might revisit its determinations if the methane emissions standards pursuant to CAA section 111(b) and (d) change in the future. Given that possibility, the statute cannot be read to mean that the Administrator must be limited to making only one determination as to the conditions in CAA 136(f)(6)(A)(i) and (ii) and never again revisit it.

Many facets of the proposed approach to the regulatory compliance exemption flowed from the interpretation that the Administrator must make only one determination as to all States. The EPA no longer finds that interpretation to be persuasive or consistent with the statutory text in light of the many persuasive comments offering a different view. Accordingly, in light of the fact that the statute permits the Administrator to make more than one determination, and in order to give meaning to the phrase "with respect to the applicable facilities," the EPA has concluded that finalizing a "State-by-State" approach to the Administrator determinations aligns with the best reading of CAA section 136(f)(6)(A).

The second determination that must be made before the regulatory compliance exemption becomes available to an applicable facility is whether the final "methane emissions standards and plans" provide equivalent or greater emissions reductions than would have been achieved by the 2021 NSPS/EG Proposal, had it been finalized and implemented as proposed. As the EPA explains in section II.D.2.d. of this preamble, the EPA has concluded that this determination should take into account the content of the final State

plans. Because plans pursuant to CAA section 111(d) will not be finalized for several years, the EPA cannot make a final equivalency determination in this final action. Instead, the EPA is finalizing an approach wherein the equivalency determination will be made for each individual State with CAA section 111(b) or (d) facilities after the CAA section 111(d) plan (*i.e.,* State or Federal plan) for that State is approved. This timing will allow for evaluation of the emissions reductions achieved by the final NSPS OOOOb and by the final State or Federal plan pursuant to EG OOOOc. More details about the nature and scope of the equivalency determination are discussed in section II.D.2.d. of this preamble.

b. Timing of Regulatory Compliance Exemption Availability to WEC Applicable Facilities

The WEC program must also establish at what point in time a WEC applicable facility may claim the regulatory compliance exemption once the Administrator determinations have been made. CAA section 136(f)(6) provides that the charges shall not be imposed "on an applicable facility that is subject to and in compliance with methane emissions requirements pursuant to subsections (b) and (d) of section 111." The EPA proposed that the exemption would become available to applicable facilities in a State once all of the standards pursuant to NSPS OOOOb and the EG OOOOc-implementing plan were effective, because at that point the facilities would be technically "subject to" emissions standards, even if their compliance dates were in the future.[47] This proposed approach, combined with the proposed approach for the timing of

⁴⁶ *Id.* at p. 22.

⁴⁷ An "effective date" is the date upon which a final rule and the associated amendments to the Code of Federal Regulations become legally effective after publication of the final rule in the **Federal Register**. *See, e.g.,* 5 U.S.C. 553(d) (establishing presumption that a final rule's effective date be 30 days after publication in the **Federal Register**, unless good cause is found for an earlier date); 5 U.S.C. 801(a)(3) (establishing requirement that a "major" rule take effect no sooner than 60 days after publication in the **Federal Register**). A "compliance date" is the date(s) included within the effective final rule upon which a regulated entity must comply with specified requirements of the regulations. *See, e.g.,* 40 CFR subpart Ba, 60.21a(g) ("*Compliance schedule* means a legally enforceable schedule specifying a date or dates by which a source or category of sources must comply with specific standards of performance contained in a plan or with any increments of progress to achieve such compliance."). In some cases, a regulation's effective date and compliance date may be the same date. In other cases, a regulation may be in effect, but not yet require compliance with some or all of its provisions until a future date. Some regulations have multiple different compliance dates for different regulatory provisions.

the exemption's prerequisite determinations, meant that all WEC applicable facilities in the country would have had gained access to the exemption at the same time—as soon as the determinations required by CAA section 136(f)(6)(A)(i)–(ii) had been made.

Based on continued consideration of the statutory text and Congress's intent in promulgating the regulatory compliance exemption, the EPA is making revisions in this final rule from the proposed approach for when WEC applicable facilities may begin to claim the exemption. The EPA is finalizing that WEC applicable facilities will be able to claim the regulatory compliance exemption once the final compliance date for applicable CAA section 111(b) and (d) facilities has passed in the State(s) and Tribal lands in which the WEC applicable facility is located. The final compliance date is the date at which all CAA section 111(b) and (d) facilities are required to comply with all of the final specified requirements pursuant to NSPS OOOOb or an EG OOOOc-implementing plan. For example, if an approved plan establishes compliance dates for some CAA section 111(d) designated facilities in 2029 and compliance dates for other designated facilities in 2030, all WEC applicable facilities in that State could begin to claim the exemption as of the 2030 compliance date. In cases where the final compliance date applies to a CAA section 111(b) or (d) facility subject to a methane emissions standard that has phased-in requirements, the final compliance date is the date of the final requirement to be phased in.

The EPA is finalizing that for WEC applicable facilities in industry segments for which a facility is defined at the basin level in subpart W that span multiple States (*e.g.,* onshore production and gathering and boosting facilities), the exemption is not available until the final compliance date has passed for all States in which the facility is located. In cases where such a WEC applicable facility could span multiple States because it is located in a basin that covers multiple States, but the WEC applicable facility itself is only located in a single State, exemption availability for that facility will be based only on the final compliance deadline for the single State in which the WEC applicable facility is located. For purposes of implementation of the regulatory compliance exemption in this final rule, a WEC applicable facility in the onshore production or gathering and boosting industry segment is considered to be located in each State or Tribal lands that a well-pad site or gathering

and boosting site, as applicable, was reported to subpart W for the reporting year. These approaches for facilities in industry segments with facility definitions that span multiple States also apply to facilities that span both States and Tribal lands. For example, in such cases where a WEC applicable facility is located both in a State and on Tribal land, the final compliance date across all of the applicable State, Federal, and Tribal EG OOOOc-implementing plans must pass before the exemption is available to the WEC applicable facility. Once the exemption is available to a WEC applicable facility under this framework, all CAA section 111(b) and (d) facilities contained within a WEC applicable facility will be required to demonstrate compliance in order to claim the exemption pursuant to CAA section 136(f)(6)(A). The requirements governing this compliance demonstration are discussed in more detail in section II.D.2.f. of this preamble.

The EPA is finalizing an approach in which all WEC applicable facilities with CAA section 111(b) and (d) facilities in a single State will be eligible for the regulatory compliance date at the same time. Establishing a single date for exemption availability for each State ensures that the exemption can be properly implemented and that the EPA can accurately verify exemption eligibility, while simultaneously reducing industry burden. Based on the data collected under subpart W and data to be collected under NSPS OOOOb and EG OOOOc-implementing plans, it is not feasible for the EPA to verify all applicable CAA section 111(b) and (d) facilities contained within each WEC applicable facility in order to determine a facility-specific compliance date. The complexity required for industry reporting and the EPA's verification render making the compliance exemption available at this granular of a level unworkable for several reasons. First, based on data submitted under subpart W, the EPA is not able to determine whether a particular source of emissions is regulated under NSPS OOOOb or an EG OOOOc-implementing plan (or neither), and therefore the EPA cannot determine which compliance deadlines are applicable. Further, the applicable compliance date would also be subject to change for a specific WEC applicable facility as individual assets are sold and/or acquired. In any event, the EPA anticipates that compliance dates in most State plans will be close together in time. To the extent that there are compliance dates for CAA section 111(d) facilities spanning more than 1

year, the WEC will continue to serve as bridge until the final compliance date has passed, with those facilities already in compliance or which have taken further actions to reduce methane emissions having the opportunity to reduce or eliminate their WEC obligation. Importantly, irrespective of CAA section 111 compliance, only WEC applicable facilities with methane emissions over the waste thresholds will be subject to charge. Thus, WEC obligated parties may choose to act early to reduce applicable emissions sufficient to avoid the charge, even before any compliance dates have passed.

The EPA is finalizing this "compliance date" approach both because it aligns with the best reading of the statute, and because it aligns with one of Congress's primary goals for the WEC—to continuously incentivize methane emission reductions across the oil and gas industry during the period leading up to the date at which the requirements in EG OOOOc-implementing plans are fully implemented. Although the EPA proposed to make the exemption available once all CAA section 111(b) and (d) standards were effective, the EPA also considered and sought comment on this alternative approach of making the regulatory compliance exemption available upon the date which CAA section 111(b) and (d) facilities are required to comply with requirements in NSPS OOOOb and the EG OOOOc implementing plans. *See* 89 FR 5339–40 (second and third discussed alternative approaches, considering both "all States" and "State-by-State" approaches). Specifically, the EPA noted that it "considered an approach that would make the regulatory compliance exemption available to WEC applicable facilities meeting the criteria at a State-by-State level as the final compliance deadline in a State or Federal plan for CAA section 111(d) facilities was reached," and sought comment on such an approach. *Id.* As noted at proposal, under this approach, "the EPA would read 'in compliance with methane emissions requirements' to mean that *all* compliance dates in the NSPS and the State and Federal plans have passed." *Id.* While the EPA stated at proposal that it believed that this "approach that would make the regulatory compliance exemption available to WEC applicable facilities meeting the criteria at a State-by-State level as the final compliance deadline in a State or Federal plan for CAA section 111(d) facilities was reached" was not as well aligned with the statute as the

proposed approach, the EPA now concludes that interpreting this phrase as described in the proposed alternative is, in fact, the better reading of the statute, particularly given the EPA's determination in this final rule that the statute also anticipates a State-by-State approach for the Administrator determinations. As one commenter stated:

[T]he proposed approach of exemption availability once the plans are approved instead of after the plans are fully implemented only delays the reduction of methane emissions . . .

Therefore, granting any regulatory compliance exemption before the passing of the ''upper bound'' compliance dates of the CAA section 111 rules, as the EPA is proposing to do, is in contradiction with the Congressional intent of the Inflation Reduction Act, will result in greater methane emissions than the alternative, and should be avoided.[48]

The EPA agrees with this commenter and, for the following reasons, the EPA is finalizing the alternative approach.

First, upon re-examining the text and in light of comments received, the EPA has concluded that applying the regulatory compliance exemption once State plans are implemented, rather than upon approval, is the best reading of the statutory text. Section 136(f)(6)(A) provides that ''charges shall not be imposed pursuant to subsection (c) on an applicable facility that is *subject to and in compliance with* methane emissions requirements pursuant to subsections (b) and (d),'' subject to the Administrator determinations. Notably, the text states that applicable facilities must be both ''subject to *and* in compliance with'' (emphasis added) methane requirements. It is a longstanding principle of statutory construction that every word or phrase in a statutory provision is to be given effect, and none should be ignored or assumed to be duplicative. *See, e.g, Reiter* v. *Sonotone Corp.,* 442 U.S. 330, 339 (1979); *Bennett* v. *Donovan*, 4 F. Supp. 3d 5, 10 (D.C. Cir. 2013) (acknowledging that the court must ''give effect, if possible, to every clause and word of a statute, avoiding, if it may [], any construction which implies that the legislature was ignorant of the meaning of the language it employed. Put differently, a court must not interpret a statute so as to render any words within that statute as 'mere surplusage.'') (citations omitted). Accordingly, the phrase ''subject to''

and the phrase ''in compliance with'' must have different legal meanings. It follows that this provision requires a WEC applicable facility to be both ''subject to'' methane emissions standards and plans under CAA section 111(b) and (d), and actively ''in compliance with'' the specific requirements therein, meaning that these requirements must actually have been implemented. In addition, the phrase ''in compliance with methane emission requirements'' indicates that the text is concerned with the contemporaneous implementation of standards at the CAA section 111(b) and (d) level. Being ''in compliance'' with a requirement, by necessity, means that a requirement mandate a regulated entity take a particular action or meet a particular standard. ''Methane emission requirements pursuant to [section 111(d)]'' will so mandate only upon the compliance date(s) in the section 111(d)-implementing State or Federal plan. This means that it is not sufficient that a standard is *effective* because it has been approved as part of an EG OOOOc-implementing State or Federal plan, if compliance with that standard is not required until some future date. There are no monitoring or reporting obligations by which one would measure compliance, for example, until that compliance date arrives. Similarly, some ''methane emission requirements pursuant to [section 111(b)],'' have tiered compliance dates, meaning that the compliance dates vary between emissions sources. In such case, the WEC applicable facility is only eligible for the regulatory compliance exemption once the compliance dates for all CAA section 111(b) and (d) sources have occurred and the Administrator determinations have been made. In sum, the EPA concludes that the best reading of ''in compliance'' means that an entity is presently subject to actual, emissions limits or work practice standards that require contemporaneous actions on the part of the regulated CAA section 111(b) and (d) sources to comply with the standards.

Second, the EPA concludes that this final approach is best aligned with Congressional intent to incentivize methane emissions reductions on an ongoing and continuous basis, both through the WEC and through compliance with CAA section 111(b) and EG OOOOc-implementing plans. This statutory scheme provides relief from the WEC for facilities once they are reducing methane emissions in compliance with requirements under CAA section 111. As noted at proposal,

implementation of the requirements included in OOOOc-implementing State or Federal plans may not be mandated immediately upon the date at which the plan goes into effect. In other words, the plans may include requirements with compliance dates that occur at a future date after plan approval, and such requirements could be implemented over multiple compliance dates in a phased manner or include deadlines for various increments of progress. Under the proposed approach, there would likely have been a gap during which WEC applicable facilities would have been able to claim the regulatory compliance exemption, but the CAA section 111(d) facilities within those WEC applicable facilities would not have actually been required to reduce emissions pursuant to the State plan's methane emission requirements. For example, if under the proposed approach the exemption had become available to all States in the country with WEC applicable facilities in 2028, based on the approval of all State plans, but those approved plans did not require implementation of methane requirements until the presumptive compliance deadline of 2029,[49] or even later, a multi-year gap would have existed in which there would be no incentive for CAA section 111(d) existing facilities within a WEC applicable facility to reduce emissions in advance of the compliance deadline. This scenario would be contrary to the Congressional intent of the regulatory compliance exemption, which is to provide relief from the WEC to applicable facilities that are ''subject to and in compliance with methane emissions requirements pursuant to subsections (b) and (d) of section 111''— that is, those actually achieving the requirements and achieving the attendant emissions reductions therein.

In addition, the concerns that the EPA expressed at proposal about a ''compliance date'' approach are no longer concerns given that we have now concluded that the best reading of the statute is a State-by-State approach to the Administrator determinations, as explained in section II.D.2.a. of this preamble. Notably, because compliance dates for the relevant methane emissions standards for a particular WEC applicable facility may occur at different points in time (because there are varying compliance dates for

---

[48] Comment of Catherine Wolfram, Ph.D., William F. Pounds Professor of Energy Economics; Professor, Applied Economics, Massachusetts Institute of Technology, Document ID No. EPA–HQ–OAR–2023–0434–0266.

[49] The 2024 Final NSPS/EG rule establishes a final compliance deadline in 2029 for CAA section 111(d) facilities. States may elect to require earlier compliance deadlines, and approved plans may also extend compliance deadlines beyond 2029 via the ''remaining useful life and other factors'' provision, or RULOF.

individual methane emissions sources within NSPS OOOOb and it is possible that the same will be true for EG OOOOc-implementing plans), we noted at proposal that such an approach may have the result of delaying the availability of the regulatory compliance exemption for many years and could make the exemption available to States at different times. *See* 89 FR 5339–40. This was particularly true when combined with the proposed approach to the Administrator determination required by CAA section 136(f)(6)(A)(i) that would only make the exemption available once plans were approved and in effect for all States. In that case, a WEC applicable facility in a State with a promptly submitted and approved EG OOOOc-implementing plan with ambitious compliance deadlines would not have been able to access the exemption until not only all States had approved plans, but all States' plans' compliance deadlines had passed—which could vary amongst States. However, under the final rule, the fact that WEC applicable facilities in some States will be eligible for the regulatory compliance exemption at different points in time is inherent in, and consistent with, the statutory scheme and is the best interpretation of the text and policy goals of the WEC.

The approach adopted in this final rule alleviates the concerns voiced in response to the proposed approach to the Administrator determinations, in which all States with WEC applicable facilities would need to wait for every other State, even potentially "lagging" or "delayed" States, to have NSPS OOOOb standards and OOOOc-implementing plans approved and in effect before WEC applicable facilities in that State would be eligible for the exemption. By proceeding in a State-by-State manner for the Administrator determinations and making the regulatory compliance exemption available upon the final compliance date in NSPS OOOOb and the relevant EG OOOOc-implementing plan, the EPA is providing States with more control over when the regulatory compliance exemption will become available for applicable facilities within their jurisdictions, while also encouraging methane emissions reductions to occur sooner. The final approach also ensures that WEC applicable facilities can secure the regulatory compliance exemption once their constituent CAA section 111(b) and (d) facilities are actually achieving reductions under NSPS OOOOb and the relevant EG OOOOc-implementing plan(s). Under the final approach adopted in this final

rule, States will be incentivized to promptly submit approvable EG OOOOc-implementing plans with timely compliance deadlines so that WEC applicable facilities within their borders gain access to the exemption. Individual States will decide how best to structure plans in terms of compliance dates consistent with EG OOOOc, and how quickly to submit proposed plans to the EPA for approval. The final approach aligns with the intent of the WEC to incentivize early reductions of methane emissions while providing flexibility to States to determine when the regulatory compliance exemption becomes available.

### c. Emissions Year in Which Regulatory Compliance Exemption Takes Effect

While the data collected under subpart W for the purposes of WEC calculation are reported on a calendar-year basis (*i.e.,* a reporting year is a calendar year), the date at which all of the criteria for the regulatory compliance exemption will be met is not yet known and could fall at any point in the course of a reporting year. The EPA is finalizing that for WEC applicable facilities that contain any CAA section 111(d) facilities, once the applicable determinations required by CAA section 136(f)(6)(A)(i)–(ii) have been made, the regulatory compliance exemption will take effect in the reporting year of the final compliance date in the EG OOOOc-implementing plan(s) applicable to the to the State(s) in which the WEC applicable facility is located. For example, if the final compliance deadline in an approved State plan is in June 2029 and the Administrator has made the necessary determinations by 2029, all eligible WEC applicable facilities in that State meeting the compliance requirements discussed in section II.D.2.f. of this preamble would be exempt from the WEC for the entire 2029 reporting year. Comments on the proposed rule were supportive of the proposed approach to make the exemption take effect the same reporting year that the prerequisite requirements for the exemption are met (as opposed to another year). The final approach is aligned with the purpose of CAA section 136(f)(6)(A) to provide the regulatory compliance exemption as a means for WEC applicable facilities to avoid being subject to the charge when their constituent CAA section 111(b) and (d) facilities are all subject to and in compliance with their applicable methane emissions standards.

### d. Approach for Regulatory Compliance Determinations

As described in section II.D.2.a., the Administrator must make two determinations before the regulatory compliance exemption can be claimed by a WEC applicable facility: one related to whether standards and approved plans are in effect and a second related to whether those standards and plans achieve equivalent reductions to the EPA's 2021 proposed NSPS and EG. While those determinations will necessarily need to be made at a later point, the EPA is finalizing certain elements related to the approach for the determinations required by CAA section 136(f)(6)(A). In this rulemaking, the EPA is finalizing a decision that both determinations will be made simultaneously for each individual State once both the NSPS OOOOb standards and EG OOOOc-implementing plans for that State are approved and in effect, as required by section 136(f)(6)(A)(i). The EPA is also finalizing a decision regarding the points of comparison for making the equivalency determinations, which are required under section 136(f)(6)(A)(ii). The EPA did not propose and is not taking final action on any other elements of the equivalency determination at this time. These elements, along with both determinations themselves, will be addressed in a future administrative action(s).

The EPA is finalizing a decision that, when the criteria for both Administrator determinations are met in a given State, the determinations for that State will be made through a single administrative action. As discussed in section II.D.2.a. of this preamble, the equivalency determination for each State will be made taking into consideration the EG OOOOc-implementing State or Federal plan that is approved for each State. Because the timing for both determinations will be aligned, making both determinations for each State via a single, State-specific administrative action will simplify implementation of these elements of the regulatory compliance exemption.

Consistent with the proposed approach of making the regulatory compliance exemption available to WEC applicable facilities once all States had CAA section 111(b) and (d) standards and plans approved and in effect, the EPA proposed that the equivalency determination would be conducted at a national level after all such NSPS OOOOb standards and EG OOOOc-implementing State or Federal plans for all States had been approved and were in effect. The EPA requested and

received comment on its proposed approach. Some commenters supported the proposed approach and recommended additional criteria that the EPA consider in its equivalency analysis, including means of ensuring that State-by-State reductions are equivalent and that year-by-year reductions are equivalent. Other commenters alternatively recommended that the EPA conduct the analysis now, using the 2024 Final NSPS/EG as the point of comparison against the 2021 NSPS/EG Proposal. Yet other commenters supported making both determinations at the same time, but recommended that they be made at the State level rather than at the national level.

After consideration of comments and the language of the statute, the EPA has concluded that it is not appropriate to make a single equivalency determination at the national level because the EPA has determined that the regulatory compliance exemption should be made available on a State-by-State basis, and therefore the equivalency determination should also be made on a State-by-State basis. While the EPA is not making a single nationwide determination, the EPA is finalizing as proposed a decision that the relevant points of comparison for the equivalency determination are between (a) the 2021 NSPS/EG Proposal and (b) the 2024 Final NSPS OOOOb and approved State plans, or Federal plans if applicable. Specifically, the comparison will be made between (a) the emissions reductions that *would have been* achieved if the 2021 NSPS/EG Proposal was finalized and implemented in each State as proposed, and (b) the emissions reductions that *will be* achieved when the final NSPS standards and plans are actually implemented in each State.

Some commenters argued that the EPA could make the equivalency determination simply by comparing the 2021 NSPS/EG Proposal with the 2024 Final NSPS OOOOb standards and EG OOOOc presumptive standards. The EPA disagrees with these comments. The statute requires that the equivalency determination be based on an assessment of the emissions reductions achieved by "compliance with the requirements described in clause (i)." CAA section 136(f)(6)(A)(ii). In turn, clause (i) references "methane emission standards *and plans*" pursuant to CAA section 111(b) and (d). *Id.* section 136(f)(6)(A)(i) (emphasis added). That is, the statutory text specifically requires that the EPA evaluate the emission reductions resulting from compliance with both the NSPS OOOOb

standards and the EG OOOOc-implementing *plans*—not the emissions guidelines established by the EPA—and determine that they "will result in equivalent or greater emissions reductions" as would be achieved by the 2021 NSPS/EG Proposal "if such rule had been finalized and implemented." [50] In addition, principles of fairness and consistency also counsel in favor of applying the equivalency determination on a State-by-State basis. Inherent in the State-by-State approach is an incentive for States to take early action in developing plans and for those plans to require timely emissions reductions. Making the equivalency determination on a national basis would negate that incentive. It would also tie the fate of all States together, and thus could unfairly penalize States that, if evaluated individually, would be able to demonstrate equivalency. The EPA is also finalizing as proposed that, to conduct the equivalency determination, we will compare the methane emission reductions resulting from compliance with the NSPS OOOOb standards and the EG OOOOc-implementing plans in each State against a baseline in which the proposed standards were finalized as drafted in the 2021 NSPS/EG Proposal and implemented in each State. For a number of reasons, the EPA believes this is the best reading of the statutory text. The statute requires the EPA to determine that compliance with these standards and plans "will result in equivalent or greater emissions reductions as would be achieved by" the 2021 NSPS/EG Proposal "if such rule had been finalized and implemented." *Id.* at 136(f)(6)(A)(ii). As the EPA explained in the proposed rule, the most straightforward reading of this statutory text is that Congress set the baseline as the emissions that the EPA projected would be achieved by the 2021 NSPS/EG Proposal. Notably, Congress did not repeat the same language in setting the baseline as it did in setting out the point of comparison for the baseline. In particular, while Congress specified that the comparator is the methane emissions reductions that "will" be achieved by the "methane standards *and plans,*" Congress specified that the baseline is the 2021 NSPS/EG Proposal "if such rule were finalized and implemented," without any specific mention of plans.

Moreover, in enacting CAA section 136, Congress clearly indicated that the

proposed rule was to serve as the benchmark for the methane emissions reductions it wanted achieved before the regulatory exemption would be available. No other reading makes sense. The statutory text uses for the baseline of the equivalency determination the emissions reductions that "would be achieved" by the 2021 NSPS/EG Proposal "if such rule were finalized and implemented." The EPA concludes that the best reading of the statute is that Congress wanted to guarantee the level of emissions reductions (*i.e.,* "equivalent or greater" than expected from the 2021 NSPS/EG Proposal) projected in the 2021 NSPS/EG Proposal before WEC applicable facilities could claim the exemption. At the time CAA section 136 was enacted, Congress expected the EPA to finalize and implement the proposal. Had simply finalizing and implementing the Proposal in whichever manner the EPA chose been sufficient to satisfy the equivalence requirement, then there would not have been any need for an equivalence requirement at all. All Congress would have needed to say was that a pre-condition to the regulatory compliance exemption was finalizing the 2021 NSPS/EG Proposal. But instead, Congress created an equivalency determination requirement, and in order to give that statutory requirement meaning, the EPA must assume that Congress was specifying the quantity of emissions reductions it wanted achieved before the regulatory compliance exemption took effect. And Congress chose the benchmark that was available to it at the time it enacted the WEC program—the 2021 NSPS/EG Proposal.

At proposal, the EPA acknowledged that it is possible that had the EPA finalized and implemented the 2021 NSPS/EG Proposal without change, some States would have set different methane standards of performance in their plans than in the presumptive standards proposed in the 2021 EG OOOOc proposal based on a provision in CAA section 111(d)(1), which permits States to "take into consideration, among other factors, the remaining useful life of the existing source to which such standard applies." (The EPA refers to this provision as the "remaining useful life and other factors" provision, or RULOF.) The EPA regulations at 40 CFR part 60 subpart Ba establish a framework through which states may, with an adequate demonstration, establish standards less stringent than the degree of emission limitation otherwise required by an EG. In such circumstances, the emissions

---

[50] The use of the word "compliance" is also instructive: in practice, sources are not required to comply with the EG; instead, sources must comply with standards later established in state or federal plans.

reductions achieved by those State plans would have been less than if the State plans had adopted and implemented the presumptive standards in the final emissions guidelines, had they been finalized.

But the EPA believes that the best reading of the statute is that Congress did not anticipate that States' use of this provision would have significantly affected the emissions reductions achieved by the 2021 NSPS/EG Proposal if it had been finalized and implemented. Historically, the RULOF provision has not been frequently invoked by States that have submitted CAA section 111(d)-implementing State plans.[51] In addition, States have the option of enacting *more* stringent standards for certain sources under their State plans than would result from direct implementation of the emissions guidelines.[52] The 2021 NSPS/EG Proposal, explicitly referenced by Congress in CAA section 136, recognized these historical facts and further explained why the EPA did not anticipate at that time that States would use the RULOF factors to a significant extent.[53] These historical facts and context, along with the Congress's clear objective to set a benchmark for the emissions reductions it wanted achieved, lead the EPA to conclude that the best reading of the statute is that Congress expected the EPA's baseline for the equivalency determination to be the 2021 NSPS methane standards and the presumptive standards the EPA set out in the 2021 EG proposal, and did not expect the EPA to forecast how States might have chosen to use the RULOF provision had the EPA finalized

and implemented the 2021 NSPS/EG Proposal. The impracticality of conducting such a forecast further supports the EPA's interpretation. Because State plans were never developed pursuant to the 2021 NSPS/EG Proposal, there is no practical means of projecting when States might have chosen to apply less-stringent standards in their State plans pursuant to the RULOF provision and what methane emissions reductions those standards might have achieved relative to the presumptive standards.

While the EPA is required to evaluate both the final NSPS OOOOb and EG OOOOc-implementing plans for each States' equivalency determination, the Agency's preliminary analysis indicates that the final NSPS OOOOb standards and final EG OOOOc presumptive standards are likely more stringent than their respective standards and presumptive standards that were proposed in 2021. The EPA therefore expects that any States that adopt the EG OOOOc presumptive standards in their EG OOOOc-implementing State plans will likely achieve equivalent or greater emissions reductions than would have been achieved by the 2021 NSPS/EG Proposal, had that proposal been finalized and implemented. To provide additional certainty to States as they develop EG OOOOc-implementing plans, the EPA will conduct a technical analysis comparing the emissions reductions achieved by the 2021 NSPS/EG Proposal and the 2024 Final NSPS/EG. The EPA expects that the results of this analysis will demonstrate that the 2024 Final NSPS/EG achieves equivalent or greater emissions reductions compared to the reductions that would have been achieved by the 2021 NSPS/EG Proposal. The results of this analysis will inform the equivalency determination that must be conducted for each State based on each State's approved plan; the EPA expects that it will also simplify the determination process and provide a general reference point for States. For example, if the EPA's analysis confirms that the 2024 Final NSPS/EG would result in equivalent or greater emissions reductions compared to the 2021 NSPS/EG Proposal, the EPA anticipates that where an approved EG OOOOc-implementing State plan directly relies on the presumptive standards in the final EG OOOOc model rule or an equivalent alternative, those State plans, in combination with the final NSPS, will also achieve equivalent or greater emissions reductions compared to those that would have occurred had the 2021 NSPS/EG Proposal been finalized and

implemented. Importantly, however, each finalized EG OOOOc-implementing plan must still be evaluated based on the reductions achieved by the plan itself.

*e. Application of the Regulatory Compliance Exemption to WEC Applicable Facilities*

A key consideration for the design of the regulatory compliance exemption is how to align the performance of CAA section 111(b) and (d) facilities, which are the sources subject to regulation under NSPS OOOOb regulations and EG OOOOc-implementing State plans, with the WEC applicable facilities to which the exemption applies. For purposes of the WEC, and as discussed in section II.A., Congress was very clear that the term "applicable facility" refers to a subpart W facility within one or more of the nine industry segments listed in section 136(d). Specifically, section 136(c) states that "the Administrator shall impose and collect a charge on methane emissions that exceed an applicable waste emissions threshold under subsection (f) from an owner or operator of an *applicable facility that reports more than 25,000 metric tons of carbon dioxide equivalent of greenhouse gases emitted per year* pursuant to subpart W." "Applicable facility" is then defined for purposes of the entirety of section 136 at section 136(d), which states that "for purposes of this section, the term "applicable facility" means a facility within the following industry segments, *as defined in subpart W;*" the statute then lists nine industry segments. The term "applicable facility" also appears at section 136(f)(6), which states that "charges shall not be imposed pursuant to subsection (c) *on an applicable facility* that is subject to and in compliance with methane emissions requirements pursuant to subsections (b) and (d) of section 7411 of this title . . ." Pursuant to section 136(d), which defined "applicable facility" "*for purposes of this section*", meaning the entirety of section 136, it is clear that section 136(f)(6)(A) directs the EPA to analyze the compliance of subpart W facilities which are subject to WEC—that is, subpart W facilities within one of nine industry segments which emit over 25,000 tons of CO₂e per year—*as a whole* with standards promulgated under sections 111(b) and (d). Notably, as explained in section II.A., an "applicable facility" as defined at section 136(d) could include any subpart W facility within the nine industry segments listed in section 136(d), even one emitting 25,000 CO₂e or less per year. However, the waste emissions charge, and thus the

---

[51] In the Supplemental Oil & Gas Proposed Rule, issued shortly after CAA section 136 was enacted, the EPA noted that "it is not aware of any CAA section 111(d) EGs under which an EPA-approved state plan has previously considered RULOF to apply a standard of performance that deviates from the presumptive level of stringency." 87 FR 74818 (December 6, 2022); *accord* 87 FR 79197, [Proposed Rule: Adoption and Submittal of State Plans for Designated Facilities: Implementing Regulations under Clean Air Act Section 111(d)] (Dec. 23, 2022). The Subpart Ba Final Rule also reiterated the EPA's "long-held interpretation of the RULOF provision as a limited variance," but noted that commenters on the proposed Oil and Gas EG "suggested that there may be more of a role for RULOF than in past EGs." *Id. See* 88 FR 80512 (Nov. 17, 2023).

[52] *See* 88 FR 80531 (Nov. 17, 2023).

[53] In the Proposed Rule for NSPS OOOOb and EG OOOOc, the EPA discussed the role that the RULOF provision might play in state plans implemented under the Final EG, including the observation at the time of proposal that "the sheer number and variety of designated facilities in the oil and natural gas industry could make a source-specific (or even a class-specific) evaluation of [RULOF]" less likely to occur. *See* 86 FR 63251 (November 15, 2021). The EPA also discussed the ways in which states may set more stringent standards of performance than those in the Final EG. *Id.* at 63251–52.

regulatory compliance exemption from charge under section 136(f)(6)(A), applies only to those subpart W facilities within the nine industry segments which emit more than 25,000 $CO_2$e. In this rulemaking we refer to these subpart W facilities as "WEC applicable facilities". Thus, for purposes of discussion regarding the regulatory compliance exemption, the EPA uses the term "WEC applicable facilities" when discussing the "applicable facilities" to which section 136(f)(6)(A) refers. As an example of how subpart W facilities are defined, and were defined at the time Congress promulgated section 136 in 2022, a facility in the onshore natural gas processing segment under the GHGRP subpart W program means "any physical property, plant, building, structure, source, or stationary equipment located on one or more contiguous or adjacent properties in actual physical contact or separated solely by a public roadway or other public right-of-way and under common ownership or common control, that emits or may emit any greenhouse gas" [54] and meets the definition of onshore natural gas processing under subpart W. For reporting year 2024, facilities in the onshore natural gas processing segment under subpart W are required to report emissions from all of the following sources at the facility: reciprocating compressor venting, centrifugal compressor venting, blowdown vent stacks, dehydrator vents, acid gas removal vents, flare stack emissions, equipment leaks from valves, connectors, open ended lines, pressure relief valves, and meters. As another example, a GHGRP subpart W facility in the onshore petroleum and natural gas production segment includes all of the wells and associated equipment within a geological production basin, which can cover a geographic area spanning hundreds of miles. Meanwhile, the terms "affected facility" [55] and "designated facility" [56] are used by the EPA in the CAA section 111 2024 Final NSPS/EG regulations to refer to an individual emissions source or a group of emissions sources at a site (e.g., a storage tank battery or a collection of pneumatic controllers) to which a standard applies. Thus, a single WEC applicable facility may contain hundreds or thousands of CAA section 111(b) and (d) facilities.

Importantly, Congress was well aware of the different ways in which a "facility" was defined under subpart W and in the context of the CAA section 111 program when it created the WEC program and the regulatory compliance exemption under section 136(f)(6), which purposely refers to the compliance of WEC applicable facilities—that is, subpart W facilities which are subject to WEC. The regulations defining "facilities" for the purposes of all nine relevant industry segments under subpart W have not been revised since 2015. The regulations defining "affected facility," for purposes of CAA section 111(b), have remain unchanged since first promulgated in the 1970s. 40 CFR 60.2; 44 FR 55173, Sept. 25, 1979. Similarly, the regulations defining "designated facility," for purposes of section 111(d) regulation, by reference to the definition of affected facility as "any existing facility . . . which would be subject to a standard of performance . . . if the existing facility were an affected facility" have also remained unchanged for decades. 40 CFR 60.21, 60.21a; 40 FR 53346, Nov. 17, 1975. Congress made its intentions clear in the plain text of section 136(f)(6) that for purposes of the regulatory compliance exemption, the EPA should consider the compliance status of WEC applicable facilities *as a whole* with standards promulgated under CAA section 111(b) and (d). Thus, due to the fact that when analyzing compliance in the CAA section 111 context, the EPA analyzes the performance of CAA section 111 affected and designated facilities, the different meanings of the term "facility" under these two different EPA programs is an important consideration in the context of the regulatory compliance exemption.

The EPA is finalizing as proposed to implement the regulatory compliance exemption such that a WEC applicable facility that contains any CAA section 111(b) or (d) facilities would have access to the exemption once all other criteria are met (i.e., the Administrator determinations and compliance elements in 40 CFR 99.41). This means that all methane emissions from emissions sources in a WEC applicable facility—even those that are not regulated by section 111(b) or (d)—are eligible for the exemption. This "all in" approach is aligned with, and is the best interpretation of, the statutory text, which clearly states that the exemption is applied at the "applicable facility" level, not at the individual emissions source or CAA section 111(b) or (d) facility levels. Table 3 shows the subpart W industry segments applicable to the WEC that may contain CAA section 111(b) or (d) facilities. WEC applicable facilities in the offshore production, LNG storage, LNG import and export, and transmission pipeline industry segments do not contain CAA section 111(b) or (d) facilities under the Crude Oil & Natural Gas source category and are not eligible for the regulatory compliance exemption. The EPA is finalizing as proposed that if any future NSPS/EG rules are finalized such that additional industry segments contain CAA section 111(b) or (d) facilities, the WEC applicable facilities in those segments would be eligible for the regulatory compliance exemption.

TABLE 3—SUBPART W INDUSTRY SEGMENT AND CAA SECTION 111(b) AND (d) FACILITY OVERLAP

| Subpart W industry segment subject to WEC | May contain CAA Section 111(b) and/or (d) facilities? |
| --- | --- |
| Onshore petroleum and natural gas production | Yes. |
| Offshore petroleum and natural gas production | No. |
| Onshore petroleum and natural gas gathering and boosting | Yes. |
| Onshore natural gas processing | Yes. |
| Onshore natural gas transmission compression | Yes. |
| Onshore natural gas transmission pipeline | No. |
| Underground natural gas storage | Yes. |
| LNG import and export equipment | No. |

[54] 40 CFR 98.6

[55] "Affected facility" is defined for purposes of an NSPS at 40 CFR 60.2 to mean "with reference to a stationary source, any apparatus to which a standard is applicable."

[56] "Designated facility" is defined for purposes of an EG at 40 CFR 60.21a to mean "any existing facility . . . which emits a designated pollutant and which would be subject to a standard of performance for that pollutant if the existing facility were an affected facility."

TABLE 3—SUBPART W INDUSTRY SEGMENT AND CAA SECTION 111(b) AND (d) FACILITY OVERLAP—Continued

| Subpart W industry segment subject to WEC | May contain CAA Section 111(b) and/or (d) facilities? |
| --- | --- |
| LNG storage | No. |

Some commenters were supportive of the proposed approach for the regulatory compliance exemption becoming available at the WEC applicable facility level. The EPA considered other potential interpretations of the statutory text of the regulatory compliance exemption while developing the proposed approach. In particular, the EPA considered an approach that would only exempt the emissions from individual CAA section 111(b) and (d) facilities, rather than the emissions of the entire WEC applicable facility. For example, if certain pneumatic devices are regulated under 2024 Final NSPS/EG pursuant to CAA sections 111(b) and (d), all reported pneumatic device methane emissions from a WEC applicable facility, as reported under subpart W, would be subtracted from that facility's reported emissions. Under this considered alternative approach, only emission sources at subpart W facilities that are not also CAA section 111(b) and (d) facilities (e.g., methane slip from engines) would be considered when determining whether a WEC applicable facility was above or below the waste emissions threshold. While this approach would exempt emissions associated with individual CAA section 111(b) and (d) facilities that are in compliance with the standards, as anticipated by the language in CAA section 136(f)(6)(A), the EPA does not believe that this approach would be consistent with the other text in that statutory provision, which clearly states that the exemption applies to the "applicable facility," which CAA section 136(d) defines as an entire subpart W facility. In contrast to the final "all in" approach, this considered alternative would have been a "some in" approach wherein only a subset of the emissions sources within a WEC applicable facility were exempted. Further, it would not be practical to implement the regulatory compliance exemption in this manner because the individual emissions source types in subpart W do not always align with the individual CAA section 111(b) and (d) facilities. Exempting methane emissions from specific equipment or processes subject to reporting under subpart W that are also regulated as a CAA section 111(b) or (d) affected or designated

facility may exclude a broader or narrower scope of equipment or components and associated emissions than those subject to the 2024 Final NSPS/EG. For example, although storage vessels are subject to both NSPS OOOOb and subpart W, the NSPS OOOOb provisions apply to equipment that exceed specific potential to emit emissions thresholds while subpart W requires reporting and quantification of emissions from all storage vessels at a subpart W facility, regardless of equipment's potential emissions. Methane emissions from CAA section 111(b) or (d) facilities therefore cannot be directly subtracted from reported subpart W data.

f. Determining Applicable Facility Eligibility for the Regulatory Compliance Exemption

It is expected that for many WEC applicable facilities, compliance with NSPS OOOOb standards and EG OOOOc-implementing plans will reduce methane emissions and therefore reduce and potentially eliminate any charge, even in the absence of an exemption. The EPA concludes that the best reading of the statutory language of the regulatory compliance exemption is that it provides relief from the charge for WEC applicable facilities that remain above the waste emissions threshold when their constituent CAA section 111(b) and (d) facilities (i.e., emissions sources) are in full compliance with their applicable methane emissions requirements. The exemption thus provides a further incentive for compliance with the applicable methane emission requirements under CAA section 111.

The EPA is finalizing as proposed that the regulatory compliance exemption would only be available to WEC applicable facilities that exceed the waste emissions threshold. CAA section 136(f)(6)(A) states that "charges shall not be imposed pursuant to subsection (c) on an applicable facility" that meets the requirements of the regulatory compliance exemption. Subsection (c) in turn states that a charge shall be collected "on methane emissions that exceed an applicable waste emissions threshold." Based on a plain reading of the statutory text, the EPA is finalizing as proposed that the exemption would

not apply to WEC applicable facilities below the waste emissions threshold. Further, providing the exemption to WEC applicable facilities below the waste emissions threshold serves no purpose as these facilities do not have WEC applicable emissions, are not subject to the charge, and therefore do not benefit from the exemption. Excluding facilities below the waste emissions threshold from the exemption also reduces the reporting burden for those facilities, which are not required to report information related to CAA section 111(b) and (d) compliance status.

*Compliance with CAA section 111(b) and (d) methane emission requirements.* As discussed in this section, CAA section 136(f)(6)(A) does not specify the definition of "compliance" for the purposes of the regulatory compliance exemption. In light of the comments on this topic highlighting the practical implications of the definition of compliance, the EPA is finalizing provisions revising the proposed approach regarding what actions would constitute "compliance with methane emissions requirements pursuant to [CAA section 111(b) and (d)]," within CAA section 136(f)(A), for the purposes of implementing the regulatory compliance exemption. The final approach reflects the best reading of the statutory text. It is intended to provide a clear threshold for establishing compliance status and eligibility for the exemption in accordance with practice for compliance tracking under CAA section 111, while minimizing the burden on industry and facilitating ease of implementation. The EPA is also finalizing related reporting requirements for WEC applicable facilities that are necessary to implement the regulatory compliance exemption (see section II.D.2.h. of this preamble).

For the purpose of determining WEC applicable facility eligibility for the regulatory compliance exemption, the EPA is finalizing that the compliance status of CAA section 111(b) and (d) facilities contained within a WEC applicable facility will be assessed based on compliance with the applicable methane emissions requirements for the Oil & Natural Gas Source Category in NSPS OOOOb and in EG OOOOc-implementing State and

Federal plans. The EPA proposed that NSPS OOOOa compliance status would also be assessed while determining eligibility for the exemption. Several commenters disagreed with the proposed inclusion of NSPS OOOOa and recommended that exemption eligibility should only be based on compliance with NSPS OOOOb and EG OOOOc-implementing plans. After consideration of comment, as well as the language and intent of the statutory text, the EPA concludes that the best interpretation of the regulatory compliance exemption statutory language is that Congress was focused on methane emissions reductions achieved through NSPS OOOOb and EG OOOOc-implementing plans for the purpose of determining eligibility for the exemption—not prior standards already in place. While the text at CAA section 136(f)(6)(A) and 136(f)(6)(A)(i) refers to "methane emissions standards and plans pursuant to subsections (b) and (d) of section 111," and while NSPS OOOOa includes standards promulgated pursuant to CAA section 111(b), the text at CAA section 136(f)(6)(A)(ii) makes clear that the equivalency determination is to be based solely on the standards in NSPS OOOOb and EG OOOOc-implementing plans. The EPA notes that most facilities regulated under NSPS OOOOa are expected to ultimately be regulated under NSPS OOOOb or EG OOOOc-implementing plans (*e.g.*, as NSPS OOOOa sources are modified or reconstructed or when the sources are regulated as existing sources once EG OOOOc-implementing plans are approved and in effect).[57] The EPA is therefore finalizing that only compliance with these methane emissions requirements, and not those in NSPS OOOOa, will be assessed.

The EPA proposed that any WEC applicable facility that contains CAA section 111(b) or (d) facilities would be eligible for the regulatory compliance exemption if each of the CAA section 111(b) and (d) facilities that constitute the WEC applicable facility had no deviations or violations of the methane emissions requirements promulgated pursuant to the applicable NSPS or EG-implementing plans. The EPA proposed

⁵⁷ *See* 89 FR 16869; 2024 Oil & Gas Final Rule; section IX.C. *How will the final EG OOOOc impact sources already subject to NSPS KKK, NSPS OOOO, or NSPS OOOOa?; see also* 40 CFR 60.5365a ("An affected facility must continue to comply with the requirements of this subpart until it begins complying with a more stringent requirement, that applies to the same affected facility, in an approved, and effective, state or Federal plan that implements subpart OOOOc of this part, or modifies or reconstructs after December 6, 2022, and thus becomes subject to subpart OOOOb of this part.") (emphasis added).

that any noncompliance at any CAA 111(b) or (d) facilities contained within a WEC applicable facility would result in that entire WEC applicable facility being ineligible for the regulatory compliance exemption for the entire reporting year. The EPA received numerous comments objecting on two grounds: (1) that the definition of noncompliance was unnecessarily strict by including deviations that were not necessarily related to excess emissions; and (2) that non-compliance at one CAA section 111 affected or designated facility should not prevent use of the exemption by the entire WEC applicable facility. Many commenters stated that the proposed approach was so stringent that the regulatory compliance exemption would be essentially unavailable. Commenters focused mainly on the types of noncompliance that could make the compliance exemption unavailable, especially a comparatively minor reporting or notification deviation that is not likely to cause excess emissions. Many commenters noted that despite industry best efforts, noncompliance events do occur, especially for these reporting and notification requirements, and given that WEC applicable facilities may contain hundreds or thousands of CAA section 111(b) or (d) facilities, particularly in the onshore production and gathering and boosting segments where facilities are defined at the basin-level, some form of noncompliance is likely to occur within a WEC applicable facility at some point. Commenters stated that, under the proposed approach, these facilities could not claim the regulatory compliance exemption for the entire year, even if the deviation is quickly corrected or is a "minor" form of noncompliance. Commenters also noted that noncompliance with NSPS OOOOb and EG OOOOc-implementing plans may be limited to individual emissions sources within a WEC applicable facility, and the duration of those noncompliance events may vary. Commenters recommended that the EPA narrow the definition of noncompliance for the purposes of exemption eligibility, narrow the scope of equipment and associated emissions that could not claim the exemption in the event of noncompliance, and limit the loss of the exemption to the time duration of the noncompliance.

The EPA agrees with commenters that the proposed approach may have unduly limited access to the regulatory compliance exemption, which would be counter to Congressional intent. Congress included the exemption to

provide relief from the charge if certain criteria were met, and the final rule should meet the Congressional purpose to incentivize emissions reductions and compliance with the law without undercutting the intent to allow exemptions when compliance is achieved. Accordingly, after consideration of comments received, the EPA is finalizing changes to the meaning of "compliance" in section 136(f)(6)(A) in several respects, as further explained, so that it reflects the best interpretation within the context of the statute as a whole and is aligned with the goals and purpose of the WEC.

The EPA is finalizing revisions to the proposed definition of "compliance" for the purpose of determining eligibility for the regulatory compliance exemption. As discussed in the proposal, Congress requires that facilities must be "in compliance with requirements" pursuant to 111(b) and (d), but Congress did not provide any specific definition for what it means to comply. Given Congress didn't provide a definition of "compliance" in the statutory text, we have examined the context in which the term is used and the objectives of the regulatory compliance exemption in the context of CAA section 136. As discussed throughout this section, the clear intent of Congress in creating the regulatory compliance exemption provision was to ensure continuous incentives to reduce methane emissions, and to relieve from the WEC those facilities that are successfully making methane emission reductions pursuant to applicable CAA section 111 standards. In other words, Congress did not intend to require the charge to apply where a WEC applicable facility was already reducing its emissions as intended by the 2024 Final NSPS/EG. Thus, it is most consistent within this statutory context to focus assessments of compliance on those deviations that indicate that a CAA section 111 facility is not reducing emissions as required by NSPS OOOOb and the applicable EG OOOOc-implementing State or Federal plan. However, where there is noncompliance with provisions of these programs that are not tied in some way to methane emission reductions, but rather some other requirement of NSPS OOOOb or the applicable EG OOOOc-implementing State or Federal Plan, it would not be consistent with the statutory context to subject the WEC applicable facility that is already responding as intended to the CAA section 111 requirements to reduce emissions, to also be subject to the charge. Accordingly, in this final rule,

the EPA's framework for assessing compliance conforms with the objectives of the regulatory compliance exemption and focuses on compliance activities that directly affect methane emissions, in accordance with the WEC's objective of incentivizing reduced methane emissions. It also makes the exemption realistically available to WEC applicable facilities and implementable for the EPA.

The EPA is finalizing two categories of NSPS OOOOb and EG OOOOc requirements that will determine eligibility for the regulatory compliance exemption. Noncompliance with respect to either category will result in ineligibility for the regulatory compliance exemption. First, any self-reported deviation [58] from monitoring requirements, emissions limits or standards (or surrogate standards), operational limits (including operating parameter limits), or work practice standards is considered noncompliance for the purposes of the regulatory compliance exemption. This category is straightforward to implement in that exemption eligibility is determined based on information that companies are already collecting and reporting. By focusing regulatory compliance exemption eligibility on compliance with emissions limits, operational limits, work practice standards, and the monitoring necessary to demonstrate compliance with those standards, exemption eligibility is based on compliance with requirements that are directly linked to a facility's emission reduction requirements. This approach also aligns with Congressional intent for the regulatory compliance exemption to apply only to WEC applicable facilities where methane emissions are otherwise being controlled under CAA section 111(b) and (d). In instances where methane emissions are not appropriately controlled consistent with these standards, it is clear that Congress meant that the facility could not claim the exemption.

Additionally, the EPA is finalizing that any determination of a violation in an administrative or judicial action of any applicable NSPS OOOOb or EG OOOOc requirement, including reporting or recordkeeping, results in a WEC applicable facility being ineligible for the regulatory compliance exemption. This approach is necessary to account for any instances of noncompliance that are not included in annual NSPS OOOOb or EG OOOOc-implementing plan reports but are

adjudicated in an administrative or judicial proceeding. The EPA is finalizing that any adjudication of reporting and recordkeeping violations results in exemption ineligibility because failing to comply with these requirements can be directly linked to noncompliance with emissions-related requirements. For example, a company could improperly fail to report or keep records of certain required information because that information would indicate violations of, for example, emission limits or work practice standards. Similarly, records maintained by companies are often key to verifying compliance with emissions limits or work practice standards. Failure to maintain these records not only prevents the EPA or other authorities from verifying compliance, but can also mask noncompliance and limit the ability to prove that noncompliance occurred. To account for these and other NSPS OOOOb and EG OOOOc violations that are not reported or improperly unreported in annual NSPS OOOOb and EG OOOOc reports, the EPA is finalizing that any adjudicated violation of NSPS OOOOb and EG OOOOc is also considered noncompliance for the purposes of exemption eligibility.

The EPA is finalizing that self-reported deviations from notification requirements are not considered a form of noncompliance that causes an applicable facility to lose exemption eligibility. For example, NSPS OOOOb includes notification requirements associated with well completions, well closures, and alternative fugitive emissions monitoring programs. These notification requirements are not necessarily directly linked to emissions reduction requirements for CAA section 111(b) and (d) facilities. The EPA is therefore finalizing that self-reported noncompliance with notification requirements in NSPS OOOOb or EG OOOOc-implementing plans does not result in ineligibility for the regulatory compliance exemption. This treatment of self-reported notification requirements is specific to implementation of the regulatory compliance exemption under CAA section 136, and does not affect any treatment of noncompliance under NSPS OOOOb or EG OOOOc-implementing plans.

A WEC applicable facility's eligibility for the regulatory compliance exemption based on the absence of deviations from the specified requirements in its annual reports does not constitute a determination of compliance for NSPS OOOOb or EG OOOOc-implementation plan. A WEC

applicable facility's eligibility for the regulatory compliance exemption in no way precludes the EPA from later finding and enforcing violations of NSPS OOOOb or EG OOOOc-State plans, whether reported or unreported. If a WEC applicable facility claims the regulatory compliance exemption based on the absence of noncompliance in its annual report, but NSPS OOOOb or EG OOOOc-implementation plan violations are later discovered or adjudicated, the WEC applicable facility's WEC obligated party must recalculate its WEC obligation accounting for the methane emissions that are disqualified from the regulatory compliance exemption due to the adjudicated violations, resubmit its WEC filing, and pay any resulting charge.

Portion of the WEC Applicable Facility Affected by Noncompliance

In this final rule, for WEC applicable facilities in the natural gas processing, transmission compression, and underground storage industry segments, the EPA is finalizing as proposed that any NSPS OOOOb or EG OOOOc noncompliance within the WEC applicable facility results in the entire WEC applicable facility losing the regulatory compliance exemption.[59] The EPA proposed that any noncompliance at CAA section 111(b) or (d) facilities contained within a WEC applicable facility would cause the entire WEC applicable facility to lose the exemption. Some commenters contended that the proposed approach would unfairly restrict availability of the exemption, and that loss of the exemption should only apply to the emissions from the noncompliant CAA 111(b) or (d) facility contained within the WEC applicable facility. The EPA does not agree with these comments. Congress was clear throughout CAA section 136 that the term "applicable facility" for purposes of that entire section, including CAA section 136(f)(6), refers to a WEC applicable facility—that is, a subpart W facility within one of the nine listed industry segments which emits over 25,000 tons of $CO_2$ per year. Accordingly, a plain reading of CAA 136(f)(6)(A) indicates that the exemption is to be applied to an entire WEC applicable facility, not just portions of it: "Charges shall not be

[58] Deviations are defined for NSPS OOOOb and EG OOOOc at 40 CFR 60.5430b and 40 CFR 60.5430c, respectively.

[59] WEC applicable facilities in the onshore production and gathering and boosting industry segments will be treated differently, as discussed in this section of the preamble. Note that the other defined WEC applicable facilities in CAA section 136(d)—the offshore production, transmission pipeline, LNG import and export, and LNG storage industry segments—are not eligible for the regulatory compliance exemption because they do not contain CAA section 111(b) or (d) facilities.

imposed pursuant to subsection (c) *on an applicable facility* that is subject to and in compliance with methane emissions requirements pursuant to subsections (b) and (d) of section 111.'' (Emphasis added).

The EPA is finalizing as proposed that WEC applicable facilities are eligible for the exemption if they contain *any* CAA section 111(b) or (d) facilities. While the EPA expects that most WEC applicable facilities in industry segments regulated under NSPS OOOOb and EG OOOOc contain CAA section 111(b) and (d) facilities, such WEC applicable facilities generally also contain equipment and emission sources that are not regulated under NSPS OOOOb and EG OOOOc. Emissions from both types of emissions sources within a WEC applicable facility—those facilities regulated under NSPS OOOOb and EG OOOOc and those sources that are not regulated—will be eligible for the regulatory compliance exemption by virtue of the fact that the exemption is applied to the entire WEC applicable facility. Some commenters recommended that once the exemption is first applied to the WEC applicable facility, only the emissions from noncompliant CAA sections 111(b) and (d) facilities should lose the exemption. In other words, these commenters argued that once the exemption is applied to the entire WEC facility, it should be lost at the CAA section 111 facility level. The EPA disagrees with this comment. First, such an approach would be contrary to the plain text of the statute, which requires the EPA to apply the exemption to the entire WEC applicable facility at once, because CAA section 136(f)(6)(A) states that ''charges shall not be imposed *on an applicable facility that is subject to and in compliance with*'' the CAA section 111 standards. According to ordinary meaning, established principles of statutory construction, and the general requirements under CAA section 136(c) that the EPA ''shall impose and collect a charge on methane emissions that exceed an applicable waste emissions threshold . . . from an owner or operator of an applicable facility that reports more than 25,000 metric tons'' of $CO_2e$ under subpart W, the inverse must also be true: charges *shall* be imposed on a WEC applicable facility that is *not* subject to and in compliance with CAA section 111 standards. That is, the regulatory compliance exemption must be applied to, and withdrawn from, a WEC applicable facility as a whole.

Second, if the EPA were to take the approach suggested by the commenters, once the facility as a whole is first granted the exemption, emissions from

those sources that are not subject to NSPS OOOOb and EG OOOOc (and thus not otherwise required to reduce emissions) would continue to benefit from the exemption forever, even while the CAA section 111 facilities are out of compliance. For example, under this approach advanced by some commenters, every CAA section 111(b) and (d) facility in a WEC applicable facility could be out of compliance, but methane emissions from every subpart W emission source that is not regulated under NSPS OOOOb or EG OOOOc would continue to receive the exemption. In this scenario, the unregulated sources would be exempted from the WEC and therefore subject to *no* incentive to reduce methane emissions even while the CAA section 111(b) and (d) facilities that permitted the WEC affected facility to apply the exemption are *also* not reducing methane emissions. It would be inconsistent to make the exemption available to these unregulated emissions sources by virtue of the fact that they are located within a WEC applicable facility that also contains CAA section 111(b) and (d) facilities, and then continue to allow them to access the exemption when the CAA section 111(b) and (d) facilities within the WEC applicable facility are in noncompliance. In other words, this would result in an ''all in'' approach for exemption eligibility, but a ''some out'' approach for loss of the exemption in the event of noncompliance. Such an approach would: not be consistent with the statute; arbitrary from a practical implementation standpoint; and counter to the intent of the WEC to incentivize methane emission reductions across the industry. Further, this approach is not practically implementable because there is no specific alignment between the definitions and scope of CAA section 111(b) and (d) applicable and designated facilities and the subpart W emissions sources at a WEC applicable facility, and therefore methane emissions from CAA section 111(b) or (d) facilities cannot be directly subtracted from reported subpart W data in order to assess the WEC against only those noncompliant facilities. Requiring collection and reporting of such data would significantly increase program complexity, as well as the burden on both industry and the EPA. The EPA therefore concludes that its proposed ''all in, all out'' approach for the portion of the WEC applicable facility that loses access to the regulatory compliance exemption is the best interpretation of the statute and is the most consistent with the WEC's goals of incentivizing

methane emissions reductions, subject to the following exceptional circumstances, as described.

*Onshore Production and Gathering and Boosting WEC Applicable Facilities: Portion of Facility Affected by Noncompliance.* Notwithstanding the foregoing discussion and the EPA's general approach for application of the regulatory compliance exemption, based on compelling comments from commenters and upon reconsideration of the Congressional intent of the WEC within the context of this exemption, the EPA is finalizing a unique approach for the portion of the WEC applicable facility affected by noncompliance specific to the onshore production and gathering and boosting industry segments. Some commenters noted that facilities in these industry segments would be uniquely affected by the proposed approach (and, the finalized approach for the natural gas processing, transmissions compression, and underground storage industry segments) of the entire WEC applicable facility losing the exemption as the result of any section 111(b) or (d) noncompliance. WEC applicable facilities in the onshore production and gathering and boosting industry segments are defined at the geologic basin level and may consist of hundreds of well pads or dozens of compressor stations spread across a wide geographic area (*e.g.,* the Permian Basin is over 80,000 square miles or about the size of the State of Utah). By comparison, WEC applicable facilities in other industry segments that are eligible for the regulatory compliance exemption, such as gas processing plants or transmission compressor stations, are typically no larger than several city blocks and consist of co-located emission sources. As one commenter noted, because of the basin-wide scale of the WEC applicable facilities in the onshore production and gathering and boosting industry segments, they may contain hundreds or thousands of CAA section 111(b) and (d) affected and designated facilities. This makes these industry segments unique in how the approach for this exemption would affect them; other WEC applicable facility industry segments such as the natural gas processing, transmissions compression, and underground storage industry segments typically have between ten and one hundred CAA 111(b) or (d) facilities. This is notable because, under the proposed and final approach that the EPA is taking for the natural gas processing, transmissions compression, and underground storage industry segments, a single noncompliant CAA

section 111(b) or (d) facility at a single well pad in the onshore production industry segments or at a single gathering compressor station in the gathering and boosting industry segment at these WEC applicable facilities (which might contain hundreds of well pads or dozens of gathering compressor stations) would result in the entire basin-wide WEC applicable facility becoming ineligible for the exemption. As stated by commenters, given the widespread geographic span and potentially very large number of CAA section 111(b) and (d) facilities associated with basin-level WEC applicable facilities, the regulatory compliance exemption could turn out to be largely unavailable for WEC applicable facilities of this type.

In promulgating the requirements under CAA section 136, Congress was aware of the existing definitions of "facility" under subpart W for the various applicable industry segments, including the basin-wide definitions that apply to onshore production and gathering and boosting facilities. And pursuant to the plain text of CAA section 136(f)(6)(A), the exemption is intended to be applied and revoked facility wide. Nevertheless, the EPA understands that Congress's general intention in establishing the regulatory compliance exemption was to provide an incentive for regulatory compliance—and in order for such an incentive to exist, it must be reasonably possible for owners and operators to achieve such compliance to ensure that the exemption is realistically available as intended. However, in the unique case of basin-wide facilities, should the EPA withdraw the exemption on a facility-wide basis in response to any one instance of noncompliance at a CAA section 111 facility, the EPA agrees with commenters that it the exemption would not be as accessible to basin-wide facilities as intended by Congress under this provision.

Some occasional instances of noncompliance are to be expected over the span of a WEC applicable facility. After considering comments, however, the EPA appreciates that in the case of basin-wide facilities, because these facilities are so vast—often containing thousands of CAA section 111 facilities—and because there are numerous ways in which any one of these CAA section 111 facilities can be in noncompliance at any one time, universal compliance for every single CAA section 111 facility would be very challenging for basin-wide facilities. The result could be that a violation at one location could result in loss of the exemption for hundreds, or potentially

thousands of other locations that are fully compliant. The EPA has concluded that such result does not comport with the Congressional intent of the WEC or with the overall purpose of the regulatory compliance exemption. Indeed, the EPA believes that such scenario would constitute an absurd result, and one not foreseen by Congress, which did not have the benefit of industry comment regarding the difficulty of universal compliance across thousands of CAA section 111 facilities, when it drafted its provision applying the regulatory compliance exemption to the WEC applicable facility as a whole, for all WEC applicable facilities to which the exemption would apply.

Historically, in cases where "unambiguous statutory commands" would nevertheless lead to "absurd results", the Supreme Court has seen fit to "adjust[ ]" these commands[60]—a theory of judicial review recognized in legal scholarship as the "absurdity doctrine."[61] Where a certain interpretation would be reasonable in most cases but compel absurd results in a particular case, the Court may read an implicit exemption into the text to allow support for the plain text reading as a general matter but to avoid the specific absurd results.[62] In particular, the Court may read an implicit exemption into the text where failing to do so would be inconsistent with Congressional intent for the purpose of the provision at issue.[63] Accordingly, for the reasons

explained in further detail, after consideration of comments, and in the interest of avoiding absurd results, the EPA is finalizing a specific approach for WEC applicable facilities in the onshore petroleum and natural gas production and onshore petroleum and natural gas gathering and boosting industry segments such that for WEC applicable facilities in these industry segments only, the loss of the exemption occurs at the site-level rather than the facility-level. The EPA notes that this distinction for basin-level onshore production and gathering and boosting industry segments does not change the definition of "applicable facility" under part 99 or the definitions of "facility" for these or other industry segments under 40 CFR part 98, because, as we discussed, Congress was well aware of the part 98 definitions when it defined applicable facility for purposes of calculating the charge by reference to the long-existing subpart W definitions—and Congress was clear in defining "applicable facility" for purposes of CAA section 136. There is nothing absurd about, for example, applying the 25,000 $CO_2e$ WEC applicability threshold at the basin-wide facility level for these industry segments; thus, we don't find these consequences to be universal across the CAA section 136 framework. Structuring this final rule such that onshore production and gathering and boosting facilities will lose the regulatory compliance exemption at the site level is exclusively for the purpose of making the regulatory compliance exemption accessible to all of the relevant WEC applicable facilities that

[60] Manning, John, "The Absurdity Doctrine", 116 Harv. L. Rev. 2388, 2389 (Jun. 2003) (citing *Clinton* v. *City of New York*, 524 U.S. 417, 429 (1998); *Pub. Citizen* v. *U.S. Dep't* of Justice, 491 U.S. 440, 454–55 (1989); *Jackson* v. *Lykes Bros. S.S. Co.*, 386 U.S. 731, 735 (1967); *United States* v. *Brown*, 333 U.S. 18, 27 (1948); *Armstrong Paint & Varnish Works* v. *Nu-Enamel Corp.*, 305 U.S. 315, 333 (1938); *Sorrells* v. *United States*, 287 U.S. 435, 447–49 (1932); *United States* v. *Katz*, 271 U.S. 354, 362 (1926); *Hawaii* v. *Mankichi*, 190 U.S. 197, 2 13–14 (1903); *Church of the Holy Trinity* v. *United States*, 143 U.S. 457, 465, 472).

[61] *See id.* at 2388.

[62] *See Utility Air Regulatory Group* v. *EPA*, 573 U.S. 302, 321–22 (2014) (holding that the term "air pollutant", which—pursuant to a plain text reading and the EPA's endangerment finding for greenhouse gases encompasses greenhouse gases in most sections of the Clean Air Act—nevertheless excludes greenhouse gases in the context of the PSD program and Title V permitting, because to read the phrase "air pollutant" to include greenhouse gases in those sections would produce absurd results; specifically, such a reading would trigger millions of new previously unregulated sources into the program, ballooning the number of Title V regulated sources alone from 15,000 to 6.1 million, and increasing costs by factors of a thousand).

[63] *See id.* ("[the] EPA itself has repeatedly acknowledged that applying the PSD and Title V permitting requirements to greenhouse gases would be inconsistent with—in fact, would overthrow—the Act's structure and design . . . [because] 'the great majority of additional sources brought into the

PSD and title V programs would be small sources that Congress did not expect would need to undergo permitting' [and] the EPA stated that these results would be so 'contrary to congressional intent,' and would so 'severely undermine what Congress sought to accomplish,' that they necessitated as much as a 1,000-fold increase in the permitting thresholds set forth in the statute."). *See also Church of the Holy Trinity* v. *United States*, 143 U.S. 457 (1982) (holding that notwithstanding a federal statute declaring it "unlawful for any person, company, partnership, or corporation, in any manner whatsoever, to prepay the transportation, or in any way assist or encourage the importation or migration of any alien or aliens, any foreigner or foreigners, into the United States . . . under contract or agreement . . . to perform labor or service of any kind in the United States . . . .", an Episcopal Church in New York City had not violated the law in contracting the services of an English pastor. *Id.* at 458. The Court stated that although "it must be conceded that the act of the [church was] within the letter of this section", applying the law to the church in this case would lead to "absurd results" which Congress surely had not intended. *Id.* at 459. Ultimately, the Court read an implicit exemption into the law applying to religious labor. *Id.* at 465–66.

Congress intended to receive the exemption.

For onshore production facilities, the site is the "well-pad site," as defined by 40 CFR 98.238.[64] For gathering and boosting facilities, the site is the "gathering and boosting site," as defined by 40 CFR 98.238.[65] In the final rule, the loss of the regulatory compliance exemption at the site level for the onshore production and gathering and boosting industry segments is applied in the same manner as at the facility-level for natural gas processing, transmission compression, and underground storage industry segments, meaning that all methane emissions at the site with NSPS OOOOb or State/Federal plan noncompliance are ineligible for the exemption. This aligns with the general "all in, all out" approach for the exemption loss for natural gas processing, transmission compression, and underground storage industry segments, whereby emissions from all emission sources (*i.e.*, emissions from sources regulated under NSPS OOOOb and EG OOOOc as well as sources not regulated under NSPS OOOOb and EG OOOOc) lose the exemption in the event of noncompliance. The EPA notes that this approach is straightforward to implement as site-level emissions reporting is required under the 2024 Subpart W Final Rule and can be directly used to calculate any emissions that lose the exemption. Section II.D.2.g. of this preamble describes the emissions calculations applicable to loss of the regulatory compliance exemption.

*Period of time for assessing the exemption in the event of noncompliance.* In the final rule, the EPA is finalizing revisions to the proposal approach with respect to the period of time for which the exemption is applied in the event of any section 111(b) or (d) noncompliance. The EPA proposed that any noncompliance would result in loss of the exemption for the entire year. Several commenters noted that the duration of a NSPS OOOOb or EG OOOOc-implementing plan noncompliance event can vary, and that some noncompliance events may be very brief. Commenters stated that the proposed approach of assessing the exemption for the entire year was unreasonable. We agree with these commenters that withholding the exemption for an entire year in the instance of noncompliance goes beyond the Congressional purpose of making the exemption reasonably available to WEC applicable facilities that are in compliance with 111(b) and (d). Some commenters noted that under the proposed approach, where noncompliance occurred for a single 111(b) or (d) facility within a WEC applicable facility for an hour, that entire WEC applicable facility would lose the exemption for the entire calendar year. The best reading of the statute requires that the exemption be realistically available to WEC applicable facilities that are achieving compliance in accordance with the requirements in 111(b) and (d)—losing the exemption for an entire year would, in many instances be out of proportion to the extent of noncompliance and unduly constrain use of the exemption.

The EPA also received comments recommending that the length of time for which the exemption be lost in the event of noncompliance correspond with the period of noncompliance. The EPA disagrees with these commenters. A key consideration in establishing a temporal element for the regulatory compliance exemption is the data used to establish the duration of noncompliance. The EPA is finalizing that data from NSPS OOOOb and State/Federal plan annual reports will be used to calculate the duration of noncompliance for the purpose of exemption eligibility. Use of existing data reduces the burden on industry and increases consistency in regulatory requirements. Although deviations for purposes of WEC are based on the NSPS OOOOb and State/Federal plan reports, the EPA notes that because NSPS OOOOb and EG OOOOc do not provide specific direction on the calculation of the deviation duration, the deviation start and stop times included in NSPS OOOOb and state/Federal plan annual reports may be inconsistent and may not be reflective of the actual length of noncompliance. Significantly, the reported start times may be based on when a deviation was detected, not when the deviation began. Reported durations therefore can significantly underestimate the actual length of noncompliance. Considering the exemption at a smaller time interval, such as hourly or daily, assumes too much certainty with respect to the information in the annual reports, and could end up providing the exemption to WEC applicable facilities during periods of noncompliance for their constituent CAA section 111(b) and (d) facilities. The EPA also concludes that such an approach is inconsistent with Congressional intent of incentivizing meaningful emission reductions and compliance with section 111(b) and (d) methane emissions standards and plans.

The EPA has concluded that, where a WEC applicable facility has instances of noncompliance with section 111(b) and (d) methane emissions standards and plans, losing the exemption for an entire year unduly constrains use of the exemption contrary to Congressional intent. The EPA has also concluded that under such scenario, losing the exemption for the same amount of time as the noncompliance event is infeasible, impractical, and counter to Congressional intent. Attempting to define that period would go well beyond existing reporting and impose a large additional burden on both the regulated industry and on the EPA. Accordingly, after consideration of comments received, the EPA is finalizing an approach in the final rule that eligibility for the regulatory compliance exemption will be evaluated on a quarterly basis. Any NSPS OOOOb or State/Federal plan noncompliance results in the entire WEC applicable facility (or site within the WEC applicable facility for the onshore production and gathering and boosting industry segments only) losing the exemption for the entire quarter(s) in which the noncompliance occurs. Quarters are delineated based on the calendar year (*e.g.*, January through March). Quarterly compliance status is based on the start and stop dates of applicable deviations as reported in annual NSPS OOOOb and State/Federal plan annual reports. Where a noncompliance event spans multiple quarters, the exemption will be lost for those multiple quarters in which noncompliance occurs.

The EPA believes that WEC applicable facilities losing the exemption on a quarterly basis in the event of noncompliance is an appropriate approach that is consistent with the language and goals of the WEC, enables use of existing reporting, and avoids significant additional reporting and administrative burden. While the statute addresses when the charge should begin (for emissions reported for calendar year 2024) and when it should resume if the conditions in CAA section 136(f)(6)(A)(i) and (ii) cease to apply (the first calendar year in which those conditions are no longer met), it does not specify what length of time an applicable facility should lose eligibility for the regulatory compliance

---

[64] "Well-pad site means all equipment on or associated with a single well-pad. Specifically, the well-pad site includes all equipment on a single well-pad plus all equipment associated with that single well-pad." 40 CFR 98.238.

[65] "Gathering and boosting site means a single gathering compressor station as defined in this section, centralized oil production site as defined in this section, gathering pipeline site as defined in this section, or other fenceline site within the onshore petroleum and natural gas gathering and boosting industry segment." *Id.*

exemption in the face of noncompliance (pursuant to CAA section 136(f)(6)(A)). Given that Congress did not specify how long a WEC applicable facility would lose the exemption for in the event of noncompliance, the EPA concludes that proceeding on a quarterly basis is a reasonable approach for the practical considerations. The final approach increases flexibility so that access to the regulatory compliance exemption is not overly restrictive (*i.e.,* one deviation would not lead to loss of the exemption for an entire year, as proposed), while maintaining the integrity of the exemption such that it is unavailable to WEC applicable facilities during times of NSPS OOOOb or State/Federal plan noncompliance (as some commenters urged). The final approach also aligns with the intent of the WEC—to provide reasonable access to an exemption from the charge for WEC applicable facilities that are in compliance with their methane emission requirements without allowing the exemption for periods of noncompliance, while also incentivizing methane emission reductions.

*Exemption Applicability under new or revised oil and gas NSPS or EG.* The EPA is finalizing as proposed that, should additional or revised NSPS/EG regulations for the oil and natural gas industry source category be finalized in the future, the EPA will reassess compliance with the methane emissions requirements in those regulations for determining continued availability of the regulatory compliance exemption. As discussed in section II.D.2.i. of this preamble, the regulatory compliance exemption could become unavailable if future NSPS/EG revisions would, upon implementation, result in fewer emissions reductions than would have been achieved by the 2021 NSPS/EG Proposal, had that proposal been finalized and implemented. Similarly, the exemption could be reinstated upon adoption and implementation of NSPS/ EG revisions that restore emissions reduction equivalency with, or improvement upon, the 2021 NSPS/EG Proposal.

It is also possible that the EPA may revise the 2024 Final NSPS/EG in the future to add requirements for equipment in industry segments that are not currently regulated. This creates the potential that the regulatory compliance exemption may become available to additional WEC applicable facilities, upon the appropriate Administrator determination. In such cases where a new or expanded regulation issued pursuant to CAA section 111(b) or (d) would apply to a methane emission source at a WEC applicable facility that

is in a segment of the oil and natural gas industry not currently covered by the 2024 Final NSPS/EG, the EPA is finalizing as proposed that such regulation will not have any effect on those WEC applicable facilities with existing access to the regulatory compliance exemption. However, in such case, the Administrator would still need to make appropriate determinations for the additional industry segments pursuant to CAA section 136(f)(6)(A)(i) consistent with the framework finalized in this rulemaking. Such WEC applicable facilities would then be eligible to claim the exemption so long as they are they are subject to and in compliance with the applicable methane emissions requirements.

g. Calculation of Emissions for Partial Eligibility for the Regulatory Compliance Exemption

The EPA is finalizing calculation methodologies for the regulatory compliance exemption at 40 CFR 99.43. These calculation methodologies are necessary to account for the revisions from the proposed rule that the EPA is finalizing, including the assessment of the emissions qualifying for exemption at the site level for WEC applicable facilities in the onshore production and gathering and boosting industry segments and assessment of compliance on a quarterly basis for purposes of the exemption for all WEC applicable facilities. Under the proposed rule, exemption eligibility was assessed for the entire year and for the entire WEC applicable facility, therefore calculation methodologies accounting for partial year exemption as well as site level assessment were not required.

Because the final approach for the regulatory compliance exemption allows for partial exemption eligibility, the EPA is by necessity revising the calculation methodology from proposal to match the approach in the final rule. In the final rule, for facilities in the onshore production and gathering and boosting industry segments, methane emissions as reported under subpart W that would not qualify for the exemption are those from the individual site(s) where NSPS OOOOb or State/ Federal plan noncompliance occurs. These site-level emissions (*i.e.,* the sum of emissions from all quarters in the year in which the noncompliance occurs) are compared to the entire WEC applicable facility's facility applicable emissions (*i.e.,* methane emissions at the WEC applicable facility above the waste emissions threshold prior to consideration of any applicable exemptions). If the sum of total methane

emissions from the site(s) with noncompliance is less than the facility applicable emissions, the sum of methane emissions from the site(s) with noncompliance is the total amount of emissions that would not qualify for the regulatory compliance exemption. If the sum of methane emissions from the site(s) with noncompliance are greater than the WEC applicable facility's facility applicable emissions, the entire WEC applicable facility would not qualify to exempt any emissions under the regulatory compliance exemption for the reporting year. In this way, facility applicable emissions serve as a ceiling for the total amount of emissions that would not qualify for the regulatory compliance exemption because in the absence of the regulatory compliance exemption, this is the highest possible amount of methane that would potentially be subject to charge. For WEC applicable facilities in all other industry segments, we are finalizing as proposed that the entire WEC applicable facility would not qualify for the regulatory compliance exemption and thus its facility applicable emissions are the highest number of metric tons of methane potentially subject to charge.

As described in section II.D.2.f. of this preamble, the EPA is finalizing that eligibility for the regulatory compliance exemption will be evaluated on a calendar quarter basis. Emissions from all emissions sources contained within a WEC applicable facility (or site, for onshore production and gathering and boosting facilities) are not eligible for the regulatory compliance exemption during any calendar quarter in which there is noncompliance among any CAA section 111(b) or (d) facilities contained within the WEC applicable facility (or site, for onshore production and gathering and boosting facilities), as described in section II.D.2.f. of this preamble and detailed at 40 CFR 99.41(d) and 99.42(d). Quarterly emissions will be calculated by taking annual facility or site subpart W methane emissions, subtracting any emissions from other large release events, and dividing by four. If emissions from other large release events occur in a quarter with noncompliance, these emissions are added to the quarter's emissions that are ineligible for the exemption. If emissions from other large release events, as reported under 40 CFR 98.236(y), span across multiple quarters, emissions from these events are allocated to individual quarters by multiplying total methane emissions from each event by the ratio of event duration, in days, to total days in the

quarter. The removal of emissions from other large release events prior to calculating average quarterly emissions ensures that these emissions are not allocated to quarters when they are known not to have occurred, and ensures they are accounted for in quarters in which there is NSPS OOOOb or State/Federal plan noncompliance. The calculation of quarterly methane emissions as annual emissions divided by four (after removing emissions from other large release events) simplifies implementation and reduces burden for both industry and the EPA. An approach that attempted to estimate methane emissions that are directly emitted in each quarter would have significantly increased the reporting requirements for industry, would not be anticipated to meaningly differ from the final approach for all emissions sources, and would have generated emissions data that would be close to impossible to verify without further increasing reporting requirements.

For WEC applicable facilities with partial-year eligibility for the regulatory compliance exemption, the quantity of emissions that qualify for the regulatory compliance exemption is calculated as the facility applicable emissions minus the sum of quarterly facility or site-level methane emissions, as appropriate, for all quarters with NSPS OOOOb or State/Federal plan noncompliance. If this calculation results in a value equal to or less than zero, the facility does not have emissions that qualify for a claim under the regulatory compliance exemption (*i.e.,* facility applicable emissions serve as a ceiling, and if there are no other eligible exempted emissions, WEC applicable emissions are equal to facility applicable emissions). If the calculation results in a positive value, then the facility applicable emissions are reduced by this amount when determining the WEC applicable emissions for the facility pursuant to the final requirements of 40 CFR 99.21(d). The positive value represents the amount of methane emissions eligible for the exemption. The calculation procedures for WEC applicable facilities with partial-year eligibility for the regulatory compliance exemption have been finalized at 40 CFR 99.43(b), including equations D–1A, for onshore production and onshore gathering and boosting facilities, and D–1B for facilities in all other industry segments. The quantity of emissions that would qualify for exemption under both the regulatory compliance exemption and any other exemption are then subtracted from this value, as described later in this section.

As a result of the finalized approach for assessment of partial regulatory compliance exemption under this final rule, it would be possible for a WEC applicable facility in the onshore production segment to have exempted emissions due to eligible permitting delays and plugged wells at a facility that also has qualified emissions eligible for the regulatory compliance exemption. In order to avoid double-counting emissions eligible for exemption (*i.e.,* subtracting the same methane emissions twice when calculating WEC applicable emissions), we are finalizing requirements at 40 CFR 99.43(c) to determine the quantity of emissions that would qualify for exemption under both the regulatory compliance exemption and any other exemption. Emissions under this scenario are quantified by multiplying the total quantity of emissions claimed for plugged wells by the ratio of the number of calendar quarters for which the facility qualified for regulatory compliance exemption divided by four added to the total quantity of emissions claimed for unreasonable permitting delay multiplied by the ratio of the number of days (considering calendar quarters) the facility qualified for the regulatory compliance exemption divided by the total number of days eligible for unreasonable permitting delay. For example, a facility qualified to claim for exemption 100 mt of $CH_4$ due to eligible unreasonable permitting delay for 365 days, qualified for exemption of 4 mt of $CH_4$ emissions from plugged wells, and qualified for regulatory compliance exemption for three calendar quarters (273 days) (January 1–March 31; April 1–June 30; and July 1–September 30), this calculation would result in a value of 77.79 mt of $CH_4$. This value is subtracted when determining the emissions attributed to qualifying for the regulatory compliance exemption. In this way, these emissions are appropriately attributed to the eligible permitting delay and/or plugged well exemptions rather than being double-counted as part of the regulatory compliance exempted emissions. For facilities in the onshore production industry segment, this assessment is computed on a site-by-site basis and then totaled. The calculations for determination of the emissions that would qualify for exemption under both the regulatory compliance exemption and another exemption are finalized at Equation D–2A, applicable for facilities in the onshore production industry segment, and Equation D–2B, applicable

for facilities in all other industry segments.

h. Reporting and Recordkeeping Requirements for the Regulatory Compliance Exemption

We are finalizing reporting requirements at 40 CFR 99.7(b)(2)(iv) relevant to the regulatory compliance exemption. Those requirements provide that once the Administrator has made the requisite determinations in CAA section 136(f)(6)(A)(i)–(ii) for a given State (or group of States, for facilities that span multiple States) and the final compliance date for CAA section 111 facilities in that State(s) has passed, each WEC filing submitted by a WEC obligated party for each WEC applicable facility in the State(s) that exceeds the waste emissions threshold that contains any CAA section 111(b) and (d) facilities and which are claiming the exemption must include certain information relevant to the regulatory compliance exemption. This final approach is conceptually similar to the proposed approach of initiating reporting requirements for the exemption only when the exemption becomes available, but it is changed in that it is now aligned with the timing of regulatory compliance exemption availability as finalized in this rulemaking. CAA section 136(f)(6)(A) mandates that the EPA shall not impose a charge upon WEC applicable facilities that qualify for the regulatory compliance exemption. Under the final approach for implementing the regulatory compliance exemption, WEC applicable facilities that are below the waste emissions threshold are ineligible for the exemption. The EPA therefore is finalizing as proposed that WEC obligated parties are not required to report information related to the compliance status of CAA section 111(b) and (d) facilities contained within WEC applicable facilities for WEC applicable facilities that are below the waste emissions threshold. The EPA is also finalizing that WEC applicable facilities that are not eligible for the regulatory compliance exemption, or that otherwise choose not to use the regulatory compliance exemption, are not subject to the reporting requirement at 40 CFR 99.7(b)(2)(iv).

The EPA is also finalizing, as proposed, reporting requirements for facilities that qualify for and elect to claim the regulatory compliance exemption at 40 CFR 99.42. We are finalizing that the WEC filing submitted by the WEC obligated party for each WEC applicable facility must include a certification of the NSPS and State and Federal plan compliance status for each

CAA section 111(b) and (d) facility located within a WEC applicable facility during the reporting year. This certification of compliance status must indicate if any CAA section 111(b) or (d) facilities contained within the WEC applicable facility had any noncompliance, as defined in this final rule, from methane requirements for monitoring, emissions limits or standards (surrogate parameters), operating limits (including operational parameter limits), or work practice standards in the reporting year, and must indicate in which quarter of the year those deviations occurred. WEC applicable facilities that meet regulatory compliance exemption eligibility requirements for the entire year or a portion of the year are required to report the ICIS–AIR ID (or if unavailable, the facility registry service (FRS) ID and EPA Registry ID from CEDRI) reporting identifiers for each CAA section 111(b) and (d) facility located within the WEC applicable facility. These identifiers provide links to reports, emissions, and compliance data for each CAA section 111(b) and (d) facility located within the WEC applicable facility, which is information necessary for the EPA to confirm the accuracy of the reported compliance status.

The EPA proposed that WEC applicable facilities that are not eligible for the exemption would be required to submit one report associated with the CAA section 111(b) and (d) facilities located within the WEC applicable facility that documents any instance of noncompliance for the reporting year. The EPA received comments stating that exemption-related reporting requirements should not apply to WEC applicable facilities that are not eligible for the exemption. The EPA agrees, and the final rule does not include reporting requirements for the regulatory compliance exemption for WEC applicable facilities that are not eligible for the regulatory compliance exemption or otherwise choose not to use the exemption. As supporting documentation for the certification of compliance status of WEC applicable facilities that are fully or partially eligible for the exemption, we are finalizing, as proposed, to require the submittal of report(s) associated with the CAA section 111(b) and (d) facilities located within the WEC applicable facility. The EPA recognizes that the compliance certification period for CAA section 111(b) and (d) facilities may not align with the reporting year for which the filing is being completed and that at the time of the WEC filing due on August 31 of each year, report(s)

covering the complete preceding reporting year for WEC filing may not be available. To accommodate these cases where the NSPS OOOOb and State/Federal plan compliance status for the complete reporting year is not known at the time of the WEC filing, the EPA is finalizing that the WEC obligated party must provide compliance reports for the portion of the year for which they are available (including the period of time covered); for the remainder of the year, the WEC obligated party must provide a certification of compliance status for each CAA section 111(b) and (d) facility at the WEC applicable facility that is not available at the time of the WEC filing. It also is possible that the complete calendar year of WEC filing is covered by two annual reports, each covering a portion of the calendar year. In this case, the WEC applicable facility must submit both annual reports. The EPA further recognizes that a WEC applicable facility may contain CAA section 111(b) and (d) facilities that first became subject to requirements under CAA sections 111(b) and (d) during the reporting year associated with the filing and for which the first year of compliance is not completed. For these CAA section 111(b) and (d) facilities, we are finalizing as proposed to require that the filing identify the type of facility, the date that it became subject, and a certification of the compliance status for the portion of the year in which it was subject to requirements under CAA sections 111(b) and (d). In cases where the initial filing does not include a report covering the entire reporting year, we are finalizing as proposed to require that the WEC obligated party provide a revised filing once such a report becomes available. The EPA is finalizing that this revised filing under the final WEC rule would be required to be made within 30 calendar days of the date that the compliance report covering the remainder of the year would be due under the applicable requirements of NSPS OOOOb or a State/Federal plan. The deadlines for filing revisions to WEC filings as discussed in section III.A.4. do not apply for the submittal of compliance reports.

We are finalizing language at 40 CFR 99.41(e) clarifying that for purposes of 40 CFR part 99, "affected facility(ies)" or "designated facility(ies)" that are located at the WEC applicable facility means the affected facility(ies) or designated facility(ies) that was (were) part of the WEC applicable facility as of December 31 of the reporting year, as well as any facility(ies) that was (were) decommissioned during the reporting year without being transferred to

another WEC applicable facility. This language serves to clarify that the basis for determining the CAA section 111 facilities for which submission of compliance reports is required and qualification for exemption of emissions is determined under the regulatory compliance exemption is aligned with the basis for reporting emissions under subpart W of the GHGRP. We are also finalizing an additional reporting requirement at 40 CFR 99.42(b)(7) necessary for verification and implementation of this basis of compliance report submittal under the regulatory compliance exemption. The EPA recognizes that the requirement to submit compliance reports covering the full calendar year for all CAA section 111 facilities located at a WEC applicable facility may result in submission of reports that include equipment that was not located at that WEC applicable facility during the year. For example, in the circumstance of a CAA section 111 facility that is purchased from another owner or operator during the reporting year, the compliance report prepared for that particular section 111 facility (*i.e.,* piece of equipment) may also include equipment that was not transferred. The reporting requirement of 40 CFR 99.42(b)(6) requires an indication of whether any compliance reports submitted pursuant to 40 CFR 99.42(b) include one or more CAA section 111 facilities that are not located at the WEC applicable facility, and for any such CAA section 111 facilities, an indication of whether the CAA section 111 facility was part of the WEC applicable facility for part of the reporting year and transferred to another facility prior to December 31 of the reporting year or if the affected or designated facility was not part of the WEC applicable at any time during the reporting year.

We are finalizing additional reporting requirements related to the regulatory compliance exemption beyond those that were proposed at 40 CFR 99.42(d), 99.42(e), and 99.42(f). These requirements are necessary to support implementation of the final approaches for assessment of noncompliance at the site level for the onshore petroleum and natural gas production and onshore petroleum and natural gas gathering and boosting industry segments, as well as quarterly assessment of whether a facility (or site) meets the criteria for exemption of emissions under the regulatory compliance exemption as discussed in section II.D.2.f. of this preamble. The final requirements at 40 CFR 99.42(d) require that for each submitted compliance report that

indicates a deviation or violation, the compliance reporting identifiers associated with the affected or designated facilities for which there was a deviation or violation are reported. Additionally, an indication for each calendar quarter is required as to whether the compliance report indicates that the criteria for exemption of emissions were met during that calendar quarter. The final requirements at 40 CFR 99.42(e) establish additional reporting for other large release events that occurred within or overlapped with a quarter in which the facility (or site) did not qualify for regulatory compliance exemption. These additional elements consist of the unique release event identification number as reported to subpart W for the release event and the duration of the event, in days, that occurred during calendar quarters in which the facility (or site) did not qualify for regulatory compliance exemption. These reported data elements are necessary for implementation of the calculation of emissions exempted under the regulatory compliance exemption that are associated with other large release events, as discussed in section II.D.2.g. of this preamble. The final requirements at 40 CFR 99.42(h) consist of the reporting of the quantity of methane emissions at the WEC applicable facility qualifying for regulatory compliance exemption, the total quantity of methane emissions that qualified for exemption under both the regulatory compliance exemption and another exemption, whether the facility (or site) did not meet the criteria for exemption of all emissions under the regulatory compliance exemption, and if so an indication for each calendar quarter of whether the facility (or site) met the criteria for exemption of emissions during that calendar quarter. In cases where multiple compliance reports are submitted for a facility, individual well-pad site (for the onshore petroleum and natural gas production industry segment) or individual gathering and boosting site (for the onshore petroleum and natural gas gathering and boosting industry segment), the calendar quarters reported under this requirement must reflect the periods of time in which the conditions for the exemption of emissions were met for the facility, well-pad site, or gathering and boosting site, as applicable, in its entirety. For example, if two reports were submitted that together represent all of the affected and designated facilities at a well-pad site, and one report indicates deviation during only the first calendar quarter (*i.e.,* January to March) while the other

report indicates deviation during only the second calendar quarter (*i.e.,* April to June), the information reported would be that for the first (*i.e.,* January to March) and second (*i.e.,* April to June) calendar quarters the conditions for the exemption of emissions were not met, and for the third (*i.e.,* July to September) and fourth (*i.e.,* October to December) calendar quarters the conditions were met.

The EPA requires this information for the verification of regulatory compliance exemption eligibility. Reported information will be used to conduct verification as discussed in section III.A.4. as well as any auditing that occurs as discussed in section III.E.1.

The EPA is aware that these reporting requirements may result in cases where a WEC obligated party makes a good-faith representation that each CAA section 111(b) and (d) facility at the WEC applicable facility is in compliance but later independently discovers an instance(s) of noncompliance. The EPA is finalizing as proposed that such independent discoveries would be considered to be substantive errors within the WEC filing. The EPA is finalizing at 40 CFR 99.7(e)(1) that a revised WEC filing must be submitted within 30 days of the discovery that a previously submitted WEC filing contains a substantive error. Provided that timely submittal of a revised filing is made, if a revised regulatory compliance exemption filing results in the imposition of WEC obligation on a WEC applicable facility that previously qualified for exemption, the EPA is finalizing that the WEC obligated party would not be subject to any penalties.

However, later discoveries of deviations or violations by the EPA or another regulatory authority, or discoveries as a result of investigation by the EPA or another regulatory authority (including information requests), are not treated the same way as filing errors. Where a WEC obligated party represents that each CAA section 111(b) and (d) facility at the WEC applicable facility is in compliance, but the EPA or another regulatory authority subsequently discovers the existence of noncompliance, or the CAA section 111(b) and (d) facility identifies the noncompliance as a result of an EPA investigation (including information requests), the WEC obligated party is required to submit a revised WEC filing with corrected information, but may be subject to enforcement and required to pay any outstanding WEC fees and penalties. False statements may be subject to criminal enforcement.

i. Resumption of WEC Under CAA Section 136(f)(6)(B)

CAA section 136(f)(6)(B) provides that if, at any point after the Administrator has made the determinations required by CAA section 136(f)(6)(A)(i) and (ii), the conditions for any such determination cease to apply, the WEC applicable facility will "again be subject to" charge. Because the EPA is finalizing that the determinations required by CAA section 136(f)(6)(A)(i) and (ii) will occur on a State-by-State basis, we are finalizing that all WEC applicable facilities in a State would lose access to the exemption if either of the conditions in CAA section 136(f)(6)(A)(i) and (ii) ceased to apply for that State. For example, if a State plan were challenged in litigation and vacated by a court after the initial Administrator determinations for that State, a plan would no longer be "approved and [] in effect" in that State, and the regulatory compliance exemption would no longer be available to WEC applicable facilities in that State. Similarly, if after the initial equivalency determination methane emissions requirements promulgated under CAA section 111(b) or (d) (either the NSPS or the State/Federal plans) were modified such that they no longer resulted in equivalent or greater aggregate emissions reductions than the 2021 NSPS/EG Proposal in a particular State, the exemption would no longer be available in that State. For WEC applicable facilities that span multiple States or Tribal lands, the exemption would no longer be available if either of the conditions required by CAA section 136(f)(6)(A)(i) and (ii) ceased to apply in any of the States or Tribal lands in which a WEC applicable facility has operations. If a WEC applicable facility is in an industry segment where facilities may span multiple States or Tribal lands and the criteria in either CAA section 136(f)(6)(A)(i) or (ii) cease to be met in one of those States or Tribal lands, but the facility can demonstrate it is not located in the State where the conditions cease to exist based upon the reporting requirement finalized at 40 CFR 99.7(b)(2)(iv)(A), the exemption remains available to the facility.

The EPA is finalizing as proposed that any determination that the criteria in CAA section 136(f)(6)(A) are no longer met after the initial determination will be made through a future administrative action. Consistent with the statutory text CAA section 136(f)(6)(B), the EPA is finalizing that the exemption will not be available for the full calendar year in which the required criteria were no longer met. The EPA is finalizing, as

proposed, that if access to the regulatory compliance exemption were lost after it was initially made available because one of the two required conditions in CAA section 136(f)(6)(A) were no longer met, it will become available again following a subsequent determination that both conditions are once again achieved. Under such circumstances, the exemption will be available again for the reporting year in which the conditions are found to be met. The EPA is finalizing, as proposed, that if the conditions ceased to apply and were then met again in the same reporting year, the exemption will be available for the entire reporting year. The EPA has finalized revised language at 40 CFR 99.40(d) and (e) to clarify the timing of availability of the exemption in this circumstance.

3. Plugged Well Exemption Under CAA Section 136(f)(7)

Congress created an incentive for plugging and permanently shutting wells by including an exemption from the WEC in CAA section 136(f)(7): "[c]harges shall not be imposed with respect to the emissions rate from any well that has been permanently shut-in and plugged in the previous year in accordance with all applicable closure requirements, as determined by the Administrator." Separately, in CAA section 136(a)(3)(D) and 136(b), Congress provided funding that can assist owners and operators who elect to permanently shut-in and plug wells on non-Federal land.[66]

In this rulemaking, we are finalizing that this exemption is applicable to wells in the onshore petroleum and natural gas production, offshore petroleum and natural gas production, and underground natural gas storage industry segments. We proposed that this exemption would apply to the production industry segments only and not to wells in the underground storage industry segment. After continued assessment of the statutory text and consideration of comments received, the EPA is finalizing the inclusion of wells in the underground storage industry segment in the plugged well exemption.

[66] On December 15, 2023, the EPA and the DOE announced the award of $350 million in formula grant funding to 14 states to help measure and reduce methane emissions, supporting industry efforts to cut methane emissions from low-producing, marginal conventional wells on non-Federal lands and environmental restoration of well sites. Press release: *https://www.epa.gov/newsreleases/biden-harris-administration-announces-350-million-14-states-reduce-methane-emissions.*

Inflation Reduction Act (IRA)—Mitigating Emissions from Marginal Conventional Wells, Funding Opportunity Number DE–FOA–003109.

CAA section 136(f)(7) does not restrict eligibility to wells in the production industry segments. In fact, the statutory text states that the exemption is applicable to the emissions rate "from any well" that has been plugged. To best align with the statutory text, the EPA is finalizing that plugged wells in the underground storage industry segment are also eligible for the plugged well exemption. Exempted emissions sources for plugged wells in the underground storage segment includes equipment leaks attributed to the wellhead. For the onshore petroleum and natural gas production and the offshore petroleum and natural gas production sectors, we are expanding the plugged well exemption to include other emissions sources reported on the well level that were not included in the proposal. To be more consistent with CAA section 136(f)(7), the final plugged well exemption includes all subpart W emissions sources attributable to an individual well, so the exemption better accounts for emissions associated with an individual well. As discussed further in section II.D.3.b. of this preamble, for onshore petroleum and natural gas production we are expanding the exemption to include well testing, associated natural gas venting and flaring, and drilling mud degassing. These emissions sources are added in addition to the wellhead equipment leaks, liquids unloading, and workovers with or without hydraulic fracturing for the onshore petroleum and natural gas production sector that were included in the proposal. For offshore petroleum and natural gas production, drilling mud degassing is included in the exemption, in addition to the component-level equipment leaks that were proposed.

We are finalizing as proposed that exempted emissions would be those from wells permanently shut-in and plugged in the previous year (*i.e.,* if a well is permanently shut-in and plugged in 2026, the exempted emissions would be deducted from the reporting year 2026 emissions totals that are filed under WEC in 2027). Taken all together, the changes being finalized in this rulemaking will help improve access to the plugged well exemption while also more closely aligning this exemption with the 2024 NSPS/EG Final rule.

a. Determining if the Exemption for Permanently Shut-In and Plugged Wells Applies to a WEC Applicable Facility

The EPA is finalizing as proposed two criteria for determining if the exemption for permanently shut-in and plugged wells applies to a WEC applicable facility.

Consistent with the other exemptions, the first criterion is that the facility must have emissions that exceed the waste emissions threshold. CAA section 136(f)(7) notes that "charges shall not be imposed" on emissions from permanently shut-in and plugged wells. Charges would not be imposed on emissions below the threshold and therefore an exemption is unnecessary in cases where facility emissions are below the threshold. The EPA is finalizing as proposed that emissions from facilities that are below the waste emissions threshold would not be exempted. The EPA is finalizing as proposed that for facilities that exceed the waste emissions threshold, emissions eligible for the plugged well exemption could be subtracted up to the point where facility emissions equal the waste emissions threshold (*i.e.,* the lowest possible WEC applicable emissions for a facility with the plugged well exemption would be zero).

Second, wells must meet the following definition of permanently shut-in and plugged in accordance with all applicable closure requirements. The EPA is finalizing as proposed that for the purposes of this exemption, a permanently shut-in and plugged well is one that has been permanently sealed to prevent any potential future leakage of oil, gas, or formation water into shallow sources of potable water, onto the surface, or into the atmosphere. For the purposes of this exemption, the EPA is finalizing as proposed that a well would be considered permanently shut-in and plugged, in accordance with all applicable closure requirements, if the owner or operator has met all applicable Federal, State, and local requirements for closure in the jurisdiction where the well is located. Although Federal, State, and local requirements for well closure may vary (*e.g.,* only some States require post-plugging reports, some States require initial checks by State environmental agency at time of plugging), wells are permanently shut-in and plugged in a similar manner. For the purposes of this exemption, we are finalizing as proposed that the date on which a well would be considered permanently shut-in and plugged is the date on which a metal plate or cap has been welded or cemented onto the casing end.

In addition to requirements specifying how to plug a well, relevant Federal, State, and local requirements often also specify requirements such as for notifications, reporting, and site remediation. For purposes of 40 CFR part 99, we are finalizing as proposed that the applicable closure requirements would include only the requirements

specific to well plugging. We are finalizing as proposed that requirements for notifications, reporting, and site remediation are not included as part of the exemption eligibility criteria for following "all applicable closure requirements" in CAA section 136(f)(7) because the closure of the well is the key activity impacting methane emissions, which is the focus of the WEC, and these other aspects of closure, while important, are less relevant to methane emissions levels. We also note that had we included these additional requirements in our interpretation of "all applicable closure requirements," the reporting requirements would increase for permanently shut-in and plugged wells and this may lead to recalculations of WEC years after the exemption was initially applied.

b. Calculations of Exempted Emissions From Permanently Shut-In and Plugged Wells

*Calculations of Exempted Emissions from Permanently Shut-in and Plugged Wells at Onshore Petroleum and Natural Gas Production Facilities.* The EPA is finalizing as proposed that only wellhead emissions are eligible for the plugged well exemption with some modifications from the proposal regarding what is included as eligible emissions for the onshore petroleum and natural gas production industry segment. In the proposal, the EPA included wellhead equipment leaks, liquids unloading, and workovers both with and without hydraulic fracturing, in the reporting year in which the well was plugged as methane emissions eligible for the exemption in the onshore petroleum and natural gas production industry segment. We are expanding the plugged well exemption for the onshore petroleum and natural gas production industry segment to include other emissions sources reported on the wellhead level (*i.e.,* well testing, associated natural gas venting and flaring, and drilling mud degassing) in addition to the emissions sources proposed.

The EPA received comments supporting expansion of the exemption to include emissions from additional sources, such as emissions from non-wellhead equipment that are co-located on the well pad. The statutory text does not describe or reference emissions from other emissions sources that may be co-located with a plugged well, and the EPA determined that the statutory text is best read to exclude these emissions. Moreover, as we noted in the proposal, methane emissions from other equipment onsite (*e.g.,* separator, compressor, flare) may result from co-

mingled natural gas throughput from multiple wells and not just the wells that are plugged.

For the purposes of quantifying the methane emissions from eligible emissions sources associated with each permanently shut-in and plugged well, we are finalizing as proposed to use the methane emissions and throughput data reported to subpart W of part 98. The final amendments in the 2024 Subpart W Final Rule impact the data available to best estimate the exempted emissions from the permanently shut-in and plugged well. Therefore, as described in more detail in this section, for applicable emission sources and industry segments, different approaches are finalized for certain time periods.

For reporting year 2024, the current subpart W rule requires that onshore petroleum and natural gas production facilities report methane emissions from liquids unloading and workovers by sub-basin for each WEC applicable facility, as well as methane emissions from well testing, associated natural gas venting and flaring, and equipment leaks at the facility-level. Drilling mud degassing is not an emission source category collected under the current subpart W rule for reporting year 2024. Subpart W of part 98 also currently requires offshore petroleum and natural gas production facilities and onshore petroleum and natural gas production facilities to report facility-level throughput of gas and oil handled or sent to sale, respectively. Revisions included in the 2024 Subpart W Final Rule require onshore petroleum and natural gas production facilities to report additional elements that facilitate quantification of methane emissions from individual shut-in and plugged wells. Specifically, effective January 1, 2025, and applicable beginning with reporting for 2024, the 2024 Subpart W Final Rule requires onshore petroleum and natural gas production facilities to report well-level throughput volumes for gas and oil sent to sale from wells that are permanently shut-in and plugged. Additionally, beginning in reporting year 2025, the 2024 Subpart W Final Rule increases the granularity of methane emissions reporting for eligible equipment categories, except equipment leaks, to the well-level and methane emissions reporting for equipment leaks to the well-pad site level. Due to the differences in available reporting data for 2024 and future years, the final approach for quantifying methane emissions in part 99 for individual wells located at onshore petroleum and natural gas production facilities that are permanently shut-in and plugged in 2024 is different than the approach for

quantifying methane emissions from wells located at onshore petroleum and natural gas production facilities that are permanently shut-in and plugged in 2025 and future years.

For reporting year 2024, the EPA is finalizing as proposed through 40 CFR 99.52 that WEC applicable facilities in the onshore petroleum and natural gas industry segment would quantify methane emissions from permanently shut-in and plugged wells by allocating the subpart W of part 98 reported facility-level methane emissions from eligible emissions sources using subpart W of part 98 reported production volumes of gas and oil sent to sale. We are finalizing as proposed that WEC applicable facilities in the onshore petroleum and natural gas industry segment would sum the total subpart W of part 98 reported methane emissions from methane emissions from eligible emissions sources, and multiply the sum of the methane emissions by the ratio of subpart W of part 98 reported production at the permanently shut-in and plugged well to the subpart W of part 98 reported facility-level total production.

For facilities with only gas production with exempt plugged well emissions, we are finalizing as proposed that the reported gas produced from the plugged wells be divided by the total gas production at the facility to develop the ratio. For facilities with only oil production with exempt plugged well emissions, we are finalizing as proposed that the reported oil produced from the plugged wells be divided by the total oil production at the facility to develop the ratio. For facilities with both gas and oil production with exempt plugged well emissions, we proposed and are finalizing that gas production that is reported to subpart W of part 98 by the WEC applicable facility in the onshore petroleum and natural gas industry segment would be converted to barrels of oil equivalent, such that throughput volumes will be on the same basis for facilities that report production of gas and oil. The EPA is finalizing as proposed to use a default value of 6,000 scf/barrel.

For reporting year 2025 and future years, we are finalizing as proposed that WEC applicable facilities in the onshore petroleum and natural gas industry segment must estimate well-level emissions in accordance with part 98 methods for the permanently shut-in and plugged well. As described in this section, for 2025 and future years, subpart W of part 98 requires reporting of methane emissions from liquids unloading, workovers, well testing, associated natural gas venting and

flaring, and drilling mud degassing to be at the well-level for facilities in the onshore petroleum and natural gas industry segment; therefore, we are finalizing as proposed that facilities in the onshore petroleum and natural gas industry segment would utilize the methane emissions as reported to subpart W part 98 in their part 99 exemption calculation for these emissions sources. Also, as described in this section, for 2025 and future years, subpart W of part 98 requires reporting of methane emissions from wellhead equipment leaks at the well-pad site level for facilities in the onshore petroleum and natural gas industry segment. In order to obtain a well-level estimate for the part 99 exemption calculation, we are finalizing as proposed to require facilities in the onshore petroleum and natural gas industry segment to utilize the subpart W of part 98 input data and emission estimation methods for wellhead equipment leaks, including the use of direct measurement surveys as specified in the 2024 Subpart W Final Rule, to calculate the methane emissions at the well level for the permanently shut-in and plugged well. For example, if equipment leak methane emissions included emissions from a permanently shut-in and plugged well or wells were estimated using the leaker emission factor method in 40 CFR 98.233(q) at the well-pad site, the WEC applicable facility would use the count of leakers by component type (*e.g.,* valve, connector) recorded for the permanently shut-in and plugged well, the time the components were leaking and operational at the well during the year, and the appropriate emissions factors from subpart W of part 98 to estimate the methane emissions from the permanently shut-in and plugged well. Similarly, if the equipment leak methane emissions at the well-pad site that includes the permanently shut-in and plugged well were estimated using the population count method in 40 CFR 98.233(r), the WEC applicable facility would use the operating time of the well during the year and the appropriate emissions factors from subpart W of part 98 to estimate the emissions from the permanently shut-in and plugged well.

*Calculations of Exempted Emissions from Permanently Shut-in and Plugged Wells at Offshore Petroleum and Natural Gas Production Facilities.* For offshore petroleum and natural gas production facilities, the current subpart W of part 98 reporting requirements are based on the facility's submission to the Bureau of Ocean Energy Management (BOEM), which includes methane

emissions for component-level equipment leaks and drilling mud degassing. The methane emissions required to be reported by offshore facilities are unchanged by the 2024 Subpart W Final Rule as it pertains to this exemption in that these facilities will continue to report the data from their BOEM report. Subpart W of part 98 also currently requires offshore petroleum and natural gas production facilities to report facility-level throughput of gas and oil handled in the reporting year. Final revisions included in the 2024 Subpart W Final Rule for offshore petroleum and natural gas production facilities add requirements for the reporting of well-level throughput volumes for gas and oil sent to sale from wells that are permanently shut-in and plugged beginning in reporting year 2024. The 2024 Subpart W Final Rule also revised the terms in the current reporting elements for facility-level throughput to refer to gas sent to sale, rather than handled, for consistency with the CAA language and with the onshore production industry segment. As noted in the preamble for the 2024 Subpart W Final Rule, these verbiage changes for facility-level throughput are not expected to impact the quantity of production volumes reported and were made for consistency and clarity. For the purposes of estimating the exempted emissions for permanently shut-in and plugged wells at offshore petroleum and natural gas production facilities, we are finalizing that facilities allocate the component level equipment leaks (*i.e.,* those from valves, connectors) at the wellhead, as proposed, and drilling mud degassing by the ratio of production from the well that has been permanently shut-in and plugged to the total facility-level production. Analogous to the approach for onshore petroleum and natural gas production facilities for reporting year 2024, in cases where a facility produced both oil and gas, we are finalizing as proposed that gas sent to sale be converted to barrels of oil equivalent and have provided an option to use 6,000 scf/barrel for the conversion.

*Calculations of Exempted Emissions from Permanently Shut-in and Plugged Wells at Underground Natural Gas Storage Facilities.* For underground natural gas storage facilities, the EPA is finalizing that equipment leaks at the wellhead level are eligible for the plugged well exemption. The exemption only includes wellhead equipment leaks because other emissions sources, such as liquids unloading or workovers as seen in the exemption for onshore

production wells, do not occur at non-production wells.

To quantify the methane emissions associated with each permanently shut-in and plugged well, we are finalizing the use of methane emissions reported to subpart W of part 98. Subpart W of part 98 requires underground natural gas storage facilities to report methane emissions from equipment leaks associated with all wells at the facility, but emissions are not attributable to a particular wellhead. In order to obtain a well-level estimate of equipment leaks, we are finalizing that facilities in the underground natural gas storage industry segment must utilize the subpart W of part 98 input data and emission estimation methods for wellhead equipment leaks, including the use of direct measurement surveys as specified in the 2024 Subpart W Final Rule, to calculate the methane emissions at the well level for the permanently shut-in and plugged well.

*Calculations of Exempted Emissions for Multiple Permanently Shut-in and Plugged Wells.* For all reporting years and applicable industry segments, if the WEC applicable facility has more than one permanently shut-in and plugged well, we are finalizing as proposed that the part 99 emissions calculations would be performed for each well and summed to determine the net annual quantity of methane emissions at the WEC applicable facility eligible for the exemption.

c. Reporting and Recordkeeping Requirements for the Exemption for Permanently Shut-In and Plugged Wells

Through the provisions proposed at 40 CFR 99.51, the EPA is finalizing as proposed that the WEC obligated party receiving the exemption would provide for each well at a WEC applicable facility, the well ID number; the date the well was permanently shut-in and plugged; the statutory citation for each State, local, and Federal regulation stipulating requirements that were applicable to the closure of the permanently shut-in and plugged well; the emissions attributable to the well, and for each WEC applicable facility, and the total emissions attributable to all permanently shut-in and plugged wells at the facility. In the final rule, we are adding a reporting requirement of a certification by the designated representative for the WEC obligated party that all identified wells were closed in accordance with State, local, and Federal requirements. We are also finalizing additional reporting requirements to provide information related to the emissions calculations including an indication of the method

used to calculate wellhead equipment leaks, inputs to the methods to calculate wellhead equipment leaks, and the quantity of methane emissions attributable to the well from wellhead equipment leaks. Specifically for onshore production and underground storage wells, data inputs for wellhead equipment leaks were added to provide sufficient data to facilitate verification of the exempted emissions quantity. The data associated with underground natural gas storage facilities is reported to subpart W at the facility level; therefore, well level data will need to be reported to 40 CFR part 99 to ensure verification of the emissions can be performed. We are also finalizing additional reporting requirements related to associated gas flaring and completions and workovers without hydraulic fracturing. These requirements consist of reporting the volume of gas sent to a flare from the plugged well for which exemption is being sought as well as the calculated quantity of methane emissions attributable to the well from associated gas flaring and from completions and workovers without hydraulic fracturing and with flaring. We are finalizing as proposed that the information included in the report would be subject to the general recordkeeping requirements for part 99, meaning these records must be retained for 5 years following the WEC filing year of the exemption such that they can be made available to the EPA for inspection and review.

The EPA requires this information for the verification of exemption eligibility and of exempted emission quantity. Reported information will be used to conduct verification as discussed in section III.A.4., and reported information, records, and other information as applicable will be used to conduct any auditing that occurs under section III.E.1.

## III. General Requirements of the Final Rule

### A. WEC Filing Requirements

#### 1. Required WEC Filers

The WEC obligated party is required to submit a WEC filing annually by August 31 that will include data collected from each WEC applicable facility for which it (the WEC obligated party, as defined in 40 CFR 99.2) is responsible as of December 31 of each reporting year. The WEC filing must include payment of any WEC obligation. The WEC filing provides the data necessary for the EPA to assess and verify the WEC obligation including certain part 98 emissions information and information on netting, as

applicable, as well as supporting documentation for any WEC applicable facility exemptions.

#### 2. Filing Deadlines

As required under the CAA sections 136(c) and (e), the assessment of the first WEC will be based on data collected under subpart W of the GHGRP for year 2024, beginning on January 1, 2024. The EPA proposed that the WEC filing would be due by March 31 of each year following each reporting year, and that any final revisions to the filing would be due by November 1 of each year following each reporting year. The proposed approach aligned the WEC filing and subpart W reporting deadlines. Many commenters were opposed to these proposed deadlines and recommended that the WEC filing occur later in the year. After consideration of comments received, the EPA is revising the WEC filing deadlines from the proposal in this final rule. The EPA is finalizing in 40 CFR 99.5 that the first WEC filing, for year 2024 emissions, is due September 2, 2025,[67] and would be required to be submitted annually by August 31 thereafter, as applicable. The EPA is finalizing a requirement that revisions to the August 31 WEC filing, with the exception of resubmissions to provide CAA section 111(b) or (d) compliance reports or revisions to previously reported compliance reports for the purposes of the regulatory compliance exemption, will be allowed through December 15 of the filing year. It is expected that with the final WEC filing date of August 31, there will be fewer resubmissions of WEC filings due to revised subpart W data compared to the proposed WEC filing deadline of March 31. The EPA is finalizing later WEC filing deadlines than proposed to simplify WEC implementation. The majority of the data used for WEC calculations are the facility-level methane emissions and hydrocarbon throughput volumes reported under subpart W. This information must be reported by March 31 of each year for the previous reporting (*i.e.*, calendar) year. After submission, these data go through the EPA verification process to identify potential errors and engage with facilities to correct them. This process generally concludes at the end of July or early August. In mid-August of each year, the EPA "freezes" the subpart W data set for publication in October. Facilities may continue to

resubmit subpart W data after this point, but it is not included in that year's October data release.[68] As a result of the verification process and a desire by companies to ensure any corrected data is included in that year's public release of data, most, but not all, potential errors identified during the verification process are typically resolved by mid-August. Many commenters noted that requiring the WEC filing at the same time as subpart W reporting would lead to a cycle of WEC payments and refunds as the WEC filing was adjusted based on corrections and resubmissions resulting from the subpart W verification process, and that this cycle would be burdensome for both the EPA and industry. The EPA agrees and is therefore finalizing a WEC filing date of August 31. This date is after the majority of the yearly subpart W verification cycle is substantially complete and gives facilities sufficient time to make any corrections to their March 31 subpart W report and ensure accurate WEC calculations.

The EPA is also finalizing a final WEC resubmission date that is later in the calendar year than proposed. The final deadline of December 15 will provide time for the EPA to verify the initial WEC filings and time for WEC obligated parties to respond to any identified potential errors and resubmit WEC filings. The later WEC filing deadlines will also simplify reporting associated with the regulatory compliance exemption when it becomes available. Annual reporting deadlines for CAA section 111(b) and (d) facilities may fall at different times in the year. Many more WEC applicable facilities will know the compliance status of their constituent CAA section 111(b) and (d) facilities for the respective reporting year by August 31 compared to March 31. The EPA expects only a small number of annual reports for CAA section 111(b) and (d) would not be available by December 15. The final WEC filing dates will therefore reduce the need for WEC resubmissions to account for changes in CAA 111(b) and (d) compliance status for the purposes of determining eligibility for the regulatory compliance exemption.

#### 3. Submission of the WEC Filing

The EPA is finalizing as proposed that each WEC filing must be submitted electronically in accordance with the

---

[67] August 31, 2025, falls on a Sunday, and Labor Day is the following day on September 1, 2025. Therefore, pursuant to final 40 CFR 99.5, the deadline for the initial WEC filing is September 2, 2025.

[68] The EPA publishes GHGRP data every October, covering both the most recently completed reporting year as well as changes impacting the 5 prior years. Changes made post-August would be reflected in the annual publication cycle the following calendar year.

requirements of 40 CFR 99.6 and in a format specified by the Administrator.

As noted previously in this section of the preamble, the EPA is finalizing that each WEC obligated party will submit a WEC filing annually. The WEC filing content provides the data necessary to complete the WEC calculations as described in section II.C. of the preamble. The EPA is finalizing WEC filing requirements to cover general company information including physical address, email, telephone number, list of associated WEC applicable facilities and their identifying information (*e.g.*, part 98, subpart W facility ID), as well as the net WEC emissions calculated in accordance with 40 CFR 99.22, the net WEC emissions after transfers resulting from the netting procedures pursuant to 40 CFR 99.23, and the WEC obligation as calculated pursuant to 40 CFR 99.24. The EPA is also finalizing that each WEC obligated party's WEC filing include certain information at the WEC applicable facility level. Specifically, the EPA is finalizing that for each WEC applicable facility that comprises the WEC obligated party, the filing requirements cover facility-level information including the facility's ID, the facility's industry segment(s), the facility's total subpart W GHG emissions in $CO_2e$, the facility's total subpart W methane emissions, and applicable natural gas or oil throughput as reported under subpart W, the facility's waste emissions threshold calculated in accordance with 40 CFR 99.20, and the facility's WEC applicable emissions calculated in accordance with 40 CFR 99.21.

The EPA received comments on the proposed reporting and recordkeeping requirements, including the contents of the WEC filing. Commenters recommended that the EPA add elements to the WEC filing related to the inputs to the WEC equations. After consideration of comments received, the EPA is adding WEC applicable facility filing requirements for total facility subpart W $CO_2e$, total subpart W methane, and total subpart W natural gas or oil throughput for the metric applicable to the facility's industry segment. These elements have been added to the final rule at 40 CFR 99.7(b)(2)(viii) through (xi). These additional data elements will support data verification and improve transparency by providing all of the primary WEC calculation data inputs in the WEC filing. The EPA notes that including these data elements, which are already reported under subpart W, will not increase the burden for industry as they will be automatically pulled from a WEC applicable facility's subpart W report into the electronic WEC filing system.

The EPA is also finalizing filing requirements for each WEC obligated party related to the three WEC exemptions, which are discussed in sections II.D.1. through 3. of this preamble. The EPA is finalizing as proposed that the exemptions are only available to WEC applicable facilities that exceed the waste emissions threshold. The EPA is therefore finalizing as proposed, with one clarifying revision, that these filing requirements would only apply to WEC applicable facilities that exceed the waste emissions threshold and are otherwise eligible for the exemption(s). The EPA is finalizing clarifying language at 40 CFR 99.7(b)(2)(iii) through (v) to allow a WEC obligated party to elect whether or not to submit a claim for exemption for a WEC applicable facility that meets the applicability requirements for each exemption. Coordinating revisions are being finalized at 40 CFR 99.31(a), and 99.42(a), along with a new paragraph 40 CFR 99.51(a). Comments received on the proposed filing requirements for each exemption are discussed individually for each exemption in sections II.D.1. through 3. of this preamble.

We are finalizing filing requirements related to stationary combustion source other large release events at 40 CFR 99.7(b)(2)(xiii). These reporting requirements are additions to those proposed and are necessary to address for purposes of 40 CFR part 99 the specified double-counting of emissions related to stationary combustion source other large release events as discussed in section II.C.2. of this preamble. For any combustion-related other large release events that were reported pursuant to subpart W, the WEC obligated party must report the unique release event identification number, and determine and report the quantities of $CO_2$, $CH_4$, and $CO_2e$ emissions, in metric tons, that were reported under 40 CFR 98.236(z) for the duration of the other large release event as it was reported under 40 CFR 98.236(y)(4). These values represent the double-count of emissions present in the subpart W report for the WEC applicable facility. The determination of these quantities must be made using the applicable methods in subpart W and using measurement data, if available, or a combination of process knowledge, engineering estimates, and best available data when measurement data are not available.

### 4. Verification and WEC Filing Revisions

The foundation of the WEC obligated party's WEC filing will be the methane emissions and throughput reported by the WEC obligated party's WEC applicable facilities in their subpart W reports. As specified in 40 CFR 98.3(f) and (h) of this chapter, part 98 currently includes a verification process and resubmission process for resolving substantive error(s) [69] in reporting. These errors are either found through self-discovery by the facility or are found by the EPA during the verification process. In part 98, errors must be resolved within 45 days from discovery or notification of the error by the EPA. The EPA may grant a 30-day extension request if the request is timely, such that a total of 75 days may be provided for complete issue resolution. Additional extensions may be approved by the Administrator in specified limited circumstances. Resolution is either made by report revision and resubmission or by providing an adequate demonstration that the previously submitted report does not contain the identified substantive error or that the identified error is not a substantive error. Upon satisfying these requirements, the EPA determines that the error is resolved. If the requirements in 40 CFR 98.3 of this chapter are not satisfied, the EPA considers the part 98 report unverified.

Several commenters suggested strong verification protocols for WEC so that the charge obligations accurately reflect reported emissions. After consideration of comments received, the EPA is making one revision to the verification protocols to help ensure the charge obligations accurately represent emissions. Specifically, the EPA is finalizing that WEC filings will not be verified if they incorporate netted negative emissions generated from an unverified subpart W report. On all other aspects of the WEC verification protocols, the EPA is finalizing as proposed that the verification status of the WEC applicable facility with respect to the reporting in subpart W part 98 would be considered by the EPA when determining the verification status of the part 99 filing because the subpart W data would be the cornerstone of the WEC. In effect, a WEC filing may not achieve verified status until all errors associated with subpart W reports that impact the total WEC are corrected. For example, if the subpart W part 98 report

---

[69] 40 CFR 98.3(h)(3): A substantive error is an error that impacts the quantity of GHG emissions reported or otherwise prevents the reported data from being validated or verified.

of one WEC applicable facility contains errors related to reported emissions or throughput that affect the total WEC, the EPA could, by extension consider the WEC filing of the WEC obligated party that includes that WEC applicable facility to be unverified.

Separately, there are elements of the part 99 filing that are not directly tied to the subpart W report, such as the calculation of the WEC including netting and any exemption information. The EPA is finalizing as proposed to use a similar verification procedure under part 99 to that which exists under part 98. In implementing the verification of information submitted under part 99, the EPA will use a two-step process. First, the EPA will conduct an initial centralized review of the data that would help assure the completeness and accuracy of data. Second, the EPA will notify WEC obligated parties of potential errors, discrepancies, or make inquiries as needed concerning the WEC filing. Specifically, regarding the WEC filing, the EPA anticipates that there could be errors or clarifications with respect to the supporting documentation and quantification of emissions associated with exemptions from the WEC, which may require the EPA to review, evaluate, and confirm their validity and accuracy. The part 99 verification review will identify issues resulting from the calculation of WEC based on verified subpart W GHGRP reports and verified WEC filings to the extent possible. A thorough discussion of the separate process for unverified reports and approach for reassessment of WEC obligation due to unverified emissions is discussed in section III.B. of this preamble.

The EPA is finalizing provisions that would require a WEC obligated party to respond to the EPA within 30 days of either being contacted in writing by the EPA notifying them of the presence of a substantive error in their WEC filing or by self-discovering that a previously submitted WEC filing contains one or more substantive errors (except as described later in this section) as opposed to 45 days as proposed. Initial submission, resubmission, and correspondence between parties will happen through an electronic system similar to the existing e-GGRT system used by the GHGRP, which will allow for back and forth between operators and the EPA prior to resubmissions. For the purposes of part 99, the EPA is finalizing as proposed to consider a substantive error to be an error that impacts the Administrator's ability to accurately calculate the WEC obligated party's obligation, which may include, but would not be limited to, the list of

WEC applicable facilities associated with a WEC obligated party and corresponding data reported in each listed WEC applicable facility part 98 report(s), emissions associated with exemptions, and supporting information for each exemption to demonstrate its validity. The EPA is finalizing that a revised WEC filing must correct all substantive errors. If the WEC obligated party does not agree with the EPA's finding that the WEC filing contains substantive errors, the WEC obligated party must provide information demonstrating that the previously submitted report does not contain the identified substantive error or that the identified error is not a substantive error.

If a WEC applicable facility revises and resubmits their part 98 report, which results in impacts on the WEC calculations, the WEC obligated party is also required to submit a revised WEC filing. In the event that a subpart W report revision results in a change in the applicability of part 99 to the facility, the WEC obligated party must submit a revised WEC filing adding or removing any facilities, as appropriate. With the exception of resubmissions to provide CAA section 111(b) or (d) compliance reports or revisions to previously reported compliance reports for the purposes of the regulatory compliance exemption, part 99 resubmissions must be filed by December 15 of the year following the reporting year. Resubmissions related to CAA section 111(b) or (d) compliance reports for the purposes of the regulatory compliance exemption must be made as discussed in section II.D.2.h. of this preamble. Any part 98 resubmissions after this date that impact WEC calculations will not be required to be resubmitted in a revised WEC filing; facilities may continue to resubmit data under subpart W, as permitted. Under subpart W, facilities may resubmit data for historic reporting years via e-GGRT for the most recent five reporting years (e.g., facilities may submit updates electronically to 2018–2023 data during calendar year 2024). Data resubmission for historic reporting years in the context of the WEC program is very complicated due to the potential changes in facility ownership over time and the implications this has on netting of emissions from facilities under common ownership or control. For example, a company or a facility owned by a company in one year may be owned in whole or in part by one or multiple different companies the next year. With such changes occurring annually to multiple facilities across multiple owners and operators with

more than one facility under common ownership or control, there is no practical means of incorporating resubmitted data for historic reporting years in the WEC program. This could result in a very large administrative burden of reviewing recalculations and associated invoicing or refunds. The EPA therefore is finalizing a deadline of December 15 for each year, after which time no WEC resubmission filings initiated by the facility can be resubmitted. For example, resubmissions of subpart W data initially reported by March 31, 2025, or data from the WEC filing submitted September 2, 2025, that are used to assess WEC for the 2024 reporting year, must be submitted by December 15, 2025. This approach does not allow resubmissions for historic reporting years for WEC filings, even if the corresponding subpart W data is resubmitted for historic reporting years for purposes of subpart W. Subpart W facilities continue to be subject to part 98 requirements for resubmitting data for previous reporting years, but any data resubmitted under part 98 after December 15 of the calendar year following the respective reporting year will not be considered for the purposes of WEC under part 99. These approaches for WEC filing requirements and data verification are intended to incentivize complete and accurate WEC filings under part 99 by August 31 of each year, as well as complete and accurate reporting under part 98. The EPA is finalizing that it retains the right to re-evaluate WEC obligations in WEC filings after December 15 (e.g., as part of the EPA audit of facility data, an enforcement investigation, or other relevant information). Similarly, the December 15 deadline would not apply to adjustments to WEC obligations resulting from the process to resolve unverified data, finalized at 40 CFR 99.8, should that resolution occur after December 15. Finally, in the event that annual CAA 111(b) or (d) compliance reports covering the entire previous WEC filing year are not available by December 15 due to the reporting schedule for those CAA 111(b) or (d) facilities, WEC obligated parties must revise their WEC filings after December 15 for the sole purpose of updating eligibility status for the regulatory compliance exemption.

## B. Remittance and Assessment of WEC

We are finalizing as proposed that each WEC obligation payment must be submitted electronically in accordance with the requirements of 40 CFR 99.6 and in a format specified by the Administrator as part of the submission

of the WEC filing (*i.e.*, by August 31 each year covering the preceding reporting year).

Several commenters opposed any daily penalty for WEC obligated parties who fail to submit their annual filing by the deadline. Nevertheless, the EPA disagrees with the commenters since the absence of penalties would provide the perverse incentive for facilities to delay payment of the WEC. Therefore, the EPA is finalizing as proposed financial sanctions under 40 CFR 99.10 of subpart A. For WEC obligated parties that fail to submit their annual WEC filing by the deadline discussed in section III.A.2. of this preamble, the EPA is finalizing as proposed a daily penalty no greater than the rate associated with 42 U.S.C. 7413(d)(1) specified in Table 1 of 40 CFR 19.4, as amended. We are finalizing as proposed that this penalty will be invoiced by the EPA after the late filing is made. The EPA Finance Centers will assess interest, handling, and penalty charges in 30-day increments on any invoiced penalties. We are finalizing as proposed that the assessment of this penalty begins on the date that the WEC filing is considered past due (*i.e.*, September 1st)[70] and continue until such time that the WEC filing is submitted and certified by the WEC obligated party.

Under 31 U.S.C. 3717, there are interest, penalties, and costs that may be imposed on outstanding or delinquent debts arising under a claim owed by a person to the U.S. Government. Specifically, under 31 U.S.C. 3717(a)(1), agencies shall charge a minimum annual rate of interest on an outstanding debt on a United States Government claim owed by a person.[71] Under the EPA's implementing Policy Number 2540–9–P2, accounts are considered delinquent when the EPA does not receive payment by the due date specified on a bill or invoice. The EPA is finalizing as proposed to cite this Federal claims interest charge authority on any invoiced amounts past due. In the proposed rule, we included an equation (Equation A–1) detailing how interest would be assessed. To be

consistent with other EPA regulations where interest is assessed, we have decided Equation A–1 is unnecessary and have removed it from the final rule.

Under 31 U.S.C. 3717(e)(1), agencies must collect an additional penalty charge of not more than six percent per year for failure to pay any part of an invoiced debt more than 90 days past due, as well as additional charge to cover the cost of processing delinquent claims. The EPA will assess interest, handling, and penalty charges in 30-day increments for late payments and will assess the six percent penalty with the third demand letter, invoice, or notice. The EPA is finalizing as proposed to include this additional six percent non-payment penalty charge for invoiced WEC debts that are more than 90 days past due.

### 1. Process for Reassessing WEC for WEC Filings Resubmitted After the Initial Waste Emission Charge Has Been Assessed

As discussed in section III.A.4. of this preamble, WEC obligated parties may need to resubmit their WEC filings and WEC applicable facilities may need to resubmit their GHGRP reports. These resubmittals have the potential to result in recalculation of the WEC obligation for the WEC obligated party. As discussed in section III.A.4. of this preamble, the EPA is finalizing that data resubmissions (initiated by facilities) for the previous reporting year would be required to be submitted by December 15 in order to be considered for WEC recalculations, with the exception of resubmissions related to CAA section 111(b) or (d) compliance reports for the purposes of the regulatory compliance exemption. If the recalculated WEC obligation is less than the original WEC obligation owed by the WEC obligated party, the EPA will authorize a refund to the WEC obligated party equal to the difference in WEC obligation. If the recalculated WEC obligation is greater than the original WEC obligation owed by the WEC obligated party, the WEC obligated party must resubmit their WEC filing and pay the additional charge. Finally, as noted above, notwithstanding the generally applicable deadline, the EPA is finalizing that it retains the right to reevaluate WEC obligations in WEC filings after December 15 (*e.g.*, as part of the EPA audit of facility data, an enforcement investigation, or other relevant information), and authorize refunds if and when appropriate.[72]

### 2. Process for Assessing WEC for Unverified Part 99 Filings

As discussed in section III.A.4. of this preamble, the EPA's verification review process for WEC will ideally end with the resolution of identified potential errors through either correction and resubmission of facilities' reports or justification provided through correspondence with reporters that no substantive error exists. When WEC applicable facilities or WEC obligated parties do not provide appropriate information to resolve the errors in their part 99 data after 30 days of either being contacted in writing by the EPA notifying them of the presence of a substantive error or by self-discovering that a WEC filing contains one or more substantive errors, the EPA considers their WEC filing to be unverified.

If a WEC filing is unverified but the EPA is able to correct the error(s) based on reported data to part 98 and part 99, we are finalizing as proposed that the EPA may recalculate the WEC obligation using available information and provide an invoice or refund to the WEC obligated party within 60 days of notifying the WEC obligated party that its WEC filing is unverified. If the WEC obligated party resubmits a WEC filing within that timeframe, the EPA will either accept the resubmission, or take the resubmission into account when calculating the WEC. The EPA received comments indicating that the proposed rule did not include sufficient detail on the standard for requiring a third-party audit. The EPA is therefore clarifying that, in cases where the EPA is unable to calculate the WEC with available information due to unresolved errors in either an included part 98 report(s) or the part 99 report, the WEC obligated party may be required to undergo a third-party audit. The WEC obligated party must make the information detailed in 40 CFR 99.8(c)(1)(v) available to the auditor for review. Comments also recommended that the EPA target auditing based on various factors that may be indicative of problems with WEC filings. The EPA is clarifying that the third-party auditor will primarily focus their review on resolving identified errors associated with part 98 and/or part 99 data elements required for calculation of the WEC that remain unverified, but the review should also include resolution of any additional errors identified during the course of their review. As defined in

---

[70] For reporting year 2024, the due date falls on a Sunday, August 31, 2025. Monday, September 1, 2025, is a Federal holiday; therefore, Tuesday, September 2, 2025, is the filing date after which WEC filings are considered past due.

[71] This rate of interest is known as the Current Value of Funds Rate, or CVFR, and is published prior to November 30th of each year by Treasury. The CVFR is based on the weekly average of the Effective Federal Funds Rate, less 25 basis points, for the 12-month period ending September 30th of each year, rounded to the nearest whole percent. This rate may be revised on a quarterly basis if the annual average, on a moving basis, changes by 2 percentage points or more.

[72] Note that 31 U.S.C. 1322(b)(2) creates a permanent indefinite appropriation for the Treasury to make refunds out of miscellaneous receipts for

"collections erroneously deposited that are not properly chargeable to another appropriation." In the event a reassessment is made for any of the reasons outlined above, this appropriation would apply.

40 CFR 99.8(c), these data elements may include records of total GHG emissions reported, facility methane emissions, facility hydrocarbon throughput, applied exemptions, and netting. The WEC obligated party will direct the third-party auditor to submit this information to the EPA and the WEC obligated party within 90 days of the EPA notifying the WEC obligated party that an audit is required. The EPA is adding this 90-day requirement to ensure timely resolution of unverified WEC data and to provide additional clarity to WEC obligated parties. After verifying data received by the third-party auditor, the EPA will notify the WEC obligated party. The WEC obligated party will have 30 days from this date of notification to resubmit their WEC filing, if necessary. Third-party audits may be required to be arranged by and conducted at the expense of the WEC obligated party.

The EPA also received comments stating that the proposed rule did not include sufficient detail regarding the certification criteria for auditors. In response to these comments, the EPA is providing additional detail in this final rule on the criteria for auditors. To be considered a third-party auditor, the EPA is requiring that the auditor have professional work experience in the petroleum engineering field or related to oil and gas production, gathering, processing, transmission, or storage. Additionally, the auditor must be a qualified professional engineer. The third-party auditor must be independent of the WEC obligated party (*e.g.*, not operated or employed by the WEC obligated party). The requirements for third-party auditors are defined at 40 CFR 99.8(c).

A WEC obligated party is required to pay an invoice received from the EPA for any updated WEC obligation or CAA penalty by the specified due date, or within 30 days of the date of the invoice or bill if a due date is not provided.

## C. Authorizing the Designated Representative

The EPA is finalizing as proposed provisions for each affected WEC obligated party to identify a designated representative. Each WEC obligated party must have one designated representative who is an individual selected by an agreement binding on the WEC obligated party. This designated representative acts as a legal representative between the WEC obligated party and the Agency. The EPA is finalizing as proposed that the designated representative must submit a complete certificate of representation at least 60 days prior to the submission of

the first WEC filing made by the WEC obligated party. Additionally, each WEC filing must contain a signed certification by a designated representative of the WEC obligated party. On behalf of the owner or operator, the designated representative certifies under penalty of law that the WEC filing has been prepared in accordance with the requirements of 40 CFR part 99 and that the information contained in the WEC filing is true and accurate, based on a reasonable inquiry of individuals responsible for obtaining the information. The EPA received a comment indicating that an employee serving as a designated representative could leave their position at a company before the end of the 60-day time period. However, the EPA notes that in these circumstances, the certificate of representation may be changed as subsequently explained in this section.

The EPA also is finalizing as proposed that the designated representative could appoint an alternate to act on their behalf, but the designated representative maintains legal responsibility for the submission of complete, true, and accurate emissions data and supplemental data. A part 99 designated representative or alternate designated representative may delegate one or more "agents." The part 99 agent (*e.g.*, a part 98 subpart W designated representative could be delegated as an agent to provide facility-specific information) can enter data for a part 99 WEC filing, but an agent is not allowed to submit, certify, or sign a WEC filing. Pursuant to 40 CFR 99.4(f), only one alternate designated representative, who shall be an individual selected by an agreement binding on the owner and operator, and may act on behalf of the WEC obligated party designated representative (*e.g.*, submit, certify or sign a WEC filing) may be selected; however, either the designated representative or the alternate may be changed at any time following the requirements in 40 CFR 99.4(g).

The EPA is finalizing that within 90 days after any change in the WEC obligated party, the designated representative or any alternate designated representative of the new WEC obligated party must submit a certificate of representation that is complete under this section to reflect the change. These requirements ensure that the certificate of representation is updated to reflect changes to WEC obligated parties, and ensure alignment between the WEC obligated party and the certificate of representation's listed designated representative. In addition, as proposed, the EPA is finalizing the binding nature of the certificate of

representation. Pursuant to 40 CFR 99.4(k) once a complete certificate of representation for a WEC obligated party has been received, the Administrator will rely on the certificate of representation unless and until a later signed, complete certificate of representation for the WEC obligated party is received by the Administrator.

The EPA is finalizing requirements for the contents of the certificate of representation at 40 CFR 99.4(i). These elements of the certificate of representation include certification statements for the designated representative and any alternative designated representative as well as information needed to implement the WEC. The final certificate of representation contents include elements that were not included in the proposed rule. These additional requirements are necessary due to changes from the proposal to allow netting at the parent company level. Including this information in the certificate of representation, and requiring the certificate to be updated annually, will allow the EPA to review data related to the relationships between WEC applicable facilities, WEC obligated parties, and parent companies prior to the WEC filing deadline. This will allow the EPA to engage with WEC obligated parties to correct any potential errors or conflicts in these data (*e.g.*, netting relationships) prior to the WEC filing deadline and therefore ensure efficient implementation of the rule.

## D. General Recordkeeping Requirements

We are finalizing as proposed that WEC applicable facilities and WEC obligated parties must retain all required records for at least 5 years from the date of submission of the WEC report for the reporting year in which the record was generated. We are finalizing as proposed that the records shall be kept in an electronic or hard-copy format (as appropriate) and recorded in a form that is suitable for expeditious inspection and auditing. Under the final provisions, upon request by the Administrator, the records required under this section must be made available to the EPA or a third-party auditor if one is required. We are finalizing as proposed that records may be retained off site if the records are readily available for expeditious inspection and review. For records that are electronically generated or maintained, we are finalizing as proposed that the equipment or software necessary to read the records shall be made available, or, if requested by the EPA, electronic records shall be converted to paper documents. The

records that must be retained include, records prescribed in each applicable subpart of part 99, information required to be retained under part 98, including subparts A and W, any other information needed to complete the WEC filing, and all information required to be submitted as part of the WEC filing, including any supporting documentation. The EPA received comment indicating that the five-year retention requirement in the proposed rule did not clarify that companies who purchase WEC applicable facilities are not responsible for filings and errors made by previous owners. The EPA has revised from proposal 40 CFR 99.7(d) to more explicitly state that the WEC obligated party is the entity to which the recordkeeping requirement applies. Similar language was present at proposal given the use of the term "you" (defined as a WEC obligated party subject to part 99) in 40 CFR 99.7(d) as proposed. We are finalizing additional clarifying language that the general recordkeeping provision at 40 CFR 99.7(d) applies to all records prescribed in each subpart of part 99.

*E. General Provisions, Including Auditing and Compliance and Enforcement*

1. Auditing Provisions

Several commenters stated that small producers who are below the WEC reporting threshold and do not pay WEC obligation should be exempt from audits and enforcement actions related to the WEC. Since the EPA may want to conduct an audit to verify that the facility is accurately quantifying emissions and appropriately claiming to be exempt from the WEC obligation, we

are finalizing as proposed that the EPA, or a party acting on behalf of the EPA, may conduct on-site audits of facilities, as indicated in 40 CFR 99.7(c), including of those facilities under the 25,000 mt $CO_2e$ threshold. Under the general recordkeeping provision at 40 CFR 99.7(d), the records generated under this part must be available to the EPA, a party acting on behalf of the EPA, or a third-party auditor during an on-site audit and the records must be recorded in a form that is suitable for expeditious inspection and review upon request. The on-site audits may be conducted by private auditors contracted by the EPA or by Federal, State, or local personnel, as appropriate. The EPA proposed that audits conducted under 40 CFR 99.7(c) may be required to be arranged by and conducted at the expense of the WEC obligated party. In this final rule, the EPA is clarifying that WEC obligated parties would not be responsible for arranging and paying for audits conducted under 40 CFR 99.7(c). As described in section III.B.2. of this preamble, WEC obligated parties may be required to arrange and pay for third-party audits conducted to resolve unverified data necessary for calculation of the WEC.

2. Compliance and Enforcement

The EPA received comments supporting robust enforcement and verification protocols for WEC implementation. We are finalizing as proposed that any violation of any requirement of this part shall be a violation of the Clean Air Act, including section 114 (42 U.S.C. 7414) and section 136 (*42 U.S.C. 7436*). A violation would

include but is not limited to failure to submit, or resubmit as required, a WEC filing, failure to collect data needed to calculate the WEC obligation (including any data relevant to determining the applicability of any exemptions and how the netting was conducted), failure to select a WEC obligated party, failure to retain records needed to verify the amount of WEC obligation, providing false or incorrect information in a WEC filing, and failure to remit WEC payment. Per 40 CFR 99.4(b), it is a violation to fail to authorize a designated representative for a WEC obligated party. In the case of a WEC applicable facility with more than one owner and/or operator, failure to select a WEC obligated party would constitute a violation on the part of each owner and each operator, as per 40 CFR 99.4. Each day of a violation constitutes a separate violation.

*F. Other Final Minor Revisions or Clarifications*

See Table 4 of this preamble for the miscellaneous minor technical corrections not previously described in this preamble that we are finalizing throughout part 99. These revisions from the proposed rule primarily include revisions to better reflect the EPA's intent of the proposed rule or editorial changes. Additionally, conforming edits to cross-references and paragraph designations in the final rule were made reflective of additional paragraphs that were finalized but not proposed as well as paragraphs that were proposed but are not being finalized, as discussed in detail in sections II and III of this preamble.

TABLE 4—FINAL TECHNICAL CORRECTIONS TO PART 99

| Section (40 CFR) | Description of amendment |
| --- | --- |
| **Revisions from Proposed Language that are Finalized** | |
| 99.7(b)(2)(iii), 99.7(b)(2)(v), 99.30(a), 99.50(b) | Revised use of the phrase "as defined in 40 CFR 99.50" to "as those industry segment terms are defined in 40 CFR 98.230 of this chapter" to tie industry segments to the definitions provided in subpart W and simply language from proposal. |
| 99.7(d), 99.7(e), 99.8(c) | Revised instances of "EPA" to "the EPA" for consistency. |
| 99.7(e)(2)(ii), 99.7(f)(2) | Revised instances of "report" to "filing" for consistency in terminology when referencing required submittals pursuant to part 99. |
| 99.8(b) | Revised instances of "WEC" to "WEC obligation" for consistency in terminology. |
| 99.40(b)(1) | Added "or Tribal lands" for accuracy of applicability. |
| 99.40(c) | Added "the emissions from" to clarify the waste emissions charge is relevant to emissions. |
| 99.41(a) | Deleted "or (d)". This was a typographical error noted by commenters. |
| 99.42 | Added headings to clarify contents of each paragraph. |
| 99.42(g) | Revised instances of "waste emissions charge" to "WEC obligation" for consistency. |

## IV. Final Confidentiality Determinations for Certain Data Reporting Elements

### A. Overview and Background

In this action, the EPA is finalizing requirements for WEC obligated parties to report the general information described in section III.A.3. of this preamble and the information specific to any applicable exemptions as described in sections II.D.1. through 3. of this preamble. This information is necessary for the EPA to verify the contents of the WEC filing, including confirming that all of the required WEC applicable facilities were included, each WEC applicable facility (or each site for WEC applicable facilities in the onshore production and gathering and boosting industry segments) is eligible for any exemptions that were applied, and the WEC applicable emissions and the amount of the WEC obligation were calculated correctly. As explained in the remainder of this section, the EPA is finalizing as proposed that for the data elements that are not inputs to emission equations, nearly all of the data reported will be either emission data or otherwise ineligible for confidential treatment. As a result of these determinations, information in these categories is not subject to the case-by-case or class determination processes under 40 CFR part 2 that the EPA typically uses to evaluate whether such information qualifies for confidential treatment. Where we codify a determination that information is emission data or otherwise not entitled to confidential treatment, it will be subject to disclosure to the public without further notice. Any determination that applies for submitted information continues to apply even if that information is carried into other documents that the EPA prepares for internal review or publication. The EPA also notes that the Agency is not making confidentiality determinations in this rulemaking for information included in supporting documentation required for eligible exemptions or additional information provided in software comments fields, which will remain subject to the case-by-case or class determination process under 40 CFR part 2, as established in this rulemaking under 40 CFR 2.301(j)(4).

The EPA did not propose that any of the reported information would be designated as "inputs to emission equations." However, some of the additional reporting requirements being finalized include information that the EPA is designating as "inputs to emission equations" falling within the definition of "emission data." For each element that falls in this category, we further designate that the data element will be directly reported to the EPA (see section IV.D. of this preamble for a discussion of "inputs to emission equations").

### B. Final Confidentiality Determinations for New Data Elements

Pursuant to CAA section 114(c), the EPA proposed to make categorical emission data and confidentiality determinations for the categories of information reported under part 99. The EPA described the proposed emission data categories and confidentiality determinations for the reported information, as well as the basis for such proposed determinations, in this section of the proposed and final preamble. This approach is similar to the approach the EPA has taken for the GHGRP under 40 CFR part 98 (see 75 FR 39094, July 7, 2010, and 75 FR 30782, May 26, 2011, for more information).

The determinations the EPA is finalizing in this rulemaking serve as notification of the Agency's decisions concerning: (1) The categories of information the Agency will not treat as confidential because it is emission data; (2) the information that is not emission data but is not entitled to confidential treatment; and (3) the information that the submitter may claim as confidential but will remain subject to the existing 40 CFR part 2 process. The EPA is not making in this final rule a determination in favor of confidential treatment for any data elements collected under 40 CFR part 99. Instead, in responding to requests for information not determined in this final rule to be emission data or otherwise not entitled to confidential treatment, the EPA finalized as proposed to apply the default case-by-case process found in 40 CFR part 2.

The emission data and confidentiality determinations finalized in this rulemaking are intended to provide consistency in the treatment of the information collected by the EPA as part of the WEC filings. The EPA anticipates that making these determinations in advance through this rulemaking will provide predictability and transparency for both the public and submitters. The regulatory provisions regarding confidentiality determinations for these products are being codified broadly in 40 CFR 99.13. To provide additional clarity on the final confidentiality determinations for data elements under this rulemaking, individual data elements and their confidentiality determinations are provided in the memorandum, *Confidentiality Determinations and Emissions Data Designations in the Final Waste Emissions Charge Rule,* available in the docket to this rulemaking.

The EPA requested comment on the proposed confidentiality determinations, including the categories of information considered emission data, the placement of specific data elements under different categories of emission data, and the treatment of data elements that the EPA did not propose to be considered emission data. Several commenters disagreed that the name of a part 99 designated representative and their contact information should be considered emission data and not entitled to confidential treatment and stated that this information should not be made publicly available. The EPA is finalizing as proposed that this information is emissions data but is clarifying that because it includes personal identification information, it will not be published by the agency and may be subject to personal privacy rules in certain scenarios. This final approach is aligned with the treatment of identical data elements under part 98. Changes from the proposal are discussed in more detail in this section of the preamble.

The EPA is finalizing as proposed that the categories of information determined to be emission data, and therefore not eligible to be treated as confidential business information and available to be disclosed to the public, in this action are codified in 40 CFR 99.13(a) and include:

(1) Methane emissions;
(2) Calculation methodology; and
(3) Facility and unit identifier information.

The EPA is finalizing as proposed to group types of information (data elements) that WEC obligated parties must submit under part 99 that are considered emission data into these three categories based on their shared characteristics. For the sake of organization, for any information that logically could be grouped into more than one category, the EPA has chosen to label information as being in just one category where the Agency thinks it fits best. This approach will reduce redundancy within the categories that could otherwise lead to confusion and will ensure consistency in the treatment of similar information in the future.

For reporting elements that the EPA does not designate as "emission data" (including "inputs to emission equations"), the EPA proposed to assess each individual reporting element according to the *Argus Leader* criteria (*i.e.,* whether the information is customarily and actually treated as private by the submitter) and 40 CFR 2.208(a) through (d). Therefore, the EPA

did not propose and is not finalizing categories and categorical confidentiality determinations for information that is not "emission data." However, the EPA is finalizing as proposed descriptions of the type of information that is not eligible for confidential treatment in 40 CFR 99.13(b), including certain information demonstrating compliance with standards and information that is publicly available. The EPA also finalized as proposed in 40 CFR 99.13(c) and (d) to specify certain data elements and types of information that will remain subject to the Agency's general process for conducting confidentiality determinations on a case-by-case basis in 40 CFR part 2. The final provisions in 40 CFR 99.13(b) establish the proposed confidentiality determinations of the final data elements in part 99 and also provide clarity and ensure consistent treatment of new or substantively revised data elements if the content of the WEC filing is amended in a future rulemaking. Sections IV.B.2. and 3. of this preamble describe these final provisions, and our assessment of each individual reporting element that is not "emission data."

1. Emission Data

The EPA is finalizing as proposed to establish in 40 CFR 99.13(a) that certain categories of information the EPA will collect in the WEC filings are information that meets the regulatory definition of emission data under 40 CFR 2.301(a)(2)(i). The following sections describe the categories of information we are determining to be emission data, based on application of the definition at 40 CFR 2.301(a)(2)(i) to the shared characteristics of the information in each category, and our rationale for each determination. Final determinations for the individual data elements included in each category of emission data can be found in a memorandum, *Confidentiality Determinations and Emissions Data Designations in the Final Waste Emissions Charge Rule,* available in the docket for this rulemaking. The EPA is providing this memorandum to provide clarity on the final data elements that fall into each category, including some data elements that were not directly included in the proposal that meet the definition emission data. These additional data elements are necessary to add in the final version of the rule as a result of revisions made from the proposal in response to comments. For example, revisions made from the proposal to allow netting at the parent company level requires additional reporting associated with the transfer of

net WEC emissions between WEC obligated parties. The EPA notes that these added data elements in the final rule are derived from or outgrowths of data elements that were proposed with confidentiality determinations finding that they were emission data. While these data elements were revised in the final version of the rule in what would be specifically reported to the Agency, the revisions did not change the Agency's rationale for the proposed emission data determinations and are being finalized under the same rationale.

The EPA also notes that many of the final data elements for which confidentiality determinations are being finalized in this rulemaking are identical to or derived from data elements reported under part 98 that have been determined to be emissions data under that subpart.

a. Information Necessary To Determine the Identity, Amount, Frequency, Concentration, or Other Characteristics of Emissions Emitted by the Source

Under 40 CFR 2.301(a)(2)(i)(A), emission data includes "[i]nformation necessary to determine the identity, amount, frequency, concentration, or other characteristics (to the extent related to air quality) of any emission which has been emitted by the source (or of any pollutant resulting from any emission by the source), or any combination of the foregoing[.]" The EPA is finalizing that the following categories of information are emission data under 40 CFR 2.301(a)(2)(i)(A):

(1) Methane emissions; and
(2) Calculation methodology.

*Methane emissions.* Data elements included in the Methane emissions data category are the net WEC emissions, net WEC emissions after transfers, facility waste emissions thresholds, industry segment waste emissions thresholds for each applicable industry segment within the facility (if more than one industry segment applies), and WEC applicable emissions, as well as the quantities of methane emissions that the WEC obligated party calculates should be exempted due to the unreasonable delay, regulatory compliance, and plugged well exemptions. The EPA has determined that the emissions at each reporting level constitute "emission data." These data elements are information regarding the identity, amount, and frequency of any emission emitted by the WEC applicable facility, and, therefore, they are "emission data" and not eligible to be claimed as confidential.

*Calculation methodology.* The data element included in this category is the

method used to determine the quantity of methane emissions that the WEC obligated party calculates should be exempt due to the unreasonable delay exemption, regulatory compliance exemption, and plugged well exemption. Most of the necessary calculations in part 99 do not include multiple equations or approaches that could be selected by a WEC obligated party, and in those cases, the calculation methodology used is readily apparent for any WEC obligated party. Calculations for the exemptions for unreasonable delay, regulatory compliance, and plugged wells do include multiple equations that facilities must use under different circumstances.

The EPA has concluded that the data elements in the calculation methodology category are "emission data" under 2.301(a)(2) because they are "information necessary to determine . . . the amount" of emissions emitted by the source. The method used to calculate emissions is emission data under 40 CFR 2.301(a)(2) because it is information necessary for the WEC obligated party to calculate the emissions and for the EPA and the public to verify that an appropriate method was used.

b. Information That is Emission Data Because It Provides a General Description of the Location and/or Nature of the Source to the Extent Necessary To Identify the Source and To Distinguish It From Other Sources

Under 40 CFR 2.301(a)(2)(i)(C), emission data includes "a "[g]eneral description of the location and/or nature of the source to the extent necessary to identify the source and to distinguish it from other sources (including, to the extent necessary for such purposes, a description of the device, installation, or operation constituting the source)." The EPA is finalizing that the data elements in the facility and unit identifier information category of information are emission data under 40 CFR 2.301(a)(2)(i)(C).

The finalized part 99 regulations require WEC obligated parties to report in the WEC filing information needed to identify each facility as well as specific emission units (affected facilities) and/ or well-pads associated with an exemption. Facility-identifying information must be reported for all facilities as specified in 40 CFR part 99, subpart A. Affected facility-specific identifying information is required for the regulatory compliance exemption. Well-pad-specific identifying information is reported if required by an applicable exemption for onshore

petroleum and natural gas production facilities.

Data elements in this category include the following data elements required under 40 CFR part 99, subpart A to be included in each annual WEC filing: WEC obligated party company name and address and a signed and dated certification statement of the accuracy and completeness of the report, which is provided by the designated representative of the owner or operator. The EPA proposed that the name and contact information for the designated representative of the WEC obligated party for each WEC applicable facility would be also included in the annual WEC filing. The EPA received comments disagreeing with the requirement to include the name and contact information for the designated representative of the WEC obligated party. After consideration of comments, the EPA is not finalizing that these data elements be included in the WEC filing, and therefore they will not be regularly published by the EPA. Because this information is not reported, it is not relevant to the confidentiality determinations discussed in this section of the preamble. The final part 99 regulations also require that the filing include specific information about each facility covered by the annual WEC filing, including the industry segment and facility ID. For each exemption, the facility and unit identifier information category include (as applicable) the facility identifier, the well-pad and/or well identifier reported under subpart W (if applicable), other facility or affected facility identifiers used to identify the facility/sources in other EPA systems (specifically, the ICIS–AIR ID or Facility Registry Service (FRS) ID and the EPA Registry ID from the Compliance and Emissions Data Reporting Interface (CEDRI)), emission source-specific methane mitigation activities impacted by an unreasonable permitting delay, and exemption-specific certification statements.

As discussed in section IV.A. of this preamble, emission data must be available to the public and is not entitled to confidential treatment under CAA section 114(c). "Emission data" is defined in 40 CFR 2.301(a)(2)(i)(C) to include "[a] general description of the location and/or nature of the source to the extent necessary to identify the source and to distinguish it from other sources. . . ." Consistent with this definition of emission data, the EPA considers facility and emission unit identifiers to be source information or "information necessary to determine the identity . . . of any emission which has been emitted by the source," and

therefore emission data under 40 CFR 2.301(a)(2)(i). Further, 40 CFR 2.301(a)(2)(i)(A) specifies that emission data includes, among other things, "information necessary to determine the identity, amount, frequency, concentration, or other characteristics (to the extent related to air quality) of any emission which has been emitted by the source. . . ." The EPA considers the term "identity . . . of any emission" as not simply referring only to the names of the pollutants being emitted, but to also include other identifying information, such as from what and where (*e.g.,* the identity of the emission unit) the pollutants are being emitted.

2. Reported Information That Cannot Be Claimed as Confidential

The EPA will assess the confidentiality of each individual part 99 reporting element that is not otherwise designated as emission data in this rulemaking according to the *Argus Leader* criteria (*i.e.,* whether the information is customarily and actually treated as private by the submitter) and 40 CFR 2.208(a) through (d). However, in this action, the EPA finalized as proposed descriptions of the type of information that would not be eligible for confidential treatment in 40 CFR 99.13(b), in part to establish the confidentiality determinations of the data elements in part 99 but also to provide clarity and consistency in the event that the content of the WEC filings are amended in a future rulemaking. The WEC obligation is calculated by multiplying the net WEC emissions by a set dollar amount, depending on the reporting year. As explained in section IV.B.1.a. of this preamble, the EPA determined that the net WEC emissions are emission data. Therefore, the EPA is finalizing that the WEC obligation, which is calculated as the net WEC emissions multiplied by a dollar per ton rate that is prescribed in CAA section 136, is not eligible for confidential treatment.

The EPA is also finalizing as proposed that certain information considered to be compliance information in part 99, regardless of whether it is or is not otherwise eligible for confidential treatment. Compliance information collected under part 99 includes information necessary to demonstrate compliance with the eligibility requirements for the exemptions for unreasonable permitting delay, regulatory compliance, and wells that have been permanently shut-in and plugged. Examples of the information collected include: for the unreasonable delay exemption, the date of the permit

request, the estimated date to commence operation if the application had been approved within a set period of months, the first date that offtake to the gathering or transmission infrastructure from the implementation of methane emissions mitigation occurred once the application was approved, the beginning and ending date for which the eligible delay limited the offtake of natural gas associated with methane emissions mitigation activities, a listing of methane emissions mitigation activities that are impacted by the unreasonable permitting delay, and the quantity of methane emissions to be exempted due to the unreasonable delay for the reporting year. For the regulatory compliance exemption, copies of reports and other evidence of compliance with NSPS OOOOb or a State, Tribal, or Federal plan under 40 CFR part 62; and for the plugged well exemption, the date a well was permanently shut-in and plugged and the statutory citation for the requirements that were followed for that process. Operating and construction permits are available to the public through the State issuing the permits (as the delegated authority of the EPA), generally either through an online information system or website, or upon request to the State agency issuing the permits. These permits are expected to contain information about the type and size of process equipment operated at a facility, control devices or other measures undertaken to reduce emissions from each process, and the emission standards to which the facility is subject (including Federal standards as well as State or local standards). Reports submitted by owners and operators of facilities subject to NSPS OOOOb or a State, Tribal, or Federal plan under 40 CFR part 62 are available through the EPA's online repository "WebFIRE." See *https://www.epa.gov/ electronic-reporting-air-emissions/ webfire.* Finally, well-specific information, including age, production rate, and operating status, is publicly available through State oil and gas commissions and/or State databases as well as sources such as Enverus. Because this information is already publicly available, it will not be eligible for confidential treatment.

The EPA is also finalizing in 40 CFR 99.13(b)(3) that any other information that has been published and made publicly available, including the publicly available reports submitted under the GHGRP and information on websites, are not eligible for confidential treatment. Information that is publicly available does not meet the criteria for information entitled to

confidential treatment specified in 40 CFR 2.208(c). Section IV.B.3. of this preamble specifies an additional type of information that is not eligible for confidential treatment when evaluating the confidentiality of supporting documentation submitted as described in 40 CFR 99.13(c) or (d).

3. Information for Which the EPA Is Not Finalizing a Confidentiality Determination

This section describes information for which the EPA is not finalizing a confidentiality determination. The EPA will initially treat this information as confidential upon receipt, if the submitter claimed it as such, until a case-by-case determination may be made by the Agency under the 40 CFR part 2 process.

The EPA does not expect emission data to be submitted in supporting documentation, but the Agency is finalizing as proposed that information in supporting documentation as described in 40 CFR 99.13(c) (*i.e.,* information not listed in 40 CFR 99.13(a) or (b) as not eligible for confidential treatment) will be treated as confidential if claimed as such until a case-by-case determination is made under the 40 CFR part 2 process. The EPA is also finalizing that information provided in software comments fields as described in 40 CFR 99.13(d) will not be eligible for confidential treatment if it is listed in 40 CFR 99.13(a) or (b) as not eligible for confidential treatment. Otherwise, the EPA will treat the information as confidential if claimed as such until a case-by-case determination is made under the 40 CFR part 2 process, as specified in 40 CFR 99.13(c). The EPA recognizes that supporting documentation and reporter comments may include information that is sensitive or proprietary, such as detailed process designs or site plans. Because the exact nature of this documentation cannot be predicted with certainty, the EPA will make case-by-case confidentiality determinations under CAA section 114(c) for any supporting documentation, or comments claimed confidential by applicants either upon receipt of such information or upon a request for such information after receipt.

*C. Final Amendments to 40 CFR Part 2*

Pursuant to CAA section 114(c), the EPA must make available to the public data submitted under part 99, except for data (other than emission data) that are considered confidential under CAA section 114(c). Accordingly, the EPA may publicly release part 99 data without further notice after submission

to the EPA in accordance with the EPA's determinations of their confidentiality status in the final rule. Specifically, the EPA may publicly release part 99 data that are determined in this final rule to be emission data or not otherwise entitled to confidential treatment under CAA section 114(c) (*i.e.,* "non-CBI"). For data elements that the EPA determined to be entitled to confidential treatment under CAA section 114(c), the EPA will release or publish such data only if the information can be aggregated in a manner that would protect the confidentiality of these data at the facility level. Existing regulations in 40 CFR part 2, subpart B set forth procedural steps that the EPA must follow before releasing any information, either on the Agency's own initiative or in response to requests made pursuant to the Freedom of Information Act (FOIA). In particular, the EPA is generally required to make case-by-case confidentiality determinations and to notify individual reporters before disclosing information that businesses have submitted with a confidentiality claim. As discussed in section IV.B of this preamble, in light of the voluminous data the EPA receives under subpart W of part 98 and the multiple procedural steps required under 40 CFR part 2, subpart B, the EPA would not be able to make part 99 data (determined to be emission data or non-CBI) publicly available in a timely fashion if it were required to make separate confidentiality determinations based on each submitter's individual claim of confidentiality.

To facilitate timely release of GHG data collected under part 99 that are emission data or non-CBI, the EPA is finalizing as proposed an amendment to 40 CFR 2.301, Special rules governing certain information obtained under the Clean Air Act. Specifically, the EPA is finalizing as proposed to revise 40 CFR 2.301(d) to specify that the special rules for data submitted under part 98 also apply to part 99. Under the final amendment, the EPA may release part 99 data that are determined to be emission data or information determined to be not entitled to confidential treatment upon finalizing the confidentiality status of these data. Consistent with the 40 CFR part 2 procedures, the approach finalized in this rulemaking provides the WEC obligated party an opportunity to justify and substantiate any confidentiality claim they may have for the data they are required to submit (except for emission data and other data not entitled to confidential treatment pursuant to CAA section 114(c)). In

addition, WEC obligated parties have the benefit of seeing the EPA's rationales and analyses prior to submitting any justification, information that they would not otherwise have under the current 40 CFR part 2 procedures.

*D. Final Reporting Determinations for Inputs to Emission Equations*

In this section, we discuss data elements that the EPA is assigning to the "Inputs to Emission Equations" data category. This data category includes data elements that are the inputs to the emission equations used by WEC obligated parties to calculate their annual GHG emissions. See 75 FR 39094, July 7, 2010 for a full description of the "Inputs to Emission Equations" data category. As discussed in section VI.B.1. of the 2022 proposed *Revisions and Confidentiality Determinations for Data Elements Under the Greenhouse Gas Reporting Rule* (87 FR 36920, June 21, 2022), the EPA determined that the Argus Leader standard does not apply to our approach for handling data elements assigned to the "Inputs to Emission Equations" data category.

The EPA organizes data assigned to the "Inputs to Emission Equations" data category into two subcategories. The first subcategory includes "inputs to emission equations" that must be directly reported to the EPA. This is done in circumstances where the EPA has determined that the data elements do not meet the criteria necessary for them to be entered into verification software.[73] These "inputs to emission equations," in the form received by the EPA, are not entitled to confidential treatment. The second subcategory includes "inputs to emission equations" that are entered into verification software. These "inputs to emission equations" are entered into verification software to satisfy the EPA's verification requirements. These data must be maintained as verification software records by the submitter, but the data are not included in the annual report that is submitted to the EPA. This is done in circumstances where the EPA has determined that the data elements meet the criteria necessary for them to be entered into the verification software. Refer to the memorandum, *Reporting Determinations for Data Elements Assigned to the Inputs to Emission Equations Data Category in the Final Waste Emissions Charge Rule,* available in the docket for this rulemaking, for a

---

[73] The term "verification software" refers to specific software and tools. For example, under part 98, the EPA provides an Inputs Verification Tool (IVT) in e-GGRT.

discussion of the criteria established in 2011 for evaluating whether data assigned to the ''Inputs to Emission Equations'' data category should be entered into the verification software.

After review of all the final data elements in this rulemaking, the EPA has determined that some of the final data elements are assigned to the ''Inputs to Emission Equations'' data category. The EPA evaluated each of the data elements assigned to the ''Inputs to Emission Equations'' data category and determined that none of these data elements meet the criteria necessary for them to be entered into verification software; therefore, these data elements will be directly reported to the EPA. The EPA has determined that some of these ''inputs to emission equations'' are identical to or derived from data elements reported under part 98 that have been determined to not be eligible for confidential treatment. The ''inputs to emission equations'' used to determine the quantities of methane emissions that the WEC obligated party calculates should be exempted due to the unreasonable delay, regulatory compliance, and plugged well exemptions must be directly reported to the EPA so that the EPA can fully verify the quantities. As ''inputs to emission equations'' are emissions data, these data elements will not be eligible for confidential treatment once directly reported to the EPA, and they may be published once received by the EPA. Refer to the memorandum, *Reporting Determinations for Data Elements Assigned to the Inputs to Emission Equations Data Category in the Final Waste Emissions Charge Rule,* available in the docket for this rulemaking, for a list of the data elements designated as ''inputs to emission equations'' that will be directly reported to the EPA and the EPA's rationale for the reporting determinations.

### E. Changes to Confidentiality Determinations for Data Elements Reported Under Subpart W

The industry segment waste emissions thresholds are calculated pursuant to 40 CFR 99.20. Except for facilities in the Offshore Petroleum and Natural Gas Production industry segment or the Onshore Petroleum and Natural Gas Production industry segment that have no natural gas sent to sale, each threshold is calculated by multiplying the specified natural gas throughput for that industry segment by two constant values, the density of methane and the industry segment-specific methane intensity threshold (as summarized in Table 2 of this preamble). As noted in section IV.B.1.a.

of this preamble, the EPA is finalizing as proposed that the facility waste emissions thresholds and industry segment waste emissions thresholds are emission data and will therefore be made publicly available. For two industry segments, Onshore Natural Gas Processing and Onshore Natural Gas Transmission Compression, throughput quantities similar to those specified in the industry segment waste emissions threshold calculations have historically not been made publicly available under subpart W. However, for WEC applicable facilities, once the industry segment-specific waste emissions thresholds are made publicly available, the throughputs can be calculated based on available information.

For the Onshore Natural Gas Processing industry segment, a new data element was finalized as part of the 2024 Subpart W Final Rule, the quantity of residue gas leaving that has been processed by the facility and any gas that passes through the facility to sale without being processed by the facility in the calendar year, in thousand standard cubic feet, reported under finalized 40 CFR 98.236(aa)(3)(ix). The EPA previously made a final determination in 79 FR 70352 (November 25, 2014) that the quantity of natural gas received at the gas processing plant in the calendar year (reported under 40 CFR 98.236(aa)(3)(i)) and the quantity of processed (residue) gas leaving the gas processing plant (reported under 40 CFR 98.236(aa)(3)(ii)), should be maintained as confidential. As explained in 79 FR 70352 (November 25, 2014), the reporting of this information to the Energy Information Administration is less frequent than required under subpart W, and the EPA had not identified any reliable public sources of the quantity of residue gas produced. In the June 2023 memorandum *Proposed Confidentiality Determinations and Emission Data Designations for Data Elements in Proposed Revisions to the Greenhouse Gas Reporting Rule for Petroleum and Natural Gas Systems* (Docket ID No. EPA–HQ–OAR–2023–0234–0167), the EPA stated that the proposed new data element under 40 CFR 98.236(aa)(3)(ix) would collect similar information to that under 40 CFR 98.236(aa)(3)(ii). As a result, the EPA determined that the information collected under 40 CFR 98.236(aa)(3)(ix) would be eligible for confidential treatment.

However, because the EPA is finalizing as proposed the determination that the industry segment-specific waste emissions thresholds are emission data, then those industry segment-specific

waste emissions thresholds will be made publicly available as emission data. Therefore, the EPA is not finalizing a confidentiality determination for this throughput quantity data element (*i.e.,* the quantity of residue gas leaving that has been processed by the facility and any gas that passes through the facility to sale without being processed by the facility in the calendar year) under part 98. The confidentiality status of this data element will be evaluated on a case-by-case basis, in light of any publicly available information and in accordance with the existing regulations in 40 CFR part 2, subpart B, upon receipt of a public request for these data elements.

For Onshore Natural Gas Transmission Compression, the EPA previously decided in 2014 not to make a confidentiality determination that would apply for all facilities for 40 CFR 98.236(aa)(4)(i), the quantity of gas transported through a compressor station. In 79 FR 70352 (November 25, 2014), the EPA explained that the Agency had proposed that this data element would not be eligible for confidential treatment because natural gas transmission sector is heavily regulated by FERC and State commissions, resulting in a lack of competition between companies. However, the EPA received comments on this November 2014 proposal noting that FERC Order 636 had introduced greater competition to this sector and that some companies charge customers less than the FERC approved rates because of competitive market pressures. The commenters indicated that quantity of gas transported through the compressor station would provide information on the quantity of gas transported by a specific pipeline, which may potentially cause competitive harm to some pipeline companies operating in more competitive market areas. Since the determination would depend on the particular market conditions for each company, the EPA did not make a determination for the data element from this industry segment.[74]

In this rulemaking, the EPA is not finalizing a change to that previous decision and is not finalizing a confidentiality determination for the quantity of natural gas transported through a compressor station. While the Supreme Court's 2019 decision in *Argus Leader* altered the review criteria for confidentiality determinations from the Agency's 2014 decision, the basis

---

[74] Prior to *Argus Leader,* the EPA considered whether the business had satisfactorily shown that disclosure of the information is likely to cause substantial harm to the business's competitive position when evaluating claims of confidentiality.

provided by commenters to justify the confidential nature of the information is still relevant to a finding that the information is eligible for confidential treatment. For information pertaining to the quantity of gas transported through a compressor station collected under part 99, the EPA will conduct reviews of any claims made under the existing regulations in 40 CFR part 2, subpart B, upon receipt of a public request for this information. Any such reviews will consider the public availability of the same or similar information, including WEC filings, as part of the determination process.

## V. Impacts of the Final Rule

In accordance with the requirements of Executive Order 12866, the EPA projected the emissions reductions, costs, benefits, and transfer payments that may result from this action. These results are presented in detail in the *Regulatory Impact Analysis of the Waste Emission Charge* (RIA) accompanying this final rule developed in response to Executive Order 12866 and available in the docket to this rulemaking, Docket ID No. EPA–HQ–OAR–2023–0434. This section provides a summary of the RIA. The EPA notes that the EPA's duties and authority for this rulemaking are derived under CAA section 136 of the CAA, and its decisions in this rulemaking are made within the confines of that authority and justified under the EPA's record-based analysis and analysis of the statutory language of CAA section 136. The analysis in the final RIA prepared under Executive Order 12866 is entirely distinct from the statutory determinations, is not used to justify this action, and is presented solely for the purposes of complying with E.O. 12866. Congress did not authorize the EPA to consider a formal cost-benefits analysis in implementing CAA section 136, and the EPA's decisions were based on the best reading of the statutory directives that Congress did provide. Nevertheless, the EPA believes the results of the analysis in the final RIA prepared under Executive Order 12866 of the WEC final rule are reasonable.

The WEC does not directly require emissions reductions from applicable facilities or emissions sources. However, by imposing a charge on methane emissions that exceed waste emissions thresholds, oil, and natural gas facilities subject to the WEC are expected to perform methane mitigation actions and make operational changes where the costs of those changes are less than the WEC payments that could be avoided by reducing methane emissions. In addition, because volatile organic compound (VOC) and hazardous air pollutant (HAP) emissions are emitted along with methane from oil and natural gas industry activities, reductions in methane emissions as a result of the WEC also result in co-reductions of VOC and HAP emissions.

The RIA accompanying this proposal analyzes emissions changes and economic impacts of the WEC that arise through two pathways: (1) through the application of cost-effective methane mitigation technologies, and (2) through changes in oil and natural gas production and prices resulting from the WEC and associated mitigation responses. The analysis of methane mitigation is based on bottom-up engineering cost and mitigation potential information for a range of methane mitigation technologies. Application of methane mitigation technologies reduce WEC payments for WEC obligated parties by reducing methane emissions compared to a baseline without additional methane mitigation actions. The analysis assumes that methane mitigation is implemented where the engineering control costs are less than the avoided WEC payments for a particular mitigation technology.

Additionally, oil and natural gas firms may change their production and operational decisions in response to the WEC. This potential impact is modeled using a partial equilibrium model of the crude oil and natural gas markets. The total cost of methane mitigation and WEC payments is added as an increase to production costs, resulting in changes in equilibrium production of oil and natural gas and associated emissions. Projected WEC payments are estimated after methane emissions reductions from both methane mitigation and economic impacts are accounted for.

The number of facilities that will owe WEC obligations, and the amount of those WEC obligations, will ultimately depend on decisions that are within the control of owners and operators, among other factors. However, the EPA estimates that only a relatively small proportion of owner-operators of oil and gas facilities will owe WEC obligations. Using emissions reported to subpart W for RY2022 as an illustrative example, approximately 250 companies would owe WEC obligations related to less than 400 facilities, less than one-fifth of facilities that report to subpart W. Based on RY2022, Table 1–1 of the RIA shows that the WEC would be imposed on less than 15 percent of national methane emissions from petroleum and natural gas systems. Total methane emissions reported to subpart W are significantly less than national methane emissions

from the U.S. Greenhouse Gas Inventory for petroleum and natural gas systems. WEC-applicable facilities are the subset of GHGRP facilities that report at least 25,000 mt $CO_2e$ to subpart W industry segments subject to the WEC.

It is also important to note that the WEC would only apply to methane emissions that are above the emissions threshold, not for all emissions from WEC-applicable facilities. The WEC has exemptions related to regulatory compliance, emissions from plugged wells, and unreasonable delay in environmental permitting, although these provisions do not impact the illustrative results in Table 1–1 of the RIA. Finally, emissions subject to WEC accounts for netting of emissions between facilities and entities under common ownership and control. Under the final WEC, facilities with emissions below their emissions threshold may reduce emissions subject to the WEC at other facilities with emissions above the emissions threshold where those facilities are under common ownership or control.

The benefit-cost analysis contained in the RIA accompanying this rulemaking for the WEC considers the potential benefits and costs of the WEC arising from cost-effective mitigation actions under the WEC as well as the potential transfers from affected operators to the government in payments. Costs include engineering costs for methane mitigation actions and costs resulting from production changes in oil and gas energy markets under this final rule. While the EPA expects a range of health and environmental benefits from reductions in methane, VOC, and HAP emissions under the WEC, the monetized benefits of the final rule are limited to the estimated climate benefits from projected methane emissions reductions. These benefits are based on the social cost of methane (SC–$CH_4$). A screening-level analysis of ozone-related benefits from projected VOC reductions can be found in Appendix A of the RIA. However, these estimates are treated as illustrative and are not included in the quantified benefit-cost comparisons in the RIA.

The EPA estimates that this action will result in cumulative emissions reductions of 1.2 million metric tons of methane over the 2024 to 2035 period. These reductions represent about 40 percent of methane emissions that would be subject to the WEC before accounting for the adoption of cost-effective emission reduction technologies. Virtually all the reduced emissions result from mitigation activities undertaken by industry to reduce WEC payments. Less than one

percent of reductions are associated with decreased production activity in the oil and gas sector resulting from the final rule. In addition to methane emissions reductions, the WEC is estimated to result in reductions of 170 thousand metric tons of VOC and six thousand metric tons of HAP.

The WEC has important interactions and is designed to work hand-in-hand with the NSPS and EG for the Oil and Natural Gas Sector by accelerating the adoption of cost-effective methane mitigation technologies, including those that would eventually be required under the 2024 Final NSPS/EG. The annual projected emissions reductions, costs, and WEC obligations are significantly affected by these interactions.

The EPA finalized updates to the Oil and Gas NSPS/EG in March 2024. In addition to requirements already in place, these Oil and Gas NSPS/EG rules include standards for many of the major sources of methane emissions in the oil and natural gas industry. To avoid double counting of benefits and costs, the baseline for this analysis includes reductions resulting from the 2024 Final NSPS/EG based on information from the Final RIA for that rule (available in Docket No. EPA–HQ–OAR–2021–0317). Specifically, that analysis showed gradually increasing reductions in methane emissions resulting from the NSPS and deep reductions in methane emissions beginning to take effect in 2028 as a result of the EG. As facilities implement emission controls required by the 2024 Final NSPS/EG, emissions subject to the WEC decline.

The second interaction between the WEC and NSPS/EG is the regulatory compliance exemption provision of the WEC. Under this provision, when certain conditions are met with respect to the implementation of the Oil and Gas NSPS/EG, applicable facilities in compliance with their applicable requirements are exempted from the WEC. The analysis in the RIA assumes that the regulatory compliance exemption takes effect in 2029, such that in 2029 and later, facilities in the industry segments subject to requirements under the NSPS/EG do not owe WEC payments. This assumption is based on an assumed timeline under which the conditions of the regulatory compliance exemption could be met. The timing of the regulatory compliance exemption availability will vary by State. As timing for any individual State is unknown, this RIA analysis assumes that the regulatory compliance exemption becomes available for all relevant facilities in 2029.

Climate benefits associated with this final rule are the monetized value of

methane reductions using the SC–CH₄, which calculates the avoided climate related damages from reducing methane emissions. Methane is the principal component of natural gas. As discussed in section I.C.1. of this preamble, methane is also a potent GHG that, once emitted into the atmosphere, absorbs terrestrial infrared radiation, which in turn contributes to increased global warming and continuing climate change.

This final rulemaking is projected to reduce VOC emissions, which are a precursor to ozone. Ozone is not generally emitted directly into the atmosphere but is created when its two primary precursors, VOC and oxides of nitrogen (NO$_X$), react in the atmosphere in the presence of sunlight. Emissions reductions under the WEC may decrease ozone formation, human exposure to ozone, and the incidence of ozone-related health effects. VOC emissions are also a precursor to fine particulate matter (PM$_{2.5}$), so VOC reductions may also decrease human exposure to PM$_{2.5}$ and the incidence of PM$_{2.5}$-related health effects.

Available emissions data show that several different HAP are emitted from oil and natural gas operations. Emissions of eight HAP make up a large percentage of the total HAP emissions by mass from the oil and natural gas sector: toluene, hexane, benzene, xylenes (mixed), ethylene glycol, methanol, ethyl benzene, and 2,2,4-trimethylpentane.[75] Reductions of HAP emissions under the WEC may reduce exposure to these and other HAP.

In section 9.3 of the RIA, the EPA identifies existing potential environmental justice issues for the communities in counties that have emissions sources that are expected to owe the WEC charge before accounting for mitigation actions and thus may be positively affected by emissions changes under the final rule. Compared to the national average, these communities include a higher percentage of individuals who identify as racial and ethnic minorities, have lower average incomes, and have slightly elevated health risks associated with various air emissions. Reductions in VOC and HAP emissions as a result of the WEC are expected to benefit communities in these counties. Because the WEC does not directly require emissions reductions, the EPA has not projected specific locations where emissions reductions might occur. In addition,

detailed proximity analysis is infeasible because the emissions affected by the WEC occur at hundreds of thousands of locations.

The total cost of the final rule includes the engineering costs for methane mitigation actions implemented by the oil and natural gas industry in order to avoid or reduce WEC obligations. Costs for methane mitigation are calculated on an annualized basis, with total costs spread over the expected lifetime. This includes the initial capital costs required to implement and install the specific mitigation technology. In addition, for mitigation technologies with expected lifetimes greater than one-year, annual recurring operations and maintenance costs, which include labor, energy and materials, are also incorporated. Finally, the total mitigation costs also include the avoided cost of natural gas losses.

The social cost of energy market impacts is the loss in consumer and producer surplus value from changes in natural gas market production and prices. The economic impacts analysis uses a partial equilibrium model and estimates that the impact of the gas market is minimal, with the largest impact occurring in the first few years with a price increase of less than 0.1 percent and a quantity reduction of less than 0.1 percent.

Table 5 presents results of the benefit-cost analysis for the final WEC. It presents the present value (PV) and equivalent annual value (EAV), estimated using discount rates of 2, 3, and 7 percent, of the changes in quantified benefits, costs, and net benefits relative to the baseline.[76] These values reflect an analytical time horizon of 2024 to 2035, are discounted to 2023,

[75] U.S. EPA. The Benefits and Costs of the Clean Air Act from 1990 to 2020. Washington, DC. Retrieved from *https://www.epa.gov/sites/production/files/2015-07/documents/fullreport_rev_a.pdf.*

[76] Monetized climate effects are presented under a 2 percent near-term Ramsey discount rate, consistent with the EPA's updated estimates of the SC–GHG. The 2003 version of OMB's Circular A–4 had generally recommended 3 percent and 7 percent as default discount rates for costs and benefits, though as part of the Interagency Working Group on the Social Cost of Greenhouse Gases, OMB had also long recognized that climate effects should be discounted only at appropriate consumption-based discount rates. OMB finalized an update to Circular A–4 in 2023, in which it recommended the general application of a 2.0 percent discount rate to costs and benefits (subject to regular updates), as well as the consideration of the shadow price of capital when costs or benefits are likely to accrue to capital. Because the SC–GHG estimates reflect net climate change damages in terms of reduced consumption (or monetary consumption equivalents), the use of the discount rate estimated using the average return on capital (7 percent in OMB Circular A–4 (2003)) to discount damages estimated in terms of reduced consumption would inappropriately underestimate the impacts of climate change for the purposes of estimating the SC–GHG. See section 6.1 of the RIA for more discussion.

and are presented in 2019 constant dollars. The table includes consideration of the non-monetized benefits associated with the emissions reductions projected under this proposal.

### TABLE 5—PROJECTED EMISSIONS REDUCTIONS UNDER THE FINAL RULE, 2024–2035 TOTAL

| Pollutant | Emissions reductions (2024–2035 Total) |
|---|---|
| Methane (thousand metric tons)[a] | 1,200 |
| VOC (thousand metric tons) | 170 |
| Hazardous Air Pollutant (thousand short tons) | 6 |
| Methane (million metric tons $CO_2e$)[b] | 34 |

[a] To convert from metric tons to short tons, multiply the short tons by 1.102. Alternatively, to convert from short tons to metric tons, multiply the short tons by 0.907.

[b] Carbon dioxide equivalent ($CO_2e$). Calculated using a global warming potential of 28.

### TABLE 6—BENEFITS, COSTS, AND NET BENEFITS OF THE FINAL RULE, 2024 THROUGH 2035

[Dollar estimates in millions of 2019 dollars][a]

| Climate benefits[b] | 2 Percent near-term Ramsey discount rate | | | | | |
|---|---|---|---|---|---|---|
| | Present value | Equivalent annual value | Present value | Equivalent annual value | Present value | Equivalent annual value |
| | $2,400 | $230 | $2,400 | $230 | $2,400 | $230 |
| | 2 Percent discount rate | | 3 Percent discount rate | | 7 Percent discount rate | |
| | Present value | Equivalent annual value | Present value | Equivalent annual value | Present value | Equivalent annual value |
| Total Social Costs | $460 | $43 | $440 | $44 | $380 | $48 |
| *Cost of Methane Mitigation* | 420 | 40 | 400 | 41 | 350 | 44 |
| *Cost of Energy Market Impacts* | 39 | 4 | 38 | 4 | 33 | 4 |
| Net Benefits | 1,900 | 190 | 2,000 | 190 | 2,000 | 180 |
| Non-Monetized Benefits | Climate and ozone health benefits from reducing 1.2 million metric tons of methane from 2024 to 2035<br>$PM_{2.5}$ and ozone health benefits from reducing 170 thousand metric tons of VOC from 2024 to 2035[c]<br>HAP benefits from reducing 6 thousand metric tons of HAP from 2024 to 2035<br>Visibility benefits<br>Reduced vegetation effects | | | | | |

[a] Values rounded to two significant figures. Totals may not appear to add correctly due to rounding.

[b] Climate benefits are based on reductions in methane emissions and are calculated using three different estimates of the social cost of methane ($SC$–$CH_4$) (under 1.5 percent, 2.0 percent, and 2.5 percent near-term Ramsey discount rates). For the presentational purposes of this table, we show the climate benefits associated with the $SC$–$CH_4$ at the 2 percent near-term Ramsey discount rate. Please see Table 6–5 of the RIA for the full range of monetized climate benefits estimates.

[c] A screening-level analysis of ozone benefits from VOC reductions can be found in Appendix A of the RIA.

WEC payments are transfers and do not affect total net benefits to society as a whole because payments by oil and natural gas operators are offset by receipts by the government. Therefore, from a net-benefit accounting perspective, transfers are considered separately from costs and benefits (and are therefore not included in Table 6). As explained further in section 2.7 of the RIA, the approach to transfers taken here is in line with OMB guidance and the approach taken for RIAs for other rules impacting payments to the government, such as the Bureau of Land Management (BLM)'s waste prevention rule.

One of the reasons that transfers are not considered costs is because they represent payments to the U.S. Treasury

that do not affect total resources available to society. Payments to the U.S. Treasury can then be used to fund other programs, and the pairing of revenue collection (*e.g.,* the WEC payments) with commensurate expenditures (*e.g.,* financial assistance programs) by the Federal government can be designed to be revenue neutral. The Methane Emission Reduction Program created under CAA section 136 includes both collection and expenditure components. In addition to establishing the WEC, another key purpose of CAA section 136 is to encourage the development of innovative technologies in the detection and mitigation of methane emissions. See 168 Cong. Rec. E869 (August 23, 2022) (statement of Rep. Frank Pallone).

CAA section 136(a) and (b) provides financial and technical assistance to reduce methane emissions from the oil and gas sector. To implement this program, the EPA is partnering with the U.S. Department of Energy (DOE) to provide up to $1.36 billion in financial and technical assistance to reduce methane emissions from the oil and gas sector. As designed by Congress, these resources and incentives were intended to complement the regulatory programs and to help facilitate the transition to a more efficient petroleum and natural gas industry. These incentives for methane mitigation and monitoring complement the WEC.

The WEC has the effect of better aligning the economic incentives of oil and natural gas companies with the

costs and benefits faced by society from oil and gas activities. In the baseline scenario the environmental damages resulting from methane emissions from the oil and gas sector are a negative externality spread across society as a whole. Under the WEC, this negative externality is internalized, and oil and gas companies are required to make WEC payments in proportion to the climate damages of methane emissions subject to the WEC. Alternatively, firms can avoid making WEC payments by mitigating their emissions generating climate benefits associated with the amount of mitigation.

Table 7 provides details of the calculation steps used to estimate projected WEC obligations and climate damages based on projected emissions subject to WEC. In order to compare projected WEC payments to climate damages from emissions subject to the WEC, WEC payments are converted from nominal dollars to 2019 constant dollars using a chain-weighted GDP price index from the 2023 Annual Energy Outlook. Projected WEC payments after accounting for methane mitigation and energy market impacts are estimated to be about $540 million nominal dollars in 2024, and then drop significantly as reductions from the EG OOOOc are implemented in 2028 and the regulatory compliance exemption takes effect in 2029.

TABLE 7—DETAILS OF PROJECTED WEC OBLIGATIONS AND CLIMATE DAMAGES FROM EMISSIONS SUBJECT TO WEC, 2024 THROUGH 2035

[Dollar estimates in millions of 2019 dollars] a

| Year | Methane emissions subject to WEC in policy scenario (thousand metric tons) | Charge specified by Congress (nominal $ per metric ton) | WEC payments in policy scenario (million nominal $) | WEC payments in policy scenario (million 2019$) | SC–CH$_4$ values at 2 percent discount rate (2019$ per metric ton) | Climate damages from emissions subject to WEC (million 2019$) a |
|---|---|---|---|---|---|---|
| 2024 | 600 | $900 | $540 | $450 | $1,900 | $1,200 |
| 2025 | 460 | 1,200 | 560 | 450 | 2,000 | 930 |
| 2026 | 340 | 1,500 | 510 | 400 | 2,100 | 700 |
| 2027 | 320 | 1,500 | 480 | 380 | 2,200 | 690 |
| 2028 | 35 | 1,500 | 52 | 40 | 2,200 | 77 |
| 2029 | 3 | 1,500 | 5 | 4 | 2,300 | 7 |
| 2030 | 3 | 1,500 | 4 | 3 | 2,400 | 7 |
| 2031 | 3 | 1,500 | 4 | 3 | 2,500 | 7 |
| 2032 | 2 | 1,500 | 4 | 3 | 2,500 | 6 |
| 2033 | 2 | 1,500 | 3 | 3 | 2,600 | 5 |
| 2034 | 2 | 1,500 | 3 | 2 | 2,700 | 5 |
| 2035 | 1 | 1,500 | 2 | 1 | 2,800 | 4 |
| Total 2024–2035 | 1,800 | .................... | 2,200 | 1,700 | .................... | 3,600 |

a Climate damages are based on remaining methane emissions subject to WEC after accounting for emissions reductions and are calculated using three different estimates of the social cost of methane (SC–CH$_4$) (under 1.5 percent, 2.0 percent, and 2.5 percent near-term Ramsey discount rates). For the presentational purposes of this table, we show the climate benefits associated with the SC–CH$_4$ at the 2 percent near-term Ramsey discount rate.

Compared to the analysis presented in the RIA for the January 2024 WEC proposal, the RIA analysis reflects some updates to methodologies used to project impacts reflecting changes in the final regulations relative to the proposal and updated available data. The analysis incorporates broader allowance for netting among owner-operators that share a common parent company, updates to requirements of the regulatory compliance exemption, and updated base year data from GHGRP for 2022.

## VI. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 14094: Modernizing Regulatory Review

This action is a ''significant regulatory action'' as defined under section 3(f)(1) of Executive Order 12866, as amended by Executive Order 14094. Accordingly, the EPA submitted this action to the Office of Management and Budget (OMB) for Executive Order 12866 review. Documentation of any changes made in response to the Executive Order 12866 review is available in the docket for this rulemaking, Docket ID No. EPA–HQ–OAR–2023–0434. The EPA prepared an analysis of the potential impacts associated with this action. This analysis, *Regulatory Impact Analysis of the Waste Emissions Charge,* is also available in the docket to this rulemaking and is briefly summarized in section V. of this preamble.

### B. Paperwork Reduction Act (PRA)

The information collection activities in this rulemaking have been submitted for approval to the OMB under the PRA. The Information Collection Request (ICR) document that the EPA prepared has been assigned EPA ICR number 2787.02 (OMB Control No. 2060–0752). You can find a copy of the ICR in the docket for this rulemaking, Docket ID No. EPA–HQ–OAR–2023–0434, and it is briefly summarized here. The information collection requirements are not enforceable until OMB approves them. Two comments were received regarding the proposed ICR. The commenters stated that actual costs may be higher than estimated by the EPA due to unfamiliarity and glitches with new programs, that burden would be reduced by offering more incentives, and that the proposed ICR was in conflict with the policy standards under the PRA of minimizing paperwork burden and the cost to the Federal government. The commenters did not identify specific aspects of the proposed ICR that were overly burdensome nor did the commenters identify ways to minimize burden to the Agency nor to affected WEC respondents. The EPA acknowledges the commenters' concerns and consistent with the obligation established by CAA section 136 on the EPA to impose and collect a charge, subject to statutorily specified exemptions, the EPA has taken steps to minimize the added paperwork and recordkeeping burden and avoid duplicative reporting, while maintaining effectiveness of the final rule through the utilization of existing systems such as the electronic

Greenhouse Gas Reporting Tool (e-GGRT) system.

The EPA estimates that the final rule would result in an increase in burden. The burden associated with the final rule is due to reporting and recordkeeping requirements in the final rule.

This information collection under the final rule is necessary for the EPA to implement the charge requirements of CAA section 136. The filing required by the final rule contains information identifying the WEC obligated party, the list of identification numbers assigned by the EPA's electronic tool for submission of GHGRP reports for the WEC applicable facilities under the WEC obligated party, and for each WEC applicable facility, information related to the exemptions provided for under CAA section 136(f). Additionally, the filing includes calculations of the waste emissions threshold for each WEC applicable facility and emissions subject to charge at the level of the WEC obligated party (designated as "net WEC emissions") and at the individual WEC applicable facility level (designated as "WEC applicable emissions"). Each of these final reporting requirements are necessary for the EPA to determine the quantity of methane emissions subject to charge. To reduce the burden of data reporting under the final rule, the EPA plans to utilize the identification numbers reported in the final rule to link to data reported under the GHGRP. Additionally, the final rule amended 40 CFR part 98, subpart A to harmonize reporting obligations under part 98 and part 99.

The respondent reporting burden for this collection of information is estimated to be an annual average of 12,876 hours and $1,756,935 over the 3 years covered by this information collection, which includes an annual average of $1,726,440 in labor costs, $0 in operation and maintenance costs, and $30,495 in capital costs. The annual average incremental burden to the EPA for this period is anticipated at 31,200 hours and $5,783,774 ($2024) over the 3 years covered by this information collection, which includes an annual average of $2,117,107 in labor costs and $3,666,667 in non-labor costs.

*Respondents/affected entities:* Owners and operators of petroleum and natural gas systems that must submit a WEC filing to the EPA to comply with 40 CFR part 99.

*Respondent's obligation to respond:* The respondent's obligation to respond is mandatory under the authority provided in CAA sections 114 and 136.

*Estimated number of respondents:* 3,105.

*Frequency of response:* Annually.
*Total estimated burden:* 12,876 hours (per year). Burden is defined at 5 CFR 1320.3(b).

*Total estimated cost:* $1.8 million (per year), includes $30,495 annualized capital or operation and maintenance costs.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for the EPA's regulations in 40 CFR are listed in 40 CFR part 9. When OMB approves this ICR, the Agency will announce that approval in the **Federal Register** and publish a technical amendment to 40 CFR part 9 to display the OMB control number for the approved information collection activities contained in this final rule.

*C. Regulatory Flexibility Act (RFA)*

I certify that this final action would not have a significant economic impact on a substantial number of small entities under the RFA. The small entities that would be subject to the requirements of this action are small businesses in the petroleum and natural gas industry. Small entities include small businesses, small organizations, and small governmental jurisdictions. The EPA has determined that some small entities are affected because their processes emit methane that must be reported under subpart W and thus may be subject to WEC.

To evaluate whether this final rule would have a significant economic impact on a substantial number of small entities, the EPA conducted a small entity analysis that evaluated the costs of the final rule on small entities identified in the reporting year (RY) 2022 subpart W dataset. The EPA used reported facility-to-parent company and facility-to-owner or operator data to link facilities to WEC obligated parties. The EPA then reviewed the available RY 2022 data for the WEC obligated parties of subpart W facilities to determine whether the reporters were part of a small entity and whether the annualized costs of the proposal would have a significant impact on a substantial number of small entities. The number of small entities potentially affected by the WEC regulation were estimated based on the information collected for 590 owners or operators associated with a facility within one or more of the industry segments identified in CAA section 136(d) reporting at least 25,000 metric tons $CO_2$e under part 98 subpart W in RY2022. Of these, 371 were identified as small entities. Although the screening analysis suggests that

some small entities may have cost-to-revenue ratios that exceed 3 percent (approximately 19 percent), the EPA's evaluation of the impacts to small entities relied on several methodologies involving conservative assumptions. For example, the identification and classification of subpart W parent entities reporting under more than one NAICS code resulted in a designation of "small" based on whether the business information available met the SBA size classification threshold for a single NAICS code. In addition to the conservative assumptions, there were further mitigating factors not included in the screening analysis that would likely significantly reduce compliance costs, and, as a result, cost-to-revenue-ratios. For example, the compliance cost estimate used only the defined WEC cost and did not account for early adoption of mitigation measures that could lower an entity's emissions below the threshold and therefore result in no WEC. Details of this analysis are presented in the *Regulatory Impact Analysis of the Waste Emissions Charge,* available in the docket for this rulemaking. The cumulative effect of the mitigating factors and conservative assumptions used in the screening analysis indicates that, overall, the final rule would not have a significant impact on a substantial number of small entities.

*D. Unfunded Mandates Reform Act (UMRA)*

This action contains a Federal mandate that may result in expenditures of $183 million in 2023$ ($100 million in 1995$ adjusted for inflation using the GDP implicit price deflator) or more as described in UMRA, 2 U.S.C. 1531–1538 for State, local and Tribal governments, in the aggregate, or the private sector in any one year. Accordingly, the EPA has prepared under section 202 of the UMRA a written statement of the benefit-cost analysis, which can be found in Section V. of this preamble and in the *Regulatory Impact Analysis of the Waste Emissions Charge* (RIA), available in the docket for this rulemaking. The final action in part implements mandate(s) specifically and explicitly set forth in CAA section 136.

The applicability, magnitude of charge, methane emissions subject to charge, and exemptions from charge for the WEC program are established by CAA section 136(c) through (g). Given that this framework is required by statute, it is not possible for the EPA to consider regulatory alternatives that are inconsistent with these elements. As such, to evaluate the benefits and costs of the final rule, in the RIA

accompanying this rulemaking two scenarios were evaluated: a baseline scenario (*i.e.*, not including the effects of the WEC program) and a policy scenario inclusive of the costs, benefits, and transfers projected under the final rule. This action is not subject to the requirements of section 203 of UMRA because it contains no regulatory requirements that might significantly or uniquely affect small governments. This final rule does not apply to governmental entities unless the government entity owns a facility in the applicable petroleum and gas industry segments and reports more 25,000 mt $CO_2e$ to subpart W of the GHGRP. It would not impose any implementation responsibilities on State, local, or Tribal governments and it is not expected to increase the cost of existing regulatory programs managed by those governments. Thus, the impact on governments affected by the final rule is expected to be minimal.

*E. Executive Order 13132: Federalism*

This action does not have Federalism implications. It will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. This final rule will not apply to governmental entities unless the government entity owns a facility in the applicable petroleum and natural gas industry segments that and reports more 25,000 mt $CO_2e$ to subpart W of the GHGRP. Therefore, the EPA anticipates relatively few State or local government facilities will be affected. However, consistent with the EPA's policy to promote communications between the EPA and State and local governments, the EPA solicited comment on this action from State and local officials.

Specifically, the EPA issued an RFI to seek public input through a non-regulatory docket on broad elements of the Methane Emissions Reduction Program, including waste emissions charge revisions, in the early stages of its design (see Docket ID. No. EPA–HQ–OAR–2022–0875). The EPA received five comments from government entities related to implementation of the WEC. The EPA also solicited comments on the proposal. The EPA received two comments from local government entities and thirteen comments from State or Tribal government entities in response to the proposed rulemaking. All comments received on the proposed rulemaking were considered during the development of the final rule.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action has Tribal implications. While this action does not preempt Tribal law, it will impose direct compliance costs on one or more Federally recognized Tribal governments, and the Federal government will not provide the funds necessary to pay those costs; however, the final rule and the associated compliance costs are required by statute. This final regulation will apply directly to petroleum and natural gas facilities that may be owned by Tribal governments. However, it will generally only have Tribal implications where the Tribal entity owns or operates a facility in an applicable industry segment that emits GHGs above threshold levels or potentially where privately owned facilities subject to the charge are located in Indian country. Based on currently available data, the EPA anticipates that only one Tribe will be directly affected. Of the subpart W facilities currently reporting to the GHGRP in RY2022, this Tribe is the owner or partial owner of three facilities currently reporting to part 98. Based on RY2022 data, all three facilities would be WEC applicable facilities, and the WEC applicable emissions (without consideration of exemptions) for the individual facilities would range from less than 0 mt $CH_4$ for one facility, up to about 2,700 mt $CH_4$ for the largest facility (which corresponds to a WEC obligation of around \$2.4 million using charge of \$900/MT). Note that one of the facilities is within the onshore natural gas processing sector, and thus, this calculation utilizes proxy data of CBI throughput, which may not reflect the actual facility throughput and resulting WEC applicable emissions. Each of the three facilities has a different owner or operator or combination of owners or operators, so the Tribe may not be the WEC obligated party for all three facilities. These estimates do not consider any exemptions that might apply for the three facilities with emissions greater than the facility waste emissions threshold.

In addition to the Tribe that may be directly impacted by the WEC due to owning a facility subject to the charge, the EPA anticipates that Tribes could be impacted in cases where privately-owned facilities subject to the charge are located in Indian country. For example, the EPA reviewed the location of the production wells reported by facilities under the Onshore Petroleum and Natural Gas Production industry segment and found production wells

reported under subpart W on lands associated with approximately 20 Tribes. Therefore, although the EPA anticipates that at most only one Tribe may be designated as a WEC obligated party and has the potential to be subject to the WEC, the EPA has sought opportunities to provide information to Tribal governments and representatives during rule development. Further, consistent with the EPA Policy on Consultation and Coordination with Indian Tribes, the EPA engaged in consultation with Tribal officials during the development of this action and specifically solicited comment on this action from Tribal officials.

Consistent with the EPA Policy on Consultation and Coordination with Indian Tribes, the EPA consulted with Tribal officials early in the process of developing this regulation to ensure meaningful and timely Tribal input into its development. On January 26, 2024, the EPA invited all 574 Federally-recognized Tribes to consult on the proposed regulation. Separately, consistent with EPA's Guiding Principles for Consulting with Alaska Native Claims Settlement Act (ANCSA) Corporations, EPA invited ANCSA corporations to consult on the proposed rulemaking. A copy of this letter is available in the docket to this rulemaking (see Docket ID No. EPA–HQ–OAR–2023–0434). Only two Tribes requested government-to-government consultation with the EPA. The EPA consulted with the Southern Ute Indian Tribe via video conference at 12:00 p.m. Eastern Time on March 21, 2024. A summary of the consultation with the Southern Ute Indian Tribe is provided at Docket ID No. EPA–HQ–OAR–2023–0434. The Southern Ute Tribe additionally submitted written comments to the docket. In response to the Ute Indian Tribe's consultation request, the EPA scheduled a video conference with the Ute Indian Tribe's Business Committee at 3:30 p.m. Eastern Time on April 2, 2024; however, the Business Committee informed the EPA during the meeting that the video conference did not meet the Tribe's requirements for a consultation and ended the meeting before providing any input on the proposed rulemaking to the EPA. The Business Committee informed the EPA that the meeting is only considered consultation if the meeting is in person and on Tribal land, but it submitted written comments to the docket.

The EPA encouraged Tribal representatives to submit written comments through the docket on the proposed rulemaking and has responded in detail to Tribal comments

in the response to comments document on the proposed regulation to address Tribal concerns. The EPA has considered the Tribal input from the coordination and consultation calls and public comments in the development of the final rule.

As required by section 7(a), the EPA's Tribal Consultation Official has certified that the requirements of the executive order have been met in a meaningful and timely manner. A copy of the certification is included in the docket for this action.

*G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

The EPA interprets Executive Order 13045 as applying only to regulatory actions that concern environmental health or safety risks that the EPA has reason to believe may disproportionately affect children, per the definition of ''covered regulatory action'' in section 2–202 of the Executive Order. This action would not establish an environmental standard intended to mitigate health or safety risks and does not focus on information-gathering actions concerned with children's health. Therefore, this action is not subject to Executive Order 13045 because it does not concern an environmental health risk or safety risk. Since this action does not concern human health, the EPA's Policy on Children's Health also does not apply.

Although this final action does not establish an environmental standard applicable to methane emissions or mandate methane emissions reductions, it is expected that the WEC implemented under this final action would result in elective methane mitigation actions by applicable facilities in the oil and gas industry in order to reduce, or eliminate, the imposition of charges. As such, the EPA believes that the impacts of this final action would result in a reduction in an environmental health or safety risk that has a disproportionate effect on children. Accordingly, the Agency has elected to evaluate the environmental health and welfare effects of climate change on children outside of this action. Greenhouse gases, including methane, contribute to climate change and are emitted in significant quantities by the oil and gas industry. The EPA believes that the implementation of the WEC in this action would improve children's health as a result of methane mitigation actions and operational changes taken by oil and gas applicable facilities to avoid the imposition of WEC. The assessment literature cited in the EPA's 2009 Endangerment Findings

concluded that certain populations and life stages, including children, the elderly, and the poor, are most vulnerable to climate-related health effects (74 FR 66524, December 15, 2009). The assessment literature since 2009 strengthens these conclusions by providing more detailed findings regarding these groups' vulnerabilities and the projected impacts they may experience (*e.g.,* the 2016 Climate and Health Assessment).[77] These assessments describe how children's unique physiological and developmental factors contribute to making them particularly vulnerable to climate change. Impacts to children are expected from heat waves, air pollution, and infectious and waterborne illnesses resulting in physical and mental health effects from extreme weather events. In addition, children are among those especially susceptible to most allergic diseases, as well as health effects associated with storms and floods. Additional health concerns may arise in low-income households, especially those with children, if climate change reduces food availability and increases prices, leading to food insecurity within households.

*H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use*

This final action is not a ''significant energy action'' because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. To make this determination, we compare the projected change in crude oil and natural gas costs and production to guidance articulated in a January 13, 2021 OMB memorandum ''Furthering Compliance with Executive Order 13211, Titled ''Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use.''[78] With respect to increases in the cost of energy production or distribution, the guidance indicates that a regulatory action produces a significant adverse effect if it is expected to increase costs in excess of one percent. With respect to crude oil production, the guidance indicates that a regulatory action produces a significant adverse effect if it is expected to produce reductions in crude oil supply, in excess of 20 million

barrels per year. With respect to natural gas production, the guidance indicates that a regulatory action produces a significant adverse effect if it reduces natural gas production in excess of 40 million thousand cubic feet (mcf) per year.[79] The economic impacts analysis conducted as part of the RIA accompanying this rulemaking estimated a maximum impact on the gas market of a 0.044 percent price increase and a 0.026 percent decrease in production. The highest impact year is estimated to be in 2026, with a production decrease of 10.7 million mcf of natural gas. The analysis projected a maximum impact on the oil market of a 0.03 percent price increase and a 0.026 percent decrease in production. The highest impact year is estimated to be in 2026. These impacts are substantially below the thresholds available in OMB memoranda as measures of a significant adverse effect on the energy supply. Further discussion of this analysis is available in the *Regulatory Impact Analysis of the Waste Emissions Charge,* available in the docket for this rulemaking.

*I. National Technology Transfer and Advancement Act*

This rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations and Executive Order 14096: Revitalizing Our Nation's Commitment to Environmental Justice for All*

The EPA concludes that the emissions reductions likely to result from this rule will improve health and environmental outcomes for communities facing disproportionate and adverse human health effects from the pollution subject to the waste emissions charge, including communities with environmental justice concerns. The EPA finalizes, however, to determine that the Executive Order charge to perform an environmental justice analysis does not apply to this rulemaking because it is a rulemaking that addresses information collection, reporting procedures, and imposition of the waste emissions charge directive of CAA section 136. Although the EPA

[77] USGCRP, 2016: *The Impacts of Climate Change on Human Health in the United States: A Scientific Assessment.* Crimmins, A., J. Balbus, J.L. Gamble, C.B. Beard, J.E. Bell, D. Dodgen, R.J. Eisen, N. Fann, M.D. Hawkins, S.C. Herring, L. Jantarasami, D.M. Mills, S. Saha, M.C. Sarofim, J. Trtanj, and L. Ziska, Eds. U.S. Global Change Research Program, Washington, DC, 312 pp. *https://dx.doi.org/10.7930/J0R49NQX.*

[78] See *https://www.whitehouse.gov/wp-content/uploads/2021/01/M-21-12.pdf.*

[79] The 2021 EO 13211 guidance memo states that the natural gas production decrease that indicates the regulatory action is a significant energy action is 40 mcf per year. Because this is a relatively small amount of natural gas and previous guidance from 2001 indicated a threshold of 25 million mcf, we assume the 2021 memo was intended to establish 40 million mcf as the indicator of an adverse energy effect. See *https://www.whitehouse.gov/wp-content/uploads/2017/11/2001-M-01-27-Guidance-for-Implementing-E.O.-13211.pdf.*

anticipates a reduction in methane and associated co-pollutant emissions from this action, these reductions are not the result of emissions standards or mandated reductions.

Although this regulation does not require action that will directly affect human health or environmental conditions, it is expected that the WEC implemented under this final action would result in elective methane mitigation actions by applicable facilities in the oil and gas industry in order to reduce, or eliminate, the imposition of charges. Accordingly, the EPA has identified and addressed environmental justice concerns by electing to conduct a qualitative assessment of the environmental justice outcomes from the action. The EPA believes the human health or environmental conditions that exist prior to this final action would result in or have the potential to result in disproportionate and adverse human health or environmental effects on communities with environmental justice concerns. The EPA identified counties where Onshore Petroleum and Natural Gas Production and/or Onshore Petroleum and Natural Gas Gathering and Boosting facilities with emissions that may be above the waste emissions threshold and therefore subject to the WEC operated in 2022. These are the counties where emissions might change due to the WEC. The EPA found that there are generally higher percentages of low income and members of minority groups in these communities who may experience higher than average health risks. The EPA believes that in aggregate the final action will result in reduction of methane, hazardous air pollutants, and volatile organic compounds, and, generally, this result will improve environmental justice outcomes.

The information supporting this Executive Order review is contained in the *Regulatory Impact Analysis of the Waste Emissions Charge,* available in the docket for this rulemaking.

The EPA has promoted meaningful engagement from communities in developing this action. The EPA has provided several opportunities for public engagement. The EPA opened the proposed rule for public comment from January 26 to March 26, 2024, and hosted a virtual public hearing for the proposed revisions on February 12, 2024. The EPA provided three informational webinars on the technical aspects of the proposed rule on January 25, February 20, and March 5, 2024. The EPA has taken into consideration the comments received from representatives and stakeholders in the development of this final rule.

### K. Congressional Review Act

This action is subject to the Congressional Review Act, and the EPA will submit a report on the final rule to each House of the Congress and to the Comptroller General of the United States. This action meets the criteria set forth by 5 U.S.C. 804(2).

### L. Judicial Review

Under CAA section 307(b)(1), any petition for review of this final rule must be filed in the U.S. Court of Appeals for the District of Columbia Circuit by January 17, 2025. This final rule establishes requirements applicable to owners and operators of facilities in the petroleum and natural gas systems source category located across the United States that are subject to 40 CFR part 99 and therefore is ''nationally applicable'' within the meaning of CAA section 307(b)(1). Under CAA section 307(d)(7)(B), only an objection to this final rule that was raised with reasonable specificity during the period for public comment can be raised during judicial review. CAA section 307(d)(7)(B) also provides a mechanism for the EPA to convene a proceeding for reconsideration, ''[i]f the person raising an objection can demonstrate to the EPA that it was impracticable to raise such objection within [the period for public comment] or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule.'' Any person seeking to make such a demonstration should submit a Petition for Reconsideration to the Office of the Administrator, Environmental Protection Agency, Room 3000, William Jefferson Clinton Building, 1200 Pennsylvania Ave. NW, Washington, DC 20460, with an electronic copy to the person listed in **FOR FURTHER INFORMATION CONTACT**, and the Associate General Counsel for the Air and Radiation Law Office, Office of General Counsel (Mail Code 2344A), Environmental Protection Agency, 1200 Pennsylvania Ave. NW, Washington, DC 20004. Note that under CAA section 307(b)(2), the requirements established by this final rule may not be challenged separately in any civil or criminal proceedings brought by the EPA to enforce these requirements.

### M. Determination Under CAA Section 307(d)

Pursuant to CAA section 307(d)(1)(V), the Administrator determines that this action is subject to the provisions of CAA section 307(d). Section

307(d)(1)(V) of the CAA provides that the provisions of CAA section 307(d) apply to ''such other actions as the Administrator may determine.''

### N. Severability

This final rule is multifaceted and addresses many separate elements of the WEC program established by Congress for independent reasons, as detailed in each respective portion of this preamble. We intend each portion of this final rule to be severable from each other, though we took the approach of including all the parts in one rulemaking rather than promulgating multiple final rules in order to promote coordination of the adoption and implementation of the final rule, even though many elements are not interdependent. Should a reviewing court vacate certain elements of the final rule and not others, the remaining elements can and should function independently.

For example, the provisions for calculating the charge, which are largely dictated by the statute, are severable from the provisions concerning netting and exemptions. Notably, the regulatory compliance exemption is not available until ''methane emissions standards and plans pursuant to subsections (b) and (d) of section 111 have been approved and are in effect in all States with respect to the applicable facility.'' Because of the time it will take for States to promulgate State plans and the EPA to review and approve them or issue a Federal plan, the regulatory compliance exemption would not be available for a few years after this final rule. Thus, should a court conclude that the EPA erred in codifying the regulatory compliance exemption, EPA anticipates that it would be able to timely address any identified errors.

Likewise, the calculation methodologies and data input elements for the WEC calculations reflect the differences in thresholds established by Congress for certain oil and gas operations and the industry segment-specific methane intensity thresholds specified in CAA 136(f) and listed in Table 2 of this preamble. If a reviewing court were to invalidate any of the calculation methodologies for a particular segment, the remainder of the calculations for other segments subject to the WEC would be independent from and do not rely on the calculations that were to be invalidated. Accordingly, each calculation methodology and data input element for the WEC calculations is severable. This is reflected in the structure of the final rule, which describes each of the equations for calculation of the WEC separately.

Moreover, because the calculations as established in this rulemaking are direct translations of the statute into practical terms for ease of implementation, the calculations themselves could be done even without the specific methodologies finalized in this rulemaking.

The EPA is also finalizing certain requirements regarding implementation of the netting requirement established in CAA section 136(f)(4). To the extent a reviewing court were to find any legal issue with any element of the EPA's netting requirements as finalized, that would have no bearing on the implementation of any other elements of the netting requirement, or on any other aspect of the final rule, including the underlying charge obligation.

Each of the exemptions identified in this final rule (emissions from eligible delays in environmental permitting under CAA section 136(f)(5); the regulatory compliance exemption under CAA section 136(f)(6); and the plugged well exemption under CAA section 136(f)(7)) are also severable from each other and from the other provisions of the final rule. Each exemption was established independently under each separate authority under CAA section 136 and each regards a different (and unrelated) set of factual circumstances. Each exemption can function and be implemented in the absence of each other, and are severable. Additionally, certain provisions promulgated within each exemption are also severable. For instance, the EPA is finalizing a determination that plugged wells in the underground storage industry segment are eligible for the plugged well exemption. To the extent that a court were to find any legal issue with the eligibility of the underground storage industry segment for this exemption, it would have no bearing on the eligibility of wells in the production industry segments—nor would it have bearing on the application of any other exemption. As described in section III. of this preamble, the EPA is also finalizing certain general requirements and establishing confidentiality determinations for the reporting of certain data elements. Each of these requirements continues to be fully implementable even in the absence of any one or more of these elements, because each element is reported and evaluated independently pursuant to requirements finalized in this rulemaking.

Finally, as described in section II.A. of this preamble, the EPA is finalizing revisions to the general provisions (subpart A) of part 98. These reporting requirements are independent of the general requirements and other reporting requirements under part 99, and invalidation of the revisions to subpart A of part 98 would have no bearing on the EPA's ability to calculate the WEC. Moreover, the WEC rule can continue to function irrespective of the status of the latest subpart W revisions, because if any aspect of those revisions were invalidated, the previously existing version of the subpart W regulation would then apply.

Thus, the EPA has independently considered and adopted portions of the final rule (including but not limited to the definitions to support WEC implementation; provisions related to common ownership or control; calculation methodologies for each part of the WEC; each of the provisions regarding the exemptions to the WEC; the general requirements of this final rule, and establishing confidentiality determinations for the reporting of certain data elements), and each of these components is severable. If a court were to invalidate any one of these elements of the final rule, we intend the remainder of this action to remain effective. We have designed these different elements of the program to function independently; the supporting basis for each of these elements of the final rule reflects that they are independently justified and appropriate; and our analysis finding each separate portion to be appropriate remains valid even in the event that one or more other parts of the final rule has been set aside. Moreover, this list is not intended to be exhaustive, and should not be viewed as an intention by the EPA to consider other parts of the final rule not explicitly listed here as not severable from other parts of the final rule.

## List of Subjects

### 40 CFR Part 2

Administrative practice and procedure, Confidential business information, Courts, Environmental protection, Freedom of information, Government employees.

### 40 CFR Part 98

Environmental protection, Greenhouse gases, Reporting and recordkeeping requirements.

### 40 CFR Part 99

Environmental protection, Greenhouse gases, Natural gas, Petroleum, Reporting and recordkeeping requirements, Penalties.

**Michael S. Regan,**
*Administrator.*

For the reasons stated in the preamble, the Environmental Protection Agency amends title 40, chapter I, of the Code of Federal Regulations as follows:

## PART 2—PUBLIC INFORMATION

■ 1. The authority citation for part 2 continues to read as follows:

**Authority:** 5 U.S.C. 552, 552a, 553; 28 U.S.C. 509, 510, 534; 31 U.S.C. 3717.

## Subpart B—Confidentiality of Business Information

■ 2. Amend § 2.301 by revising paragraph (d) to read as follows:

### § 2.301 Special rules governing certain information obtained under the Clean Air Act.

\*      \*      \*      \*      \*

(d) *Data submitted under parts 98 or 99 of this chapter.* (1) Sections 2.201 through 2.215 do not apply to data submitted under parts 98 or 99 of this chapter that EPA has determined, pursuant to sections 114(c) and 307(d) of the Clean Air Act, to be either of the following:

(i) Emission data.

(ii) Data not otherwise entitled to confidential treatment pursuant to section 114(c) of the Clean Air Act.

(2) Except as otherwise provided in this paragraph (d)(2) and (4) of this section, §§ 2.201 through 2.215 do not apply to data submitted under parts 98 or 99 of this chapter that EPA has determined, pursuant to sections 114(c) and 307(d) of the Clean Air Act, to be entitled to confidential treatment. EPA shall treat that information as confidential in accordance with the provisions of § 2.211, subject to paragraph (d)(4) of this section and § 2.209.

(3) Upon receiving a request under 5 U.S.C. 552 for data submitted under parts 98 or 99 of this chapter that EPA has determined, pursuant to sections 114(c) and 307(d) of the Clean Air Act, to be entitled to confidential treatment, the EPA office shall furnish the requestor a notice that the information has been determined to be entitled to confidential treatment and that the request is therefore denied. The notice shall include or cite to the appropriate EPA determination.

(4) *Modification of prior confidentiality determination.* A determination made pursuant to sections 114(c) and 307(d) of the Clean Air Act that information submitted under parts 98 or 99 of this chapter is entitled to confidential treatment shall continue in effect unless, subsequent to the confidentiality determination, EPA takes one of the following actions:

(i) EPA determines, pursuant to sections 114(c) and 307(d) of the Clean

Air Act, that the information is emission data or data not otherwise entitled to confidential treatment under section 114(c) of the Clean Air Act.

(ii) The Office of General Counsel issues a final determination, based on the criteria in § 2.208, stating that the information is no longer entitled to confidential treatment because of change in the applicable law or newly discovered or changed facts. Prior to making such final determination, EPA shall afford the business an opportunity to submit comments on pertinent issues in the manner described by §§ 2.204(e) and 2.205(b). If, after consideration of any timely comments submitted by the business, the Office of General Counsel makes a revised final determination that the information is not entitled to confidential treatment under section 114(c) of the Clean Air Act, EPA will notify the business in accordance with the procedures described in § 2.205(f)(2).

* * * * *

**PART 98—MANDATORY GREENHOUSE GAS REPORTING**

■ 3. The authority citation for part 98 continues to read as follows:

**Authority:** 42 U.S.C. 7401–7671q.

**Subpart A—General Provision**

■ 4. Amend § 98.3 by adding paragraph (c)(14) to read as follows:

**§ 98.3 What are the general monitoring, reporting, recordkeeping and verification requirements of this part?**

* * * * *

(c) * * *

(14) Additional reporting for facilities subject to reporting under subpart W of this part. Legal name(s) and physical address(es) of each owner and each operator of the facility as of December 31 of the year for which data are being reported.

* * * * *

■ 5. Amend § 98.4 by revising paragraphs (g), (h), and (n)(2) and adding paragraph (o) to read as follows:

**§ 98.4 Authorization and responsibilities of the designated representative.**

* * * * *

(g) *Changing a designated representative or alternate designated representative.* The designated representative or alternate designated representative identified in a complete certificate of representation under this section for a facility or supplier received by the Administrator may be changed at any time upon receipt by the Administrator of another later signed,

complete certificate of representation under this section for the facility or supplier. Except as provided in paragraph (o) of this section, notwithstanding any such change, all representations, actions, inactions, and submissions by the previous designated representative or the previous alternate designated representative of the facility or supplier before the time and date when the Administrator receives such later signed certificate of representation shall be binding on the new designated representative and the owners and operators of the facility or supplier.

(h) *Changes in owners and operators.* Except as provided in paragraphs (n) and (o) of this section, in the event an owner or operator of the facility or supplier is not included in the list of owners and operators in the certificate of representation under this section for the facility or supplier, such owner or operator shall be deemed to be subject to and bound by the certificate of representation, the representations, actions, inactions, and submissions of the designated representative and any alternate designated representative of the facility or supplier, as if the owner or operator were included in such list. Within 90 days after any change in the owners and operators of the facility or supplier (including the addition of a new owner or operator), the designated representative or any alternate designated representative shall submit a certificate of representation that is complete under this section except that such list shall be amended to reflect the change. If the designated representative or alternate designated representative determines at any time that an owner or operator of the facility or supplier is not included in such list and such exclusion is not the result of a change in the owners and operators, the designated representative or any alternate designated representative shall submit, within 90 days of making such determination, a certificate of representation that is complete under this section except that such list shall be amended to include such owner or operator.

* * * * *

(n) * * *

(2) If the entire facility is acquired by an owner or operator that already has a reporting facility in the same industry segment and basin (for onshore petroleum and natural gas production or onshore petroleum and natural gas gathering and boosting) or State (for natural gas distribution), the new owner or operator shall merge the acquired facility into their existing facility for purposes of the annual GHG report. The

previous owner or operator shall also follow the provisions of § 98.2(i)(6) to notify EPA that the sold facility will discontinue reporting and shall provide the e-GGRT identification number of the merged, or reconstituted, facility. The owner or operator of the merged facility shall be responsible for submitting the annual report for the merged facility for the entire reporting year beginning with the reporting year in which the acquisition occurred. The owner or operator of the merged facility shall provide the e-GGRT identification number of the acquired facility.

* * * * *

(o) *Alternative provisions for responsibility for submissions and revisions to annual GHG reports for reporting years prior to changes in owners and operators for facilities that report under subpart W of this part.* If there is a change to the owner or operator of a facility that reports under subpart W of this part on January 17, 2025 or later and paragraph (o)(3) of this section does not apply, the entity (or entities) that was (were) the owner or operator as of December 31 of each reporting year remains responsible for submission and any revisions to annual reports for that reporting year and if applicable, annual GHG reports under § 98.3(h) for reporting years as specified in paragraph (o)(6) of this section. If paragraph (o)(1) or (o)(2) applies, the seller(s) shall select a historic reporting representative according to paragraph (o)(1) or (o)(2) of this section, as applicable, and according to paragraph (o)(5) of this section who will be responsible for submission (if not already submitted before the transaction) and revisions to annual GHG reports under § 98.3(h) for reporting years as specified in paragraph (o)(6) of this section. If there is a change to the owner or operator of a facility that reports under subpart W of this part that occurs during a transaction that results in the selling owner(s) and operator(s) ceasing to exist or if there is a change in owner or operator that occurs after December 31, 2024 and prior to January 17, 2025, the owner(s) and operators(s) as of December 31, 2024 and buyer(s) shall select a historic reporting representative according to paragraph (o)(3) or (o)(4) of this section, as applicable, and paragraph (o)(5) of this section who will be responsible for submission (if not already submitted before the transaction) and revisions to annual GHG reports under § 98.3(h) for reporting years as specified in paragraph (o)(6) of this section. If an entire facility is merged or acquired by a new owner(s) or operator(s), the owner(s) or

operator(s) prior to the transaction must notify EPA of the date of the last transaction that results in a change to the owner or operator of the facility and the acquiring owner(s) or operator(s) must provide the e-GGRT identification number of the facility acquired in the transaction. For facilities that meet the criteria in this paragraph (o), the terms *Owner* and *Operator* used in this subpart A and subpart W of this part refer to the owner(s) and operator(s) responsible for submission (if not already submitted before the transaction) and revisions to annual GHG reports under § 98.3(h) for reporting years as specified in paragraph (o)(6) of this section.

(1) If a facility reporting under subpart W had a single owner or operator as of December 31 of the year prior to the transaction(s), then within 90 days of a transaction(s) that results in a change to the owner or operator of the facility from the owner or operator as of December 31 of that reporting year, the owner or operator as of December 31 of that reporting year shall select a historic reporting representative who will be responsible for submission (if not already submitted before the transaction(s)) and revisions to annual GHG reports under § 98.3(h) for reporting years as specified in paragraph (o)(6) of this section. The historic reporting representative shall be an individual selected by an agreement binding on the owner or operator as of December 31 of that reporting year, following the provisions of paragraph (b) of this section.

(2) If a facility reporting under subpart W had more than one owner or operator as of December 31 of the year prior to the transaction(s), then within 90 days of a transaction(s) that results in a change to the owners or operators of the facility from the owners and operators of that reporting year, the owners and operators, as applicable, as of December 31 of that reporting year, shall select a historic reporting representative who will be responsible for submission (if not already submitted before the transaction(s)) and revisions to annual GHG reports under § 98.3(h) for reporting years as specified in paragraph (o)(6) of this section. The historic reporting representative shall be an individual selected by an agreement binding on each of the owners and operators as of December 31 of that reporting year, following the provisions of paragraph (b) of this section. If the transaction results in a change to the owner(s) or operator(s) for the entire facility, the new owner(s) or operator(s) must notify EPA of the date(s) of each transaction that results in a change to

the owner or operator of the facility and must provide the e-GGRT identification number of the facility acquired in the transaction.

(3) If a facility is sold by the owner(s) or operator(s) as of December 31 of the year prior to the transaction and the owner(s) or operator(s) selling the facility is(are) acquired or all of the remaining assets of the owner(s) or operators(s) are acquired such that the selling owner(s) or operator(s) cease to exist as a result of a transaction that results in a change to the owner(s) or operator(s) of a facility, the owners or operators involved in that transaction shall select a historic reporting representative who will be responsible for submission (if not already submitted before the transaction) and revisions to annual GHG reports under § 98.3(h) for reporting years as specified in paragraph (o)(6) of this section. The historic reporting representative shall be an individual selected by an agreement binding on each of the owners and operators involved in the transaction, following the provisions of paragraph (b) of this section. If the transaction results in a change to the owner(s) or operator(s) for the entire facility, the new owner(s) or operator(s) must notify EPA of the date(s) of each transaction that results in a change to the owner or operator of the facility and must provide the e-GGRT identification number of the facility acquired in the transaction.

(4) If a facility is sold after December 31, 2024 and prior to January 17, 2025, all of the owners or operators involved in that transaction(s) must select a historic reporting representative who will be responsible for submission (if not already submitted before the transaction(s)) and revisions to annual GHG reports under § 98.3(h) for reporting years as specified in paragraph (o)(6) of this section. The historic reporting representative shall be an individual selected by an agreement binding on each of the owners and operators involved in the transaction(s), following the provisions of paragraph (b) of this section. If the transaction results in a change to the owner(s) or operator(s) for the entire facility, the new owner(s) or operator(s) must notify EPA of the date(s) of each transaction that results in a change to the owner or operator of the facility and must provide the e-GGRT identification number of the facility acquired in the transaction.

(5) The provisions of paragraphs (b), (c), (e), (f), (g), and (m) of this section apply to the historic reporting representative selected in paragraphs (o)(1) through (4) of this section by substituting the term "historic reporting representative" for "designated

representative." The provisions of paragraph (i) of this section apply to the historic reporting representative by adding the term "historic reporting representative and any historic alternate designated representative to instances of "the designated representative and any alternate designated representative."

(6) Following a transaction as specified in this paragraph (o), the owner(s) or operator(s) relevant as specified in this paragraph (o) (and their selected historic reporting representative as specified in this paragraph (o)) remain responsible for submission (if not already submitted before the transaction) and any revisions to annual reports for the reporting year prior to the transaction and, if applicable, annual GHG reports under § 98.3(h) for additional reporting years prior to the transaction as specified in paragraphs (o)(6)(i) and (ii) of this section. If the responsible owner(s) or operators(s) are acquired such that the owner(s) or operator(s) as of cease to exist as a result of a transaction, the acquiring owners would become responsible for submission (if not already submitted before the transaction) and any revisions to annual reports for the reporting year prior to the transaction and, if applicable, annual GHG reports under § 98.3(h) for additional reporting years prior to the transaction as specified in paragraphs (o)(6)(i) and (ii) of this section.

(i) For the first transaction that occurs as specified in this paragraph (o), all reporting years prior to the reporting year prior to the transaction.

(ii) For each transaction after the first transaction that occurs as specified in this paragraph (o), all reporting years prior to the reporting year in which the transaction occurred and for which the owner(s) or operator(s) was (were) the owner(s) or operator(s) for the facility as of December 31st of the reporting year (and for which the historic reporting representative represents).

■ 6. Add part 99 to read as follows:

## PART 99—WASTE EMISSIONS CHARGE

Sec.

### Subpart A—General Provisions

99.1   Purpose and scope.
99.2   Definitions.
99.3   Who must file?
99.4   How do I authorize and what are the responsibilities of the designated representative?
99.5   When must I file and remit the applicable WEC obligation?
99.6   How do I file?
99.7   What are the general reporting, recordkeeping, and verification requirements of this part?

99.8 What are the general provisions for assessment of the WEC obligation?

99.9 How are payments required by this part made?

99.10 What fees apply to delinquent payments?

99.11 What are the compliance and enforcement provisions of this part?

99.12 What addresses apply for this part?

99.13 What are the confidentiality determinations and related procedures for this part?

**Subpart B—Determining Waste Emissions Charge**

99.20 How will the waste emissions threshold for each WEC applicable facility be determined?

99.21 How will the WEC applicable emissions for a WEC applicable facility be determined?

99.22 How will the net WEC emissions for a WEC obligated party be determined?

99.23 How will the transfer of negative net WEC emissions for facilities under the same parent company be determined?

99.24 How will the WEC Obligation for a WEC obligated party be determined?

**Subpart C—Unreasonable Delay Exemption**

99.30 Who qualifies for the exemption for emissions caused by an unreasonable delay in environmental permitting of gathering or transmission infrastructure?

99.31 What are the reporting requirements for the exemption for emissions caused by an unreasonable delay in environmental permitting of gathering or transmission infrastructure?

99.32 How are the methane emissions caused by an unreasonable delay in environmental permitting of gathering or transmission infrastructure quantified?

99.33 What are the recordkeeping requirements for methane emissions caused by an unreasonable delay in environmental permitting of gathering or transmission infrastructure?

**Subpart D—Regulatory Compliance Exemption**

99.40 When is the regulatory compliance exemption available, and under what conditions does the exemption cease to be available?

99.41 Which facilities qualify for the exemption for regulatory compliance?

99.42 What are the reporting requirements for the exemption for regulatory compliance?

99.43 How are the emissions qualifying for regulatory compliance exemption in the reporting year quantified?

**Subpart E—Exemption for Permanently Shut-in and Plugged Wells**

99.50 Who qualifies for the exemption of emissions from permanently shut-in and plugged wells?

99.51 What are the reporting requirements for the exemption for wells that were permanently shut-in and plugged?

99.52 How are the net emissions attributable to all wells at a WEC applicable facility that were permanently shut-in and plugged in the reporting year quantified?

**Authority:** 42 U.S.C. 7401–7671q; 31 U.S.C. 3717.

## Subpart A—General Provisions

### § 99.1 Purpose and scope.

(a) This part establishes requirements for owners and operators of certain petroleum and natural gas systems facilities to make filings and be assessed waste emission charges as required by section 136 of the Clean Air Act (CAA).

(b) Owners and operators of facilities that are subject to this part must follow the requirements of this subpart and all applicable subparts of this part. If a conflict exists between a provision in subpart A and any other applicable subpart, the requirements of the applicable subpart of this chapter shall take precedence.

### § 99.2 Definitions.

All terms used in this part shall have the same meaning given in the Clean Air Act, unless as defined in this section. Terms defined here only apply to this part.

*Act* means the Clean Air Act, as amended, 42 U.S.C. 7401, *et seq.*

*Administrator* means the Administrator of the United States Environmental Protection Agency (EPA) or the Administrator's authorized representative.

*Affected facility* means, for the purposes of the regulatory compliance exemption of this part, affected facilities, as defined in part 60, subpart A of this chapter, that are subject to methane emissions requirements pursuant to part 60 of this chapter.

*Applicable facility* means a facility within one or more of the following industry segments, as those industry segment terms are defined in § 98.230 of this chapter. In the case where operations from two or more industry segments are co-located at the same part 98 reporting facility, operations for all co-located segments constitute a single *applicable facility* under this part:

(1) Offshore petroleum and natural gas production.

(2) Onshore petroleum and natural gas production.

(3) Onshore natural gas processing.

(4) Onshore natural gas transmission compression.

(5) Underground natural gas storage.

(6) Liquefied natural gas storage.

(7) Liquefied natural gas import and export equipment.

(8) Onshore petroleum and natural gas gathering and boosting.

(9) Onshore natural gas transmission pipeline.

*Carbon dioxide equivalent or CO₂e* means the number of metric tons of $CO_2$ emissions with the same global warming potential as one metric ton of another greenhouse gas and is calculated using equation A–1 in § 98.2(b) of this chapter.

*Designated facility* means, for purposes of the regulatory compliance exemption of this part, designated facilities, as defined in § 60.21a(b) of this chapter, subject to methane emissions requirements pursuant to a State, Tribal, or Federal plan implementing part 60 of this chapter.

*Deviation* means, for the purposes of the regulatory compliance exemption of this part, the same meaning as defined in part 60, subparts OOOOb and OOOOc of this chapter.

*Facility applicable emissions* means the annual methane emissions, as calculated in § 99.21, associated with a Waste Emissions Charge (WEC) applicable facility that are either equal to, below, or exceeding the waste emissions threshold for the WEC applicable facility prior to consideration of any applicable exemptions.

*Facility ID number* means the identification number assigned to a facility by the EPA's Greenhouse Gas Reporting Program (GHGRP).

*Gas to oil ratio (GOR)* means the ratio of the volume of gas at standard temperature and pressure that is produced from a volume of oil when depressurized to standard temperature and pressure.

*Gathering and boosting site* means a single gathering compressor station as defined in this section, centralized oil production site as defined in this section, gathering pipeline site as defined in this section, or other fence-line site within the onshore petroleum and natural gas gathering and boosting industry segment.

*Gathering and boosting system* means a single network of pipelines, compressors and process equipment, including equipment to perform natural gas compression, dehydration, and acid gas removal, that has one or more connection points to gas and oil production or one or more other gathering and boosting systems and a downstream endpoint, typically a gas processing plant, transmission pipeline, Local gas distribution company (LDC) pipeline, or other gathering and boosting system.

*Gathering and boosting system owner or operator* means any person that holds a contract in which they agree to transport petroleum or natural gas from one or more onshore petroleum and natural gas production wells or one or more other gathering and boosting systems to a downstream endpoint, typically a natural gas processing

facility, another gathering and boosting system, a natural gas transmission pipeline, or a distribution pipeline, or any person responsible for custody of the petroleum or natural gas transported.

*Global warming potential or GWP* means the ratio of the time-integrated radiative forcing from the instantaneous release of one kilogram of a trace substance relative to that of one kilogram of a reference gas (*i.e.*, $CO_2$). GWPs for each greenhouse gas are provided in Table A–1 of part 98, subpart A of this chapter.

*Greenhouse gas or GHG* means the air pollutants carbon dioxide ($CO_2$), hydrofluorocarbons (HFCs), methane ($CH_4$), nitrous oxide ($N_2O$), perfluorocarbons (PFCs), and sulfur hexafluoride ($SF_6$).

*Natural gas* means a naturally occurring mixture or process derivative of hydrocarbon and non-hydrocarbon gases found in geologic formations beneath the earth's surface, of which its constituents include, but are not limited to, methane, heavier hydrocarbons, and carbon dioxide. Natural gas may be field quality, pipeline quality, or process gas.

*Net WEC emissions* means the sum of WEC applicable emissions from facilities with the same WEC obligated party as calculated pursuant to § 99.22 using equation B–8 of this part. If the conditions specified in § 99.7(b)(1)(iv) apply for a reporting year, a single WEC obligated party may have multiple net WEC emissions totals for that reporting year.

*Net WEC emissions after transfers* means the total quantity of methane emissions subject to charge for a WEC obligated party. If the WEC obligated party is not eligible to, or elects not to, transfer or receive negative net WEC emissions pursuant to § 99.23, the net WEC emissions after transfers are determined pursuant to § 99.22. If the WEC obligated party transfers or receives negative net WEC emissions pursuant to § 99.23, the net WEC emissions after transfers reflect such transfers subject to the requirements of § 99.23.

*Nonproduction sector* means facilities in the onshore natural gas processing, the liquefied natural gas storage, the liquefied natural gas import and export equipment, and the onshore petroleum and natural gas gathering and boosting industry segments as those industry segments are defined in § 98.230 of this chapter.

*Onshore natural gas transmission pipeline owner or operator* means, for interstate pipelines, the person identified as the transmission pipeline owner or operator on the Certificate of Public Convenience and Necessity issued under 15 U.S.C. 717f, or, for intrastate pipelines, the person identified as the owner or operator on the transmission pipeline's Statement of Operating Conditions under section 311 of the Natural Gas Policy Act, or for pipelines that fall under the "Hinshaw Exemption" as referenced in section 1(c) of the Natural Gas Act, 15 U.S.C. 717–717 (w)(1994), the person identified as the owner or operator on blanket certificates issued under 18 CFR 284.224. If an intrastate pipeline is not subject to section 311 of the Natural Gas Policy Act (NGPA), the onshore natural gas transmission pipeline owner or operator is the person identified as the owner or operator on reports to the State regulatory body regulating rates and charges for the sale of natural gas to consumers.

*Onshore petroleum and natural gas production owner or operator* means the person or entity who holds the permit to operate petroleum and natural gas wells on the drilling permit or an operating permit where no drilling permit is issued, which operates a facility in the onshore petroleum and/or natural gas production industry segment (as that industry segment is defined in § 98.230(a)(2) of this chapter). Where petroleum and natural gas wells operate without a drilling or operating permit, the person or entity that pays the State or Federal business income taxes is considered the owner or operator.

*Operator* means, except as otherwise defined in this section, any person who operates or supervises a facility.

*Owner* means, except as otherwise defined in this section, any person who has legal or equitable title to, has a leasehold interest in, or control of an applicable facility, except a person whose legal or equitable title to or leasehold interest in the facility arises solely because the person is a limited partner in a partnership that has legal or equitable title to, has a leasehold interest in, or control of the facility shall not be considered an "owner" of the facility.

*Parent company* means the United States parent company.

*Part 98 report* means the annual report required under part 98 of this chapter for owners and operators of certain facilities under the Petroleum and Natural Gas Systems source category.

*Petroleum* means oil removed from the earth and the oil derived from tar sands and shale.

*Production sector* means facilities in the offshore petroleum and natural gas production and the onshore petroleum and natural gas production industry segments as those industry segments are defined in § 98.230 of this chapter.

*Qualified Professional Engineer* means an individual who is licensed by a State as a Professional Engineer to practice in one or more disciplines of engineering, is in good standing and who is qualified by education, technical knowledge, and experience to review and interpret the records required under this subpart.

*Reporting year* means the calendar year during which data are required to be collected for purposes of the annual WEC filing. For example, reporting year 2024 is January 1, 2024, through December 31, 2024, and the annual WEC filing for reporting year 2024 is submitted to the EPA by August 31, 2025.

*Standard temperature and pressure* means 60 °F and 14.7 psia.

*Transmission sector* means facilities in the onshore natural gas transmission compression, the underground natural gas storage, and the onshore transmission pipeline industry segments as those industry segments are defined in § 98.230 of this chapter.

*United States parent company(s)* means the highest-level United States company(s), as reported under § 98.3 of this chapter for a WEC applicable facility, with an ownership interest in the facility as of December 31 of the year for which data are being reported.

*Waste emissions threshold* means the metric tons of methane emissions calculated by multiplying WEC applicable facility throughput by the industry segment-specific methane intensity thresholds established in CAA section 136(f) and the density of methane (0.0192 metric ton per thousand standard cubic feet).

*WEC* means waste emissions charge, the charge established in CAA section 136(c) on methane emissions that exceed certain thresholds.

*WEC applicable emissions* means the annual methane emissions, as calculated in § 99.21, associated with a WEC applicable facility that are either equal to, below, or exceeding the waste emissions threshold for the WEC applicable facility after consideration of any applicable exemptions.

*WEC applicable facility* means an applicable facility, as defined in this section, for which the owner(s) or operator(s) of the part 98 of this chapter reporting facility was (were) required to report GHG emissions under part 98, subpart W of this chapter of more than 25,000 metric tons $CO_2e$ for the reporting year.

*WEC filing* means the report and payment of applicable WEC obligation required to be submitted by a WEC

obligated party under the requirements of this chapter. The WEC filing contains information regarding the WEC obligated party and WEC applicable facilities for the previous reporting year. For example, the WEC filing due on August 31, 2025 contains information regarding reporting year 2024, which is January 1, 2024 through December 31, 2024.

*WEC obligated party* means the WEC applicable facility's owner or operator as defined in this section for the applicable industry segment as of December 31 of the reporting year or that became an owner or operator of the WEC applicable facility in a transaction occurring subsequent to the end of the reporting year (*i.e.,* between January 1 and December 31 of the year following the reporting year) that resulted in the owner(s) or operator(s) of the facility as of December 31 of the reporting year ceasing to exist prior to the WEC filing date pursuant to § 99.5. In cases where a WEC applicable facility has more than one owner or operator, the WEC obligated party must be one of the owners or operators of the facility selected by an agreement binding on each of the owners and operators of the facility, following the provisions of § 99.4(b). Each WEC applicable facility must have only one WEC obligated party for a reporting year.

*WEC obligation* means the WEC charge amount resulting from the calculations in § 99.24.

*Well identification (ID) number* means the unique and permanent identification number assigned to a petroleum or natural gas well. If the well has been assigned a US Well Number, the well ID number required in this subpart is the US Well Number. If a US Well Number has not been assigned to the well, the well ID number is the identifier established by the well's permitting authority.

*Well-pad site* means all equipment on or associated with a single well-pad. Specifically, the *well-pad site* includes all equipment on a single well-pad plus all equipment associated with that single well-pad.

*You* means a WEC obligated party subject to this part.

### § 99.3 Who must file?

WEC obligated parties, as defined in § 99.2, are required to submit a WEC filing and remit applicable WEC obligations and payments.

### § 99.4 How do I authorize and what are the responsibilities of the designated representative?

Each WEC obligated party must follow the procedures in paragraphs (a) through (l) of this section, as applicable, to identify a WEC obligated party designated representative. In cases where a WEC applicable facility has more than one owner or operator, the WEC obligated party shall be an owner or operator selected by an agreement binding on each of the owners and operators involved with the facility, following the provisions of paragraph (b) of this section. Failure to select a WEC obligated party for each WEC applicable facility with multiple owners or operators following the procedures of paragraph (b) of this section is considered a violation of this part for each owner and operator (as defined in § 99.2 of this part) for the applicable industry segment of the associated WEC applicable facility. If an owner or operator acquires a WEC applicable facility in a transaction occurring subsequent to the end of the reporting year (*i.e.,* between January 1 and December 31 of the year following the reporting year) that resulted in the owner(s) or operator(s) of the facility as of December 31 of the reporting year ceasing to exist prior to the WEC filing date pursuant to § 99.5, the acquiring owner or operator shall be considered the WEC obligated party for that facility.

(a) *General.* Except as provided under paragraph (f) of this section, each WEC obligated party that is subject to this part shall have one designated representative, who shall be responsible for certifying, signing, and submitting WEC filings or other submissions to the Administrator under this part.

(b) *Authorization of a designated representative.* The designated representative of each WEC obligated party shall be an individual selected by an agreement binding on the owner and operator of such entity and shall act in accordance with the certification statement in paragraph (i) of this section. Failure of a WEC obligated party to authorize a designated representative following the procedures of this section is considered a violation of this part.

(c) *Responsibility of the designated representative.* Upon receipt by the Administrator of a complete certificate of representation under this section for the WEC obligated party, the designated representative identified in such certificate of representation shall represent and, by their representations, actions, inactions, or submissions, legally bind the WEC obligated party in all matters pertaining to this part, notwithstanding any agreement between the designated representative and said WEC obligated party. The owner and operator shall be bound by any decision or order issued to the designated representative by the Administrator or a court.

(d) *Timing.* No WEC filing or other submissions under this part for a WEC obligated party will be accepted until the Administrator has received a complete certificate of representation for the reporting year under this section for a designated representative of the WEC obligated party. Such certificate of representation shall be submitted at least 60 days before the deadline for submission of the WEC obligated party's WEC filing under § 99.5 in each reporting year.

(e) *Certification of the WEC filing.* Each WEC filing and any other submission under this part for a WEC obligated party shall be certified, signed, and submitted by the designated representative or any alternate designated representative of the WEC obligated party in accordance with this section and § 3.10 of this chapter.

(1) Each such submission shall include the following certification statement signed by the designated representative or any alternate designated representative: ''I am authorized to make this submission on behalf of the WEC obligated party, for which the submission is made. I certify under penalty of law that I have personally examined, and am familiar with, the statements and information submitted in this document and all its attachments. Based on my inquiry of those individuals with primary responsibility for obtaining the information, I certify that the statements and information are to the best of my knowledge and belief true, accurate, and complete. I am aware that there are significant penalties for submitting false statements and information or omitting required statements and information, including the possibility of fine or imprisonment.''

(2) The Administrator will accept a WEC filing or other submission for a WEC obligated party under this part only if the submission is certified, signed, and submitted in accordance with this section.

(f) *Alternate designated representative.* A certificate of representation under this section for the WEC obligated party may designate one alternate designated representative, who shall be an individual selected by an agreement binding on the owner and operator, and may act on behalf of the WEC obligated party designated representative. The agreement by which the alternate designated representative is selected shall include a procedure for authorizing the alternate designated representative to act in lieu of the designated representative.

(1) Upon receipt by the Administrator of a complete certificate of representation under this section for a WEC obligated party identifying an alternate designated representative, the following apply.

(i) The alternate WEC obligated party designated representative may act on behalf of the WEC obligated party designated representative.

(ii) Any representation, action, inaction, or submission by the alternate designated representative shall be deemed to be a representation, action, inaction, or submission by the WEC obligated party designated representative.

(2) Except in this section, whenever the term "designated representative" is used in this part, the term shall be construed to include the designated representative or any alternate designated representative.

(g) *Changing a designated representative or alternate designated representative.* The designated representative or alternate designated representative identified in a complete certificate of representation under this section for a WEC obligated party received by the Administrator may be changed at any time upon receipt by the Administrator of another later signed, complete certificate of representation under this section for the WEC obligated party. Notwithstanding any such change, all representations, actions, inactions, and submissions by the previous designated representative or the previous alternate designated representative of the WEC obligated party before the time and date when the Administrator receives such later signed certificate of representation shall be binding on the new designated representative and the owner and operator of the WEC obligated party.

(h) *Changes in the WEC obligated party.* Within 90 days after any change in the WEC obligated party, the designated representative or any alternate designated representative shall submit a certificate of representation that is complete under this section to reflect the change.

(i) *Certificate of representation.* The annual certificate of representation shall be complete if it includes the following elements in a format prescribed by the Administrator in accordance with this section:

(1) Identification of the WEC obligated party and the United States address of the WEC obligated party for which the certificate of representation is submitted.

(2) The name, organization name (company affiliation-employer), address, email address, telephone number, and facsimile transmission number (if any) of the designated representative and any alternate designated representative.

(3) The facility ID number for each WEC applicable facility comprising the WEC obligated party.

(4) The name and United States address of the parent company for purposes of netting under subpart B of this part for the WEC obligated party and the WEC applicable facilities. The indicated parent company must meet the requirements specified in paragraphs (i)(4)(i) and (ii) of this section. As an alternative to reporting a parent company, the WEC obligated party may be listed and paragraphs (i)(4)(i) and (ii) of this section do not apply.

(i) The indicated parent company must have been reported pursuant to § 98.3(c)(11) of this chapter for each WEC applicable facility listed in the certificate of representation for which the WEC obligated party was an owner or operator of the facility as of December 31 of the reporting year and was reported pursuant to § 98.3(c)(14) of this chapter.

(ii) The WEC obligated party must be a subsidiary of, or partially owned by, the indicated parent company.

(5) The following certification statements by the designated representative and any alternate designated representative:

(i) "I certify that I was selected as the designated representative or alternate designated representative, as applicable, by an agreement binding on the WEC obligated party."

(ii) "I certify that I have all the necessary authority to carry out my duties and responsibilities under 40 CFR part 99 on behalf of the WEC obligated party and that such owner and operator shall be fully bound by my representations, actions, inactions, or submissions."

(iii) "I certify that the owner and operator of the WEC obligated party, as applicable, shall be bound by any order issued to me by the Administrator or a court therein."

(iv) If there are multiple owners and/or operators reported pursuant to § 98.3(c)(14) of this chapter for any WEC applicable facility listed in the certificate of representation pursuant to paragraph (i)(5) of this section, for each facility, "I certify that I have given a written notice of my selection as the 'designated representative' or 'alternate designated representative', as applicable, and of the agreement by which I was selected to each owner and operator of the WEC applicable facility for which there are multiple owners and/or operators."

(6) The signature of the designated representative and any alternate designated representative and the dates signed.

(j) *Documents of agreement.* Unless otherwise required by the Administrator, documents of agreement referred to in the certificate of representation shall not be submitted to the Administrator. The Administrator shall not be under any obligation to review or evaluate the sufficiency of such documents, if submitted.

(k) *Binding nature of the certificate of representation.* Once a complete certificate of representation under this section for a WEC obligated party has been received, the Administrator will rely on the certificate of representation unless and until a later signed, complete certificate of representation under this section for the facility is received by the Administrator.

(l) *Objections concerning a designated representative.* (1) Except as provided in paragraph (g) of this section, no objection or other communication submitted to the Administrator concerning the authorization, or any representation, action, inaction, or submission, of the designated representative or alternate designated representative shall affect any representation, action, inaction, or submission of the designated representative or alternate designated representative, or the finality of any decision or order by the Administrator under this part.

(2) The Administrator will not adjudicate any private legal dispute concerning the authorization or any representation, action, inaction, or submission of any designated representative or alternate designated representative.

## § 99.5  When must I file and remit the applicable WEC obligation?

Each WEC obligated party must submit their WEC filing including the information specified in § 99.7, which contains payment of the applicable WEC obligation no later than August 31 of the year following the reporting year. All filing revisions must be received according to the schedule in § 99.7(e) to be considered for revisions to WEC obligations. If the submission date falls on a weekend or a Federal holiday, the submission date shall be extended to the next business day.

## § 99.6  How do I file?

Each WEC filing, certificate of representation, and remittance of applicable WEC fees for the WEC obligated party must be submitted electronically in accordance with the

requirements of this part and in a format specified by the Administrator.

**§ 99.7 What are the general reporting, recordkeeping, and verification requirements of this part?**

The WEC obligated party that is subject to the requirements of this part must submit a WEC filing to the Administrator as specified in this section.

(a) *Schedule.* The WEC filing must be submitted in accordance with § 99.5.

(b) *Content of the WEC filing.* For each WEC obligated party, report the information in paragraphs (b)(1)(i) through (vii) of this section. For each WEC applicable facility comprising the WEC obligated party, report the information in paragraphs (b)(2)(i) through (xiii) of this section, as appropriate. The WEC filing must also include payment of applicable WEC obligation, as specified in paragraph (b)(3) of this section.

(1) Reporting requirements at the WEC obligated party level.

(i) The WEC obligated party company name.

(ii) The United States address for the WEC obligated party.

(iii) The list of facility ID number(s) under which the WEC applicable facilities comprising the WEC obligated party as of December 31 of the reporting year reported under part 98, subpart W of this chapter.

(iv) If the WEC obligated party acquired one or more WEC applicable facilities in a transaction occurring subsequent to the end of the reporting year (*i.e.*, between January 1 and December 31 of the year following the reporting year) that resulted in the owner(s) or operator(s) of the facility as of December 31 of the reporting year ceasing to exist prior to the WEC filing date pursuant to § 99.5, report the facility ID number for each WEC applicable facility. You must include these WEC applicable facilities in the reporting requirements under § 99.7(b)(2). For each such WEC applicable facility, also report an indication of whether the parent company identified in paragraph (b)(1)(vi) of this section was reported in the part 98 report for the reporting year pursuant to § 98.3(c)(11) of this chapter. For any such WEC applicable facilities that were not associated with the parent company identified in paragraph (b)(1)(vi) of this section, you may elect to report a parent company for that WEC applicable facility subject to the requirement that such parent company must have been reported in the part 98 report for the reporting year pursuant to

§ 98.3(c)(11) of this chapter for that facility.

(v) The net WEC emissions, as calculated pursuant to § 99.22, net WEC emissions after transfers, following the provisions of § 99.23, and WEC obligation, as calculated pursuant to § 99.24, for the WEC obligated party. If the condition specified in § 99.7(b)(1)(iv) applies for the reporting year, report separately the net WEC emissions, net WEC emissions after transfers, and WEC obligation associated with each WEC applicable facility that was acquired.

(vi) The parent company for purposes of netting under subpart B of this part for the WEC obligated party and the WEC applicable facilities. The indicated parent company must meet the requirements specified in paragraphs (b)(1)(vi)(A) and (B) of this section. As an alternative to reporting a parent company, the WEC obligated party may be listed and paragraphs (b)(1)(vi)(A) and (B) of this section do not apply.

(A) The indicated parent company must have been reported pursuant to § 98.3(c)(11) of this chapter for each WEC applicable facility listed pursuant to paragraph (b)(1)(iii) of this section.

(B) The WEC obligated party must be a subsidiary of, or partially owned by, the indicated parent company.

(vii) The United States address of the parent company, if electing to report a parent company for purposes of netting under subpart B of this part.

(2) Reporting requirements for each WEC applicable facility comprising the WEC obligated party.

(i) The facility ID number under which the WEC applicable facility emissions are reported under part 98, subpart W of this chapter.

(ii) The industry segment(s) for the WEC applicable facility.

(iii) For WEC applicable facilities in the offshore petroleum and natural gas production or onshore petroleum and natural gas production industry segment, as those industry segment terms are defined in § 98.230 of this chapter, if the conditions specified in § 99.30 regarding emissions from delays in permitting are met, indicate if you are electing to claim for exemption any emissions from delays in permitting. If so, you must provide information as specified in § 99.31.

(iv) If the WEC applicable facility meets the conditions specified in § 99.41(a) and (b) regarding the regulatory compliance exemption, indicate if you are electing to claim for exemption any emissions related to regulatory compliance. If so, you must report the following:

(A) A list of the State(s) and/or Tribal land(s) meeting the conditions specified in § 99.40 for the reporting year in which the WEC applicable facility is located. For WEC applicable facilities in the onshore petroleum and natural gas production or onshore petroleum and natural gas gathering and boosting industry segments, as those industry segment terms are defined in § 98.230 of this chapter, a WEC applicable facility is considered to be located in each State or Tribal lands within which a well-pad site or gathering and boosting site, as applicable, was reported pursuant to §§ 98.236(aa)(1)(iv)(C) or (aa)(10)(v)(E) of this chapter, as applicable, for the reporting year.

(B) An indication of whether the WEC applicable facility contained any affected facilities subject to methane emissions standards under part 60 of this chapter as of December 31st of the reporting year or any designated facilities subject to methane emissions standards under an applicable approved State, Tribal, or Federal plan in part 62 of this chapter as of December 31st of the reporting year. If so, provide the information specified in § 99.42, as applicable.

(v) For WEC applicable facilities in the onshore petroleum and natural gas production, offshore petroleum and natural gas production, or underground natural gas storage industry segments, as those industry segment terms are defined in § 98.230 of this chapter, if the conditions specified in § 99.50 regarding emissions from permanently shut-in and plugged wells are met, indicate if you are electing to claim for exemption any emissions from plugged wells. If so, you must report the information specified in § 99.51.

(vi) The facility waste emissions threshold as calculated pursuant to § 99.20, and, if there is more than one applicable industry segment within the WEC applicable facility, each industry segment waste emissions threshold for each applicable industry segment within the applicable facility, as calculated pursuant to § 99.20.

(vii) The facility applicable emissions, as calculated pursuant to § 99.21 and the WEC applicable emissions, as calculated pursuant to § 99.21.

(viii) The total emissions for the WEC applicable facility as reported under part 98, subpart W of this chapter for the reporting year, mt $CO_2e$. If the facility reported information related to one or more combustion-related other large release events pursuant to paragraph (b)(2)(xiii) of this section, reduce this amount by the total quantity of emissions reported pursuant to paragraph (b)(2)(xiii)(D) of this section.

If the adjusted total emissions for the WEC applicable facility following this reduction are less than or equal to 25,000 metric tons $CO_2e$ for the reporting year, then the total facility applicable emissions and WEC applicable emissions for the WEC applicable facility are zero, paragraphs (a) through (d) of § 99.20 do not apply to the WEC applicable facility, and the reporting requirements of paragraphs (b)(2)(iii) through (vii) of this section do not apply.

(ix) The annual methane emissions for the WEC applicable facility, as reported under part 98, subpart W of this chapter for the corresponding reporting year, mt $CH_4$. If the facility reported information related to one or more combustion-related other large release events pursuant to paragraph (b)(2)(xiii) of this section, reduce this amount by the total quantity of emissions reported pursuant to paragraph (b)(2)(xiii)(C) of this section.

(x) The total quantity of natural gas that is sent to sale from the WEC applicable facility in the reporting year, as reported pursuant to part 98, subpart W of this chapter, in Mscf.

(xi) The total quantity of crude oil that is sent to sale from the WEC applicable facility in the reporting year, as reported pursuant to part 98, subpart W of this chapter, in barrels.

(xii) The percentage of ownership interest of the parent company reported pursuant to § 99.7(b)(1)(vi) of the WEC applicable facility as reported pursuant to § 98.3(c)(11) of this chapter for the reporting year. Report 0 for any WEC applicable facilities reported pursuant to § 99.7(b)(1)(iv) for which the parent company was not reported pursuant to § 98.3(c)(11) of this chapter for the reporting year.

(xiii) For reporting year 2025 and later, if one or more combustion-related other large release events were reported pursuant to § 98.236(y) of this chapter and reported emissions pursuant § 98.236(z) of this chapter for the same combustion unit for the timespan of the event for the WEC applicable facility in the part 98 report for that reporting year, then for each combustion-related other large release event report the information specified in paragraphs (b)(2)(xiii)(A) through (D) of this section. For purposes of this part, a combustion-related other large release event is one in which the equipment involved in the release identified pursuant to § 98.236(y)(5)(i) of this chapter is equipment that reports emissions pursuant § 98.236(z) of this chapter.

(A) The unique release event identification number for the other large release event as reported pursuant to § 98.236(y)(2) of this chapter.

(B) The annual $CO_2$ emissions, in metric tons $CO_2$, that were reported pursuant to § 98.236(z) of this chapter from the equipment associated with the release that occurred during the timespan of the release as reported pursuant to § 98.236(y)(4) of this chapter. Determine this quantity using the applicable method in paragraphs § 98.236(z)(1) through (3) of this chapter and using measurement data, if available, or a combination of process knowledge, engineering estimates, and best available data when measurement data are not available.

(C) The annual $CH_4$ emissions, in metric tons $CH_4$, that were reported pursuant to § 98.236(z) of this chapter from the equipment associated with the release that occurred during the timespan of the release as reported pursuant to § 98.236(y)(4) of this chapter. Determine this quantity using the applicable method in paragraphs § 98.236(z)(1) through (3) of this chapter and using measurement data, if available, or a combination of process knowledge, engineering estimates, and best available data when measurement data are not available.

(D) The $CO_2e$ emissions, in metric tons $CO_2e$, that were reported pursuant to § 98.236(z) of this chapter from the equipment associated with the release that occurred during the timespan of the release as reported pursuant to § 98.236(y)(4) of this chapter. Calculate this value using equation A–1 of subpart A to part 98 of this chapter, using the values of $CO_2$ and $CH_4$ reported pursuant to paragraphs (b)(2)(xiii)(B) and (C), respectively, of this section.

(3) Payment of applicable WEC obligation, submitted in accordance with § 99.9.

(c) *Verification of the WEC filing.* To verify the completeness and accuracy of WEC filing, the EPA will consider the verification status of part 98 reports and may review the certification statements described in § 99.4 and any other credible evidence, in conjunction with a comprehensive review of the WEC filing, including attachments. The EPA intends to conduct audits of select WEC obligated parties and associated WEC applicable facilities. During such audits, the records generated under this part must be made available to the EPA. The on-site audits may be conducted by private auditors contracted by the EPA or by Federal, State or local personnel, as appropriate. Nothing in this section prohibits the EPA from requesting or using additional information, including reports, prepared and submitted in accordance with part 60 of this chapter,

or an applicable approved State, Tribal, or Federal plan under part 62 of this chapter that implements the emission guidelines contained in part 60 of this chapter, to verify the completeness and accuracy of the filings.

(d) *Recordkeeping.* A WEC obligated party that is subject to the requirements of this part must keep records as specified in this paragraph (d). You must retain all required records for at least 5 years from the date of submission of the WEC filing for the reporting year in which the record was generated. The records shall be kept in an electronic or hard-copy format (as appropriate) and recorded in a form that is suitable for expeditious inspection and review. Upon request by the Administrator, the records required under this section must be made available to the EPA or a third-party auditor if one is required. Records may be retained off site if the records are readily available for expeditious inspection and review. For records that are electronically generated or maintained, the equipment or software necessary to read the records shall be made available, or, if requested by the EPA, electronic records shall be converted to paper documents. You must retain the following records, in addition to those records prescribed in each applicable subpart of this part:

(1) All information required to be retained by part 98, including subparts A and W of this chapter.

(2) Any other information not included in a part 98 report used to complete the WEC filing.

(3) All information required to be submitted as part of the WEC filing.

(e) *Annual WEC filing revisions.* Except as specified in paragraph (e)(2) of this section, the provisions of this paragraph (e) apply until December 15 of the year following the reporting year, or for a given reporting year after the December 15 deadline if the resubmission is related to the resolution of unverified filings specified at § 99.8. If the deadline falls on a weekend or a Federal holiday, the deadline date shall be extended to the next business day.

(1) The WEC obligated party shall submit a revised WEC filing within 30 days of discovering that a previously submitted WEC filing contains one or more substantive errors. The revised WEC filing must correct all substantive errors. If the resubmission is due to a correction in a part 98 report resubmitted by a WEC applicable facility, the WEC obligated party must report the number of corrections made in the part 98 report(s) and a description of how the changes impact the assessment of the WEC obligation.

(2) The revisions for substantive errors as described in paragraphs (e)(2)(i) through (iii) of this section are not subject to the December 15 deadline and must be submitted according to the schedule therein.

(i) Revised filings for purposes of the regulatory compliance exemption must be submitted as follows:

(A) Revised filings to submit a CAA section 111(b) or (d) compliance report which covers the remaining portion of a WEC filing year, which were not available at the time of the WEC filing, must be submitted within 30 calendar days of the date that the compliance report covering the remainder of the year is due under the applicable requirements of CAA section 111(b) or (d), as applicable.

(B) Revised filings to submit findings by the WEC obligated party that one or more deviations or violations discovered after the WEC filing must be submitted within 30 days of the discovery.

(ii) The Administrator may notify the WEC obligated party in writing that a WEC filing previously submitted by the WEC obligated party contains one or more substantive errors. Such notification will identify each such substantive error. The WEC obligated party shall, within 30 days of receipt of the notification, either resubmit the WEC filing that, for each identified substantive error, corrects the identified substantive error (in accordance with the applicable requirements of this part) or provide information demonstrating that the previously submitted filing does not contain the identified substantive error or that the identified error is not a substantive error. The EPA reserves the right to revise WEC obligations for a given reporting year after the December 15 final resubmission deadline if data errors are discovered by the EPA at a later date.

(iii) Revised filings submitted pursuant to Administrator approval or an Agreement between the WEC obligated party and the Administrator to correct substantive errors.

(3) A substantive error is an error that impacts the Administrator's ability to accurately calculate a WEC obligated party's WEC obligation, which may include, but is not limited to, the list of WEC applicable facilities associated with a WEC obligated party, the emissions or throughput reported in the WEC applicable facility part 98 report(s), emissions associated with exemptions, and supporting information for each exemption to demonstrate its validity.

(4) Notwithstanding paragraphs (e)(1) and (2) of this section, upon request the Administrator may provide an extension of the 30-day period for submission of a revised report or information under paragraphs (e)(1) and (2) of this section if adequate justification is provided by the WEC obligated party. The Administrator may provide an extension provided that the request is received by email to an address prescribed by the Administrator prior to the expiration of the 30-day period and that the request demonstrates that it is not practicable to submit a revised report or information under paragraphs (e)(1) and (2) of this section within 30 days. In no case shall an extension be granted beyond the December 15 final submission deadline.

(5) The WEC obligated party shall retain documentation for a minimum of 5 years from the date of creation to support any revision made to a WEC filing.

(6) If a WEC applicable facility changes ownership such that there is a change to the WEC obligated party, the entity that was the WEC obligated party as reported pursuant to § 99.7(b)(1)(i) in the WEC filing submitted for a reporting year remains responsible for any revisions to WEC filings for that reporting year.

(f) *Designation of unverified filings and reports.* Following the verification process discussed in § 98.3(h) of this chapter for part 98 reports and paragraph (c) of this section for WEC filings, the EPA shall designate:

(1) The annual part 98 report associated with each WEC applicable facility as either verified or unverified. An unverified report is one in which the EPA has provided notification under § 98.3(h)(2) of this chapter and the owner or operator of the WEC applicable facility has failed to revise and resubmit the report and resolve the error or provide justification to the satisfaction of the EPA that the identified error is not a substantive error (in accordance with the applicable requirements of § 98.3(h)(3) of this chapter).

(2) The annual WEC filing from each WEC obligated party submitted pursuant to § 99.7 as either verified or unverified. An unverified filing is one in which the EPA has provided notification under § 99.7(e)(2) and the WEC obligated party designated representative has failed to resubmit the filing and for each identified substantive error correct the identified substantive error (in accordance with the applicable requirements of paragraph (e)(3) of this section) or provide information demonstrating that the submitted filing does not contain the identified substantive error or that the identified error is not a substantive error. The determination of verification status of a part 98 report under paragraph (f)(1) of this section will be taken into consideration in the determination of the verification status of a WEC filing. A WEC filing may also be designated as unverified if it includes receipt of a transfer of negative net WEC emissions, pursuant to § 99.23, associated with an unverified part 98 report (*i.e.,* the WEC obligated party which transferred the negative net WEC emissions includes one or more WEC applicable facilities for which the associated part 98 report is unverified).

**§ 99.8 What are the general provisions for assessment of the WEC obligation?**

(a) *Assessment of the WEC obligation.* WEC obligation assessments shall be made pursuant to § 99.23 on the basis of information submitted by the date specified in § 99.5 and following the submittal requirements of § 99.6.

(b) *Assessment of the WEC obligation for unverified filings.* If a WEC filing is unverified but the EPA is able to correct the error(s) based on reported data, the EPA may recalculate the WEC obligation using available information and provide an invoice or refund to the WEC obligated party within 60 days of determining a WEC filing to be unverified. If the WEC obligated party resubmits a WEC filing within that timeframe, the EPA will either verify the resubmission, or take the resubmission into account when calculating the WEC obligation.

(c) *Third-party audits for unverified reports.* If the EPA is unable to calculate the WEC obligation with available information, the EPA may require the WEC obligated party to undergo a third-party audit. The EPA may require the WEC obligated party to fund and arrange the third-party audit. The WEC obligated party must make available for review to the third-party auditor all records related to the WEC filing pursuant to § 99.7. The WEC obligated party will have the audit completed and direct the third-party auditor to submit the audit results to the EPA and to the WEC obligated party pursuant to § 99.8(c)(1)(vi). The WEC obligated party will resubmit the WEC filing, if necessary, in accordance with § 99.8(c)(2)(i) and (ii). Nothing in this section regarding third-party audits shall be construed to limit the authority of the Administrator to exercise its authorities under § 114 of the CAA.

(1) *Third-party reviews.* An independent third-party audit of the information provided shall be based on a review of the relevant documents and shall identify each item required by the WEC filing, describe how the

independent third-party evaluated the accuracy of the information provided, state whether the independent third-party agrees with the information provided, and identify any exceptions between the independent third-party's findings and the information provided.

(i) Audits required under this section must be conducted by an independent third-party. The auditor must have professional work experience in the petroleum engineering field or related to oil and gas production, gathering, processing, transmission, or storage and must be a qualified professional engineer.

(ii) To be considered an independent third-party, the auditor must not be an employee of the WEC obligated party or its WEC applicable facilities at which the auditor is conducting the independent review.

(iii) The independent third-party shall submit all records pertaining to the audit required under this section, including information supporting all of the requirements of § 99.8(c)(1) to the WEC obligated party.

(iv) The independent third-party must provide to the WEC obligated party documentation of qualifications of professional work experience in the petroleum engineering field or related to oil and gas production, gathering, processing, transmission, or storage.

(v) The WEC obligated party must make the following information available to the auditor(s) for review which were used to develop the WEC filing including:

(A) All records described under § 99.7(d) of the general recordkeeping provisions for this chapter.

(B) All units, operations, processes, and activities for which GHG emissions were calculated.

(C) The GHG emissions calculations and methods used.

(D) The calculations for the development of site-specific emissions factors.

(E) The quantity of petroleum and natural gas received, produced, and consumed at the facility in the calendar year.

(F) The dates on which any measurements were conducted as well as the results of all emissions measured.

(G) The calibration reports for detection and measurement instruments used.

(H) The inventory of petroleum and natural gas for the current and/or prior calendar year.

(I) The annual part 98 reports.

(vi) The WEC obligated party will direct the independent third-party auditor to submit the audit results to the EPA and the WEC obligated party

within 90 days of notification by the EPA of the requirement to conduct a third-party audit.

(2) *Reporting and recordkeeping requirements for WEC obligated parties following third party audits.* (i) The WEC obligated party shall direct the independent third-party auditor to provide the results of the audit to the EPA and the WEC obligated party. After receiving notification from the EPA that the audited information has been verified by the EPA, the WEC obligated party must resubmit the WEC filing, including the WEC obligation amount and all supporting documentation information that is included in reporting requirements under § 99.7, 99.31, 99.42, and 99.51, as applicable, within 30 days of receipt of the EPA notification.

(ii) The WEC obligated party shall provide to the EPA documentation of qualifications of the third-party auditor.

(iii) The WEC obligated party shall retain all records pertaining to the audit required under this section for a period of 5 years from the date of creation and shall deliver such records to the Administrator upon request.

(d) *Resubmittal of filings and reports for the current or prior reporting year.* If resubmittal of a previously submitted part 98 report and/or WEC filing, submitted as specified in § 99.7(e), results in a change to the WEC obligation determined for a WEC obligated party for the reporting year the following process shall apply:

(1) If the WEC obligation based upon the resubmitted report or filing for the reporting year is less than the WEC obligation previously remitted by the WEC obligated party, the Administrator shall authorize a refund to the WEC obligated party equal to the difference in WEC obligation.

(2) If the WEC obligation based upon the resubmitted report or filing for the reporting year is greater than the WEC obligation previously remitted by the WEC obligated party, the Administrator may issue an invoice or bill to the WEC obligated party payable in accordance with § 99.9(b). WEC obligations not paid in full by the specified due date, or within 30 days of the date of the invoice or bill if a due date is not provided, shall be subject to fees as described in § 99.10.

### § 99.9  How are payments required by this part made?

(a) The WEC obligation owed for each reporting year must be paid by the WEC obligated party as part of the annual WEC filing, as required by § 99.7(b), and is considered due at the date specified in § 99.5.

(b) Other than the WEC obligation specified in paragraph (a) of this section, all other charges required by this part, including adjusted WEC obligations, interest fees, and penalties, shall be paid by the WEC obligated party in response to an invoice or bill by the specified due date, or within 30 days of the date of the invoice or bill if a due date is not provided.

(c) All WEC obligations, interest fees, and penalties required by this subpart shall be paid to the Department of the Treasury by the WEC obligated party electronically in U.S. dollars, using an online electronic payment service specified by the Administrator.

### § 99.10  What fees apply to delinquent payments?

(a) *Delinquency.* WEC obligated party accounts are delinquent if the accounts remain unpaid after the due date specified in the invoice or other notice of the WEC amount owed.

(b) *Interest fee.* In accordance with 31 U.S.C. 3717(a), delinquent WEC obligated party accounts shall be charged a minimum annual rate of interest equal to the average investment rate for Treasury tax and loan accounts (Current Value of Funds Rate or CVFR) most recently published and in effect by the Secretary of the Treasury.

(c) *Non-payment penalty.* In accordance with 31 U.S.C. 3717(e), WEC obligated party invoiced debts that are more than 90 days past due shall be charged an additional penalty of 6 percent per year assessed on any part of the invoiced debt that is past due for more than 90 days.

(d) *Penalty for non-submittal.* In accordance with 42 U.S.C. 7413(d)(1), a WEC obligated party that fails to submit an annual WEC filing by the date specified in § 99.5 may be charged an administrative penalty. The penalty assessment shall be a daily assessment per day that the WEC filing is not submitted, assessed up to the value specified in Table 1 of 40 CFR 19.4, as amended. The assessment of penalty shall begin on the date that the WEC filing was considered past due per § 99.5 and continue until such time that the WEC filing is submitted by the WEC obligated party's designated representative. (For example: A WEC filing for reporting year 2025 submitted on September 4, 2026, may be subject to an assessment of four (4) days of administrative penalty for non-submittal.)

### § 99.11  What are the compliance and enforcement provisions of this part?

Any violation of any requirement of this part shall be a violation of the Clean

Air Act, including section 114 (42 U.S.C. 7414) and section 136 (42 U.S.C. 7436). A violation would include but is not limited to failure to submit, or resubmit as required, a WEC filing, failure to collect data needed to calculate the WEC obligation (including any data relevant to determining the applicability of any exemptions and how the netting was conducted), failure to select a WEC obligated party, failure to authorize a designated representative, failure to retain records needed to verify the amount of WEC obligation, providing false or incorrect information in a WEC filing, and failure to remit WEC payment. Each day of each violation constitutes a separate violation. Any penalty assessed shall be in addition to any WEC obligation due under this part and any fees applicable to delinquent payments due under § 99.10.

### § 99.12 What addresses apply for this part?

All requests, notifications, and communications to the Administrator pursuant to this part must be submitted electronically and in a format as specified by the Administrator.

### § 99.13 What are the confidentiality determinations and related procedures for this part?

This section characterizes various categories of information for purposes of making confidentiality determinations, as follows:

(a) This paragraph (a) applies the definition of "Emission data" in 40 CFR 2.301(a)(2)(i) for information reported under this part. "Emission data" cannot be treated as confidential business information and shall be available to be disclosed to the public. The following categories of information qualify as emission data:

(1) Methane emission information, including the net WEC emissions, waste emissions thresholds, WEC applicable emissions, and the quantity of methane emissions to be exempted due to unreasonable delay and wells that were permanently shut-in and abandoned.

(2) Calculation methodology, including the method used to determine the quantity of methane emissions to be exempted due to an unreasonable permitting delay and the method used to quantify emissions exempted from permanently shut-in and plugged wells.

(3) Facility and unit identifier information, including WEC obligated party company name and address, signed and dated certification statements of the accuracy and completeness of the report, facility identifiers, industry segment, well-pad and/or well identifiers, and emission source-specific methane mitigation activities impacted by an unreasonable permitting delay.

(b) The following types of information are not eligible for confidential treatment:

(1) The WEC obligation, as calculated pursuant to § 99.24.

(2) Compliance information, including information regarding applicable emissions standards or other relevant standards of performance or requirements, information in construction or operating permits, and information submitted to document compliance with an emissions standard or a standard of performance, such as a periodic report, prepared and submitted in accordance with part 60 of this chapter, or an applicable approved State, Tribal, or Federal plan under part 62 of this chapter that implements the emission guidelines contained in part 60 of this chapter, (excluding any information redacted from the report and claimed as confidential).

(3) Published information that is publicly available, including information that is made available through publication of annual reports submitted under part 98 of this chapter, on company or other websites, or otherwise made publicly available.

(c) If you submit information that is not described in paragraphs (a) and (b) of this section, you may claim the information as confidential and the information is subject to the process for confidentiality determinations in 40

CFR part 2 as described in §§ 2.201 through 2.208 of this chapter. You may be required to provide information to substantiate your claims. If claimed, the Administrator may consider this substantiating information to be confidential to the same degree as the information for which you are requesting confidential treatment. The determination will be based on your statements, the supporting information submitted, and any other available information. However, the Administrator may determine that your information is not subject to confidential treatment consistent with 40 CFR part 2 and 5 U.S.C. 552(b)(4).

(d) Submitted applications and reports typically rely on software or templates to identify specific categories of information. If you submit information in a comment field designated for users to add general information, the Administrator will respond to requests for disclosing that information consistent with paragraphs (a) through (c) of this section.

### Subpart B—Determining Waste Emissions Charge

### § 99.20 How will the waste emissions threshold for each WEC applicable facility be determined?

The methane waste emissions threshold for each applicable industry segment within a WEC applicable facility for the reporting year will be calculated as described in paragraphs (a) through (d) of this section, as applicable. The methane waste emissions threshold for each WEC applicable facility will be determined as described in paragraph (e) of this section.

(a) For each offshore petroleum and natural gas production industry segment or onshore petroleum and natural gas production industry segment that sends natural gas to sale at a WEC applicable facility, the facility waste emissions threshold will be calculated using equation B–1 of this section.

$$TH_{is,Prod} = 0.002 \times \rho_{CH_4} \times Q_{ng,Prod} \qquad \text{(Eq. B-1)}$$

Where:

$TH_{is,Prod}$ = The methane waste emissions threshold for the industry segment at a WEC applicable facility for the reporting year in the production sector that has natural gas sent to sale, metric tons (mt) $CH_4$.

0.002 = Industry segment-specific methane intensity threshold, as specified in CAA section 136(f), for methane emissions for

applicable facilities with natural gas sales in the production sector, thousand standard cubic feet (Mscf) $CH_4$ per Mscf of natural gas sent to sale.

$\rho_{CH4}$ = Density of methane = 0.0192 kilograms per standard cubic foot (kg/scf) = 0.0192 metric tons per thousand standard cubic feet (mt/Mscf).

$Q_{ng,Prod}$ = The total quantity of natural gas that is sent to sale from the WEC

applicable facility in the reporting year, as reported pursuant to part 98, subpart W of this chapter. For onshore petroleum and natural gas production, you must use the quantity reported pursuant to § 98.236(aa)(1)(i)(B) of this chapter, in Mscf. For offshore petroleum and natural gas production, you must use the quantity reported pursuant to § 98.236(aa)(2)(i) of this chapter, in Mscf.

(b) For each offshore petroleum and natural gas production industry segment or onshore petroleum and natural gas production industry segment that has no natural gas sent to sale at a WEC applicable facility, the facility waste emissions threshold will be calculated using equation B–2 of this section.

$$TH_{is,Prod} = 10 \times Q_{o,Prod} \times 10^{-6} \qquad \text{(Eq. B-2)}$$

Where:

$TH_{is,Prod}$ = The annual methane waste emissions threshold for the industry segment at a WEC applicable facility in the production sector that has no natural gas sent to sale, mt $CH_4$.

10 = Industry segment-specific methane intensity threshold, as specified in CAA section 136(f), for applicable facilities with no natural gas sales in the production sector, mt $CH_4$ per million barrels oil sent to sale.

$Q_{o,Prod}$ = The total quantity of crude oil that is sent to sale from the WEC applicable facility in the reporting year, as reported pursuant to part 98, subpart W of this chapter. For onshore petroleum and natural gas production, you must use the quantity reported pursuant to § 98.236(aa)(1)(i)(C) of this chapter, in barrels. For offshore petroleum and natural gas production, you must use the quantity reported pursuant to § 98.236(aa)(2)(ii) of this chapter, in barrels.

$10^{-6}$ = Conversion from barrels to million barrels.

(c) For each onshore natural gas processing industry segment, liquefied natural gas storage industry segment, the liquefied natural gas import and export equipment industry segment, or the onshore petroleum and natural gas gathering and boosting industry segment at a WEC applicable facility, the facility waste emissions threshold will be calculated using equation B–3 of this section.

$$TH_{is,NonProd} = 0.0005 \times \rho_{CH_4} \times Q_{ng,NonProd} \qquad \text{(Eq. B-3)}$$

Where:

$TH_{is,NonProd}$ = The annual methane waste emissions threshold for the industry segment at a WEC applicable facility in the nonproduction sector, mt $CH_4$.

0.0005 = Industry segment-specific methane intensity threshold, as specified in CAA section 136(f), for applicable facilities in the nonproduction sector, Mscf $CH_4$ per Mscf of natural gas sent to sale from or through the facility.

$\rho_{CH_4}$ = Density of methane = 0.0192 kg/scf = 0.0192 mt/Mscf.

$Q_{ng,NonProd}$ = The total quantity of natural gas that is sent to sale from or through the industry segment at a WEC applicable facility in the reporting year as reported pursuant to part 98, subpart W of this chapter. For RY 2024 for onshore natural gas processing, you must use the quantity reported pursuant to § 98.236(aa)(3)(ii) of this chapter, in Mscf and for RY 2025 and later, you must use the quantity reported pursuant to § 98.236(aa)(3)(ix) of this chapter, in Mscf. For LNG import and export, you must use the sum of the quantities reported pursuant to § 98.236(aa)(6) and (7) of this chapter, in Mscf. For LNG storage, you must use the quantity reported pursuant to § 98.236(aa)(8)(ii) of this chapter, in Mscf. For onshore petroleum and natural gas gathering and boosting, you must use the quantity reported pursuant to § 98.236(aa)(10)(ii) of this chapter, in Mscf.

(d) For each onshore natural gas transmission compression industry segment, underground natural gas storage industry segment, or onshore natural gas transmission pipeline industry segment at a WEC applicable facility, the facility waste emissions threshold will be calculated using equation B–4 of this section.

$$TH_{is,Tran} = 0.0011 \times \rho_{CH_4} \times Q_{ng,Tran} \qquad \text{(Eq. B-4)}$$

Where:

$TH_{is,Tran}$ = The annual methane waste emissions threshold for the industry segment at a WEC applicable facility in the transmission sector, mt $CH_4$.

0.0011 = Industry segment-specific methane intensity threshold, as specified in CAA section 136(f), for applicable facilities in the transmission sector, Mscf $CH_4$ per Mscf of natural gas sent to sale from or through the facility.

$\rho_{CH_4}$ = Density of methane = 0.0192 kg/scf = 0.0192 mt/Mscf.

$Q_{ng,Tran}$ = The total quantity of natural gas that is sent to sale from or through the industry segment at a WEC applicable facility in the reporting year as reported pursuant to part 98, subpart W of this chapter. For onshore natural gas transmission compression, you must use the quantity reported pursuant to § 98.236(aa)(4)(i) of this chapter, in Mscf. For underground natural gas storage, you must use the quantity reported pursuant to § 98.236(aa)(5)(ii) of this chapter, in Mscf. For onshore natural gas transmission pipeline, you must use the quantity reported pursuant to § 98.236(aa)(11)(iv) of this chapter, in Mscf.

(e) For each WEC applicable facility that operates in a single industry segment, the methane waste emissions threshold shall be equal to the value calculated in equation B–1, equation B–2, equation B–3, or equation B–4 of this section, as applicable. For each WEC applicable facility that operates in two or more industry segments, the facility waste emissions threshold will be calculated using equation B–5 of this section.

$$TH_{WAF} = \sum_{s=1}^{N} TH_{is,s} \qquad \text{(Eq. B-5)}$$

Where:

$TH_{WAF}$ = The WEC applicable facility waste emissions threshold, mt $CH_4$.

$TH_{is,s}$ = The industry segment waste emissions threshold, as calculated in

equation B–3 or equation B–4 of this section, for each industry segment ''s'' at the WEC applicable facility, mt CH₄.

N = Number of industry segments at the WEC applicable facility.

### § 99.21 How will the WEC applicable emissions for a WEC applicable facility be determined?

Except for WEC applicable facilities with a waste emissions threshold of zero as determined in § 99.20(e), the total facility applicable emissions and WEC applicable emissions for each WEC applicable facility for the reporting year will be calculated as described in paragraphs (a) through (d) of this section, as applicable. If the waste emissions threshold for a WEC applicable facility is zero as determined in § 99.20(e), then the total facility applicable emissions and WEC applicable emissions for the WEC applicable facility are zero and paragraphs (a) through (d) of this section do not apply to the WEC applicable facility.

(a) The total facility applicable emissions for each WEC applicable facility will be calculated using equation B–6 of this section.

$$E_{TFA,CH_4} = E_{SubpartW,CH_4} - TH_{WAF} \qquad \text{(Eq. B-6)}$$

Where:

$E_{TFA,CH4}$ = The annual methane emissions equal to, below, or exceeding the waste emissions threshold for a WEC applicable facility prior to consideration of any applicable exemptions (*i.e.*, total facility applicable emissions), mt CH₄.

$E_{SubpartW,CH4}$ = The annual methane emissions for a WEC applicable facility, as reported to § 99.7(b)(2)(ix), mt CH₄.

$TH_{WAF}$ = The waste emissions threshold for a WEC applicable facility, as determined in § 99.20(e), mt CH₄.

(b) If the total facility applicable emissions calculated using equation B–6 of this section are less than or equal to 0 mt, then the WEC applicable emissions are equal to the total facility applicable emissions.

(c) If the total facility applicable emissions calculated using equation B–6 of this section are greater than 0 mt and the regulatory compliance exemption as specified in § 99.41 applies for the entire reporting year and to all sites at the WEC applicable facility, the WEC applicable emissions for that facility are equal to 0 mt.

(d) If the total facility applicable emissions calculated using equation B–6 of this section are greater than 0 mt and the regulatory compliance exemption as specified in § 99.41 does not apply for the entire reporting year or does not apply to all sites at the WEC applicable facility, the WEC applicable emissions for each WEC applicable facility will be calculated using equation B–7 of this section. If the result of this calculation is less than 0 mt CH₄, the WEC applicable emissions for the facility are equal to 0 mt CH₄.

$$E_{WA,CH_4} = E_{TFA,CH_4} - E_{Delay,CH_4} - E_{RCE,CH_4} - E_{Plug,CH_4} \qquad \text{(Eq. B-7)}$$

Where:

$E_{WA,CH4}$ = The annual methane emissions associated with a WEC applicable facility that are either equal to, below, or exceeding the waste emissions threshold for the WEC applicable facility (*i.e.*, the WEC applicable emissions), mt CH₄.

$E_{TFA,CH4}$ = The annual methane emissions equal to, below, or exceeding the waste emissions threshold for a WEC applicable facility prior to consideration of any applicable exemptions for the reporting year, mt CH₄.

$E_{Delay,CH4}$ = The quantity of methane emissions exempted, as determined in equation C–1 of § 99.32, at the WEC applicable facility due to an unreasonable delay in environmental permitting of gathering or transmission infrastructure meeting the applicability provisions of § 99.30, mt CH₄.

$E_{RCE,CH4}$ = The quantity of methane emissions, as determined pursuant to § 99.43, at the WEC applicable facility attributable to the regulatory compliance exemption subject to the applicability provisions of § 99.41, mt CH₄.

$E_{Plug,CH4}$ = The total quantity of annual methane emissions, as determined in equation E–7 of § 99.52, at the WEC applicable facility attributable to all wells that were permanently shut-in and plugged during the reporting year meeting the applicability provisions of § 99.50, mt CH₄.

### § 99.22 How will the net WEC emissions for a WEC obligated party be determined?

(a) If the condition specified in § 99.7(b)(1)(iv) does not apply for the reporting year, net WEC emissions for a WEC obligated party, equal to the sum of WEC applicable emissions from all facilities with the same WEC obligated party, as specified in § 99.2, will be calculated using equation B–8 of this section.

$$E_{NetWEC,CH_4} = \sum_{j=1}^{N} E_{WA,CH_4,j} \qquad \text{(Eq. B-8)}$$

Where:

$E_{NetWEC,CH4}$ = The net WEC emissions for the WEC obligated party for the reporting year, rounded to the nearest 0.01 mt CH₄.

$E_{WA,CH4,j}$ = The annual methane emissions equal to, below, or exceeding the waste emissions thresholds (*i.e.*, the WEC applicable emissions) for a WEC applicable facility, *j*, as calculated in § 99.21(b) or (d) of a WEC obligated party, mt CH₄.

N = Total number of WEC applicable facilities of a WEC obligated party, excluding any WEC applicable facilities for which the regulatory compliance exemption as specified in § 99.41 applied for the entire reporting year.

(b) If the condition specified in § 99.7(b)(1)(iv) applies for the reporting year, net WEC emissions for a WEC obligated party must be calculated according to this paragraph (b). The net WEC emissions for any acquired WEC applicable facilities that were not associated with the parent company reported pursuant to § 99.7(b)(1)(vi) will be calculated using equation B–8 of this section. The net WEC emissions for the WEC applicable facilities that were associated with the WEC obligated party as of December 31 of the reporting year and any acquired WEC applicable facilities that were associated with the parent company reported pursuant to § 99.7(b)(1)(vi) will be calculated using equation B–8 of this section.

(c) If net WEC emissions are calculated pursuant to paragraph (b) of this section, each calculated net WEC emission value will each be treated as a distinct net WEC emission for purposes of netting under § 99.23 and for which the WEC obligation for the WEC obligated party will be determined under § 99.24.

### § 99.23 How will the transfer of negative net WEC emissions for facilities under the same parent company be determined?

(a) Subject to the requirements of this section, a WEC obligated party with a negative quantity of net WEC emissions, as calculated pursuant to § 99.22, may elect to transfer negative quantities of net WEC emissions to another WEC obligated party sharing the same parent company, as indicated in the annual WEC filing for the reporting year submitted pursuant to § 99.7 by each WEC obligated party involved in the transfer.

(b) Following each transfer, the net WEC emissions of the WEC obligated party transferring the negative quantities of net WEC emissions will increase by the quantity of metric tons of $CH_4$ transferred and the net WEC emissions of the WEC obligated party receiving the transfer will decrease by this amount. In no case can the net WEC emissions of the WEC obligated party transferring the negative quantities of net WEC emissions become a positive value as a result of transfers.

(c) Each transfer of negative quantities of net WEC emissions must be submitted electronically in a format specified by the Administrator and must be approved by the designated representative of each WEC obligated party. Each transfer will designate the WEC obligated party making the transfer, the quantity of metric tons of negative emissions to transfer, and the WEC obligated party that is receiving the transfer. Each transfer must be initiated by the designated representative of the WEC obligated party that is transferring the negative quantities of net WEC emissions. The transfer shall be considered to have occurred at such time that the designated representative of the WEC obligated party that is receiving the transfer approves receipt of the transfer.

(d) Transfers may occur prior to the deadline for submission of the WEC filing under § 99.5, provided that all necessary information to determine net WEC emissions has been completed by both WEC obligated parties involved in the transfer. Transfers for a reporting year must be completed by the date specified in § 99.7(e).

(e) For transfers occurring after the deadline for submission of the WEC filing under § 99.5, the WEC obligated party receiving the transfer must follow the provisions of § 99.7(e) regarding WEC filing revisions and § 99.8(d) regarding resubmittals that result in a change in WEC obligation.

(f) If a WEC obligated party that previously transferred negative quantities of net WEC emissions to another WEC obligated party submits a revised WEC filing pursuant to § 99.7(e) that results in a change to that WEC obligated party's net WEC emissions, the validity of any previously transferred negative quantities of net WEC emissions will be assessed as follows:

(1) If the revised WEC filing results in a greater magnitude of negative quantities of net WEC emissions than in the prior WEC filing, those negative quantities of net WEC emissions are eligible for transfer subject to the requirements of this section.

(2) If the revised WEC filing results in a decrease or elimination of negative quantities of net WEC emissions compared to the prior WEC filing (*i.e.,* the WEC obligated party's net WEC emissions are closer to zero or a positive number), and the WEC obligated party had previously transferred negative quantities of net WEC emissions greater than the revised net WEC emissions, any previously transferred negative quantities of net WEC emissions will be invalidated such that the total quantity of remaining valid negative quantities of net WEC emissions does not exceed the revised net WEC emissions. Previously transferred negative quantities of net WEC emissions will be invalidated in the order that the transfers were approved by the designated representative of the WEC obligated party that received the transfer, beginning with the last transfer approved. Each WEC obligated party that received invalidated negative quantities of net WEC emissions must follow the provisions of § 99.7(e) regarding WEC filing revisions and § 99.8(d) regarding resubmittals that result in a change in WEC obligation.

(g) For each transfer of negative quantities of net WEC emissions between WEC obligated parties, the WEC obligated party that transferred negative quantities of net WEC emissions and the WEC obligated party that received negative quantities of net WEC emissions must maintain all records of the transaction, including any value exchanged, if applicable.

(h) Each transfer of net WEC emissions will be denominated in hundredths of a metric ton of methane (*i.e.,* 0.01 mt $CH_4$) or larger order of magnitude.

### § 99.24 How will the WEC Obligation for a WEC obligated party be determined?

(a) If the net WEC emissions for a WEC obligated party as determined in § 99.22 and following any transfers pursuant to § 99.23 (*i.e.,* the net WEC emissions after transfers) are less than or equal to zero, the WEC obligated party's WEC obligation is zero and the WEC obligated party is not subject to a waste emissions charge in the reporting year for the WEC applicable facilities included in the calculation of the net WEC emissions as determined in § 99.22.

(b) If the net WEC emissions for a WEC obligated party as determined in § 99.22 and following any transfers pursuant to § 99.23 (*i.e.,* the net WEC emissions after transfers) are greater than zero, the WEC obligation will be calculated according to the applicable provisions in paragraphs (b)(1) through (3) of this section.

(1) For reporting year 2024, multiply the net WEC emissions after transfers by $900 per mt $CH_4$ to determine the WEC obligation.

(2) For reporting year 2025, multiply the net WEC emissions after transfers by $1,200 per mt $CH_4$ to determine the WEC obligation.

(3) For reporting year 2026 and each year thereafter, multiply the net WEC emissions after transfers by $1,500 per mt $CH_4$ to determine the WEC obligation.

## Subpart C—Unreasonable Delay Exemption

### § 99.30 Which facilities qualify for the exemption for emissions caused by an unreasonable delay in environmental permitting of gathering or transmission infrastructure?

(a) The WEC applicable facility must be in the offshore petroleum and natural gas production or onshore petroleum and natural gas production industry segment, as those industry segment terms are defined in § 98.230 of this chapter.

(b) The total facility applicable emissions for the WEC applicable facility as calculated in accordance with § 99.21(a) must exceed 0 mt.

(c) The WEC obligated party seeking to exempt a portion of its facility applicable emissions from a WEC applicable facility must not have contributed to the delay. All requests for information regarding the environmental permit application received by the WEC obligated party must not have exceeded the response time requested by, or agreed to by, the

permitting agency or exceeded 30 days if no specific response time is requested. The WEC obligated party seeking eligibility for the exemption must not be a plaintiff in a lawsuit regarding the environmental permit application.

(d) The WEC applicable facility must have reported eligible methane emissions pursuant to § 98.236 of this chapter in the reporting year that occurred as a result of a delay in environmental permitting of gathering or transmission infrastructure necessary for offtake of increased volume as a result of methane emissions mitigation implementation. These eligible methane emissions must have been in compliance with all applicable local, State, and Federal regulations. For purposes of this section, eligible methane emissions for exemption consist of the emissions from the increased volume of gas used as an onsite fuel source, used for another useful purpose that an otherwise purchased fuel or raw material would have served, reinjection into a well, or flared, if that gas would have been routed to a gas gathering flow line or collection system to a sales line if not for the delay in environmental permitting.

(e) Thirty-six (36) months must have passed since submission of the technically complete environmental permit application, as documented by the appropriate permitting authority, to construct gathering or transmission infrastructure without approval or denial of the environmental permit application.

### § 99.31 What are the reporting requirements for the exemption for emissions caused by an unreasonable delay in environmental permitting of gathering or transmission infrastructure?

(a) For a WEC applicable facility meeting all criteria in § 99.30(a) through (e), you may elect to report information regarding an exemption for unreasonable delay in permitting of gathering or transmission infrastructure for a given reporting year. The unreasonable delay exemption information to be reported is described in paragraph (b) of this section. The unreasonable delay exemption information shall be submitted as described in § 99.7.

(b) For each unreasonable delay exemption, the WEC obligated party must report the information specified in paragraphs (b)(1) through (13) of this section.

(1) The company name and name of the facility that submitted the environmental permit application to construct and/or operate gathering or transmission infrastructure.

(2) For reporting year 2025 and later, for a WEC applicable facility in the onshore petroleum and natural gas production industry segment, as that industry segment term is defined in § 98.230 of this chapter, the well-pad ID, as reported pursuant to § 98.236(aa)(1)(iii)(B) of this chapter, of each well-pad impacted by the unreasonable delay in environmental permitting of gathering or transmission infrastructure.

(3) The date the environmental permit application request experiencing an unreasonable delay to build gathering or transmission infrastructure was submitted to the permitting authority and the date the permitting authority determined the application to be technically complete.

(4) A certification that the WEC obligated party seeking to exempt a portion of its facility applicable emissions from a WEC applicable facility has not contributed to the unreasonable delay, has been responsive to the relevant permitting authority regarding the environmental permit application and is not a plaintiff in litigation related to the environmental permit application. For purposes of this paragraph, responsive shall be interpreted to mean that the entity has responded to all requests from the permitting authority within the time frame requested or agreed to by the relevant authority or within thirty (30) days if no timeframe is specified.

(5) A listing of methane emissions mitigation activities that are impacted by the unreasonable permitting delay.

(6) The estimated date to commence operation of the gathering or transmission infrastructure if the application had been approved within thirty-six (36) months.

(7) If the application has been approved and operations commenced during the reporting year, the first date that offtake to the gathering or transmission infrastructure from the implementation of methane emissions mitigation occurred.

(8) The beginning and ending date for which the eligible delay limited the offtake of increased volume associated with methane emissions mitigation activities for the reporting year as determined according to § 99.32(a).

(9) The increased volumes of gas resulting from methane emissions mitigation implementation as determined according to § 99.32(b), in thousand standard cubic feet. For reporting year 2024, report these values for the WEC applicable facility. For reporting year 2025 and later, if the

WEC applicable facility is in the onshore petroleum and natural gas production industry segment, report these values for each well-pad site reported in paragraph (b)(2) of this section. Report the increased volumes associated with each of the following:

(i) Onsite fuel source.

(ii) Another useful purpose that an otherwise purchased fuel or raw material would have served, excluding use as an onsite fuel source.

(iii) Reinjection into a well.

(iv) Flaring.

(10) The quantity of methane emissions to be exempted due to the unreasonable delay for the reporting year calculated as specified in § 99.32.

(i) For a WEC applicable facility in the offshore petroleum and natural gas production industry segment, report the following for the WEC applicable facility:

(A) The result of equation C–1 of § 99.32(c)(1), in metric tons $CH_4$.

(B) The quantity of methane emissions from another useful purpose that an otherwise purchased fuel or raw material would have served, excluding use as an onsite fuel source, ($E_{Use,CH4}$), in metric tons $CH_4$.

(C) The quantity of methane emissions from reinjection of recovered gas ($E_{Reinject,CH4}$), in metric tons $CH_4$.

(D) The quantity of methane emissions from flaring ($E_{Flare,CH4}$), in metric tons $CH_4$.

(E) The total quantity of natural gas that was flared at the WEC applicable facility in the reporting year, in thousand scf.

(ii) For a WEC applicable facility in the onshore petroleum and natural gas production industry segment, for reporting year 2024 report the following for the WEC applicable facility:

(A) The result of equation C–2 of § 99.32(c)(2), in metric tons $CH_4$.

(B) The quantity of methane emissions from use as an onsite fuel source of increased volume of natural gas resulting from methane emissions mitigation implementation ($E_{Fuel,CH4}$), as calculated in equation C–5 to § 99.32(c)(5), in metric tons $CH_4$.

(C) The quantity of methane emissions from another useful purpose that an otherwise purchased fuel or raw material would have served, excluding use as an onsite fuel source, ($E_{Use,CH4}$), as calculated in equation C–6 to § 99.32(c)(6), in metric tons $CH_4$.

(D) The quantity of methane emissions from reinjection of increased volume of natural gas resulting from methane emissions mitigation implementation ($E_{Reinject,CH4}$), as calculated in equation C–7 to § 99.32(c)(7), in metric tons $CH_4$.

(E) The quantity of methane emissions from flaring of increased volume of natural gas resulting from methane emissions mitigation implementation ($E_{Flare,CH_4}$), as calculated in equation C–8B to § 99.32(c)(8), in metric tons $CH_4$.

(iii) For a WEC applicable facility in the onshore petroleum and natural gas production industry segment, for reporting year 2025 and later, report the following for each well-pad site reported in paragraph (b)(2) of this section:

(A) The result of equation C–4 of § 99.32(c)(4), in metric tons $CH_4$.

(B) The quantity of methane emissions from use as an onsite fuel source of increased volume of natural gas resulting from methane emissions mitigation implementation ($E_{Fuel,CH_4}$), as calculated in equation C–5 to § 99.32(c)(5), in metric tons $CH_4$.

(C) The quantity of methane emissions from another useful purpose that an otherwise purchased fuel or raw material would have served, excluding use as an onsite fuel source, ($E_{Use,CH_4}$), as calculated in equation C–6 to § 99.32(c)(6), in metric tons $CH_4$.

(D) The quantity of methane emissions from reinjection of increased volume of natural gas resulting from methane emissions mitigation implementation ($E_{Reinject,CH_4}$), as calculated in equation C–7 to § 99.32(c)(7), in metric tons $CH_4$.

(E) The quantity of methane emissions from flaring of increased volume of natural gas resulting from methane emissions mitigation implementation ($E_{Flare,CH_4}$), as calculated in equation C–8B to § 99.32(c)(8), in metric tons $CH_4$.

(iv) For a WEC applicable facility in the onshore petroleum and natural gas production industry segment that reported emissions from use as an onsite fuel source of increased volume of natural gas resulting from methane emissions mitigation implementation ($E_{Fuel,CH_4}$), report the information specified in paragraphs (b)(10)(iv)(A) and (B) of this section, as applicable. For reporting year 2024, report each value for the WEC applicable facility. For reporting year 2025 and later, report the value for each well-pad site.

(A) The quantity of methane emissions from combustion of increased volume of natural gas resulting from methane emissions mitigation implementation in stationary or portable fuel combustion equipment as calculated using the methods in § 98.233(z) of this chapter ($E_{CombEq,CH_4}$), in metric tons $CH_4$.

(B) The total volume of natural gas combusted in reciprocating internal combustion engines with crankcase

vents during the reporting year ($V_{RICE}$), in thousand scf.

(v) For a WEC applicable facility in the onshore petroleum and natural gas production industry segment that reported emissions from reinjection into a well ($E_{Reinject,CH_4}$), report the information specified in paragraphs (b)(10)(v)(A) and (B) of this section, as applicable. For reporting year 2024, report each value for the WEC applicable facility. For reporting year 2025 and later, report the value for each well-pad site.

(A) A list including each centrifugal compressor unique name or ID as submitted in the part 98 report for the WEC applicable facility that was used in the reinjection into wells of natural gas resulting from methane emissions mitigation implementation (*i.e.,* that was included in $Count_{Cent,Reinject}$ of equation C–7 of this part). For reporting year 2024, use the values reported to § 98.236(o)(1)(i) of this chapter. For reporting year 2025 and later, use the values reported to § 98.236(o)(1)(ii) of this chapter.

(B) A list of each reciprocating compressor unique name or ID as submitted to in the part 98 report for the WEC applicable facility that was used in the reinjection into wells of natural gas resulting from methane emissions mitigation implementation (*i.e.,* that was included in $Count_{Recip,Reinject}$ of equation C–7 of this part). For reporting year 2024, use the values reported to § 98.236(p)(1)(i) of this chapter. For reporting year 2025 and later, use the values reported to § 98.236(p)(1)(ii) of this chapter.

(vi) For a WEC applicable facility in the onshore petroleum and natural gas production industry segment that reported emissions from flaring ($E_{Flare,CH_4}$), report the information specified in paragraphs (b)(10)(vi)(A) and (B) of this section for all reporting years. For reporting year 2025 and later, report the information specified in paragraph (b)(10)(vi)(C) of this section. For reporting year 2024, report the information specified in paragraph (b)(10)(vi)(A) for the WEC applicable facility. For reporting year 2025 and later, report the information specified in paragraph (b)(10)(vi)(A) for each well-pad site.

(A) The unique name or ID as reported pursuant to § 98.236(n)(1) of this chapter for each flare stack that flared gas resulting from methane emissions mitigation implementation.

(B) For each flare stack reported to paragraph (b)(10)(vi)(A) of this section, report the volume of natural gas resulting from methane emissions mitigation implementation that was

flared at that flare as determined according to § 98.232(b)(4), in thousand scf.

(C) For each flare stack reported to paragraph (b)(10)(vi)(A) of this section, indicate if flow for each stream to the flare was measured or determined in accordance with § 98.233(n)(3)(ii) of this chapter and that stream or combination of streams contained only flow resulting from the environmental permit delay. If so, report the unique ID as reported pursuant to § 98.236(n)(3) of this chapter for each stream that contained only flow resulting from the environmental permit delay.

(vii) For a WEC applicable facility in the onshore petroleum and natural gas production industry segment that reported emissions from another useful purpose that an otherwise purchased fuel or raw material would have served, excluding use as an onsite fuel source, ($E_{Use,CH_4}$) and/or emissions from reinjection into a well ($E_{Reinject,CH_4}$) and quantified the equipment leaks associated with either/both use(s), report the information specified in paragraphs (b)(10)(vii)(A) through (F) of this section, as applicable. For reporting year 2024, report this information for the WEC applicable facility. For reporting year 2025 and later, report this information for each well-pad site. Report separately the information specified in paragraphs (b)(10)(vii)(A) through (F) of this section, as applicable, related to another useful purpose that an otherwise purchased fuel or raw material would have served, excluding use as an onsite fuel source, and related to reinjection into a well.

(A) Indicate the method used to calculate equipment leak emissions (*i.e.,* § 99.32(c)(9)(i), (ii), or (iii)).

(B) If the method in § 99.32(c)(9)(i) is used to calculate equipment leak emissions, you must report the following information for each leak: the leak detection survey method used, component type as reported in § 98.236(q) of this chapter, the volumetric flow rate of the natural gas leak in standard cubic feet per hour and the duration of the measured leak as determined in accordance with § 99.32(c)(9)(i), in hours. The measured leak rate, the component type and duration of measured leaks must only include those components associated with another useful purpose that an otherwise purchased fuel or raw material would have served, excluding use as an onsite fuel source, or associated with reinjection into a well.

(C) If the method in § 99.32(c)(9)(ii) is used to calculate equipment leak emissions, you must report the following information for each

component identified as leaking: the leak detection survey method used, the component type as specified in § 98.233(q)(2)(iii) of this chapter and the time the surveyed component is assumed to be leaking and operational, in hours. The component type and time the surveyed components are assumed to be leaking and operational must only include those components associated with another useful purpose that an otherwise purchased fuel or raw material would have served, excluding use as an onsite fuel source, or associated with reinjection into a well.

(D) If the method in § 99.32(c)(9)(iii) is used to calculate equipment leak emissions, you must report the counts of each component type listed in § 98.233(r)(2) of this chapter that are associated with a useful purpose that an otherwise purchased fuel or raw material would have served, excluding use as an onsite fuel source, or associated with reinjection into a well.

(E) The mole fraction of $CH_4$ in produced gas for the sub-basin in which the useful purpose or reinjection occurred, as reported pursuant to § 98.236(aa)(1)(iii)(I) of this chapter, unitless. For RY2024, if multiple sub-basins were impacted by the unreasonable delay, report the value of the flow-weighted average mole fraction for the sub-basin in which the useful purpose or reinjection occurred.

(F) The equipment leak emissions qualifying for exemption from another useful purpose that an otherwise purchased fuel or raw material would have served, excluding use as an onsite fuel source, or reinjection into a well as calculated in accordance with paragraphs § 99.32(c)(9)(i), (ii), or (iii), metric tons $CH_4$.

(11) A certification of the facility's compliance with all applicable local, State, and Federal regulations regarding emissions from the activities listed in § 99.30(d) that occurred as a result of a delay in environmental permitting of gathering or transmission infrastructure.

(12) For each environmental permit relevant to the exemption, the name/type of permit, permitting agency, contact information at the permitting agency, and a link to information on the permit (*e.g.,* available through the permitting agency), if available.

(13) Upon request, any other documentation deemed necessary by the Administrator to verify eligibility under this section.

## § 99.32 How are the methane emissions caused by an unreasonable delay in environmental permitting of gathering or transmission infrastructure quantified?

(a) Determine the time period, in days, associated with the emissions that occurred as a result of the eligible delay within the reporting year as specified in paragraphs (a)(1) and (2) of this section.

(1) The start date of the emissions caused by the delay in the reporting year is the latter of January 1 of the reporting year, or the date on which emissions would have been avoided through commencement of the operation of the gathering or transmission infrastructure if the environmental permit application to construct and/or operate the gathering or transmission infrastructure had been approved within 36 months as specified in § 99.31(b)(6).

(2) The end time of the emissions caused by the delay in the reporting year is the earlier of December 31 of the reporting year or the date the emissions caused by the unreasonable delay ended because the infrastructure commenced operation.

(b) Determine by engineering estimates based upon best available information the increased volume of gas, in thousand standard cubic feet, resulting from methane emissions mitigation implementation during the time period determined in paragraph (a) of this section associated with each of the activities listed in paragraphs (b)(1) through (4) of this section. If the WEC applicable facility is in the offshore petroleum and natural gas production industry segment, determine these values for the WEC applicable facility in every reporting year. If the WEC applicable facility is in the onshore petroleum and natural gas production industry segment, for reporting year 2024 determine these values for the WEC applicable facility, and for reporting year 2025 and later determine these values for each well-pad site impacted by the unreasonable delay.

(1) Onsite fuel source.

(2) Another useful purpose that an otherwise purchased fuel or raw material would have served, excluding use as an onsite fuel source.

(3) Reinjection into a well.

(4) Flaring. Determine this value in accordance with this paragraph (4)(i), (ii), or (iii), as applicable. For the onshore petroleum and natural gas production industry segment flaring volumes must be determined for each flare that received an increased volume of gas resulting from the environmental permit delay and then totaled for the WEC applicable facility or well-pad site, as applicable.

(i) If the WEC applicable facility is in the offshore petroleum and natural gas production industry segment determine by engineering estimate based upon best available information.

(ii) If the WEC applicable facility is in the onshore petroleum and natural gas production industry segment for reporting year 2024, determine by engineering estimate based upon best available information the portion of the flow reported pursuant to § 98.236(n)(4) of this chapter attributable to the environmental permit delay for each flare that received an increased volume of gas. If a continuous monitoring system (CEMS) was used to measure emissions from the flare as reported pursuant to § 98.236(n)(12) of this chapter, do not determine a volume of gas for that flare.

(iii) If the WEC applicable facility is in the onshore petroleum and natural gas production industry segment for reporting year 2025 and later, for each flare that received an increased volume of gas attributable to the environmental permit delay, if flow for each stream to the flare is measured or determined in accordance with § 98.233(n)(3)(ii) of this chapter and that stream or combination of streams contain only flow resulting from the environmental permit delay, use the flow for those streams as reported to § 98.236(n)(11) of this chapter. If flow is measured at the inlet to the flare in accordance with § 98.233(n)(3)(i) of this chapter or the stream flow measured or determined in accordance with § 98.233(n)(3)(ii) of this chapter includes flow unrelated to the environmental permit delay, use an engineering estimate based upon best available information of the portion of flow resulting from the environmental permit delay.

(c) For each well-pad site or offshore platform at a WEC applicable facility impacted by an unreasonable delay in environmental permitting of gathering or transmission infrastructure, you must calculate the emissions that occurred at the well-pad site or offshore platform that were caused by the unreasonable delay according to paragraphs (c)(1) through (9) of this section, as applicable.

(1) For a WEC applicable facility in the offshore petroleum and natural gas production industry segment, as that industry segment term is defined in § 98.230 of this chapter, equation C–1 of this section must be used to calculate the WEC applicable facility unreasonable delay emissions.

$$E_{Delay,CH_4} = \left[ \left( E_{Use,CH_4} + E_{Reinject,CH_4} \right) \times \frac{T_d}{T} \right] + \left( E_{Flare,CH_4} \times \frac{V_{MM,Flare}}{V_{WAF,Flare}} \right) \qquad \text{(Eq. C-1)}$$

Where:

$E_{Delay,CH_4}$ = The quantity of methane emissions attributable to an unreasonable delay in environmental permitting of gathering or transmission infrastructure during the reporting year at a WEC applicable facility meeting the applicability provisions of § 99.30, mt $CH_4$.

$E_{Use,CH_4}$ = The WEC applicable facility quantity of methane emissions from another useful purpose that an otherwise purchased fuel or raw material would have served, excluding use as an onsite fuel source, mt $CH_4$. For reporting year 2024, use best available data to determine the portion of fugitive emissions reported pursuant to § 98.236(s)(2) of this chapter for the reporting year that were associated with another useful purpose that an otherwise purchased fuel or raw material would have served, excluding use as an onsite fuel source. For reporting year 2025 and later, use the applicable portion of the

value reported to § 98.236(s)(3)(ii) of this chapter for the reporting year.

$E_{Reinject,CH_4}$ = The WEC applicable facility quantity of methane emissions from reinjection of recovered gas, mt $CH_4$. For reporting year 2024, use best available data to determine the portion fugitive emissions reported pursuant to § 98.236(s)(2) of this chapter for the reporting year that were associated with reinjection of recovered gas. For reporting year 2025 and later, use the applicable portion of the value reported to § 98.236(s)(3)(ii) of this chapter for the reporting year.

$T_d$ = The time period associated with the eligible delay within the reporting year, as determined pursuant to § 99.32(a), in days.

T = The number of days in the reporting year. Use 365, or for leap years, 366.

$E_{Flare,CH_4}$ = The WEC applicable facility quantity of methane emissions from flaring, mt $CH_4$. For reporting year 2024, use the value reported pursuant to

§ 98.236(s)(2) of this chapter for the reporting year. For reporting year 2025 and later, use the value reported to § 98.236(s)(3)(ii) of this chapter for the reporting year.

$V_{MM,Flare}$ = The volume of natural gas resulting from methane emissions mitigation implementation that was flared as determined pursuant to § 99.32(b)(4)(i), in thousand scf.

$V_{WAF,Flare}$ = The total quantity of natural gas that was flared at the WEC applicable facility in the reporting year, in thousand scf.

(2) For reporting year 2024, for a WEC applicable facility in the onshore petroleum and natural gas production industry segment, as that industry segment term is defined in § 98.230 of this chapter, equation C–2 of this section must be used to calculate the WEC applicable facility unreasonable delay emissions.

$$E_{Delay,CH_4} = E_{Fuel,CH_4} + E_{Use,CH_4} + E_{Reinject,CH_4} + E_{Flare,CH_4} \qquad \text{(Eq. C-2)}$$

Where:

$E_{Delay,CH_4}$ = The quantity of methane emissions attributable to an unreasonable delay in environmental permitting of gathering or transmission infrastructure during the reporting year at a WEC applicable facility meeting the applicability provisions of § 99.30, mt $CH_4$.

$E_{Fuel,CH_4}$ = The WEC applicable facility quantity of methane emissions from combustion of the increased volume of natural gas resulting from methane emissions mitigation implementation as calculated in accordance with paragraph (c)(5) of this section.

$E_{Use,CH_4}$ = The WEC applicable facility quantity of methane emissions from the increased volume of natural gas resulting from methane emissions mitigation implementation used for another useful purpose that an otherwise purchased fuel or raw material would have served, excluding use as an onsite fuel source, as calculated in accordance with paragraph (c)(6) of this section.

$E_{Reinject,CH_4}$ = The WEC applicable facility quantity of methane emissions from reinjection of the increased volume of natural gas resulting from methane emissions mitigation implementation as calculated in accordance with paragraph (c)(7) of this section.

$E_{Flare,CH_4}$ = The WEC applicable facility quantity of methane emissions from flaring of the increased volume of natural gas resulting from methane emissions mitigation implementation as calculated in accordance with paragraph (c)(8) of this section, mt $CH_4$.

(3) For reporting year 2025 and later, for a WEC applicable facility in the onshore petroleum and natural gas production industry segment, as that industry segment term is defined in § 98.230 of this chapter, equation C–3 of this section must be used to calculate the WEC applicable facility unreasonable delay emissions.

$$E_{Delay,CH_4} = \sum_{i=1}^{N} E_{WP\text{-}Delay,CH_4} \qquad \text{(Eq. C-3)}$$

Where:

$E_{Delay,CH_4}$ = The quantity of methane emissions at the WEC applicable facility attributable to unreasonable delay during the reporting year meeting the applicability provisions of § 99.30, mt $CH_4$.

$E_{WP\text{-}Delay,CH_4}$ = The quantity of methane emissions attributable to a well-pad site "i" that met the applicability provisions

of § 99.30 during the reporting year calculated using equation C–4 of this section.

N = Total number of well-pad sites that met the applicability provisions of § 99.30 during the reporting year at a WEC applicable facility.

(4) For reporting year 2025, for a WEC applicable facility in the onshore

petroleum and natural gas production industry segment, as that industry segment term is defined in § 98.230 of this chapter, equation C–4 of this section must be used to calculate the unreasonable delay emissions for each affected well-pad site.

$$E_{WP\text{-}Delay,CH_4} = E_{Fuel,CH_4} + E_{Use,CH_4} + E_{Reinject,CH_4} + E_{Flare,CH_4} \qquad \text{(Eq. C-4)}$$

Where:

$E_{WP\text{-}Delay,CH4}$ = The annual quantity of methane emissions attributable to a well-pad site impacted by an unreasonable delay in environmental permitting of gathering or transmission infrastructure during the reporting year at a WEC applicable facility meeting the applicability provisions of § 99.30, mt $CH_4$.

$E_{Fuel,CH4}$ = The well-pad site quantity of methane emissions from use as an onsite fuel source of the increased volume of natural gas resulting from methane emissions mitigation implementation as calculated in accordance with paragraph (c)(5) of this section.

$E_{Use,CH4}$ = The well-pad site quantity of methane emissions from the increased volume of natural gas resulting from methane emissions mitigation implementation used for another useful purpose that an otherwise purchased fuel or raw material would have served, excluding use as an onsite fuel source, as calculated in accordance with paragraph (c)(6) of this section.

$E_{Reinject,CH4}$ = The well-pad site quantity of methane emissions from reinjection of the increased volume of natural gas resulting from methane emissions mitigation implementation as calculated in accordance with paragraph (c)(7) of this section.

$E_{Flare,CH4}$ = The well-pad site quantity of methane emissions from flaring of the

increased volume of natural gas resulting from methane emissions mitigation implementation as calculated in accordance with paragraph (c)(8) of this section, mt $CH_4$.

(5) If a portion, or all, of the increased volume of natural gas resulting from methane emissions mitigation was used as an onsite fuel source, equation C–5 of this section must be used to calculate the quantity of methane emissions from use as an onsite fuel source of increased volume of natural gas resulting from methane emissions mitigation implementation.

$$E_{Fuel,CH_4} = E_{CombEq,CH_4} + \left( E_{CCV,CH_4} \times \frac{V_{Combusted}}{V_{RICE}} \right) \qquad \text{(Eq. C-5)}$$

Where:

$E_{Fuel,CH4}$ = The quantity of methane emissions from use as an onsite fuel source of the increased volume of natural gas resulting from methane emissions mitigation implementation, mt $CH_4$.

$E_{CombEq,CH4}$ = The quantity of methane emissions from use as an onsite fuel source of the increased volume of natural gas resulting from methane emissions mitigation implementation in stationary or portable fuel combustion equipment, mt $CH_4$. Use the methods in § 98.233(z) of this chapter to calculate the methane emissions from the use as an onsite fuel source in stationary or portable equipment of natural gas resulting from

methane emissions mitigation implementation.

$E_{CCV,CH4}$ = The WEC applicable facility sum quantity of methane emissions from crankcase venting, mt $CH_4$. For reporting year 2024, use a value of 0. For reporting year 2025 and later, use the sum total of the values reported to § 98.236(ee)(2)(ii) and (ee)(3)(iv) of this chapter for the reporting year.

$V_{Combusted}$ = The volume of natural gas resulting from methane emissions mitigation implementation that was used as an onsite fuel source as determined pursuant to § 99.32(b)(1), in thousand scf.

$V_{RICE}$ = The total volume of natural gas combusted in reciprocating internal

combustion engines with crankcase vents during the reporting year, in thousand scf.

(6) If a portion, or all, of the increased volume of natural gas resulting from methane emissions mitigation was used for another useful purpose that an otherwise purchased fuel or raw material would have served, excluding use as an onsite fuel source, equation C–6 of this section must be used to calculate the quantity of methane emissions from the use of the increased volume of natural gas resulting from methane emissions mitigation implementation.

$$E_{Use,CH_4} = E_{Leaks\text{-}Use,CH_4} \qquad \text{(Eq. C-6)}$$

Where:

$E_{Use,CH4}$ = The quantity of methane emissions from the increased volume of natural gas resulting from methane emissions mitigation implementation used for another useful purpose that an otherwise purchased fuel or raw material would have served, excluding use as an onsite fuel source as calculated in accordance with paragraph (c)(5) of this section, mt $CH_4$.

$E_{Leaks\text{-}Use,CH4}$ = The quantity of methane emissions from equipment leaks from components involved in the useful purpose as calculated in accordance with paragraphs (c)(9)(i) through (iii) of this section, as applicable, for the reporting year, mt $CH_4$. When determining the equipment leak emissions, use only the equipment components that were involved in the useful purpose that an otherwise purchased fuel or raw material

would have served during the eligible delay.

(7) If a portion, or all, of the increased volume of natural gas resulting from methane emissions mitigation was reinjected into a well, equation C–7 of this section must be used to calculate the quantity of methane emissions from reinjection of the increased volume of natural gas resulting from methane emissions mitigation implementation.

$$E_{Reinject,CH_4} = \left[ \left( E_{Cent,CH_4} \times \frac{Count_{Cent,Reinject}}{C_{Cent,Total}} \right) + \left( E_{Recip,CH_4} \times \frac{Count_{Recip,Reinject}}{C_{Recip,Total}} \right) \right] \times \frac{T_d}{T} + E_{Leaks\text{-}Reinject,CH_4} \qquad \text{(Eq. C-7)}$$

Where:

$E_{Reinject,CH4}$ = The total quantity of methane emissions from reinjection into a well of increased volume of natural gas resulting

from methane emissions mitigation implementation, mt $CH_4$.

$E_{Cent,CH4}$ = The total quantity of methane emissions from centrifugal compressors,

mt $CH_4$. For reporting year 2024, use the sum total of the values reported to § 98.236(o)(2)(ii)(D)(2) and (o)(5)(iii) of this chapter for the WEC applicable

facility. For reporting year 2025 and later, use the sum total of the values reported to § 98.236(o)(2)(ii)(D)(2) and (o)(5)(iv) of this chapter for the well-pad site.

$Count_{Cent,Reinject}$ = The count of centrifugal compressors used in the reinjection into wells of natural gas resulting from methane emissions mitigation implementation. For reporting year 2024, use the count associated with the WEC applicable facility for the reporting year. For reporting year 2025 and later, use the count associated with the well-pad site for the reporting year.

$Count_{Cent,Total}$ = The total count of centrifugal compressors reported pursuant to § 98.236(o)(1) of this chapter. For reporting year 2024, use the quantity reported at the WEC applicable facility for the reporting year. For reporting year 2025 and later, use the quantity reported for the well-pad site.

$E_{Recip,CH_4}$ = The total quantity of methane emissions from reciprocating compressors, mt $CH_4$. For reporting year 2024, use the sum total of the values reported to § 98.236(p)(2)(ii)(D)(2) and (p)(5)(iii) of this chapter for the WEC applicable facility. For reporting year 2025 and later, use the sum total of the values reported to § 98.236(p)(2)(ii)(D)(2) and (p)(5)(iv) of this chapter for the well-pad site.

$Count_{Recip,Reinject}$ = The count of reciprocating compressors used in the reinjection into wells of natural gas resulting from methane emissions mitigation implementation. For reporting year 2024, use the count associated with the WEC applicable facility for the reporting year. For reporting year 2025 and later, use the count associated with the well-pad site.

$Count_{Recip,Total}$ = The total count of reciprocating compressors reported pursuant to § 98.236(o)(1) of this chapter. For reporting year 2024, use the quantity reported at the WEC applicable facility for the reporting year. For reporting year 2025 and later, use the quantity reported for the well-pad site.

$T_d$ = The time period associated with the eligible delay within the reporting year, as determined pursuant to § 99.32(a), in days.

T = The number of days in the reporting year. Use 365, or for leap years, 366.

$E_{Leaks-Reinject,CH_4}$ = The quantity of methane emissions from equipment leaks from components involved in reinjection as calculated in accordance with paragraph (c)(9)(i) through (iii) of this section, as

applicable, for the reporting year, mt $CH_4$. When determining the equipment leaks use only the equipment components that were involved in reinjection during the eligible delay.

(8) If a portion, or all, of the increased volume of natural gas resulting from methane emissions mitigation was flared, equation C–8A of this section must be used to calculate the quantity of methane emissions from flaring of increased volume of natural gas resulting from methane emissions mitigation implementation for each associated flare. For reporting year 2024, if a CEMS was used to measure emissions from an associated flare as reported to § 98.236(n)(12) of this part, do not determine methane emissions for that flare. Equation C–8B of this section must be used to calculate the quantity of methane emissions from flaring of increased volume of natural gas resulting from methane emissions mitigation implementation for the WEC applicable facility or well-pad site, as applicable.

$$E_{Flare_i,CH_4} = V_{Flared} \times X_{CH_4} \times [(1 - \eta_D) \times Z_L + Z_U] \times \rho_{CH_4} \times 10^{-3} \qquad \text{(Eq. C-8A)}$$

Where:

$E_{Flare,i,CH_4}$ = The quantity of methane emissions from flaring of increased volume of natural gas resulting from methane emissions mitigation implementation for an individual flare, mt $CH_4$.

$V_{Flared}$ = The volume of natural gas resulting from methane emissions mitigation implementation that was flared at the flare as determined pursuant to § 98.32(b)(4)(ii) or (iii) of this chapter, as applicable, scf.

$X_{CH_4}$ = Mole fraction of $CH_4$ in the gas sent to the flare. For reporting year 2024, use the value reported to § 98.236(n)(7) of this chapter. For reporting year 2025 and later, if you determine composition of

each stream routed to the flare as specified in § 98.233(n)(4)(iii) of this chapter and the stream or combination of streams contain only the flow resulting from methane emissions mitigation implementation, use the mole fraction as reported to § 98.236(n)(14) of this chapter (if using multiple streams, use the flow-weighted average mole fraction). Otherwise, for reporting year 2025 and later, use the average mole fraction of $CH_4$ in produced gas for the sub-basin in which the well-pad site at which methane emissions mitigation implementation occurred as reported to § 98.236(aa)(1)(ii)(I) of this chapter.

O = Flare destruction efficiency for the flare. For reporting year 2024, use the flare combustion efficiency reported to

§ 98.236(n)(6) of this chapter. For reporting year 2025 and later, use the flare destruction efficiency reported to § 98.236(n)(13) of this chapter.

$Z_L$ = Fraction of the feed gas sent to the burning flare, equal to 1—$Z_U$ of this section.

$Z_U$ = Fraction of the feed gas sent to the flare when it was un-lit. For reporting year 2024, use the value reported to § 98.236(n)(5) of this chapter. For reporting year 2025 and later, use the value reported to § 98.236(n)(12) of this chapter.

$\rho_{CH_4}$ = Density of methane at 60 °F and 14.7 psia. Use 0.0192 kg/ft³.

$10^{-3}$ = Conversion from kilograms to metric tons.

$$E_{Flare,CH_4} = \sum_{i=1}^{M} E_{Flare_i,CH_4} \qquad \text{(Eq. C-8B)}$$

Where:

$E_{Flare,CH_4}$ = The quantity of methane emissions from flaring of increased volume of natural gas resulting from methane emissions mitigation implementation, mt $CH_4$.

$E_{Flare,i,CH_4}$ = The quantity of methane emissions from flaring of increased volume of natural gas resulting from methane emissions mitigation implementation for each associated flare, $i$, as determined using equation C–8A of this section, mt $CH_4$.

M = Total number of flares that received an increased volume of gas resulting from methane emissions mitigation implementation.

(9) You must quantify equipment leak methane emissions from components involved in the useful purpose or reinjection of the increased volume of natural gas resulting from methane emissions mitigation implementation at the WEC applicable facility in accordance with the methods in

paragraphs (c)(9)(i) through (iii) of this section. You must use the same calculation method for equipment leaks reported pursuant to § 98.236(q) or (r) of this chapter in the part 98 report associated with the components involved in the useful purpose or reinjection of the increased volume of natural gas resulting from methane emissions mitigation implementation at the WEC applicable facility.

(i) If equipment leak surveys and measurement were used to quantify methane emissions from components involved in the useful purpose or reinjection of the increased volume of natural gas resulting from methane emissions mitigation implementation and reported pursuant to § 98.236(q) of this chapter in the part 98 report for a WEC applicable facility, you must calculate the methane emissions (*i.e.*, $E_{Measured\ Leak,\ CH4}$) for each leak in accordance with equation C–9A of this section. The sum of the quantified methane emissions from components involved in the useful purpose or reinjection of the increased volume of natural gas resulting from methane emissions mitigation implementation calculated in accordance with equation C–9A of this section shall be considered "$E_{Leaks-Use,\ CH4}$" and "$E_{Leaks-Reinject,\ CH4}$" in Equations C–6 and C–7 of this section, as applicable.

$$E_{Measured\ Leak,CH_4} = Q_{p,z} \times T_{p,z} \times M_{CH_4} \times k \times \rho_{CH_4} \times 10^{-3} \qquad \text{(Eq. C-9A)}$$

Where:

$E_{Measured\ Leak,CH4}$ = The quantity of methane emissions attributable to a measured leak emissions from components involved in the useful purpose or reinjection of the increased volume of natural gas resulting from methane emissions mitigation implementation, mt $CH_4$

p = Component type as reported in accordance with § 98.236(q) of this chapter, as applicable.

z = An individual component involved in the useful purpose or reinjection of type "p" detected as leaking and measured any leak survey during the year.

$Q_{p,z}$ = Volumetric flow rate of the natural gas leak for component "z" of component type "p" converted to standard conditions according to § 98.233(q)(3)(iii) of this chapter, scf whole gas/hour/component, as applicable.

$M_{CH4}$ = The mole fraction of $CH_4$ in produced gas for the well. For onshore petroleum and natural gas production wells, use the mole fraction of $CH_4$ in produced gas for the sub-basin associated with the well, as reported pursuant to § 98.236(aa)(1)(ii)(I) of this chapter, unitless. For RY2024, if multiple sub-basins were impacted by

the unreasonable delay, use the flow-weighted average mole fraction.

$T_{p,z}$ = The total time the surveyed component "z" of component type "p" was assumed to be leaking. If one leak detection survey is conducted in the calendar year, assume the component was leaking from the beginning of the delay period as determined in accordance with § 99.32(a)(1) until the date the delay ended as determined in accordance with § 99.32(a)(2), days. If multiple leak detection surveys are conducted in the calendar year, assume a component found leaking in the first survey was leaking since the beginning of the year until the date of the survey; assume a component found leaking in the last survey of the year was leaking from the preceding survey through the date the delay ended as determined in accordance with § 99.32(a)(2), days; assume a component found leaking in a survey between the first and last surveys of the year was leaking since the preceding survey until the date of the survey, days; and sum times for all leak periods. For each leaking component, account for time the component was not operational (*i.e.*, not operating under pressure) using an

engineering estimate based on best available data.

k = The factor to adjust for undetected leaks by respective leak detection method. For reporting year 2024, k equals 1. For reporting year 2025 and later, k equals 1.25 for the methods in § 98.234(a)(1), (3) and (5) of this chapter; k equals 1.55 for the method in § 98.234(a)(2)(i) of this chapter; and k equals 1.27 for the method in § 98.234(a)(2)(ii) of this chapter. Select the factor for the leak detection method used for the permanently shut-in and plugged well, unitless.

$\rho_{CH4}$ = Density of methane, 0.0192 mt/Mscf.

$10^{-3}$ = Conversion factor from scf to Mscf.

(ii) If equipment leak surveys were used to quantify methane emissions from components involved in the useful purpose or reinjection of the increased volume of natural gas resulting from methane emissions mitigation implementation and reported pursuant to § 98.236(q) of this chapter in the part 98 report for a WEC applicable facility, equation C–9B of this section must be used to calculate $E_{Leaks,CH4}$.

$$E_{Leaks,CH_4} = \sum_{p=1}^{N_p} \left( EF_p \times \sum_{z=1}^{x_p} \left( T_{p,z} \times 24 \right) \right) \times M_{CH_4} \times k \times \rho_{CH_4} \times 10^{-3} \qquad \text{(Eq. C-9B)}$$

Where:

$E_{Leaks,CH4}$ = The annual quantity of methane emissions attributable to components involved in the useful purpose or reinjection of the increased volume of natural gas resulting from methane emissions mitigation implementation as reported pursuant to § 98.236(q) of this chapter for the reporting year, mt $CH_4$.

p = Component type as specified in § 98.233(q)(2)(iii) of this chapter.

$N_p$ = The number of component types with detected leaks involved in the useful purpose or reinjection.

$EF_p$ = The leaker emission factor for component "p" as specified in § 98.233(q)(2)(iii) of this chapter, scf whole gas/hour/component.

24 = Conversion from days to hours.

$M_{CH4}$ = The mole fraction of $CH_4$ in produced gas for the sub-basin in which the useful purpose or reinjection occurred, as reported pursuant to § 98.236(aa)(1)(ii)(I) of this chapter, unitless. For RY2024, if multiple sub-basins were impacted by the unreasonable delay, use the flow-weighted average mole fraction.

$x_p$ = The total number of specific components involved in the useful purpose or reinjection of type "p" detected as leaking during the year. A component found leaking in two or more surveys during the year is counted as one leaking component.

$T_{p,z}$ = The total time the surveyed component "z" of component type "p" was assumed to be leaking. If one leak detection

survey is conducted in the calendar year, assume the component was leaking from the beginning of the delay period as determined in accordance with § 99.32(a)(1) until the date the delay ended as determined in accordance with § 99.32(a)(2), days. If multiple leak detection surveys are conducted in the calendar year, assume a component found leaking in the first survey was leaking since the beginning of the year until the date of the survey; assume a component found leaking in the last survey of the year was leaking from the preceding survey through the date the delay ended as determined in accordance with § 99.32(a)(2), days; assume a component found leaking in a survey between the first and last surveys

of the year was leaking since the preceding survey until the date of the survey, days; and sum times for all leaking periods. For each leaking component, account for time the component was not operational (*i.e.,* not operating under pressure) using an engineering estimate based on best available data.

k = The factor to adjust for undetected leaks by respective leak detection method. For reporting year 2024, k equals 1. For reporting year 2025 and later, k equals 1.25 for the methods in § 98.234(a)(1), (3) and (5) of this chapter; k equals 1.55 for the method in § 98.234(a)(2)(i) of this chapter; and k equals 1.27 for the method in § 98.234(a)(2)(ii) of this chapter. Select the factor for the leak detection method used for the permanently shut-in and plugged well, unitless.

$\rho_{CH_4}$ = Density of methane, 0.0192 mt/ Mscf.

$10^{-3}$ = Conversion factor from scf to Mscf.

(iii) If equipment leaks by population count were used to quantify methane emission from components involved in the useful purpose or reinjection of the increased volume of natural gas resulting from methane emissions mitigation implementation and reported pursuant to § 98.236(r) of this chapter in the part 98 report for a WEC applicable facility, equation C–9C of this section must be used to calculate $E_{Leaks,CH_4}$.

$$E_{Leaks,CH_4} = \sum_{p=1}^{N_p} \left( Count_p \times EF_p \right) \times M_{CH_4} \times T \times 24 \times \rho_{CH_4} \times 10^{-3} \qquad \text{(Eq. C-9C)}$$

Where:

$E_{Leaks,CH_4}$ = The annual quantity of methane emissions attributable to components involved in the useful purpose or reinjection of the increased volume of natural gas resulting from methane emissions mitigation implementation as reported pursuant to § 98.236(r) of this chapter for the reporting year, mt CH₄.

$Count_p$ = For each component type, "p", listed in § 98.233(r)(2) of this chapter that was involved in the useful purpose or reinjection, count the number of components of that type.

$EF_p$ = The population emission factor for the component type, "p", as listed in § 98.233(r)(2) of this chapter.

$M_{CH4}$ = The mole fraction of CH₄ in produced gas for the sub-basin in which the useful purpose or reinjection occurred, as reported pursuant to § 98.236(aa)(1)(ii)(I) of this chapter, unitless. For RY2024, if multiple sub-basins are impacted by the unreasonable delay, use the flow-weighted average mole fraction.

T = The time period of the eligible delay within the reporting year, as determined in accordance with § 99.32(a), days.

24 = Conversion from days to hours.

$P_{CH4}$ = Density of methane, 0.0192 mt/Mscf.

$10^{-3}$ = Conversion factor from scf to Mscf.

### § 99.33 What are the recordkeeping requirements for methane emissions caused by an unreasonable delay in environmental permitting of gathering or transmission infrastructure?

(a) If the WEC obligated party, or its subsidiaries, is the entity seeking the environmental permit, for each communication the entity seeking the environmental permit has had with the permitting authority regarding the permit application:

(1) The date and type of communication.

(2) The date of the facility's response to the communication.

(3) Information on whether the facility's response included modification to the permit application.

(b) Records of values used and any information relied upon in the calculation of the emissions attributable to the unreasonable delay in § 99.32(c).

(c) For any volumes of gas determined under § 99.32(b) that were not directly measured, an explanation of how company records, engineering estimation, and/or best available information were used to determine the gas volume.

(d) A list of all applicable local, State, and Federal regulations the WEC obligated party certified compliance with, as required in § 99.31(b)(11), regarding emissions from the activities listed in § 99.30(d) that occurred as a result of a delay in environmental permitting of gathering or transmission infrastructure.

## Subpart D—Regulatory Compliance Exemption

### § 99.40 When is the regulatory compliance exemption available, and under what conditions does the exemption cease to be available?

(a) The requirements of this subpart only apply to a WEC applicable facility when the total facility applicable emissions for that WEC applicable facility as calculated in accordance with § 99.21(a) exceed 0 mt CH₄.

(b) The requirements of § 99.41 shall only be available when the conditions of paragraphs (b)(1) through (3) of this section are met. The Administrator shall make the determinations referenced in conditions (b)(1) and (2) of this section simultaneously for each individual State or Tribal lands in a single administrative action.

(1) A determination has been made by the Administrator that methane emissions standards and plans pursuant to subsections (b) and (d) of section 111 of the CAA have been approved and are in effect in all the State(s) or Tribal lands in which the WEC applicable facility is located; and

(2) A determination has been made by the Administrator that the emissions reductions achieved by compliance with the requirements described in paragraph (b)(1) of this section will result in equivalent or greater emissions reductions as would be achieved by the proposed rule of the Administrator entitled 'Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review' (86 FR 63110; November 15, 2021), if such rule had been finalized and implemented. For purposes of this equivalency determination, the comparison will be made between the emissions reductions that would have been achieved if the proposed rule was finalized and implemented in each State or Tribal lands as proposed, and the emissions reductions that will be achieved when the final standards and plans are actually implemented in each State.

(3) The final compliance date, which is the date at which all affected facilities and all designated facilities become subject to all of the final methane emissions standards established pursuant to CAA section 111(b) or (d), as applicable, has passed in the State(s) or Tribal lands in which the WEC applicable facility is located.

(c) At such time that the conditions specified in paragraphs (b)(1) through (3) of this section are met, the reporting requirements of § 99.42 shall come into effect beginning with the WEC filing due on the date specified in § 99.5 for the calendar year following the calendar year in which all of the conditions were met. Imposition of the waste emission charge shall not be made on the emissions from an applicable facility meeting the requirements for regulatory compliance exemption and electing to claim such exemption for methane emissions that occurred during the

calendar year during which the conditions of paragraphs (b)(1) through (3) of this section are met.

(d) If any of the conditions in paragraph (b)(1) or (2) of this section cease to apply after the Administrator has made the determinations in paragraphs (b)(1) and (2) of this section for the State(s) or Tribal lands in which the WEC applicable facility is located, the reporting requirements of § 99.42 shall cease to be in effect for the WEC applicable facility beginning with the WEC filing due on the date specified in § 99.5 for the calendar year during which either of the conditions were no longer met. The reporting requirements of § 99.42 shall cease to be in effect until the conditions of paragraph (e) of this section are met.

(e) The reporting requirements of § 99.42 will again come into effect at such time that a subsequent determination is made by the Administrator that the conditions in paragraphs (b)(1) and (2) of this section apply for the State(s) or Tribal lands in which the WEC applicable facility is located, and after the final compliance date specified in paragraph (b)(3) of this section. The reporting requirements of § 99.42 will again come into effect in accordance with the timing specified in paragraph (c) of this section until such time the conditions of paragraph (d) of this section apply.

### § 99.41 Which facilities qualify for the exemption for regulatory compliance?

(a) The total facility applicable emissions for the WEC applicable facility as calculated in accordance with § 99.21(a) must exceed 0 mt.

(b) The WEC applicable facility must be located in a State(s) or Tribal lands for which the conditions specified in § 99.40 were met for the reporting year. For WEC applicable facilities in the onshore petroleum and natural gas production or onshore petroleum and natural gas gathering and boosting industry segments, as those industry segment terms are defined in § 98.230 of this chapter, a WEC applicable facility is considered to be located in each State or Tribal lands within which a well-pad site or gathering and boosting site, as applicable, was reported pursuant to §§ 98.236(aa)(1)(iv)(C) or (aa)(10)(v)(E) of this chapter, as applicable, for the reporting year. For WEC applicable facilities that are located in more than one State or Tribal lands, the conditions specified in § 99.40 must be met for each State or Tribal lands.

(c) The WEC applicable facility must contain one or more affected facilities or one or more designated facilities.

(d) For WEC applicable facilities meeting the eligibility criteria of paragraphs (a) through (c) of this section for which the WEC obligated party elects to claim for exemption any emissions related to regulatory compliance, the quantity of methane emissions attributable to regulatory compliance must be determined pursuant to § 99.43. To qualify for exemption of all emissions under the regulatory compliance exemption all affected facilities and all designated facilities that are located at the WEC applicable facility (or the well-pad site or gathering and boosting site, if applicable) must meet the conditions specified in paragraphs (d)(1) and (2) of this section during each calendar quarter (*i.e.,* January 1–March 31) of the reporting year for which the exemption is being claimed.

(1) For all affected facilities and all designated facilities located at the WEC applicable facility (or the well-pad site or gathering and boosting site, if applicable) no deviations or violations of the monitoring requirements, emission limits or standards (or surrogate parameters), operating limits (including operating parameter limits), or work practice standards were identified in compliance reports of the methane emissions requirements of part 60 of this chapter and the methane emissions requirements of an applicable approved State, Tribal, or Federal plan in part 62 of this chapter during the reporting year.

(2) For all affected facilities and all designated facilities located at the WEC applicable facility (or the well-pad site or gathering and boosting site, if applicable) no violations, as determined either through an administrative action taken by the Administrator or delegated agency or through a judicial action, of any requirements of part 60 of this chapter and the methane emissions requirements of an applicable approved State, Tribal, or Federal plan in part 62 of this chapter during the reporting year.

(e) For purposes of this part, the phrase "affected facility(ies) or designated facility(ies) that are located at the WEC applicable facility" means the affected facility(ies) or designated facility(ies) that was (were) part of the WEC applicable facility as of December 31 of the reporting year as well as any facility(ies) that was (were) decommissioned during the reporting year without being transferred to another facility.

### § 99.42 What are the reporting requirements for the exemption for regulatory compliance?

(a) *Facilities that qualify to report.* For a WEC applicable facility that meets each of the criteria described in § 99.41(a) through (d) and elects to claim for exemption any emissions related to regulatory compliance, report the information as described in paragraphs (b) through (h) of this section, as applicable. The regulatory compliance exemption information shall be submitted as described in § 99.7.

(b) *Submission of reports.* For each WEC applicable facility report all of the information specified in paragraphs (b)(1) through (6) of this section, as applicable.

(1) For each WEC applicable facility, the final compliance date as determined in accordance with § 99.40(b)(3) and a certification that the facility meets all of the eligibility criteria in § 99.41.

(2) The ICIS–AIR ID (or Facility Registry Service (FRS) ID if the ICIS–AIR ID is not available) and the EPA Registry ID from CEDRI associated with each affected facility and designated facility that are located at the WEC applicable facility. For WEC applicable facilities in the onshore petroleum and natural gas production or onshore petroleum and natural gas gathering and boosting industry segments, as those industry segment terms are defined in § 98.230 of this chapter, indicate the well-pad site ID(s) or gathering and boosting site ID(s), as reported to § 98.236 of this chapter, that is/are part of each affected facility and/or designated facility.

(3) If a report, or reports, prepared and submitted in accordance with part 60 of this chapter, or an applicable approved State, Tribal, or Federal plan under part 62 of this chapter that implements the emission guidelines contained in part 60 of this chapter, cover the complete reporting year (*i.e.,* January 1 through December 31, inclusive), then submit as attachment(s) the applicable report(s). This report, or reports, must include all affected facilities or designated facilities that are located at the WEC applicable facility.

(4) If a report, or reports, prepared and submitted in accordance with part 60 of this chapter, or an applicable approved State, Tribal, or Federal plan under part 62 of this chapter that implements the emission guidelines contained in part 60 of this chapter, does not cover the complete reporting year (*i.e.,* January 1 through December 31, inclusive), then submit as attachment(s) the applicable report(s). This report, or reports, must include all affected facilities or

designated facilities that are located at the WEC applicable facility.

(5) For each report submitted under this section, provide an indication of whether the report indicates that at least one of the affected facilities subject to the requirements of part 60 of this chapter or designated facilities subject to the requirements of an applicable approved State, Tribal, or Federal plan in part 62 of this chapter that is contained within the WEC applicable facility does not meet the conditions of § 99.41(d)(1) or (2).

(6) For each report submitted under this section, indicate if the report includes one or more affected facilities or designated facilities that are not located at the WEC applicable facility. If so, indicate each such affected facility or designated facility. For each affected facility or designated facility, indicate if the affected or designated facility was part of the WEC applicable facility for part of the reporting year and transferred to another facility prior to December 31 of the reporting year or if the affected or designated facility was not part of the WEC applicable at any time during the reporting year.

(c) *Submission of incomplete or partial year reports.* If, pursuant to paragraph (b)(4) of this section, you are unable to provide an annual report covering the entire reporting year at the time of the initial submittal specified in § 99.5 for each affected facility or designated facility at the WEC applicable facility, you must provide a certification of the compliance status for each such affected facility or designated facility for the duration of time not covered by a report submitted pursuant to paragraph (b)(4) of this section. Additionally, you must provide a revised WEC filing within 30 calendar days of the date that an annual report covering the entire reporting year is required to be submitted under the applicable requirements of part 60 of this chapter or an applicable approved State, Tribal, or Federal plan in part 62 of this chapter. This requirement also applies in the case where the initial WEC filing contains an annual report covering only a portion of the reporting year. Within 30 calendar days of the date that an annual report is due under the applicable requirements of part 60 of this chapter or an applicable approved State, Tribal, or Federal plan in part 62 of this chapter for the portion of the reporting year for which a previously submitted report does not cover, you must provide a revised WEC filing including the subsequent annual report. The resubmission of the revised WEC filing shall be considered timely under this paragraph (c) if it is made within 30

calendar days of the date that the annual report is due under the applicable requirements of part 60 of this chapter or an applicable approved State, Tribal, or Federal plan in part 62 of this chapter. In such cases where a newly available report indicates that an affected facility or designated facility does not meet the conditions of § 99.41(d)(1) or (2) that were not previously indicated in the WEC filing for the reporting year (*i.e.,* the WEC applicable facility would no longer qualify for the regulatory compliance exemption for the given calendar quarter(s)), a WEC applicable facility would be required to complete the reporting requirements in § 99.42(d) and (e), as applicable, in the revised WEC filing and the emissions attributable to regulatory compliance exemption must be recalculated pursuant to § 99.43. The WEC obligated party must determine the WEC applicable emissions for the WEC applicable facility pursuant to subpart B of this part and follow the provisions of § 99.7(e) regarding WEC filing revisions and § 99.8(d) regarding resubmittals that result in a change in WEC obligation.

(d) *For reports that indicate a deviation or violation.* For each report submitted pursuant to paragraphs (b) and (c) of this section that indicates that at least one of the affected facilities subject to the requirements of part 60 of this chapter or designated facilities subject to the requirements of an applicable approved State, Tribal, or Federal plan in part 62 of this chapter that is contained within the WEC applicable facility does not meet the conditions for the exemption of all emissions in § 99.41(d)(1) and (2), report the following:

(1) The ICIS–AIR ID (or FRS ID if the ICIS–AIR ID is not available) and the EPA Registry ID from CEDRI associated with each affected facility and designated facility in the report that indicated a deviation or violation. For WEC applicable facilities in the onshore petroleum and natural gas production or onshore petroleum and natural gas gathering and boosting industry segments, as those industry segment terms are defined in § 98.230 of this chapter, indicate the well-pad site ID(s) or gathering and boosting site ID(s), as reported to § 98.236 of this chapter, that is/are part of each affected facility and/or designated facility in the report that indicated a deviation or violation.

(2) For each calendar quarter during the reporting year report whether the conditions in § 99.41(d)(1) or (2) were met. For example, a report in which the only deviation indicated lasted from March 1 to April 30 in the reporting year would be reported as the first (*i.e.,*

January to March) and second (*i.e.,* April to June) that the conditions in § 99.41(d)(1) or (2) were not met, and report for the third (*i.e.,* July to September) and fourth (*i.e.,* October to December) calendar quarters that the conditions were met.

(e) *Reporting for other large release events.* For a WEC applicable facility that reported one or more other large release events pursuant to § 98.236(y) of this chapter in the reporting year that occurred within or overlapped with a calendar quarter in which a deviation or violation was reported pursuant to paragraph (d) of this section, for each other large release event that occurred within or overlapped a quarter in which the conditions in § 99.41(d)(1) or (2) were not met report the information specified in paragraphs (e)(1) and (2) of this section.

(1) The unique release event identification number associated with the release event as reported pursuant to § 98.236(y)(2) of this chapter.

(2) The duration of the release event, based upon the start date and duration reported to § 98.236(y)(4) of this chapter, that occurred during calendar quarters in which the conditions in § 99.41(d)(1) or (2) were not met for any affected or designated facilities located at the WEC applicable facility, in days. For example, for a release event that lasted from March 1 to April 14 (*i.e.,* a total event duration of 45 days) at a WEC applicable facility in which there were reported deviations or violations in only the first calendar quarter (January through March, inclusive), the value reported under this paragraph would be 31 days.

(f) *Determination of compliance.* A WEC applicable facility's eligibility for the regulatory compliance exemption pursuant to this subpart does not constitute a determination of compliance for part 60 of this chapter, or an applicable approved State, Tribal, or Federal plan under part 62 of this chapter that implements the emission guidelines contained in part 60 of this chapter, for any affected facility or designated facility present at the applicable facility.

(g) *Administrator or delegated authority determination of non-compliance.* A WEC applicable facility's eligibility for the regulatory compliance exemption during a given reporting year does not preclude reassessment of applicable WEC obligation for that applicable facility upon any determination by the Administrator or a delegated authority of any noncompliance with respect to any applicable methane requirements pursuant to part 60 of this chapter, or

an applicable approved State, Tribal, or Federal plan under part 62 of this chapter that implements the emission guidelines contained in part 60 of this chapter, for the affected facilities or designated facilities present at the applicable facility.

(h) *Reporting of quantification parameters.* Report the following information used to quantify methane emissions to be exempted due to the regulatory compliance exemption as specified in § 99.43.

(1) For a WEC applicable facility in the onshore petroleum and natural gas production or onshore petroleum and natural gas gathering and boosting industry segment, as those industry segment terms are defined in § 98.230 of this chapter, report:

(i) The quantity of methane emissions at the WEC applicable facility qualifying for regulatory compliance exemption, in mt $CH_4$, as determined using equation D–1A of § 99.43(b)(1) ($E_{RCE,CH4}$)

(ii) The total quantity of methane emissions that qualified for exemption under both the regulatory compliance exemption and another exemption, in mt $CH_4$, as determined using equation D–2A of § 99.43(c)(1) ($E_{OtherExempt}$)

(iii) For each well-pad site or gathering and boosting site, as applicable, that was reported pursuant to § 98.236(aa)(1)(iv) or (aa)(10)(v) of this chapter, as applicable, for the reporting year, report:

(A) The well-pad site ID(s) or gathering and boosting site ID(s), as reported to § 98.236(aa)(1)(iv)(A) or (aa)(10)(v)(A) of this chapter, as applicable.

(B) An indication of whether any affected facilities or designated facilities at the site did not meet the conditions for the exemption of all emissions in § 99.41(d)(1) and (2) during the reporting year.

(C) If you report to paragraph (h)(1)(iii)(B) of this section that there were periods of time during which any affected facilities or designated facilities at the site did not meet the conditions for the exemption of all emissions in § 99.41(d)(1) and (2), for each calendar quarter in the reporting year report whether the conditions for the exemption of all emissions in § 99.41(d)(1) and (2) were met. For example, if the only deviation for any affected facilities or designated facilities at the site lasted from March 1 to April 30 report for the first (*i.e.,* January to March) and second (*i.e.,* April to June) that the conditions in § 99.41(d)(1) or (2) were not met, and report for the third (*i.e.,* July to September) and fourth (*i.e.,* October to December) calendar quarters that the conditions were met.

(D) If there were multiple reports submitted pursuant to paragraphs (b)(3) and (4) of this section for an individual well-pad site (for the onshore petroleum and natural gas production industry segment) or individual gathering and boosting site (for the onshore petroleum and natural gas gathering and boosting industry segment), the calendar quarters reported pursuant to paragraph (h)(1)(iii)(C) of this section must reflect the periods of time in which the conditions in § 99.41(d)(1) or (2) were met for the well-pad site or gathering and boosting site, as applicable, in its entirety. For example, if two reports were submitted that together represent all of the affected and designated facilities at a well-pad site, and one report indicates deviation during only the first calendar quarter (*i.e.,* January to March) while the other report indicates deviation during only the second calendar quarter (*i.e.,* April to June), the information reported would be that for the first (*i.e.,* January to March) and second (*i.e.,* April to June) calendar quarters the conditions in § 99.41(d)(1) or (2) were not met, and for the third (*i.e.,* July to September) and fourth (*i.e.,* October to December) calendar quarters that the conditions were met.

(2) For a WEC applicable facility in an industry segment other than the onshore petroleum and natural gas production or onshore petroleum and natural gas gathering and boosting industry segment, as those industry segment terms are defined in § 98.230 of this chapter, report:

(i) The quantity of methane emissions at the WEC applicable facility qualifying for regulatory compliance exemption, in mt $CH_4$, as determined using equation D–1B of § 99.43(b)(2) ($E_{RCE,CH4}$)

(ii) The total quantity of methane emissions that qualified for exemption under both the regulatory compliance exemption and another exemption, in mt $CH_4$, as determined using equation D–2B of § 99.43(c)(2) ($E_{OtherExempt}$).

(iii) An indication of whether any affected facilities or designated facilities at the facility did not meet the conditions for the exemption of all emissions in § 99.41(d)(1) and (2) during the reporting year.

(iv) If you report to paragraph (h)(2)(iii) of this section that there were periods of time during which any affected facilities or designated facilities at the site did not meet the conditions for the exemption of all emissions in § 99.41(d)(1) and (2), for each calendar quarter in the reporting year report whether the conditions for the exemption of all emissions in § 99.41(d)(1) and (2) were met. For example, if the only deviation for any affected facilities or designated facilities at the facility lasted from March 1 to April 30 report for the first (*i.e.,* January to March) and second (*i.e.,* April to June) that the conditions in § 99.41(d)(1) or (2) were not met, and report for the third (*i.e.,* July to September) and fourth (*i.e.,* October to December) calendar quarters that the conditions were met.

(v) If there were multiple reports submitted pursuant to paragraphs (b)(3) and (4) of this section for the WEC applicable facility, the calendar quarters reported pursuant to paragraph (h)(2)(iv)(C) must reflect the periods of time in which the conditions in § 99.41(d)(1) or (2) were met for the WEC applicable facility in its entirety. For example, if two reports were submitted that together represent all of the affected and designated facilities at a well-pad site, and one report indicates deviation during only the first calendar quarter (*i.e.,* January to March) while the other report indicates deviation during only the second calendar quarter (*i.e.,* April to June), the information reported would be that for the first (*i.e.,* January to March) and second (*i.e.,* April to June) calendar quarters the conditions in § 99.41(d)(1) or (2) were not met, and for the third (*i.e.,* July to September) and fourth (*i.e.,* October to December) calendar quarters that the conditions were met.

### § 99.43 How are the emissions qualifying for regulatory compliance exemption in the reporting year quantified?

(a) If the WEC applicable facility qualified for regulatory compliance exemption pursuant to § 99.41(d) for the entire reporting year, the quantity of methane emissions attributable to the regulatory compliance ($E_{RCE,CH4}$) is equal to the total facility applicable emissions calculated using equation B–6 of this part. For WEC applicable facilities in the onshore petroleum and natural gas production or onshore petroleum and natural gas gathering and boosting industry segments, as those industry segment terms are defined in § 98.230 of this chapter, the WEC applicable facility shall be considered to have qualified for the regulatory compliance exemption pursuant to § 99.41(d) for the entire reporting year if each well-pad site or gathering and boosting site, as applicable, located at the WEC applicable facility qualified for regulatory compliance exemption pursuant to § 99.41(d) for the entire reporting year.

(b) If the WEC applicable facility qualified for regulatory compliance exemption pursuant to § 99.41(d) for only part of the reporting year or for only a portion of sites for WEC

applicable facilities in the onshore petroleum and natural gas production or onshore petroleum and natural gas gathering and boosting industry segments, as those industry segment terms are defined in § 98.230 of this chapter, calculate the qualifying emissions according to the method in paragraph (b)(1) or (2) of this section, as applicable.

(1) If the WEC applicable facility is in the onshore petroleum and natural gas production or onshore petroleum and natural gas gathering and boosting industry segment, as those industry segment terms are defined in § 98.230 of this chapter, calculate the emissions qualifying for regulatory compliance exemption using equation D–1A of this section. If the result of equation D–1A of this section is less than 0 mt $CH_4$, the emissions qualifying for regulatory compliance exemption are equal to 0 mt $CH_4$.

$$E_{RCE,CH_4} = E_{TFA,CH_4} - \sum_{i=1}^{M}\left[\left(E_{NCS,i} \times \frac{(4-T_i)}{4}\right) + \sum_{j=1}^{N}\left(E_{NCS\text{-}OLRE,j} \times \frac{T_{OLRE\text{-}RCE,j}}{T_{OLRE,j}}\right)\right] - E_{OtherExempt} \qquad \text{(Eq. D-1A)}$$

Where:

$E_{RCE,CH4}$ = The quantity of methane emissions, as determined in subpart D of this part, at the WEC applicable facility qualifying for regulatory compliance exemption subject to the applicability provisions of § 99.41, mt $CH_4$.

$E_{TFA,CH4}$ = The annual methane emissions equal to, below, or exceeding the waste emissions threshold for a WEC applicable facility prior to consideration of any applicable exemptions (*i.e.*, total facility applicable emissions) as determined in equation B–6 of § 99.21, mt $CH_4$.

M = Total number of sites that did not qualify for regulatory compliance exemption for the entire calendar year.

$E_{NCS,i}$ = The total methane emissions reported pursuant to § 99.7(b)(2)(ix) for the reporting year, excluding methane emissions from other large release events reported pursuant to § 98.236(y)(10) of this chapter, for each well-pad or gathering and boosting site that did not qualify for regulatory compliance exemption for the entire year, *i*, mt $CH_4$.

$T_j$ = Time that the site, *i*, qualified for regulatory compliance exemption as reported pursuant to § 99.42(h), in calendar quarters.

4 = Number of calendar quarters per year.

N = Total number of other large release events reported pursuant to § 99.42(e) for the reporting year for the well-pad or gathering and boosting site that did not qualify for regulatory compliance exemption for the entire year, *i*.

$E_{NCS\text{-}OLRE,j}$ = The methane emissions from each other large release event that occurred during or overlapped with a calendar quarter in which the well-pad or gathering and boosting site that did not qualify for regulatory compliance exemption, *j*, for each well-pad or gathering and boosting site that did not qualify for regulatory compliance exemption for the entire year, *i*, mt $CH_4$.

$T_{OLRE\text{-}RCE,j}$ = Duration of the other large release event, *j*, that occurred during periods of time in which the WEC applicable facility did not qualify for regulatory compliance exemption as reported pursuant to § 99.42(e), in days.

$T_{OLRE,j}$ = Duration of the other large release event, *j*, based upon the value pursuant to § 98.236(y)(4) of this chapter, in days. For purposes of this part, the duration of the other large release event includes each calendar day during which the release occurred, inclusive.

$E_{OtherExempt}$ = The total quantity of methane emissions that qualified for exemption under both the regulatory compliance exemption and another exemption, as determined using equation D–2A of this section, for the reporting year, mt $CH_4$.

(2) If the WEC applicable facility is in an industry segment other than the onshore petroleum and natural gas production or onshore petroleum and natural gas gathering and boosting industry segment, as those industry segment terms are defined in § 98.230 of this chapter, calculate the emissions qualifying for regulatory compliance exemption using equation D–1B of this section. If the result of equation D–1B of this section is less than 0 mt $CH_4$, the emissions qualifying for regulatory compliance exemption are equal to 0 mt $CH_4$.

$$E_{RCE,CH_4} = E_{TFA,CH_4} - \left(E_{WAF} \times \frac{(4-T)}{4}\right) - \sum_{j=1}^{N}\left(E_{WAF\text{-}OLRE,j} \times \frac{T_{OLRE\text{-}RCE,j}}{T_{OLRE,j}}\right) - E_{OtherExempt} \qquad \text{(Eq. D-1B)}$$

Where:

$E_{RCE,CH4}$ = The quantity of methane emissions, as determined in subpart D of this part, at the WEC applicable facility qualifying for regulatory compliance exemption subject to the applicability provisions of § 99.41, mt $CH_4$.

$E_{TFA,CH4}$ = The annual methane emissions equal to, below, or exceeding the waste emissions threshold for a WEC applicable facility prior to consideration of any applicable exemptions (*i.e.*, total facility applicable emissions) as determined in equation B–6 of § 99.21, mt $CH_4$.

$E_{WAF}$ = The total methane emissions reported pursuant to § 99.7(b)(2)(ix) for the reporting year, excluding methane emissions from other large release events reported pursuant to § 98.236(y)(10) of this chapter, for the WEC applicable facility, mt $CH_4$.

T = Time that the WEC applicable facility qualified for regulatory compliance exemption as reported pursuant to § 99.42(h), in calendar quarters.

N = Total number of other large release events reported pursuant to § 99.42(e) for the reporting year for the WEC applicable facility.

$E_{WAF\text{-}OLRE,j}$ = The methane emissions from each other large release event that occurred during or overlapped with a calendar quarter in which the WEC applicable facility did not qualify for regulatory compliance exemption, *j*, for the reporting year for the WEC applicable facility, mt $CH_4$.

$T_{OLRE\text{-}RCE,j}$ = Duration of the other large release event, *j*, that occurred during periods of time in which the WEC applicable facility did not qualify for regulatory compliance exemption as reported pursuant to § 99.42(e), in days.

$T_{OLRE,j}$ = Duration of the other large release event, *j*, based upon the value pursuant to § 98.236(y)(4) of this chapter, in days. For purposes of this part, the duration of the other large release event includes each calendar day during which the release occurred, inclusive.

$E_{OtherExempt}$ = The total quantity of methane emissions that qualified for exemption under both the regulatory compliance exemption and another exemption, as determined using equation D–2B of this section, for the reporting year, mt $CH_4$.

(c) If the WEC applicable facility qualified for regulatory compliance

exemption pursuant to § 99.41(d) for only part of the reporting year and qualified to claim for exemption emissions under § 99.30 and/or § 99.50, the total quantity of methane emissions that qualified for exemption under both the regulatory compliance exemption and another exemption must be calculated according to the applicable method in paragraph (c)(1) or (2).

(1) If the WEC applicable facility is in the onshore petroleum and natural gas production, as that industry segment term is defined in § 98.230 of this chapter, equation D–2A must be used to calculate the quantity of methane emissions that qualified for exemption under both the regulatory compliance exemption and another exemption.

$$E_{OtherExempt} = \sum_{i=1}^{M}\left(E_{Delay,CS,i} + E_{Plug,CS,i}\right) + \sum_{j=1}^{N}\left[\left(E_{Plug,NCS,j} \times \frac{T_j}{4}\right) + \left(E_{Delay,NCS_j} \times \frac{T_{Delay-RCE,j}}{T_{Delay}}\right)\right] \qquad \text{(Eq. D-2A)}$$

Where:

$E_{OtherExempt}$ = The total quantity of methane emissions that qualified for exemption under both the regulatory compliance exemption and another exemption for the reporting year, mt CH$_4$.

M = Total number of well-pad sites that qualified for regulatory compliance exemption for the entire calendar year.

$E_{Delay,CS,i}$ = The quantity of methane emissions exempted due to an unreasonable delay in environmental permitting of gathering or transmission infrastructure, as determined in equation C–4 of § 99.32(c), at the WEC applicable facility from a well-pad site, $i$, that qualified for regulatory compliance exemption for the entire year, mt CH$_4$.

$E_{Plug,CS,i}$ = The quantity of methane emissions exempted due to wells that were permanently shut-in and plugged, as determined in equation E–7 of § 99.52(c), at the WEC applicable facility from a well-pad site, $i$, that qualified for regulatory compliance exemption for the entire year, mt CH$_4$.

N = Total number of well-pad sites that did not qualify for regulatory compliance exemption for the entire calendar year.

$E_{Plug,NCS,j}$ = The quantity of methane emissions exempted due to wells that were permanently shut-in and plugged, as determined in equation E–7 of § 99.52(c), at the WEC applicable facility from a well-pad site, $j$, that did not qualify for regulatory compliance exemption for the entire year, mt CH$_4$.

$T_j$ = Time that the site, $j$, at the WEC applicable facility qualified for regulatory compliance exemption as reported pursuant to § 99.42(h), in calendar quarters.

$E_{Delay,NCS,j}$ = The quantity of methane emissions exempted due to an unreasonable delay in environmental permitting of gathering or transmission infrastructure, as determined in equation C–4 of § 99.32(c), at the WEC applicable facility from a well-pad site, $j$, that did not qualify for regulatory compliance exemption for the entire year, mt CH$_4$.

$T_{Delay-RCE,j}$ = Duration of time during the reporting year that an eligible delay limited the offtake of increased volume associated with methane emissions mitigation activities that occurred during periods of time in which the well-pad site, $j$, at the WEC applicable facility qualified for regulatory compliance exemption, in days. Determine this value using the beginning and ending dates for the eligible delay as reported pursuant to § 99.31(b)(8) and the calendar quarters that the well-pad site, $j$, at the WEC applicable facility qualified for regulatory compliance exemption as reported pursuant to § 99.42(d).

$T_{Delay}$ = Duration of time during the reporting year that an eligible delay limited the offtake of increased volume associated with methane emissions mitigation activities, in days. Determine this value using the beginning and ending dates for the eligible delay as reported pursuant to § 99.31(b)(8), inclusive.

(2) If the WEC applicable facility is in an industry segment other than the onshore petroleum and natural gas production industry segment, as that industry segment term is defined in § 98.230 of this chapter, equation D–2B must be used to calculate the quantity of methane emissions that qualified for exemption under both the regulatory compliance exemption and another exemption.

$$E_{OtherExempt} = \left(E_{Plug,CH_4} \times \frac{T}{4}\right) + \left(E_{Delay,CH_4} \times \frac{T_{Delay-RCE}}{T_{Delay}}\right) \qquad \text{(Eq. D-2B)}$$

Where:

$E_{OtherExempt}$ = The total quantity of methane emissions that qualified for exemption under both the regulatory compliance exemption and another exemption for the reporting year, mt CH$_4$.

$E_{Plug,CH_4}$ = The total quantity of methane emissions, as determined in equation E–7 of § 99.52(c), at the WEC applicable facility attributable to all wells that were permanently shut-in and plugged during the reporting year meeting the applicability provisions of § 99.50, mt CH$_4$.

T = Time that the WEC applicable facility qualified for regulatory compliance exemption as reported pursuant to § 99.42(d), in calendar quarters

$E_{Delay,CH_4}$ = The quantity of methane emissions exempted, as determined in equation C–1 of § 99.32(c), at the WEC applicable facility due to an unreasonable delay in environmental permitting of gathering or transmission infrastructure meeting the applicability provisions of § 99.30, mt CH$_4$.

$T_{Delay-RCE}$ = Duration of time during the reporting year that an eligible delay limited the offtake of increased volume associated with methane emissions mitigation activities that occurred during periods of time in which the WEC applicable facility qualified for regulatory compliance exemption, in days. Determine this value using the beginning and ending dates for the eligible delay as reported pursuant to § 99.31(b)(8) and the calendar quarters that the WEC applicable facility qualified for regulatory compliance exemption as reported pursuant to § 99.42(d).

$T_{Delay,j}$ = Duration of time during the reporting year that an eligible delay limited the offtake of increased volume associated with methane emissions mitigation activities, in days. Determine this value using the beginning and ending dates for the eligible delay as reported pursuant to § 99.31(b)(8), inclusive.

(d) If the WEC applicable facility did not qualify for regulatory compliance exemption pursuant to § 99.41(d) for any portion of the reporting year, the quantity of methane emissions attributable to the regulatory compliance exemption ($E_{RCE,CH4}$) is equal to 0.

## Subpart E—Exemption for Permanently Shut-in and Plugged Wells

### § 99.50 What facilities qualify for the exemption of emissions from permanently shut-in and plugged wells?

(a) The total applicable emissions for the WEC applicable facility containing permanently shut-in and plugged wells must exceed 0 mt as calculated in accordance with § 99.21(a).

(b) This exemption is applicable to WEC applicable facilities in the onshore petroleum and natural gas production, offshore petroleum and natural gas production, or underground natural gas storage industry segments, as those industry segment terms are defined in § 98.230 of this chapter, that permanently shut-in and plug one or more wells during the reporting year.

(c) For the purposes of applying this exemption, a permanently shut-in and plugged well is one that has been permanently sealed, following all applicable local, State, or Federal regulations in the jurisdiction where the well is located, to prevent any potential future leakage of oil, gas, or formation water into shallow sources of potable water, onto the surface, or into the atmosphere. Site reclamation following placement of a metal plate or cap is not required to be completed for the well to be considered permanently shut-in and plugged for the purposes of this part.

### § 99.51 What are the reporting requirements for the exemption for wells that were permanently shut-in and plugged?

(a) For a WEC applicable facility meeting the applicability provisions of § 99.50, you may elect to report information regarding an exemption for wells that were permanently shut-in and plugged. The exemption information to be reported is described in paragraph (b) of this section. The exemption information shall be submitted as described § 99.7.

(b) Report the following information for each well meeting the applicability provisions of § 99.50 that was permanently shut-in and plugged in the reporting year.

(1) Well ID number as reported in part 98, subpart W of this chapter. If no well ID number is reported for the well to part 98, subpart W, report the well ID number as defined in this part.

(2) Date the well was permanently shut-in and plugged, which for the purposes of this exemption, is the date when welding or cementing of a metal plate or cap onto the casing end was completed.

(3) The statutory citation for each applicable State, local, and Federal regulation stipulating requirements that were applicable to the closure of the permanently shut-in and plugged well.

(4) A certification that the requirements in each of the applicable State, local, and Federal regulations identified in paragraph (b)(3) of this section were followed.

(5) If the WEC applicable facility is in the onshore petroleum and natural gas production or underground natural gas storage industry segment and the WEC obligated party calculated methane emissions attributable to the well from wellhead equipment leaks using the methods in § 99.52(b)(5) of this section, you must indicate the method used to calculate equipment leak emissions attributable to the well (i.e., § 99.52(b)(5)(i), (ii), or (iii)). For a WEC applicable facility in the underground natural gas storage industry segment, you must also report the information specified in paragraphs (b)(5)(i) through (iv) of this section, as applicable. For a WEC applicable facility in the onshore petroleum and natural gas production industry segment, you must also report the information specified in paragraphs (b)(5)(i) through (iii) of this section, as applicable. All WEC applicable facilities must report the information specified in paragraph (b)(5)(v).

(i) If the method in § 99.52(b)(5)(i) is used to calculate equipment leak emissions attributable to the well, you must report the following information for each leak: the leak detection survey method used, the component type as reported in § 98.236(q) of this chapter, the volumetric flow rate of the natural gas leak in standard cubic feet per hour and the duration of the measured leak as determined in accordance § 99.52(b)(5)(i), in hours.

(ii) If the method in § 99.52(b)(5)(ii) is used to calculate equipment leak emissions attributable to the well, you must report the following information for each component identified as leaking: the leak detection survey method used, the component type as specified in § 98.233(q)(2)(iii) or (vii) of this chapter, as applicable, and the time the surveyed component is assumed to be leaking and operational as determined in accordance § 99.52(b)(5)(ii), in hours.

(iii) If the method in § 99.52(b)(5)(iii) is used to calculate equipment leak emissions attributable to the well, you must report the counts of each component type listed in § 98.233(r)(3) of this chapter that are associated with the well, as applicable.

(iv) Indicate whether you used the default concentration of $CH_4$ (0.975) or

a facility-specific $CH_4$ concentration in the total hydrocarbon of the feed natural gas. If you used the facility-specific $CH_4$ concentration in the total hydrocarbon of the feed natural gas, report the value.

(v) The quantity of methane emissions attributable to the well from wellhead equipment leaks as calculated in accordance with § 99.52(b)(5)(i), (b)(5)(ii), or (b)(5)(iii), as applicable, for the reporting year, in metric tons $CH_4$.

(6) If the WEC applicable facility is in the onshore petroleum and natural gas production and calculated methane emissions attributable to the well from associated gas flaring and completions and workovers with hydraulic fracturing and with flaring using equation E–6 of this section, you must report the information specified in paragraphs (b)(6)(i) and (ii) of this section.

(i) The volume of gas sent to the flare from the plugged well, in thousand scf.

(ii) The quantity of methane emissions attributable to the well from associated gas flaring and from completions and workovers with hydraulic fracturing and with flaring as calculated in accordance with § 99.52(b)(6), as applicable, in metric tons $CH_4$.

(7) The emissions attributable to the well calculated using equation E–1, E–2, E–3, or E–4 in § 99.52(b), as applicable, in metric tons $CH_4$.

(c) The total quantity of methane emissions attributable to all wells that were permanently shut-in and plugged at a WEC applicable facility meeting the applicability provisions of § 99.50 during the reporting year, calculated using equation E–7 in § 99.52(c), in metric tons $CH_4$.

### § 99.52 How are the net emissions attributable to all wells at a WEC applicable facility that were permanently shut-in and plugged in the reporting year quantified?

(a) For the purposes of this section, the following source types (as specified in part 98, subpart W of this chapter) constitute emissions directly attributable to an onshore petroleum and natural gas production, offshore petroleum and natural gas production, or underground natural gas storage well, as applicable:

(1) Wellhead equipment leaks.

(2) Liquids unloading.

(3) Completions and workovers with hydraulic fracturing.

(4) Completions and workovers without hydraulic fracturing.

(5) Associated natural gas venting and flaring.

(6) Well testing.

(7) Drilling mud degassing.

(b) Calculate the annual emissions attributable to each well that was

permanently shut-in and plugged during the reporting year and included in the submittal pursuant to § 99.51 using equations E–1, E–2, E–3, or E–4 of this section, as applicable.

(1) For onshore petroleum and natural gas production wells that are part of a WEC applicable facility that are permanently shut-in and plugged in reporting years 2025 and later, equation

E–1 of this section must be used to quantify the methane emissions directly attributable to each permanently shut-in and plugged well.

$$E_{PW,CH_4} = E_{Leaks,CH_4} + E_{LU,CH_4} + E_{CWwHF,CH_4} + E_{CWwoHF,CH_4} + E_{AGV,CH_4} + E_{F,CH_4} + E_{WT,CH_4} + E_{DMD,CH_4} \quad \text{(Eq. E-1)}$$

Where:

$E_{PW,CH_4}$ = The quantity of methane emissions directly attributable to an individual well that was permanently shut-in and plugged during the reporting year at a WEC applicable facility meeting the applicability provisions of § 99.50, mt $CH_4$.

$E_{Leaks,CH_4}$ = The quantity of methane emissions attributable to the well from wellhead equipment leaks as calculated in accordance with paragraphs (b)(5)(i), (b)(5)(ii), or (b)(5)(iii) of this section, as applicable, for the reporting year, mt $CH_4$.

$E_{LU,CH_4}$ = The quantity of methane emissions attributable to the well from liquids unloading as reported pursuant to § 98.236(f)(1)(x) or (f)(2)(viii) of this chapter, as applicable, for the reporting year, mt $CH_4$.

$E_{CWwHF,CH_4}$ = The total quantity of methane emissions attributable to the well from

completions and workovers with hydraulic fracturing as reported pursuant to § 98.236(g)(9) of this chapter for the reporting year, mt $CH_4$.

$E_{CWwoHF,CH_4}$ = The total quantity of methane emissions attributable to the well from completions and workovers without hydraulic fracturing and without flaring as reported pursuant to § 98.236(h)(1)(vi) and (h)(3)(iv) of this chapter for the reporting year, mt $CH_4$.

$E_{AGV,CH_4}$ = The quantity of methane emissions attributable to the well from associated gas venting as reported pursuant to § 98.236(m)(7)(viii) of this chapter for the reporting year, mt $CH_4$.

$E_{F,CH_4}$ = The quantity of methane emissions attributable to the well from associated gas flaring and from completions and workovers without hydraulic fracturing and with flaring as calculated in accordance with paragraph (b)(6) of this section, as applicable, mt $CH_4$.

$E_{WT,CH_4}$ = The total quantity of methane emissions attributable to the well from well testing as reported pursuant to § 98.236(l)(1)(vii), (l)(2)(vii), (l)(3)(vi), and (l)(4)(vi) of this chapter, as applicable, for the reporting year, mt $CH_4$.

$E_{DMD,CH_4}$ = The quantity of methane emissions attributable to the well from drilling mud degassing as reported pursuant to § 98.236(dd)(1)(viii), (dd)(2)(iv), or (dd)(3)(iv) of this chapter, as applicable, for the reporting year, mt $CH_4$.

(2) For onshore petroleum and natural gas production wells that are part of a WEC applicable facility that are permanently shut-in and plugged in reporting year 2024, equation E–2 of this section must be used to quantify the methane emissions attributable to the well:

$$E_{PW,CH_4} = \left(E_{LkQ,CH_4} + E_{LkR,CH_4} + E_{LU,CH_4} + E_{CWwHF,CH_4} + E_{CWwoHF,CH_4} + E_{AGV,CH_4} + E_{AGF,CH_4} + E_{WT,CH_4}\right) \times$$

$$\frac{\left(\frac{Q_{ng,PW}}{6}\right) + Q_{oil,PW}}{\left(\frac{Q_{ng,WAF}}{6}\right) + Q_{oil,WAF}} \quad \text{(Eq. E-2)}$$

Where:

$E_{PW,CH_4}$ = The quantity of methane emissions attributable to an individual well that was permanently shut-in and plugged during the reporting at a WEC applicable facility meeting the applicability provisions of § 99.50, mt $CH_4$.

$E_{LkQ,CH_4}$ = The WEC applicable facility total quantity of methane emissions from equipment leaks reported pursuant to § 98.236(q)(2)(ix) of this chapter for the reporting year, mt $CH_4$.

$E_{LkR,CH_4}$ = The WEC applicable facility total quantity of methane emissions from equipment leaks reported pursuant to § 98.236(r)(1)(v) of this chapter for the reporting year, mt $CH_4$.

$E_{LU,CH_4}$ = The WEC applicable facility total quantity of methane emissions from liquids unloading as reported pursuant to § 98.236(f)(1)(x) and (f)(2)(viii) of this chapter for the reporting year, mt $CH_4$.

$E_{CWwoHF,CH_4}$ = The WEC applicable facility total quantity of methane emissions from completions and workovers with hydraulic fracturing as reported pursuant to § 98.236(g)(9) of this chapter for the reporting year, mt $CH_4$.

$E_{CWwoHF,CH_4}$ = The WEC applicable facility total quantity of methane emissions from

completions and workovers without hydraulic fracturing as reported pursuant to § 98.236(h)(1)(vi), (h)(2)(vi), (h)(3)(iv) and (h)(4)(iv) of this chapter for the reporting year, mt $CH_4$.

$E_{AGV,CH_4}$ = The WEC applicable facility quantity of methane emissions from associated gas venting as reported pursuant to § 98.236(m)(7)(iv) of this chapter for the reporting year, mt $CH_4$.

$E_{AGF,CH_4}$ = The WEC applicable facility quantity of methane emissions from associated gas flaring as reported pursuant to § 98.236(m)(8)(iii) of this chapter for the reporting year, mt $CH_4$.

$E_{WT,CH_4}$ = The WEC applicable facility total quantity of methane emissions from well testing as reported pursuant to § 98.236(l)(1)(vii), (l)(2)(vii), (l)(3)(vi), and (l)(4)(vi) of this chapter, as applicable, for the reporting year, mt $CH_4$.

$Q_{ng,PW}$ = The total annual quantity of natural gas that is produced and sent to sale from the well in the reporting year, as reported pursuant to § 98.236(aa)(1)(iii)(C) of this chapter, in thousand standard cubic feet.

6 = Conversion factor from thousand standard cubic feet of natural gas to barrel of oil equivalent.

$Q_{oil,PW}$ = The total quantity of crude oil and condensate that is produced and sent to sale from the well in the reporting year, as reported pursuant to § 98.236(aa)(1)(iii)(D)of this chapter, in barrels.

$Q_{ng,WAF}$ = The total quantity of natural gas that is produced and sent to sale for the WEC applicable facility in the reporting year, as reported pursuant to § 98.236(aa)(1)(i)(B) of this chapter, in thousand standard cubic feet.

$Q_{oil,WAF}$ = The total quantity of crude oil and condensate that is produced and sent to sale for the WEC applicable facility in the reporting year, as reported pursuant to § 98.236(aa)(1)(i)(C) of this chapter, in barrels.

(3) For offshore petroleum and natural gas production wells that are part of a WEC applicable facility that are permanently shut-in and plugged in any reporting year, equation E–3 of this section must be used to quantify the methane emissions attributable to the well.

$$E_{PW,CH_4} = \left(E_{Leaks,CH_4} + E_{DMD,CH_4}\right) \times \frac{\left(\frac{Q_{ng,PW}}{6}\right) + Q_{oil,PW}}{\left(\frac{Q_{ng,WAF}}{6}\right) + Q_{oil,WAF}} \qquad \text{(Eq. E-3)}$$

Where:

$E_{PW,CH_4}$ = The quantity of methane emissions attributable to an individual well that was permanently shut-in and plugged during the reporting year at a WEC applicable facility meeting the applicability provisions of § 99.50, mt $CH_4$.

$E_{Leaks,CH_4}$ = The WEC applicable facility total quantity of methane emissions from non-compressor component level fugitives (*i.e.*, equipment leaks), mt $CH_4$. For reporting year 2024, use the value reported pursuant to § 98.236(s)(2) of this chapter for the reporting year. For reporting year 2025 and later, use the value reported to § 98.236(s)(3)(ii) of this chapter for the reporting year.

$E_{DMD,CH_4}$ = The WEC applicable facility total annual quantity of methane emissions

from drilling mud degassing, mt $CH_4$. For reporting year 2024, use the value reported pursuant to § 98.236(s)(2) of this chapter for the reporting year. For reporting year 2025 and later, use the value reported to § 98.236(s)(3)(ii) of this chapter for the reporting year.

$Q_{ng,PW}$ = The total quantity of natural gas that is produced and sent to sale from the well in the reporting year as reported pursuant to § 98.236(aa)(2)(iii) of this chapter, in thousand scf.

6 = Conversion factor from thousand standard cubic feet of natural gas to barrel of oil equivalent.

$Q_{oil,PW}$ = The total quantity of crude oil and condensate that is produced and sent to sale from the well in the reporting year, as reported pursuant to § 98.236(aa)(2)(iv) of this chapter, in barrels.

$Q_{ng,WAF}$ = The total quantity of natural gas that is produced and sent to sale from the WEC applicable facility in the reporting year, as reported pursuant to § 98.236(aa)(2)(i) of this chapter, in thousand scf.

$Q_{oil,WAF}$ = The total quantity of crude oil and condensate that is produced and sent to sale from the WEC applicable facility in the reporting year, as reported pursuant to § 98.236(aa)(2)(ii) of this chapter, in barrels.

(4) For underground natural gas storage wells that are part of a WEC applicable facility that are permanently shut-in and plugged in any reporting year, equation E–4 of this section must be used to quantify the methane emissions attributable to the well.

$$E_{PW,CH_4} = E_{Leaks,CH_4} \qquad \text{(Eq. E-4)}$$

Where:

$E_{PW,CH_4}$ = The quantity of methane emissions directly attributable to an individual well that was permanently shut-in and plugged during the reporting year at a WEC applicable facility meeting the applicability provisions of § 99.50, mt $CH_4$.

$E_{Leaks,CH_4}$ = The quantity of methane emissions attributable to the well from storage wellhead equipment leaks in accordance with paragraphs (b)(5)(i), (b)(5)(ii) or (b)(5)(iii) of this section, as applicable, for the reporting year, mt $CH_4$.

(5) You must quantify equipment leak methane emissions from the

permanently shut-in and plugged well at the WEC applicable facility in accordance with the methods in (b)(5)(i) through (iii) of this section. You must use the same calculation method for equipment leaks reported pursuant to § 98.236(q) or (r) of this chapter in the part 98 report for the well-pad site or facility, as applicable, which is associated with the permanently shut-in and plugged well.

(i) If equipment leak surveys and measurement were used to quantify methane emissions from the permanently shut-in and plugged well

and reported pursuant to § 98.236(q) of this chapter in the part 98 report for a WEC applicable facility, you must calculate the methane emissions (*i.e.*, $E_{Measured\ Leak,\ CH_4}$) for each measured wellhead leak in accordance with equation E–5A. The sum of the quantified methane emissions from each measured wellhead leak at the permanently shut-in and plugged well calculated in accordance with equation E–5A shall be considered "$E_{Leaks,\ CH_4}$" in Equations E–1 and E–4 of this section, as applicable.

$$E_{Measured\ Leak,CH_4} = Q_{p,z} \times T_{p,z} \times M_{CH_4} \times k \times \rho_{CH_4} \times 10^{-3} \qquad \text{(Eq. E-5A)}$$

Where:

$E_{Measured\ Leak,CH_4}$ = The quantity of methane emissions attributable to a measured leak from a wellhead leak component at the permanently shut-in and plugged well, mt $CH_4$.

p = Component type as reported in accordance with § 98.236(q) of this chapter, as applicable.

z = An individual component of type "p" detected as leaking and measured at the permanently shut-in and plugged well in any leak survey during the year.

$Q_{p,z}$ = Volumetric flow rate of the natural gas leak for component "z" of component type "p" converted to standard conditions according to § 98.233(q)(3)(iii)

of this chapter, scf whole gas/hour/component, as applicable.

$M_{CH_4}$ = The mole fraction of $CH_4$ in produced gas for the well. For onshore petroleum and natural gas production wells, use the mole fraction of $CH_4$ in produced gas for the sub-basin associated with the well, as reported pursuant to § 98.236(aa)(1)(ii)(I) of this chapter, unitless. For underground natural gas wellheads, use 0.975 or the concentration of $CH_4$ in the total hydrocarbon of the feed natural gas, unitless.

$T_{p,z}$ = The total time the surveyed and measured component "z" of component type "p" was assumed to be leaking and operational, in hours. If one leak detection survey is conducted in the

calendar year, assume the component was leaking for the entire calendar year, hours. If multiple leak detection surveys are conducted in the calendar year, assume a component found leaking in the first survey was leaking since the beginning of the year until the date of the survey, hours; assume a component found leaking in the last survey of the year was leaking from the preceding survey through the end of the year, hours; assume a component found leaking in a survey between the first and last surveys of the year was leaking since the preceding survey until the date of the survey, hours; and sum times for all leaking periods. For each leaking component, account for time the

component was not operational (*i.e.*, not operating under pressure) using the same estimates and available data used for calculating the total time the surveyed and measured components were leaking and operational in accordance with § 98.233(q)(3)(ii) of this chapter.

k = The factor to adjust for undetected leaks by respective leak detection method. For reporting year 2024, k equals 1. For reporting year 2025 and later, k equals

1.25 for the methods in § 98.234 (a)(1), (3) and (5) of this chapter; k equals 1.55 for the method in § 98.234(a)(2)(i) of this chapter; and k equals 1.27 for the method in § 98.234(a)(2)(ii) of this chapter. Select the factor for the leak detection method used for the permanently shut-in and plugged well, unitless.

$\rho_{CH_4}$ = Density of methane, 0.0192 mt/Mscf.

$10^{-3}$ = Conversion factor from scf to Mscf.

(ii) If equipment leak surveys and leaker emission factors were used to quantify methane emissions from the permanently shut-in and plugged well and reported pursuant to § 98.236(q) of this chapter in the part 98 report for a WEC applicable facility, equation E–5B of this section must be used to calculate $E_{Leaks,CH_4}$.

$$E_{Leaks,CH_4} = \sum_{p=1}^{N_p} \left( EF_p \times \sum_{z=1}^{x_p} T_{p,z} \right) \times M_{CH_4} \times k \times \rho_{CH_4} \times 10^{-3} \qquad \text{(Eq. E-5B)}$$

Where:

$E_{Leaks,CH_4}$ = The quantity of methane emissions attributable to the well from wellhead equipment leaks as reported pursuant to § 98.236(q) of this chapter for the reporting year, mt $CH_4$.

p = Component type as specified in § 98.233(q)(2)(iii) and (vii) of this chapter, as applicable.

$N_p$ = The number of component types reported pursuant to § 98.233(q)(2)(ii) of this chapter for which there were detected leaks at the well reported pursuant to § 98.233(q)(2)(iii) or (vii) of this chapter, as applicable.

$EF_p$ = The leaker emission factor for component "p" as specified in § 98.233(q)(2)(iii) or (vii) of this chapter, scf whole gas/hour/component, as applicable.

$M_{CH_4}$ = For onshore petroleum and natural gas production wells, the mole fraction of $CH_4$ in produced gas for the sub-basin associated with the well, as reported pursuant to § 98.236(aa)(1)(ii)(I) of this chapter, unitless. For underground natural gas wellheads, the mole fraction of $CH_4$ equals 0.975 for $CH_4$ or concentration of $CH_4$, in the total hydrocarbon of the feed natural gas.

$x_p$ = The total number of specific components of type "p" detected as leaking at the permanently shut-in and plugged well in any leak survey during the year. A component found leaking in two or more surveys during the year is counted as one leaking component.

$T_{p,z}$ = The total time the surveyed component "z" of component type "p" was assumed to be leaking and operational, in hours. If one leak detection survey is conducted in the calendar year, assume the component was leaking for the entire calendar year, hours. If multiple leak detection surveys are conducted in the calendar year, assume a component found leaking in the first survey was leaking since the beginning of the year until the date of the survey, hours; assume a component found leaking in the last survey of the year was leaking from the preceding survey through the end of the year, hours; assume a component found leaking in a survey between the first and last surveys of the year was leaking since the preceding survey until the date of the survey, hours; and sum times for all leaking periods. For each leaking component, account for time the component was not operational (*i.e.*, not operating under

pressure) using the same estimates and available data used for calculating the total time the surveyed components were leaking and operational in accordance with § 98.233(q)(2) of this chapter.

k = The factor to adjust for undetected leaks by respective leak detection method. For reporting year 2024, k equals 1. For reporting year 2025 and later, k equals 1.25 for the methods in § 98.234 (a)(1), (3) and (5) of this chapter; k equals 1.55 for the method in § 98.234(a)(2)(i) of this chapter; and k equals 1.27 for the method in § 98.234(a)(2)(ii) of this chapter. Select the factor for the leak detection method used for the permanently shut-in and plugged well, unitless.

$\rho_{CH_4}$ = Density of methane, 0.0192 mt/Mscf.

$10^{-3}$ = Conversion factor from scf to Mscf.

(iii) If equipment leaks by population count were used to quantify methane emission from the permanently shut-in and plugged well and reported pursuant to § 98.236(r) of this chapter in the part 98 report for a WEC applicable facility, equation E–5C of this section must be used to calculate $E_{Leaks,CH_4}$.

$$E_{Leaks,CH_4} = Count_{wh} \times EF_{wh} \times M_{CH_4} \times T \times \rho_{CH_4} \times 10^{-3} \qquad \text{(Eq. E-5C)}$$

Where:

$E_{Leaks,CH_4}$ = The annual quantity of methane emissions attributable to the well from wellhead equipment leaks as reported pursuant to § 98.236(r) of this chapter for the reporting year, mt $CH_4$.

$Count_{wh}$ = Underground natural gas storage facilities must count each component at the storage wellhead listed in § 98.233(r)(3) of this chapter. Onshore petroleum and natural gas production must use a value of 1 wellhead.

$EF_{wh}$ = The population emission factor for wellheads, as listed in § 98.233(r)(2) and (3) of this chapter, as applicable.

$M_{CH4}$ = For onshore petroleum and natural gas production wells, the mole fraction of $CH_4$ in produced gas for the sub-basin associated with the well as reported pursuant to § 98.236(aa)(1)(ii)(I) of this chapter, unitless. For underground natural gas wellheads, the mole fraction of $CH_4$ equals 0.975 for $CH_4$ or concentration of $CH_4$, in the total hydrocarbon of the feed natural gas.

T = The total time that has elapsed from the beginning of the reporting year until the date the well was plugged in accordance with § 99.51(b)(2), hours.

$P_{CH4}$ = Density of methane, 0.0192 mt/Mscf.

$10^{-3}$ = Conversion factor from scf to Mscf.

(6) For onshore petroleum and natural gas production wells that are part of a WEC applicable facility that are permanently shut-in and plugged in reporting years 2025 and later, equation E–6 of this section must be used to quantify the methane emissions attributable to the well from associated gas flaring and completions and workovers without hydraulic fracturing and with flaring:

$$E_{F,CH_4} = V_{PW} \times X_{CH_4} \times \left[ (1 - \eta_D) \times Z_L + Z_U \right] \times \rho_{CH_4} \times 10^{-3} \qquad \text{(Eq. E-6)}$$

Where:

$E_{F,CH4}$ = The quantity of methane emissions from associated gas flaring and from completions and workovers without hydraulic fracturing and with flaring attributable to the plugged well for the reporting year, mt $CH_4$.

$V_{PW}$ = The volume of gas sent to the flare from the plugged well, scf. If flow for each stream to the flare is measured or determined in accordance with § 98.233(n)(3)(ii) of this chapter and that stream contains only the flow from the plugged well, use the flow for that individual stream as reported to § 98.236(n)(11) of this chapter. If flow is measured at the inlet to the flare in accordance with § 98.233(n)(3)(i) of this chapter or the stream flow measured or determined in accordance with § 98.233(n)(3)(ii) of this chapter includes flow from other sources, use an engineering estimate based upon best available information of the portion of flow from the plugged well.

$X_{CH4}$ = Annual average mole fraction of $CH_4$ in the gas sent to the flare from the plugged well. If you determine composition of each stream routed to the flare as specified in § 98.233(n)(4)(iii) of this chapter and that stream contains only the flow from the plugged well, use the mole fraction for the individual stream as reported to § 98.236(n)(14) of this chapter. Otherwise, use the average mole fraction of $CH_4$ in produced gas for the sub-basin in which the plugged well is located as reported to § 98.236(aa)(1)(ii)(I) of this chapter.

$\eta_D$ = Flare destruction efficiency, as reported to § 98.236(n)(13) of this chapter.

$Z_L$ = Fraction of the feed gas sent to the burning flare, equal to $1 - Z_U$.

$Z_U$ = Fraction of the feed gas sent to the flare when it is un-lit, as reported to § 98.236(n)(12) of this chapter.

$\rho_{CH4}$ = Density of methane at 60 °F and 14.7 psia. Use 0.0192 kg/ft³.

$10^{-3}$ = Conversion from kilograms to metric tons.

(c) Calculate the total emissions attributable to all wells included in the submittal received pursuant to § 99.51 using equation E–7 of this section:

$$E_{Plug,CH_4} = \sum_{j=1}^{N} E_{PW_j,CH_4} \qquad \text{(Eq. E-7)}$$

Where:

$E_{Plug,CH4}$ = The total quantity of methane emissions, as determined in subpart E of this part, at the WEC applicable facility attributable to all wells that were permanently shut-in and plugged during the reporting year meeting the applicability provisions of § 99.50, mt $CH_4$.

$E_{PW,j,CH4}$ = The annual quantity of methane emissions attributable to a well "j" that was permanently shut-in and plugged during the reporting year at a WEC applicable facility meeting the applicability provisions of § 99.50 calculated using equation E–1, E–2, E–3, or E–4 of this section, as applicable.

$N$ = Total number of wells that were permanently shut-in and plugged during the reporting year in accordance with all applicable closure requirements at a WEC applicable facility.

[FR Doc. 2024–26643 Filed 11–15–24; 8:45 am]

**BILLING CODE 6560–50–P**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| AMERICAN EXPLORATION & PRODUCTION COUNCIL,<br><br>*Petitioner,*<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and JANE NISHIDA, Acting Administrator, United States Environmental Protection Agency,<br><br>*Respondents.* | No. ___ |

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT OF AMERICAN EXPLORATION & PRODUCTION COUNCIL

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner American Exploration & Production Council ("AXPC") states that it is an incorporated national trade association representing leading independent oil and natural gas exploration and production companies in the United States. AXPC members are "independent" in that their operations are predominantly limited to exploration for and production of oil and natural gas. Its members operate autonomously, unlike their fully integrated counterparts, which operate in additional segments of the energy

1

business, such as downstream refining and marketing.  AXPC members are leaders in developing and applying the innovative and advanced technologies necessary to explore for and produce oil and natural gas in environmentally responsible ways.  AXPC has no parent corporation and no publicly held corporation owns more than 10% of its stock.

Respectfully submitted this 17th day of January, 2025,

WILLIAMS WEESE PEPPLE & FERGUSON PC

*/s/ R. Clay Taylor*

R. Clay Taylor
John H. Bernetich
Jennifer L. Biever
Corey Y. Lim
1801 California Street, Suite 3400
Denver, CO 80202
Phone: 303-861-2828
Fax: 303-861-4017
E-mail: ctaylor@williamsweese.com
       jbernetich@williamsweese.com
       jbiever@williamsweese.com
       clim@williamsweese.com

*Attorneys for Petitioner American Exploration & Production Council*

# CERTIFICATE OF SERVICE

I certify that, on January 17, 2025, I caused a true and correct

copy of the foregoing to be served on the following Respondents by U.S.

Mail:

Jane Nishida
Office of the Administrator (1101A)
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Correspondence Control Unit
Office of General Counsel (2311)
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Hon. Merrick Garland
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Todd Kim
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-00001

*/s/Ingrid List*
WILLIAMS WEESE PEPPLE & FERGUSON PC